1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
   Email: DLN@LNBYB.com, JYO@LNBYB.com
5
6  Proposed Attorneys for Chapter 11 Debtors
   and Debtors in Possession

7              **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9                  **SANTA ANA DIVISION**

10

11  In re                              ) Case No. 8:17-bk-12213-CB
                                        )
12  SOLID LANDINGS BEHAVIORAL           ) Joint Administration Proposed With:
13  HEALTH, INC., *et al.*,             ) Case No. 8:17-bk-12218-CB
                                        ) Case No. 8:17-bk-12221-CB
14        Debtors and                   ) Case No. 8:17-bk-12222-CB
15        Debtors in Possession.        ) Case No. 8:17-bk-12223-CB
                                        )
16  _____     ) Chapter 11
                                        )
17  ___  Affects Cedar Creek Recovery, Inc. ) **OMNIBUS DECLARATION OF**
18  Only                                ) **KATIE S. GOODMAN IN SUPPORT**
    ___  Affects EMS Toxicology Only    ) **OF DEBTORS' "FIRST DAY"**
19  ___  Affects Silver Rock Recovery Only ) **MOTIONS**
    ___  Affects Solid Landings Behavioral )
20  Health, Inc. Only                   )
    ___  Affects Sure Haven, Inc. Only  ) DATE:      June 5, 2017
21   X   Affects All Debtors            ) TIME:      2:00 p.m.
                                        ) PLACE:     Courtroom "5D"
22                                      )            411 West Fourth Street
23                                      )            Santa Ana, California
                                        )
24                                      )
                                        )
25                                      )
                                        )
26                                      )
                                        )
27                                      )
                                        )
28  _____     )

I, Katie S. Goodman, hereby declare as follows:

1.    I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.    I am a Managing Partner of GGG Partners, LLC ("GGG Partners"), a financial advisory services firm that specializes in interim management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.  In my capacity as a Managing Partner of GGG Partners, I have been engaged as the Chief Restructuring Officer of Solid Landings Behavioral Health, Inc. ("Solid Landings"), Cedar Creek Recovery, Inc. ("Cedar Creek"), EMS Toxicology ("EMS Toxicology"), Silver Rock Recovery ("Silver Rock"), and Sure Haven, Inc. ("Sure Haven," and collectively with Solid Landings, Cedar Creek, EMS Toxicology, and Silver Rock, the "Debtors"), the debtors and debtor-in-possession in the above-captioned Chapter 11 bankruptcy cases, which are proposed to be jointly administered under the lead bankruptcy case of Solid Landings, and am therefore familiar with the business operations and financial books and records of the Debtors.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

3.    I have access to the Debtors' books and records and have reviewed the organization, operations and financial condition of the Debtors.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtors' business at or near the time of act, condition or event to which they relate by persons employed by the Debtors who had a business duty to the Debtors to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtors' books and records.

4.    I make this declaration in support of the following "first day" motions filed concurrently herewith by one or more of the Debtors:

   a.    "Debtor's Emergency Motion For Entry Of An Order For Joint Administration Of Cases" (the "Joint Administration Motion") [all Debtors].

b. "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority Wages; And (2) Honor Employment And Benefit Policies" (the "<u>Wage Motion</u>") [Solid Landings only].

c. "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant To 11 U.S.C. § 366" (the "<u>Utility Motion</u>") [Cedar Creek, EMS Toxicology, Silver Rock and Sure Haven only].

d. "Debtors' Emergency Motion For Entry Of An Order Authorizing The Debtors To Implement And Maintain Cash Management System" (the "<u>Cash Management Motion</u>") [All Debtors].

e. "Debtors' Emergency Motion For Entry Of Interim And Final Orders Authorizing The Debtors To (A) Maintain, Continue, And Renew Their Prepetition Insurance Policies And Pay All Obligations In Respect Thereof, And (B) Continue Premium Financing Program And Pay All Obligations In Respect Thereof" (the "<u>Insurance Motion</u>") [All Debtors].

f. "Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, And (B) Utilize Cash Collateral Of Prepetition Secured Parties Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363 And 364; (III) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c); And (IV) Granting Related Relief (the "<u>DIP Motion</u>") [All Debtors].

g. "Notice Of Motion And Motion For Entry Of Order Establishing Bidding Procedures For Sale Of Substantially All Assets Of The Debtors" (the "<u>Bidding Procedures Motion</u>") [All Debtors].

A.    **Background.**

5.    On June 1, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"). Each of the Debtors is continuing to operate its business, manage its financial affairs and operate its respective bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.    Each of the Debtors, other than Sure Haven, is owned in equal proportions by three (3) shareholders, Stephen Fennelly, Elizabeth Perry, and Mark Shandrow. Sure Haven is also owned by a fourth shareholder, John Case, so that its ownership is as follows: (i) Stephen Fennelly

– 33.34%; (ii) Elizabeth Perry – 33.33%; (iii) Mark Shandrow – 32.33%; and (iv) John Case – 1.0%. Based upon, among other things, the commonality of ownership among the Debtors, the Debtors have sought to have their Chapter 11 bankruptcy cases jointly administered.

7.    The Debtors are providers of individualized 12-Step and alternative treatment programs for people suffering from substance abuse and mental health disorders, with facilities located in California, Nevada, and Texas. The "Solid Landings" brand was created in 2009, when the Debtors' shareholders opened their first sober living residence in Costa Mesa, California, which residence was operated by Sure Haven.

8.    Currently, Solid Landings serves as the corporate arm of the Debtors' enterprise, is the employer for all of the employees who provide services to the Debtors, and operates the corporate office located in Costa Mesa, California. EMS Toxicology operates a clinical laboratory facility located in Las Vegas, Nevada. The remaining three Debtors (*i.e.*, Cedar Creek, Silver Rock, and Sure Haven) operate a total of ten (10) residential, inpatient, outpatient, and sober living facilities – specifically, Cedar Creek operates a residential treatment facility located in Manor, Texas; Silver Rock operates one outpatient treatment facility and one inpatient treatment facility, both located in Las Vegas, Nevada; and Sure Haven operates five residential treatment facilities, one outpatient treatment facility, and one sober living facility.

9.    By the end of 2014, Sure Haven's program and its related California-based program through an affiliate entity called Rock Solid Recovery had grown to become fully licensed and accredited programs offering a full continuum of care – from detox services, residential primary treatment, intensive outpatient treatment, and sober living services – offering close to 100 client beds in the Costa Mesa, California area and employing approximately 700 employees.

10.    The Debtors' decentralized model (utilizing centralized outpatient treatment centers and multiple residential houses for detox and residential treatment services) presented operational inefficiencies with, among other things, staffing and patient transportation. In addition, the Debtors' programs attracted the attention of the City of Costa Mesa (the "City"), which in October 2014 enacted a city ordinance severely restricting the ability of the Debtors (and other similarly-

situated operators) to operate their programs.  As a result, in November 2014, Solid Landings filed suit against the City asserting that its ordinance was preempted by federal law and violated the Fair Housing Amendments Act, the Americans with Disabilities Act, and the Fourteenth Amendment to the United States Constitution.  In April 2016, after years of costly litigation, Solid Landings made a business-driven decision to withdraw its pending legal proceedings against the City in exchange for an agreement by the City to suspend enforcement of the ordinance against Solid Landings and its affiliates.  As part of its settlement with the City, Solid Landings and its affiliates agreed to cease operating many of their facilities located in the City of Costa Mesa.

11.    Notwithstanding the challenges faced by the Debtors in connection with their California-based programs, the Debtors continued to grow throughout 2015, and expanded their operations to Nevada and Texas using more centralized, single-facility models.  The Debtors opened a facility in the Austin Texas area in May 2015 (which was operated by Cedar Creek), and opened a facility in Las Vegas, Nevada in June 2015 (which was operated by Silver Rock).  Like Sure Haven in California, Cedar Creek and Silver Rock offered a full continuum of licensed and accredited detox, residential, and intensive outpatient substance abuse treatment services.

12.    The Debtors also added toxicology testing services to their organization with the development of three (3) clinical laboratories, including a clinical laboratory located in Las Vegas, Nevada, which is operated by EMS Toxicology.  Prior to the Petition Date, two of the laboratories were sold by the Debtors, leaving one open clinical laboratory (located in Las Vegas and operated by EMS Toxicology) as of the Petition Date.

13.    As a result of the Debtors' expansion efforts, by September 2015, the Debtors' operations in California, Nevada and Texas offered more than 550 beds, serving more than 3,000 clients annually, and employed approximately 1,200 employees.

14.    In the spring of 2015, the Debtors engaged an investment banking firm, Brentwood Capital Advisors ("Brentwood"), to seek either a sale or equity recapitalization of their businesses. Brentwood directed a full marketing process and received approximately 50 signed nondisclosure agreements and 6 letters of interest to acquire either a minority or majority position in the Debtors.

1    Ultimately, however, Brentwood and the Debtors halted marketing efforts in December 2015

2    following challenges to complete a quality of earnings analysis.

3        15.    In approximately November 2015, the Debtors obtained secured financing in the

4    original principal sum of $7,500,000 from a third-party lender, CapStar Bank ("CapStar").

5    **B.    Events Leading To Bankruptcy Filings.**

6        16.    When the Debtors first began operating in 2009, client payments were primarily

7    self/cash-pay.  However, with the implementation of the Patient Protection and Affordable Care

8    Act and with more individuals having access to behavioral health insurance benefits, by 2015,

9    approximately 95% of the Debtors' revenue came from reimbursements from commercial

10   insurance companies.  Calendar year 2016 brought a marked decrease in reimbursement rates and

11   slowdown in the timing of reimbursements from the insurance companies, with certain companies

12   such as Cigna and Health Net ceasing payments altogether.

13       17.    While the Debtors' revenues stagnated in 2015 and 2016, the Debtors' liabilities

14   increased.  In 2015 and 2016, multiple lawsuits were filed against the Debtors, including at least

15   five (5) employee wage and hour lawsuits and a number of collection actions based upon, among

16   other things, defaults by Sure Haven under a multi-million dollar lease agreement in the City of

17   Long Beach and a multi-million dollar development project in Santa Ana, California (both of

18   which were pursued to replace the facilities in Costa Mesa that were surrendered as part of Solid

19   Landings' settlement with the City of Costa Mesa).  As a result of the Debtors' financial

20   difficulties and resulting cash flow problems, the Debtors were unable to keep current on their

21   payment obligations to vendors and landlords.

22       18.    Beginning in early 2016, in an effort to resolve the growing financial liabilities of

23   the Debtors and stabilize their business operations, the Debtors took a number of proactive steps to

24   streamline operations, significantly reduce expenses, increase revenues, and improve the rate and

25   timing of collection of accounts receivables.  During such period, Solid Landings brought in new

26   senior management to implement the foregoing steps, recruiting Gerik Degner of Alpine Pacific

27   Capital, LLC ("Alpine") to act as the President of Solid Landings and appointing an interim

28

6

replacement financial executive.

19.    Despite all of the Debtors' efforts, in June 2016, the Debtors defaulted on its loan obligations to CapStar.    Subsequently, the Debtors and CapStar entered into a forbearance agreement to allow the Debtors an opportunity to pursue and consummate a sale of the Debtors' businesses.  Solid Landings again engaged Brentwood to assist in the marketing and sale of the Debtors' businesses, particularly those facilities operated by the Debtors in Texas and Las Vegas, Nevada. Although Brentwood reached out to 25 prospective buyers/investors throughout the month of August 2016 and received two letters of intent, the letters of intent were ultimately rejected as the sale terms proposed therein provided for deferred payment of the purchase price such that minimal proceeds would be immediately available to pay CapStar.

20.    As a result of the Debtors efforts to "downsize" and streamline their business operations, by early 2017, the Debtors' operations in California, Nevada and Texas were reduced to 133 licensed beds in a total of ten (10) inpatient treatment, outpatient treatment, residential treatment, and sober living facilities, with a vastly decreased client census.  The revenues generated by the Debtors' streamlined operations were insufficient to meet the debt obligations created by a much larger business enterprise, and the Debtors continued to fall behind on their obligations to their vendors and landlords.

21.    As a result of the Debtors' continuing financial difficulties, shortly before the Petition Date, the Debtors retained my firm, GGG Partners, to provide financial consulting services, including to, among other things, explore and pursue a potential going-concern sale of the Debtors' businesses and guide the Debtors through Chapter 11 bankruptcy proceedings.    In conjunction with GGG Partners' retention as financial advisor to the Debtors, I was brought in to act as Chief Restructuring Officer of the Debtors.

22.    With the assistance of GGG Partners, the Debtors undertook efforts to market the Debtors' businesses and assets for sale prior to the Petition Date.  In connection with such efforts, the Debtors received, and ultimately executed on April 12, 2017, a letter of intent (the "Letter of Interest") from Alpine, pursuant to which Alpine expressed its interest in acquiring substantially all

1   of the assets of the Debtors for aggregate consideration of approximately $9,050,000, free and

2   clear of any interests, liens and liabilities except those expressly set forth in the Letter of Interest,

3   through a sale conducted under 11 U.S.C. § 363.

4        23.    Thereafter, the Debtors and Alpine, with the input of CapStar, negotiated the terms

5   of and finalized a written asset purchase agreement which the Debtors and Alpine (or its designees,

6   the "<u>Purchaser</u>") ultimately executed on June 1, 2017 (the "<u>APA</u>").  Accordingly, concurrently

7   herewith, the Debtors have filed a motion seeking Court approval of the bidding procedures

8   described in the APA, and intend to file a motion shortly seeking Court approval of the proposed

9   sale of the Debtors' assets to Purchaser, subject to overbid, pursuant to 11 U.S.C. § 363.

10       24.    Through their bankruptcy cases, the Debtors intend to pursue and consummate the

11  sale of their businesses and/or assets, free and clear of any interests, liens and liabilities, to

12  Purchaser (or a successful overbidder) in the most expeditious and cost-effective manner possible,

13  in order to preserve and maximize the value of the Debtors' assets for the benefit of all creditors.

14  **C.    <u>Joint Administration Motions</u>.**

15       25.    Through the Joint Administration Motion, the Debtors are seeking to have their

16  bankruptcy cases jointly administered.

17       26.    As noted above, all of the Debtors share common owners – *i.e.,* Stephen Fennelly,

18  Elizabeth Perry, and Mark Shandrow.[1]  In addition, I believe that the business and financial affairs

19  of the Debtors are sufficiently intertwined to make joint administration of their cases more efficient

20  and economical than separate administration.

21       27.    I believe that joint administration of the Debtors' five bankruptcy cases, including

22  the use of a single pleadings docket, the combining of notices to creditors of the different estates,

23  and the joint handling of purely administrative matters will eliminate any potential confusion and

24  waste associated with maintaining separate dockets, and will aid in expediting the cases and

25  rendering the process less costly.

26

27  _____

28      [1] As noted above, Sure Haven is also owned in part by a fourth shareholder, John Case.

28.     I also believe that there would be no material prejudice to any creditor if the Debtors' cases are jointly administered.  Creditors of the estates of the Debtors will benefit from the general reduction of administrative costs and fees but will continue to receive appropriate notice of pertinent matters.  Moreover, to the extent any conflict between the estates arises, the Court could take further steps to modify any order of joint administration to eliminate any such conflict.

**D.      The Wage Motion.**

29.     Since prior to the Petition Date, all of the Debtors' employees and independent contractors are employed by and paid by Solid Landings.

30.     As of the Petition Date, the Debtors employed approximately 89 non-insider employees and independent contractors (collectively, "Employees," and each, an "Employee").  A list of the Employees which reflects their respective wages is attached as **Exhibit "1"** hereto.  All of Employees reflected in Exhibit "1" hereto are still employed by Solid Landings.

31.     Eighty-two (82) of the Employees are W-2 employees ("W-2 Employees") who are paid on a weekly basis (*i.e.*, every Friday), while the remaining seven (7) Employees are independent contractors who are paid on either a weekly basis (*i.e.*, every Friday) or on a less frequent basis based upon actual billing/invoicing.  While Solid Landings endeavors to pay independent contractor Employees on a substantially current basis (except when there is a delay between the date(s) services are provided by such independent contractor Employees and the invoices for such services are actually received and paid by Solid Landings), the W-2 Employees who are paid on a weekly basis are paid approximately six (6) days in arrears.  So, for example, the payroll paid on Friday, May 26, 2017 (prior to the commencement of the Debtors' bankruptcy cases) to those W-2 Employees who are paid on a weekly basis covered the one-week period from May 14-20, 2017.

32.     Prior to the Petition Date, Solid Landings entered into a written client service agreement (the "CSA") with Insperity PEO Services, L.P. ("Insperity"), pursuant to which Insperity acts as a "co-employer" of Solid Landings' Employees and provides Solid Landings with

full-service outsourced human resources and payroll processing services. Under the terms of the CSA, Solid Landings is required to maintain a prefunded payroll account balance estimated to be equal to two weeks' worth of Wages for the W-2 Employees (including all applicable federal and state withholding taxes and payroll taxes). Accordingly, each Monday (*i.e.*, 4 days prior to each Friday payroll date), Solid Landings is required to transfer funds to Insperity in an amount sufficient to replenish the payroll account balance such that the amount of Wages payable to the W-2 Employees during the next two (2) payroll dates is covered. For example, on Monday, May 29, 2017, Solid Landings transferred funds to Insperity in an amount sufficient to cover the Wages due to W-2 Employees on Friday, June 9, 2017, thereby maintaining a prefunded payroll account balance equal to two weeks' worth of Wages for the W-2 Employees (*i.e.*, the Wages due to be paid to the W-2 Employees on both Friday, June 2, 2017 and Friday, June 9, 2017). Insperity then ensures payment of the Wages (either by check or direct deposit into the W-2 Employees' bank accounts) by each payroll date.

33.    On Friday, June 2, 2017, Solid Landings will owe Wages to the W-2 Employees for the one-week period from May 21, 2017 to May 27, 2017 – all seven (7) days of which will constitute pre-petition obligations. In addition, on Friday, June 9, 2017, Solid Landings will owe Wages to the W-2 Employees for the one-week period from May 28, 2017 to June 3, 2017 – three (3) days of which will constitute pre-petition obligations. As noted above, under the terms of the CSA with Insperity, Solid Landings was required to transfer the funds necessary for the payment of Wages to the W-2 Employees due on Friday, June 2, 2017, in the approximate sum of $94,986, to Insperity two weeks in advance – *i.e.*, by Monday, May 22, 2017. Similarly, Solid Landings was required to transfer the funds necessary for the payment of Wages to the W-2 Employees due on Friday, June 9, 2017, also in the approximate sum of $94,986, to Insperity by Monday, May 29, 2017. Accordingly, the amounts of the Wages payable to the W-2 Employees on both Friday, June 2, 2017 and Friday, June 9, 2017 have already been prefunded.

34.    By Monday, June 5, 2017, Solid Landings will be required to transfer funds to Insperity in an amount sufficient to cover the Wages due to the W-2 Employees on Friday, June

16, 2017 (for the payroll period covering June 4-10, 2017), which amount Solid Landings estimates will also total $94,986. To ensure that there is no interruption or delay in the payment of Wages to those W-2 Employees who are paid on a weekly basis, Solid Landings requests that the Court set an emergency hearing such that the Wage Motion might be approved **by Friday, June 2, 2017**, the next payroll date.

35. Solid Landings also anticipates that Wages will be due to its independent contractor Employees on Friday, June 2, 2017 for services rendered by such Employees prior to the Petition Date. While it is difficult to determine the exact amount of pre-petition Wages owed to such independent contractor Employees as of the Petition Date, based upon historical invoices, Solid Landings believes that the total amount of pre-petition Wages owed and payable to the seven (7) independent contractor Employees will be no more than $2,000.

36. Solid Landings is ***not*** seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code. The Employees who are the subject of the Wage Motion do not include any "insider" employees of any of the Debtors. Approval to pay compensation to the Debtors' "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

37. In order to attract and retain the Employees, Solid Landings maintains what I believe are competitive and reasonable employment and benefit policies which are comparable to the programs that are typically offered by other employers within the industry. I believe that maintaining good relationships with, and the morale of, the Employees requires the Debtor to continue to honor the employment and benefit policies which are currently in effect for the Employees, as further described below:

a. ***Vacation And Sick Leave Policy***. Solid Landings offers a Personal Time Off ("PTO") policy to the W-2 Employees who work more than 30 hours per week. For California-based (part-time) employees who work under 30 hours per week, a separate paid sick time policy applies. The accrual rates for PTO and paid sick time are as follows:

i.      Non-Exempt (hourly) W-2 Employees in their first three years of employment with Solid Landings and working within the state of California – 70 hours (based on an 8-hour workday) per calendar year, with incremental increases after 3 years of employment and 9 years of employment;

ii.      Non-Exempt (hourly) W-2 Employees in their first three years of employment with Solid Landings and working outside the state of California – 48 hours (based on an 8-hour workday, so six 8-hour days) per calendar year, with incremental increases after 3 years of employment and 9 years of employment;

iii.      Exempt (salaried) W-2 Employees in their first three years of employment with Solid Landings – 80 hours (based on an 8-hour workday, so ten 8-hour days) per calendar year, with incremental increases after 3 years of employment and 9 years of employment; and

iv.      California-based (part-time) employees who work under 30 hours per week receive an allowance of twenty-four (24) hours of paid sick time (based on an 8-hour workday, so three 8-hour days) per calendar year, but do not accrue any other PTO.

W-2 Employees are not permitted to "cash out" their accrued and unused PTO or sick time. Solid Landings desires to continue having its existing PTO and Paid Sick Time policies in effect, and seeks authority to honor such policies post-petition as set forth above.

b.      ***Health Insurance Policy***. Certain W-2 Employees – specifically, those W-2 Employees who work more than 30 hours per week – are eligible to receive company-subsidized medical insurance coverage (through United Health Care and Kaiser Permanente, as offered through Insperity). Solid Landings subsidizes up to approximately 50% of the premiums for medical insurance coverage for eligible W-2 Employees. As of the Petition Date, there were approximately fifty-seven (57) W-2 Employees who were receiving company-subsidized medical insurance coverage. Solid Landings desires to

continue having its health insurance policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

        c.     ***401(K) Plan Contribution Policy.***  Solid Landings offers full-time W-2 Employees after thirty (30) days of employment the opportunity to participate in Solid Landings' 401(k) plan with entry permitted at any time thereafter. The 401(k) plan allows eligible W-2 Employees to contribute up to the current IRS maximum to the 401(k) plan through payroll deductions. Solid Landings will match the employee's contributions up to a maximum of four percent (4%) of the W-2 Employee's gross wages.  Both the W-2 Employee's contributions and Solid Landings' matching contributions to the 401(k) are invested in employee-participant directed accounts.  The matching contributions are submitted by Solid Landings to the 401(k) administrator on a weekly basis.

38.     I believe that significantly all of the Employees will quit if they are not paid their salaries and benefits in full in a timely fashion.  As an operator of substance abuse treatment facilities, I believe it is crucial for the Debtors to retain their highly specialized and knowledgeable staff of Employees to operate each of their treatment facilities.  The Debtors must retain the Employees to continue their business operations without interruption and to preserve and maximize the value of their assets during these Chapter 11 cases, while the Debtors pursue an expeditious sale of their businesses and assets to Alpine (or a successful overbidder).  The Debtors' personnel are familiar with the Debtors' facility operations and are therefore essential to the preservation of the Debtors' businesses.  The failure to pay pre-petition Wages to the Employees and honor Solid Landings' employment and benefit policies will likely result in severe disruptions to the Debtors' business operations to the detriment of creditors.  I believe the Debtors' ability to preserve the full value of their businesses and assets depends upon the Debtors' continued operations, which cannot occur without the efforts of the Employees.

39.     The source of the funds to be used to pay and/or honor the pre-petition Wages and to continue honoring Solid Landings' employment and benefit policies will be the revenue generated by all of the Debtors, which the Debtors believe CapStar contends constitutes its cash

1    collateral.  Accordingly, concurrently herewith, the Debtors have filed a motion for the entry of an

2    order authorizing the Debtors to use cash collateral and to obtain debtor-in-possession financing

3    from CapStar (the "DIP Loan") to enable the Debtors to maintain their business operations and

4    preserve the value of the Debtors' assets (the "DIP Motion").  Based on the initial consolidated

5    operating budget submitted by the Debtors in connection with the DIP Motion and approved by

6    CapStar (the "Initial Approved Budget"), a copy of which is attached as **Exhibit "5"** hereto,

7    approval to pay and/or honor the Employees' Wages will not render the Debtors' bankruptcy

8    estates administratively insolvent.

9    **E.        The Utility Motion.**

10        40.    As of the Petition Date, Cedar Creek is operating one (1) residential treatment

11   facility located at 11908 Sparks Road, Manor, Texas 78653.

12        41.    As of the Petition Date, EMS Toxicology is operating one (1) laboratory facility

13   located 6171 McLeod Drive, Suite A, Las Vegas, Nevada 89120.

14        42.    As of the Petition Date, Silver Rock is operating one (1) outpatient treatment

15   facility located at 2060 Pama Lane, Las Vegas, Nevada 89119 and one (1) inpatient treatment

16   facility located at 4011 McLeod Drive, Las Vegas, Nevada 89121.

17        2.     As of the Petition Date, Sure Haven is operating a total of eight (8) facilities

18   within the state of California – *i.e.*, five (5) residential treatment facilities, one (1) sober living

19   facility, one (1) outpatient treatment facility/administrative office, and (1) corporate housing

20   facility.

21        43.    In connection with the operation of the foregoing facilities (collectively, the

22   "Facilities"), the Debtors receive water, electricity, telephone, internet, trash and/or similar utility

23   services from a number of utility companies (collectively, the "Utility Companies," and each, a

24   "Utility Company").  Given the importance of the services provided by such Utility Companies

25   to the continued operation of the Debtors' Facilities, it is crucial that the means of providing

26   adequate assurance to such Utility Companies that provide utility services at the Facilities be

27   determined promptly so that there is no interruption in the services provided.

28

14

44.     Attached as **Exhibit "2"** hereto and incorporated herein by this reference is a list which sets forth the name and address of each Utility Company that is currently providing utility services to the Debtors' Facilities, the type of utility service provided by each Utility Company, the account number(s) associated with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company as adequate assurance of payment (collectively, the "Cash Deposits," and individually, a "Cash Deposit").

45.     The Debtors request authority to pay the proposed Cash Deposits to the Utility Companies for the utility accounts reflected in Exhibit "2" hereto, unless lower amounts are agreed to in writing by the Utility Companies, regardless of whether such utility accounts are under the name of one or more of the Debtors, a non-debtor affiliate of the Debtors, or a principal(s) of the Debtors.

46.     The total aggregate amount of the Cash Deposits proposed to be paid by each of the Debtor is as follows:

| Debtor | Cash Deposits |
|---|---|
| Cedar Creek Recovery, Inc. | $2,892.52 |
| EMS Toxicology | $1,642.42 |
| Silver Rock Recovery | $6,112.59 |
| Sure Haven, Inc. | $23,512.40 |
| **Total:** | **$34,159.93** |

47.     Generally, the Debtors are proposing to provide each Utility Company with a cash deposit in an amount equal to the average monthly payment based on payments historically made on the utility account(s) (as determined by the last four monthly or bi-monthly payments made on such utility accounts), or a lower amount if agreed to in writing by the applicable Utility Company.

48.     In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

49.     The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the revenue generated by all of the Debtors, which the Debtors believe

that CapStar contends constitutes its cash collateral. As noted above, the Debtors have filed concurrently herewith the DIP Motion, pursuant to which the Debtors seek authority to use cash collateral and to obtain the DIP Loan from Capstar to enable the Debtors to maintain their business operations and preserve the value of the Debtors' assets. Based on the Initial Approved Budget submitted in connection with the DIP Motion, approval to pay the Cash Deposits to the Utility Companies will not render the Debtors' bankruptcy estates administratively insolvent.

**F.    The Cash Management Motion.**

50.    Prior to the Petition Date, the Debtors maintained the following twelve (12) bank accounts at CapStar:

| Debtor/Account Holder | Account | Account No. |
|---|---|---|
| Solid Landings Behavioral Health, Inc. | Operating Account | -8741 |
| Cedar Creek Recovery, Inc. | Operating Account | -0461 |
| Cedar Creek Recovery, Inc. | Collection Account (*inactive*) | -3138 |
| Cedar Creek Recovery, Inc. | Payroll Account (*inactive*) | -4359 |
| EMS Toxicology | Operating Account | -1703 |
| EMS Toxicology | Collection Account | -0238 |
| Silver Rock Recovery | Operating Account | -3057 |
| Silver Rock Recovery | Collection Account | -9478 |
| Silver Rock Recovery | Payroll Account (*inactive*) | -1009 |
| Sure Haven, Inc. | Operating Account | -2458 |
| Sure Haven, Inc. | Collection Account | -5159 |
| Sure Haven, Inc. | Payroll Account (*inactive*) | -8956 |

51.    As reflected in the table above, four (4) of the Debtors' pre-petition bank accounts were inactive prior to the Petition Date.

52.    ***Centralized Pre-Petition Operating Account.***  Of the eight (8) active pre-petition bank accounts maintained by the Debtors, one account, specifically, the operating account under the name of Solid Landings (account no. ending in -8741), has been used by the Debtors as a centralized bank account from which all of the Debtors' operating disbursements have been made (the "Pre-Petition Operating Account").

53.    ***Collection Bank Accounts***.    The remaining seven (7) active pre-petition bank accounts maintained by the Debtors, which are separately listed below (collectively, the "Collection Bank Accounts"), operate solely as collection accounts and receive payments (often automatically) from the Debtors' clients and other sources.

| Debtor/Account Holder | Account | Account No. |
|---|---|---|
| Cedar Creek Recovery, Inc. | Operating Account | -0461 |
| EMS Toxicology | Operating Account | -1703 |
| EMS Toxicology | Collection Account | -0238 |
| Silver Rock Recovery | Operating Account | -3057 |
| Silver Rock Recovery | Collection Account | -9478 |
| Sure Haven, Inc. | Operating Account | -2458 |
| Sure Haven, Inc. | Collection Account | -5159 |

54.    The Debtors receive payments from the Debtors' clients and other sources into the Collection Bank Accounts (often automatically).    The Debtors do not make operating disbursements from any of the Collection Bank Accounts.  Rather, the funds that are collected in the Collection Bank Accounts are swept into the Pre-Petition Operating Account, generally on a daily basis.  In addition, CapStar funds the Debtors' advance requests by sending advances to the Pre-Petition Operating Account.  The Debtors then use the funds in the Pre-Petition Operating Account to make all of the Debtors' operating disbursements.

55.    Pursuant to the Cash Management Motion, the Debtors seek authority to establish and utilize one (1) centralized debtor-in-possession bank account to replace the Pre-Petition Operating Account (the "DIP Operating Account"), which account will be established and maintained under the name of Solid Landings, and from which account all of the Debtors' post-petition disbursements will be made and accounted for.  Pursuant to the Cash Management Motion, the Debtors request that any requirements for the Debtors to establish additional debtor-in-possession bank accounts be waived.

56.    In addition, pursuant to the Cash Management Motion, the Debtors seek authority to maintain and keep open the seven (7) Collection Bank Accounts for the sole purpose of collecting payments from their clients and other revenue sources.  The Debtors will not make any

17

disbursements directly from the Collection Bank Accounts. All of the funds deposited into the Collection Bank Accounts will be transferred, in their entirety, to the DIP Operating Account, from which the Debtors will make any necessary disbursements.

57. The Collection Bank Accounts have been utilized by the Debtors for the collection of accounts receivable for some time and provide a very efficient and secure means of collecting and managing payments from many of the Debtors' clients and other revenue sources. If the Debtors are required to close the Collection Bank Accounts, the Debtors' ability to collect their accounts receivable will likely be disrupted and/or delayed, which in turn will have a negative and potentially significant impact on the Debtors' cash flow and ability to operate their business. Consequently, I believe the maintenance of the Collection Bank Accounts in the Debtors' existing cash management system is not only essential but is in the best interests of all creditors and other parties in interest.

58. If the Debtors are required to close the Collection Bank Accounts, the Debtors' ability to collect their accounts receivable will likely be disrupted and/or delayed. Authority for the Debtors to maintain and utilize the Collection Bank Accounts post-petition will, among other things: (i) ensure the uninterrupted collection of the Debtors' accounts receivable, (ii) minimize the disruption which would result from being forced to assist clients and other revenue sources in redirecting their payments, and (iii) facilitate the fluid continuance of the Debtors' business transactions and assist in the Debtors' smooth transition into Chapter 11.

59. In addition to the Collection Bank Accounts, the Debtors have historically maintained and utilized one centralized bank account (*i.e.*, the Pre-Petition Operating Account) to make operating disbursements, rather than an individual bank account under each of the Debtors' respective names. The Debtors believe that the continued use of one centralized operating account (*i.e.*, the DIP Operating Account) post-petition will promote efficiency and continuity, and is particularly appropriate under the circumstances of the Debtors' cases, where the Debtors are proposing to use CapStar's cash collateral and the proceeds of the DIP Loan to be provided by CapStar in accordance with the consolidated Initial Approved Budget.

60.     Moreover, since all of the revenues generated by the Debtors and the advances made by CapStar to the Debtors under the DIP Loan will ultimately be deposited into the DIP Operating Account (from which any and all operating disbursements made by or on behalf of the Debtors will be made), the Debtors will still be able to account for all of their receipts and disbursements in compliance with the reporting guidelines and requirements of the Office of the United States Trustee.

**G.    The Insurance Motion.**

61.     In connection with the operation of their business, the Debtors maintain approximately nine (9) insurance policies (each, an "Insurance Policy," and collectively, the "Insurance Policies").  The Insurance Policies currently in effect and the associated premiums, insurance carriers, and policy terms are summarized on **Exhibit "3"** hereto.  The Debtors maintain multiple insurance policies, which insure the Debtors against, among other things, general commercial liability, commercial property liability, commercial crime liability, commercial automobile liability, professional liability, and cyber liability.

62.     The annual premiums due under the Insurance Policies range from $253 to $88,658.  When feasible and economically beneficial, the Debtors finance the premiums for certain of their Insurance Policies rather than pay such premiums in lump-sum payments.  Accordingly, prior to the Petition Date, the Debtors financed $222,973 of insurance premiums for eight (8) of their Insurance Policies pursuant to the terms of that certain Commercial Premium Finance Agreement with First Insurance Funding Corp. (the "Pre-Petition Financing Agreement").  A true and correct copy of the Pre-Petition Financing Agreement is attached as **Exhibit "4"** hereto.

63.     Pursuant to the Pre-Petition Financing Agreement, the Debtors are required to make nine (9) monthly payments, each in the sum of $19,490.32, through and including the month of December, 2017.  The Debtors' obligations to make payments under the Pre-Petition Financing Agreement (the "Pre-Petition Financing Payments") are secured by all unearned or return premiums and dividends related to the financed Insurance Policies.  Pursuant to the Pre-

19

Petition Financing Agreement, First Insurance Funding Corp. also has the right to cancel the financed Insurance Policies if the Debtors fail to make any of the Pre-Petition Financing Payments due thereunder.

64.    By the Insurance Motion, the Debtors are seeking authority to maintain, supplement, amend, extend, renew, or replace their Insurance Policies on an uninterrupted basis and to pay insurance-related payments which fall into the following two (2) general categories.

a.    *Insurance Obligations.*    First, the Debtors seek authority to pay any obligations which are required to maintain coverage under the Insurance Policies in the ordinary course of business, whether arising pre-petition or post-petition (collectively, the "Insurance Obligations"), including, without limitation, non-financed premiums, deductibles, self-insured retention amounts, broker fees, and administrative fees.    For example, the Debtors maintain a professional and general liability package policy for EMS Toxicology, the premium for which the Debtors have historically paid up-front, without financing.    The Debtors were current on the payment of the premium for the foregoing non-financed policy as of the Petition Date, and seek only to continue paying the premium for such policy in the ordinary course of business to maintain coverage.

b.    *Pre-Petition Financing Payments.*    Second, the Debtors seek authority to continue making the Pre-Petition Financing Payments due under the Debtors' Pre-Petition Financing Agreement with First Insurance Funding Corp.    The Pre-Petition Financing Agreement required the Debtors to make a down payment of $51,668.79 followed by 9 monthly installment payments each in the sum of $19,490.32.    To date, the Debtors have paid $90,649.43 under the Pre-Petition Financing Agreement, consisting of the down payment and two monthly installment payments.    The next monthly installment payment of $19,490.32 is due on June 1, 2017, and has not yet been paid.    The total amount of the remaining obligations under the Pre-Petition Financing Agreement is $136,432.24.

1      *c.* *Obligations Due During First 21 Days Of These Cases.* The Debtors

2 anticipate that approximately $19,490.32 in insurance related payments, specifically, the

3 monthly Pre-Petition Financing Payment due on June 1, 2017 under the Pre-Petition

4 Financing Agreement, will be due within the first 21 days of the Debtors' bankruptcy

5 cases.  Accordingly, by the Insurance Motion, the Debtors request authority to make the

6 foregoing payments, in an aggregate amount not to exceed $20,000, on or before the

7 entry of a final order granting the Insurance Motion.

8    65. I believe that the nature of the Debtors' business makes it essential for the Debtors

9 to maintain their Insurance Policies on an ongoing and uninterrupted basis, and payment of the

10 Insurance Obligations and Pre-Petition Financing Payments is therefore appropriate and

11 warranted.  The nonpayment of any premiums or related fees under the Insurance Policies could

12 result in insurance carriers terminating the Debtors' existing Insurance Policies and/or declining

13 to renew the Insurance Policies, which, in turn, would expose the Debtors to substantial liability,

14 impair the Debtors' business and the value of the Debtors' assets, and ultimately jeopardize the

15 Debtors' ability to successfully consummate the contemplated sale of the Debtors' assets and

16 business to Alpine (or a successful overbidder) in these cases.

17    66. For the same reasons noted above, I believe it is important for the Debtors to have

18 the authority to renew the Insurance Policies or obtain replacement coverage without further

19 order of the Court.  If the Insurance Policies are allowed to lapse without renewal or

20 replacement, the Debtors could be exposed to substantial liability, which exposure could impair

21 the Debtors' business and the value of the Debtors' assets (and, in turn, jeopardize the Debtors'

22 ability to successfully consummate a sale of their business and assets).  Absent granting the relief

23 requested herein, the Debtors may be forced to obtain replacement policies on an expedited basis

24 at what would likely be a significantly higher cost.  It is therefore essential that the Insurance

25 Policies be maintained on an ongoing and uninterrupted basis, and that the Debtors have the

26 authority to revise, supplement, or change their insurance coverage by, among other things,

27 renewing current policies or purchasing new replacement policies.

28

67.    The source of the funds to be used to pay the Insurance Obligations and the Pre-Petition Financing Payments will be the revenue generated by all of the Debtors, which the Debtors believe that CapStar contends constitutes its cash collateral.  As noted above, the Debtors have filed concurrently herewith the DIP Motion, pursuant to which the Debtors seek authority to use cash collateral and to obtain the DIP Loan from CapStar to enable the Debtors to maintain their business operations and preserve the value of the Debtors' assets.  Based on the Initial Approved Budget submitted in connection with the DIP Motion, approval to pay the Insurance Obligations and the Pre-Petition Financing Payments will not render the Debtors' bankruptcy estates administratively insolvent.

**H.    The DIP Motion.**

68.    The Debtors' primary assets are as follows:

a.    Security Deposits.  As of the Petition Date, the Debtors had security deposits with public utilities, landlords, equipment lessors and others in the total sum of approximately $366,852.31, as follows:

| Debtor | Security Deposits |
|---|---|
| Cedar Creek Recovery, Inc. | $80,300.00 |
| EMS Toxicology | $99,423.21 |
| Silver Rock Recovery | $64,379.10 |
| Sure Haven, Inc. | $122,750.00 |
| **Total:** | **$366,852.31** |

b.    Accounts Receivable.  As of the Petition Date, the Debtors had accounts receivable with an aggregate face value in excess of $68,000,000, which accounts receivable are estimated by the Debtors to have an aggregate current value of approximately $4,324,693.00, as follows:

| Debtor | Accounts Receivable |
|---|---|
| Cedar Creek Recovery, Inc. | $696,634.00 |
| EMS Toxicology | $673,420.00 |
| Silver Rock Recovery | $655,527.00 |
| Sure Haven, Inc. | $2,299,112.00 |
| **Total:** | **$4,324,693.00** |

22

c.    Vehicles, Office Furniture and Equipment.  As of the Petition Date, the Debtors owned vehicles, office furniture and equipment valued at approximately $2,353,694.29 (value based on net book value), as follows:

| Debtor | Furniture/Equipment | Vehicles |
|---|---|---|
| Cedar Creek Recovery, Inc. | $200,625.76 | - |
| EMS Toxicology | $209,558.98 | - |
| Silver Rock Recovery | $267,359.08 | - |
| Sure Haven, Inc. | $1,387,943.02 | $288,207.45 |
| | | |
| Total Furniture/Equipment: | $2,065,486.84 | |
| Total Vehicles: | | $288,207.45 |
| **Total:** | | **$2,353,694.29** |

69.    The Debtors' senior secured lender is CapStar.  I am advised and believe that the Debtors and certain of their non-debtor affiliates are borrowers under that certain *Loan and Security Agreement* dated as of November 20, 2015 with CapStar (the "Loan Agreement," and together with all security agreements, pledge agreements, and other security and ancillary documents executed by the Debtors, their non-debtor affiliates and/or any guarantor in favor of CapStar, the "Pre-Petition Loan Documents").[2]  I am advised and believe that, in order to ensure repayment of their obligations to CapStar, the Debtors granted CapStar first-priority perfected security interests and liens (the "Pre-Petition Liens") in substantially all of Debtors' assets (the "Pre-Petition Collateral"), as documented in the Loan Agreement and other Pre-Petition Loan Documents.  The obligations and duties owed by the Debtors under the Pre-Petition Loan Documents are referred to herein as the "Pre-Petition Obligations."  To the best of my knowledge, the Debtors are currently indebted to CapStar in an amount of no less than $10,296,266.99.

70.    I am advised and believe that the Debtors' shareholders, Stephen Fennelly, Elizabeth Perry, and Mark Shandrow (collectively, the "Guarantors"), executed written

---

[2] Copies of the Pre-Petition Loan Documents are included in an Appendix Of Supplemental Exhibits filed concurrently herewith.

guaranties dated November 20, 2015 guaranteeing the Debtors' obligations under the Pre-Petition Loan Documents.

71.    I am further advised and believe that CapStar filed UCC-1 financing statements against each of the Debtors asserting liens against all of the Debtors' assets.  A summary of the financing statements recorded against the Debtors by CapStar is set forth in the Declaration of Juliet Y. Oh (the "Oh Declaration") filed concurrently herewith, with copies of the financing statements attached thereto.

72.    I am advised and believe that, in addition to the financing statements filed by CapStar against the Debtors, there are a number of financing statements that have been filed against EMS Toxicology and Sure Haven by an equipment lessor, QA Group LLC ("QA Group"), which purport to cover only the equipment identified in such financing statements.  A summary of the financing statements recorded against EMS Toxicology and Sure Haven by QA Group is set forth in the Oh Declaration filed concurrently herewith, with copies of the individual financing statements attached thereto.

73.    I am advised and believe that, in addition to the financing statements filed by CapStar and QA Group against one or more of the Debtors, there is a notice of judgment lien that was recorded against Sure Haven on December 1, 2016 by CPF Airway Associates LLC ("CPF"), based upon a judgment obtained by CPF against Sure Haven on November 18, 2016, in the amount of $132,935.71 (as of December 1, 2016).  A true and correct copy of the foregoing notice of judgment lien is attached to the Oh Declaration filed concurrently herewith.

74.    Based on the foregoing, I believe that the only parties who may potentially have security interests in the Debtors' cash are CapStar and CPF.

75.    Due to the Debtors' current financial condition, the use of the Debtors' cash collateral alone will be insufficient to meet the Debtors' immediate post-petition liquidity needs. The Debtors require new post-petition funding to maintain their businesses and preserve the value of their assets while the Debtors pursue and expedited sale process which will allow the

Debtors to sell their businesses and/or assets as a going concern or, if appropriate, liquidate the assets of the Debtors in an orderly and efficient manner.

76.    CapStar has agreed to consent to the Debtors' use of cash collateral and provide the Debtors with post-petition financing in the form of delayed draw term loans drawn under a revolving credit facility in the aggregate principal amount not to exceed $2,000,000 (the "DIP Loan"), pursuant to the terms and conditions set forth in that certain *Stipulation Re: Debtor In Possession Financing And Use Of Cash Collateral* (the "Stipulation"), a true and correct copy of which Stipulation is attached as **Exhibit "6"** hereto, and that certain *Debtor-In-Possession Loan And Security Agreement* (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement," and collectively with the Promissory Note related thereto and any other documents and instruments delivered pursuant to or in connection therewith, the "DIP Financing Documents").[3]

77.    CapStar has indicated that it is willing to consent to the Debtors' use of cash collateral and provide the Debtors with the proposed DIP Loan solely on the terms and conditions set forth in the Stipulation and the DIP Financing Documents.

78.    Attached as **Exhibit "5"** hereto is a ten (10) week cash flow forecast for the Debtors setting forth all projected cash receipts and cash disbursements following the Petition Date (the "Initial Approved Budget").  Based on the Initial Approved Budget, I believe that the proposed DIP Loan will provide the Debtors with sufficient funds to maintain the Debtors' business operations and successfully consummate a sale of the Debtors' businesses and/or assets.

79.    The Debtors are unable to obtain sufficient interim and/or long-term financing from sources other than CapStar on terms and subject to conditions more favorable than under the DIP Loan and the DIP Financing Documents, and are not able to obtain unsecured credit allowable as an administrative expense.  The Debtors are also unable to obtain secured credit on

---

[3] All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in the proposed interim order granting this Motion in substantially the form attached as **Exhibit "7"** hereto (the "Interim Order") or, if the terms are not defined in the Interim Order, the meanings ascribed to them in the DIP Credit Agreement.

1    a junior lien basis for the purposes set forth in the DIP Credit Agreement without the Debtors' (i)

2    granting to CapStar, subject to the Carve-Out, (x) the DIP Super-Priority Claim and (y) the DIP

3    Liens in the DIP Collateral, as provided in the Stipulation and the DIP Financing Documents;

4    and (ii) providing CapStar the adequate protection as provided in the Stipulation and the DIP

5    Financing Documents.

6           80.    To date, the only financing commitment that has been provided to the Debtors is

7    the one offered by CapStar.  In order to avoid a complete shutdown of the Debtors' business and

8    liquidation of the Debtors' assets, the Debtors diligently sought additional financing before the

9    Debtors' bankruptcy filings.  However, given the amount of the Debtors' secured debt and the

10    Debtors' current cash flow situation, I do not believe it is realistic for any lender to be willing to

11    provide the Debtors with unsecured financing or even secured financing on a junior lien basis.

12    Fortunately, CapStar has offered to provide the Debtors with post-petition secured financing but

13    solely on the terms and conditions set forth in the Stipulation and the DIP Financing Documents.

14    CapStar has presumably agreed to provide financing to the Debtors, when no other lender has

15    expressed a willingness to do so, in the hopes of maximizing the recovery on the pre-petition

16    secured debt owed to CapStar.  I have little doubt that, even if there was another lender who was

17    willing to provide the Debtors with the necessary post-petition financing (recognizing that the

18    Debtors are not aware of any such lender at this time), such lender would require that its

19    financing be secured by a senior priming lien against the Debtors' assets, upon terms that would

20    very likely be less favorable than those currently offered by CapStar.  The terms and conditions

21    set forth in the Stipulation and the DIP Financing Documents have been negotiated extensively,

22    in good faith and at arms' length, by the parties.

23           81.    After considering all of their alternatives, I believe that the DIP Loan to be

24    provided by CapStar, combined with the consent to use cash collateral provided by CapStar,

25    represents the best financing presently available to the Debtors.

26    ///

27    ///

28

**I.    The Bidding Procedures Motion.**

82.    I am advised and believe that the Debtors have actively marketed their businesses and assets for sale for more than two (2) years.  I am advised and believe that, in the spring of 2015, the Debtors engaged Brentwood to pursue a sale or equity recapitalization of the Debtors' businesses.  I am further advised and believe that, although the Debtors and Brentwood initiated a full marketing process to try to sell and/or recapitalize the Debtors' businesses, the process was unsuccessful and was ultimately halted in December, 2015.

83.    I am advised and believe that, in the summer of 2016, the Debtors again engaged Brentwood to assist in the marketing and sale of the Debtors' businesses, particularly those facilities operated by the Debtors in Texas and Las Vegas, Nevada.  I am advised and believe that, although the marketing efforts undertaken by the Debtors and Brentwood in 2016 resulted in letters of intent from two prospective purchasers, both letters of intent were ultimately rejected as the sale terms proposed therein provided for deferred payments of the proposed purchase price and were, for that and other reasons, unacceptable to the Debtors and CapStar.

84.    Subsequently, in February, 2017, the Debtors retained my firm, GGG Partners, as their financial advisor to, among other things, assist in the marketing of the Debtors' businesses and pursue a potential going-concern sale of the Debtors' businesses.  During the approximately four-month period between the Debtors' retention of GGG Partners and the Petition Date, the Debtors and GGG Partners marketed the Debtors' businesses and assets for sale.  Although the Debtors received expressions of interest from two different groups during such period, both groups were interested in acquiring only one or two of the Debtors' facilities located in Las Vegas, Nevada.   The Debtor received no written expressions of interest from any other prospective purchasers during the foregoing period.

85.    Given that Alpine's Letter of Intent contemplated the acquisition of substantially all of the Debtors' assets rather than a small subset thereof, the Debtors, with the input of CapStar, determined that it was in the far better interest of the Debtors and their creditors to

negotiate a sale of the Debtors' assets to Alpine than to either of the groups who'd expressed an interest in acquiring one or two of the Debtors' facilities.

86.     As noted above, on April 12, 2017, the Debtors and Alpine executed the Letter of Intent, pursuant to which Alpine expressed its desire to acquire substantially all of the Debtors' assets, free and clear of any interests, liens and liabilities, and subject to overbid.

87.     Following the execution of the Letter of Intent, the Debtors, CapStar, and Purchaser spent a substantial amount of time negotiating the terms and conditions of the proposed sale of the Debtors' assets to the Purchaser, which terms and conditions are memorialized in the APA.

88.     The APA, a true and correct copy of which is attached as **Exhibit "8"** hereto, contemplates the sale and transfer of substantially all assets of the Debtors (collectively, the "Transferred Assets"), free and clear of liens, claims, encumbrances, and other interests, to the Purchaser for cash and other consideration computed by the Debtors to have a total aggregate value of $9,050,000 (the "Purchase Price").

89.     Under the terms of the APA, the Purchase Price to be paid by the Purchaser for the Transferred Assets shall consist of the following consideration:  (a) cash in the amount of $3,750,000, (b) a secured promissory note in the amount of $3,250,000 payable to CapStar, (c) the Purchaser's share of the amounts required to be paid to cure the Debtors' monetary defaults under those executory contracts and unexpired leases sought by the Purchaser to be assumed by the Debtors and assigned to it, and (d) monies paid by or on behalf of the Purchaser to CapStar pursuant to a make-whole agreement entered into by such parties.

90.     As reflected in the APA, the Purchaser has agreed to act as the stalking horse bidder, with its proposal to purchase the Transferred Assets (in accordance with the terms of the APA) to be subject to competitive bidding.  The Purchaser has required that certain bidding procedures be implemented which establish the rules and procedures for tendering a competing bid for the Transferred Assets (the "Bidding Procedures"); however, a competing bid may be

1    structured in any manner, including, but not limited to, the structure proposed in the APA, or as a

2    restructuring or a cash bid (each, a proposed "Transfer Transaction").

3        91.    The Bidding Procedures negotiated by the Debtors and the Purchaser, and

4    requested to be approved by the Debtors, are set forth in **Exhibit "9"** hereto.

5        92.    Among other things, the Bidding Procedures provide for the payment of a break-

6    up fee in the sum of $350,000 (the "Break-Up Fee") to the Purchaser in the event that the

7    successful bidder for the Transferred Assets is someone other than the Purchaser and the Debtors

8    close the Transfer Transaction to such successful bidder.

9        93.    Based upon my discussions and negotiations with the Purchaser (among others), it

10   has been made clear to me that the Purchaser's willingness to enter into the APA, which I believe

11   provides indisputable benefits to the Debtors' estates, was expressly conditioned upon all of the

12   terms of the APA being approved by the Court, including the approval of the Bidding

13   Procedures.  The Bidding Procedures are not only a critical component of the APA negotiated by

14   the Debtors, CapStar and the Purchaser, but I believe they also provide a structure for the sale of

15   the Transferred Assets and ensure a level of certainty with respect to any overbids.

16       94.    The Break-Up Fee allowed the Debtors to attract (and retain) an offer from the

17   Purchaser to purchase the Transferred Assets.  I believe it is highly unlikely that the Purchaser

18   would have agreed to undertake the expense and risks associated with negotiating and

19   documenting the terms of the Transfer Transaction without some assurance that it would be

20   compensated for the expenses it incurred (at least in part) in the event that the Debtors pursued

21   and ultimately closed a sale of the Transferred Assets to a different party.  Based upon the level

22   of due diligence conducted by the Purchaser and the amount of work and the corresponding

23   amount of legal fees and costs that I understand the Purchaser has incurred to date, I believe the

24   amount of the Break-Up Fee (*i.e.*, $350,000) is reasonably related to the Purchaser's efforts and

25   the magnitude of the proposed Transfer Transaction.

26       95.    In addition, I believe the Break-Up Fee serves to establish a bid standard for other

27   potential bidders to follow.

28

96.    As a whole, I believe the Bidding Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration potential purchasers who do not have the financial ability to consummate a Transfer Transaction in an expeditious manner; and (iii) ensure that the highest possible purchase price is obtained for the Transferred Assets.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 1st day of June, 2017, at Costa Mesa, California.

KATIE S. GOODMAN

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "1"**

[Payroll List]

SOLID LANDINGS BEHAVIORAL HEALTH, INC. - PAYROLL (W2 LIST)

Payroll Date: May 26, 2017

Payroll Period Covered:  May 14 -20, 2017

Reported by Insperity on: 05/24/2017

| Employee Name | Department Name | Job Title | Net Pay | Gross Pay | Overhead Amount (Incl Work Comp, ER portion Taxes, ER contrib Health Ins, Admin fee etc. | Employer 401K Match | Total Payroll Cost |
|---|---|---|---|---|---|---|---|
| ALATORRE, ELIZABETH | MAINT (Maintenance) | HOUSEKEEPING MANAGER | 635.81 | 840.00 | 231.83 | | 1,071.83 |
| ALDEN-SMITH, ALYSSA C | OPER (Operations) | LOGISTICS COORDINATOR | 457.94 | 618.00 | 169.48 | 24.72 | 812.20 |
| ALVARADO, KIMBERLY R | QA | QA AUDITOR | 691.03 | 865.38 | 140.30 | | 1,005.68 |
| BARAJAS, ASHLEY | ACCT (Accounting) | STAFF ACCOUNTANT | 478.82 | 640.00 | 171.71 | | 811.71 |
| BEACH, KIMBERLEY | ACCR (Account Receivable) | INTAKE ACCOUNTANT | 523.76 | 775.20 | 182.67 | | 957.87 |
| BECERRA, ANTONIETA P | OPER (Operations) | SHIFT LEAD | 354.72 | 636.23 | 204.65 | 25.45 | 866.33 |
| BECK, LAURIE | CLINI (Clinical) | CLINICAL DIRECTOR | 1,048.92 | 1,442.31 | 279.50 | | 1,721.81 |
| BLAUM, LAURYN | SALES (Marketing) | ADMISSIONS COUNSELOR | 509.29 | 611.70 | 84.01 | | 695.71 |
| BOLAND, JUDITH | CLINI (Clinical) | GROUP FACILITATOR | 748.43 | 945.49 | 225.84 | | 1,171.33 |
| BURCH, ROBERT A | CLINI (Clinical) | GROUP FACILITATOR | 548.89 | 834.49 | 129.06 | | 963.55 |
| CAGAMPAN, STEFANIE | CLINI (Clinical) | CLINICAL SUPERVISOR | 877.47 | 1,250.00 | 286.49 | 25.00 | 1,561.49 |
| CANTU, VANESSA CHANTAL | OPER (Operations) | CLIENT ADVOCATE | 442.04 | 536.19 | 132.12 | | 668.31 |
| CHENG, YIN YAN | ACCT (Accounting) | ACCOUNTING MANAGER | 889.84 | 1,280.38 | 223.62 | 51.22 | 1,555.22 |
| CLIFF, NATASHA KRISTINE | OPER (Operations) | LOGISTICS COORDINATOR | 849.38 | 1,171.84 | 214.37 | | 1,386.21 |
| DANIELS, DESSIMBER | CCS (Client Care Services) | LICENSED VOCATIONAL NURSE | 919.31 | 1,184.96 | 248.00 | | 1,432.96 |
| DEDDEN, JOHN E | OPER (Operations) | CLIENT ADVOCATE | 391.34 | 436.10 | 70.78 | | 506.88 |
| DESMARAIS, TRICIA A | LAB (Laboratory) | LEGAL COUNSEL | 1,748.68 | 2,932.69 | 357.55 | | 3,290.24 |
| DEVENING, STACEY | CLINI (Clinical) | THERAPIST | 687.26 | 917.73 | 229.45 | | 1,147.18 |
| DOLL, RACHEAL I | SALES (Marketing) | ADMISSIONS COUNSELOR | 479.68 | 794.38 | 177.92 | | 972.30 |
| DUFAU, HEATHER S | ADMIN (Administration) | CORPORATE COUNSEL | 1,335.52 | 2,115.38 | 291.29 | | 2,406.67 |
| DULLY, WILLIAM H | LAB (Laboratory) | PRESIDENT OF LAB, LOGISTICS, PROCUREMENT | 2,290.75 | 3,461.54 | 317.25 | | 3,778.79 |
| DUNN, ASHLEY REBECCA | QA | CLINICAL QA AUDITOR | 767.76 | 1,030.00 | 120.17 | 41.20 | 1,191.37 |
| EREBIA, ANASTACIA | CCS (Client Care Services) | LICENSED VOCATIONAL NURSE | 382.47 | 498.41 | 158.81 | 19.94 | 677.16 |
| FAVELA, VANESSA | CCS (Client Care Services) | LICENSED VOCATIONAL NURSE | 611.09 | 824.55 | 204.82 | | 1,029.37 |
| FAZZIO, FRANCES | CLINI (Clinical) | CASE MANAGER | 708.61 | 942.31 | 225.48 | | 1,167.79 |
| FERMAN, STEPHANIE J | OPER (Operations) | LOGISTICS COORDINATOR | 429.78 | 581.00 | 158.95 | | 739.95 |
| FLECK, SAMI JO | CLINI (Clinical) | CLIENT CARE COORDINATOR | 727.28 | 948.18 | 113.46 | | 1,061.64 |
| FREEMAN, MARY F | OPER (Operations) | SUPPORT STAFF | 517.36 | 642.36 | 119.24 | | 761.60 |
| FURNIS, JOHN JEFFERY | FOOD (Kitchen) | CHEF | 705.65 | 961.54 | 226.29 | | 1,187.83 |
| GAUT, ROBIN | BILL (Billing) | COLLECTIONS SPECIALIST | 390.97 | 475.73 | 75.25 | | 550.98 |
| GRIMES, CONNIE K | OPER (Operations) | PROGRAM DIRECTOR | 621.45 | 750.00 | 83.30 | | 833.30 |
| GUZMAN, MARGARET R | OPER (Operations) | SHIFT LEAD | 439.79 | 585.82 | 197.88 | | 783.70 |
| HANCOCK, KATRINA A | OPER (Operations) | LOGISTICS COORDINATOR | 480.91 | 811.20 | 217.97 | | 1,029.17 |
| HOBBS, JENNIFER | OPER (Operations) | LOGISTICS COORDINATOR | 469.81 | 624.00 | 168.63 | | 792.63 |
| HOLLAND, JAIME LIAN | REVENUE CYCLE | CLIENT SOLUTIONS SPECIALIST | 791.04 | 1,078.99 | 207.30 | | 1,286.29 |
| HUGHES, TAYLOR | OPER (Operations) | CLIENT ADVOCATE | 100.92 | 117.18 | 43.77 | | 160.95 |
| IN, LINDA | Maintenance & Construction | FACILITIES MANAGER | 618.10 | 865.38 | 152.05 | 34.62 | 1,052.05 |
| JOHNSON, DARRYS R | STAFF | ADMINISTRATIVE ASSISTANT | 394.84 | 511.97 | 159.86 | | 671.83 |
| JONES, ANGELA | OPER (Operations) | CLIENT ADVOCATE | 369.26 | 494.00 | 174.53 | | 668.53 |
| JUSE, ROSEANNE M | BILL (Billing) | COLLECTIONS SPECIALIST | 586.43 | 670.88 | 77.24 | | 748.12 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KENNEDY, TANAE RASHEENA | FOOD (Kitchen) | COOK | 445.19 | 562.20 | 218.14 | | 780.34 |
| LAW, QAY M | LAB (Laboratory) | LABORATORY ASSISTANT | 558.90 | 733.23 | 202.26 | | 935.49 |
| LUNA, ASHLEY NICOLE | MAINT (Maintenance) | MAINTENANCE | 477.21 | 581.67 | 101.07 | | 682.74 |
| LUPIAN, ALMA U | Maintenance & Construction | HOUSEKEEPER | 521.19 | 654.02 | 130.15 | | 784.17 |
| MANGRELLO, CHARMARIE D | ADMIN (Administration) | HR & PAYROLL MANAGER | 1,511.42 | 2,211.50 | 215.93 | | 2,427.43 |
| MARTINEZ, CARLOS | | | 806.23 | 1,118.33 | 194.78 | | 1,313.11 |
| MAY, KELSEY | ADMISS (Admissions) | ADMISSIONS COORDINATOR | 394.73 | 507.07 | 160.93 | | 668.00 |
| MCKITRICK, AMY M | ADMISS (Admissions) | ADMISSIONS COUNSELOR | 793.48 | 1,192.31 | 216.48 | 47.69 | 1,456.48 |
| MEDINA, KANDI | BILL (Billing) | CLIENT CARE | 631.98 | 834.90 | 243.78 | | 1,078.68 |
| MESSMER, CHRISTOPHER | OPER (Operations) | OPERATIONS MANAGER | 687.96 | 961.54 | 197.78 | 38.46 | 1,197.78 |
| MURIEL, CLAUDIA | EXEC | EXECUTIVE VICE PRESIDENT OF REVENUE CYCLE | 2,796.48 | 4,326.92 | 471.88 | 173.08 | 4,971.88 |
| NHEAN, LOEUR | ACCT (Accounting) | ACCOUNTS RECEIVABLE CLERK | 498.73 | 741.84 | 179.96 | | 921.80 |
| OGRADY, MARY F | QA | DIRECTOR OF ACCREDITATION, COMPLIANCE | 741.62 | 1,192.31 | 210.18 | 47.69 | 1,450.18 |
| OLIVAREZ, ELIZABETH | CLINI (Clinical) | THERAPIST | 728.09 | 942.31 | 225.48 | | 1,167.79 |
| OMAHONY, MICHAEL | EXEC | EXECUTIVE DIRECTOR | 1,786.82 | 2,596.15 | 239.67 | 103.85 | 2,939.67 |
| OSORIO, CLAUDIO | BILL (Billing) | CLAIMS BILLING SUPERVISOR | 490.80 | 595.79 | 168.13 | | 763.92 |
| PARK, ISAAC | LAB (Laboratory) | RESEARCH SCIENTIST | 1,589.24 | 2,269.23 | 293.43 | 90.77 | 2,653.43 |
| PARKER, TRACY L | CCS (Client Care Services) | NURSING MANAGER | 750.28 | 1,050.00 | 237.40 | | 1,287.40 |
| PATTERSON, CORY | MAINT (Maintenance) | MAINTENANCE MANAGER | 805.79 | 1,057.69 | 238.27 | | 1,295.96 |
| PEDROZA, FERNANDO O | OPER (Operations) | RISK & COMPLIANCE MANAGER | 745.81 | 903.85 | 109.95 | | 1,013.80 |
| PETROVIC, LAUREN T | SALES (Marketing) | ADMISSIONS COORDINATOR | 247.88 | 283.92 | 59.69 | | 343.61 |
| PORTER, JUSTIN RYAN | OPER (Operations) | CLIENT ADVOCATE | 416.61 | 518.44 | 129.01 | | 647.45 |
| RASAR, GEORGIA MELINDA | FOOD (Kitchen) | LEAD COOK | 533.07 | 687.65 | 128.10 | | 815.75 |
| RIOS, ROSALINA M | OPER (Operations) | GRAVEYARD SUPPORT STAFF | 527.54 | 627.33 | 125.77 | | 753.10 |
| RIVERA, JULIO | Maintenance & Construction | MAINTENANCE TECHNICIAN | 512.78 | 600.45 | 116.73 | | 717.18 |
| RODRIGUEZ, DIANA | ACCT (Accounting) | ACCOUNTS PAYABLE ACCOUNTANT | 735.86 | 865.89 | 190.03 | | 1,055.92 |
| SAINDON, CHRISTOPHER | UR | PEER REVIEWER | 1,019.24 | 1,538.46 | 244.54 | | 1,783.00 |
| SALENSKY, AMY L | BILL (Billing) | ACCOUNTANT | 659.10 | 961.54 | 195.02 | | 1,156.56 |
| SAN EMETERIO, YUDELMIS | LAB (Laboratory) | LABORATORY ASSISTANT | 404.99 | 473.20 | 89.90 | | 563.10 |
| SEFFER, URI | CLINI (Clinical) | GROUP FACILITATOR | 747.96 | 1,004.39 | 194.88 | 38.44 | 1,237.71 |
| SERNA, REBECCA MARIE | ACCT (Accounting) | STAFF ACCOUNTANT | 596.32 | 790.18 | 183.88 | | 974.06 |
| SHANDROW, MARK | EXEC | EXECUTIVE MANAGER & FOUNDER | 141.82 | 840.00 | 181.63 | 33.60 | 1,055.23 |
| SLOSSON, SCOTT | OPER (Operations) | LOGISTICS COORDINATOR | 554.52 | 723.62 | 178.41 | | 902.03 |
| STONE, WILLIAM | | | 274.85 | 335.16 | 73.70 | | 408.86 |
| TOGISALA, JACQUELINE LEE | CLINI (Clinical) | CASE MANAGER | 467.57 | 592.49 | 198.61 | | 791.10 |
| TUMLINSON, PAMELA | CLINI (Clinical) | CASE MANAGER | 544.82 | 682.25 | 196.70 | | 878.95 |
| TYLER, SELENA | CLINI (Clinical) | THERAPIST | 742.35 | 942.31 | 225.48 | | 1,167.79 |
| VAFADARI, VEESTA | BILL (Billing) | CLIENT SERVICES SPECIALIST | 587.52 | 777.90 | 182.89 | | 960.79 |
| VIGURI, DIANA | | | 388.51 | 424.83 | 119.09 | | 543.92 |
| WESTNEDGE, ELIZABETH | STAFF | COMMUNITY OUTREACH MANAGER | 1,331.98 | 1,442.31 | 149.45 | | 1,591.76 |
| WOLFE, THOMAS | OPER (Operations) | SUPPORT STAFF | 246.97 | 481.44 | 183.96 | 19.26 | 684.66 |
| YOUNG, JENNIFER M | OPER (Operations) | LOGISTICS COORDINATOR | 605.57 | 800.38 | 184.68 | | 985.06 |
| | | | 57,072.18 | 79,130.49 | 15,040.69 | 814.99 | 94,986.17 |

In re Solid Landings Behavioral Health, Inc.
**Independent Contractor Payments**

| Contractor/Consultant Name | | April Dates of Payments----------------------------/ | | | | May Dates of Payments ------------------------------ | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 |
| **Weekly per Contract** | | | | | | | | | |
| Kenneth Ihenetu | Medical Consulting Services | 745.27 | 745.27 | 745.27 | 745.27 | 745.27 | 745.27 | 745.27 | 745.27 |
| **As per approved invoices** | | | | | | | | | |
| Joanna Garza | Reiki Therapist | | | | | 300.00 | | | |
| John Biroc | Clinical Consultant | 570.00 | 570.00 | | | 570.00 | | | 570.00 |
| Randall Kopfer | Yoga Therapist | | | | | | | 855 | |
| Kevin Palmer | Maintence Services | | | | | | | | |
| Sarah Torres | Dietician | | | | | | | | |
| Barbara Guynesir | Massage Therapist | | 80.00 | | | | | | 80.00 |
| | | 1,315.27 | 1,395.27 | 745.27 | 745.27 | 1,615.27 | 1,600.27 | 745.27 | 1,395.27 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "2"

[Utility Lists]

Cedar Creek Recovery, Inc. - Utility Deposits

| ENTITY | Location | Utility | Name | Security Deposits | | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | Avg. monthly Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| CEDAR CREEK RECOVERY | Sparks Road | Phone | | | | | | | | |
| | | Gas | Amerigas | | | $ 706.66 | $ 125.57 | $ 735.86 | $ 203.37 | $ 442.87 |
| | | Electricity | AMBITENERGY | $ | 405.00 | $ 2,092.99 | $ 1,682.08 | $ 1,464.75 | $ 1,276.58 | $ 1,629.10 |
| | | Water | Aqua Water Supply | | | $ 206.10 | $ 920.24 | $ 209.50 | $ 314.05 | $ 412.47 |
| | | Sewer | Republic Services of Tx | | | $ 205.78 | $ 207.12 | $ 196.76 | $ 201.89 | $ 202.89 |
| | | Cable | Direct Tv | | | $ 136.68 | $ 136.68 | $ 136.68 | $ 136.68 | $ 136.68 |
| | | Internet | AT&T | | | $ 68.51 | $ 68.51 | $ 68.51 | $ 68.51 | $ 68.51 |

TOTAL:    $    2,892.52

EMS Toxicology - Utility Deposits

| ENTITY | Location | Utility | Name | Security Deposits | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | Avg. monthly Amt. |
|--------|----------|---------|------|-------------------|-----------|-----------|-----------|-----------|-------------------|
| **EMS TOXICOLOGY** | 6171 McLeod, Suite A | Phone | | | | | | | |
| | | Gas | Covered by Landlord CAM Fees | | | | | | |
| | | Electricity | NV Energy | | $ 1,465.29 | $ 1,486.57 | $ 1,227.37 | $1,164.50 | $ 1,335.93 |
| | | Water | Covered by Landlord CAM Fees | | | | | | |
| | | Sewer | Republic Service | | $ 105.49 | $ 66.16 | $ 59.84 | $94.45 | $ 81.49 |
| | | Cable | Cox | | $ 225.00 | $ 225.00 | $ 225.00 | $225.00 | $ 225.00 |
| | | Internet | | | | | | | |

|  | | | | | | | | TOTAL: | $ 1,642.42 |

Silver Rock Recovery - Utility Deposits

| ENTITY | Location | Utility | Name | Security Deposits | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | Avg. monthly Amt. |
|---|---|---|---|---|---|---|---|---|---|
| **SILVER ROCK RECOVERY** | **4011 McLeod Drive** | Phone | | | | | | | |
| | | Gas | Southwest Gas | | $ 325.27 | $ 275.63 | $ 218.24 | $ 221.86 | $ 260.25 |
| | | Electricity | NV Energy | | $ 1,389.72 | $ 1,435.34 | $ 1,446.59 | $ 1,386.46 | $ 1,414.53 |
| | | Water | LVVWD | | $ 1,146.55 | $ 1,817.58 | $ 1,389.88 | $ 824.29 | $ 1,294.58 |
| | | Sewer | Republic Service | | $ 1,837.01 | $ 1,799.71 | $ 1,748.71 | $ 1,693.20 | $ 1,769.66 |
| | | Cable | Direct TV | | $ 353.37 | $ 353.37 | $ 353.37 | $ 353.37 | $ 353.37 |
| | | Internet | Cox | | $ 155.40 | $ 155.40 | $ 155.40 | $ 155.40 | $ 155.40 |
| **SILVER ROCK RECOVERY** | **2060 Pama Lane** | Phone | | | | | | | |
| | | Gas | Covered by Landlord CAM Fees | | | | | | |
| | | Electricity | NV Energy | | $ 249.81 | $ 246.33 | $ 231.82 | $ 368.48 | $ 274.11 |
| | | Water | Covered by Landlord CAM Fees | | | | | | |
| | | Sewer | Republic Service | | $ 510.30 | $ 510.30 | $ 510.30 | $ 510.30 | $ 510.30 |
| | | Cable | | | | | | | |
| | | Internet | Cox | | $ 80.40 | $ 80.40 | $ 80.40 | $ 80.40 | $ 80.40 |

TOTAL: $ 6,112.59

Sure Haven, Inc. - Utility Deposits

| ENTITY | Location | Utility | Name | Security Deposits | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | Avg. monthly Amt. |
|---|---|---|---|---|---|---|---|---|---|
| SURE HAVEN | 2729 Bristol Street | Phone | | | | | | | |
| | | Gas | | | | | | | |
| | | Electricity | So Cal Edison | | $ 1,734.68 | $ 1,821.79 | $ 1,876.98 | $ 1,736.65 | $ 1,792.53 |
| | | Water | Mesawater Distric | | $ 584.53 | $ 542.24 | $ 375.64 | $ 262.04 | $ 441.11 |
| | | Sewer | Waste Management | | $ 700.16 | $ 701.13 | $ 701.95 | $ 700.11 | $ 700.84 |
| | | Cable | | | | | | | |
| | | Internet | Telepacific Communications | | $ 4,256.89 | $ 4,676.48 | $ 2,905.94 | $ 2,616.43 | $ 3,613.94 |
| SURE HAVEN | 725 Center Street, Units A & B | Phone | | | | | | | |
| | | Gas | So Cal Gas | | $ 15.96 | $ 16.74 | $ 19.89 | $ 19.89 | $ 18.12 |
| | | Electricity | So Cal Edison | | $ 117.14 | $ 135.76 | $ 127.61 | $ 118.75 | $ 124.82 |
| | | Water | Mesawater Distric | | $ 103.23 | $ 109.24 | $ 98.54 | $ 80.92 | $ 97.98 |
| | | Sewer | CR&R Incorporated | | $ 120.00 | $ 120.00 | $ 120.00 | $ 120.00 | $ 120.00 |
| | | Cable | Time Warner | | $ 584.15 | $ 584.15 | $ 584.15 | $ 584.15 | $ 584.15 |
| | | Internet | | | | | | | |
| SURE HAVEN | 3072 Madison Avenue | Phone | | | | | | | |
| | | Gas | So Cal Gas | | $ 79.90 | $ 40.11 | $ 17.32 | $ 18.48 | $ 38.95 |
| | | Electricity | So Cal Edison | | $ 229.05 | $ 269.33 | $ 246.58 | $ 204.70 | $ 237.42 |
| | | Water | Mesawater Distric | | $ 127.80 | $ 117.78 | $ 175.04 | $ 160.56 | $ 145.30 |
| | | Sewer | | | | | | | |
| | | Cable | Time Warner | | $ 406.08 | $ 406.08 | $ 406.08 | $ 406.08 | $ 406.08 |
| | | Internet | | | | | | | |
| SURE HAVEN | 3073 Madison Avenue | Phone | | | | | | | |
| | | Gas | So Cal Gas | | $ 113.62 | $ 80.21 | $ 20.41 | $ 9.60 | $ 55.96 |
| | | Electricity | So Cal Edison | | $ 411.48 | $ 143.68 | $ 91.25 | $ 45.14 | $ 172.89 |
| | | Water | Mesawater Distric | | $ 310.32 | $ 131.89 | $ 70.06 | $ 61.20 | $ 143.37 |
| | | Sewer | CR&R Incorporated | | $ 48.00 | $ 48.00 | $ 48.00 | $ 48.00 | $ 48.00 |
| | | Cable | Time Warner | | $ 391.03 | $ 391.03 | $ 391.03 | $ 423.07 | $ 399.04 |
| | | Internet | | | | | | | |
| SURE HAVEN | 3125 Pierce Avenue | Phone | | | | | | | |
| | | Gas | So Cal Gas | | $ 20.00 | $ 8.95 | $ 8.68 | $ 7.67 | $ 11.33 |
| | | Electricity | So Cal Edison | | $ 99.03 | $ 69.50 | $ 67.59 | $ 36.92 | $ 68.26 |
| | | Water | Mesawater Distric | | $ 110.72 | $ 118.28 | $ 38.12 | $ 43.50 | $ 77.66 |
| | | Sewer | | | | | | | |
| | | Cable | Directv | | | | | | |
| | | Internet | Time Warner | | $ 354.62 | $ 354.62 | $ 354.62 | $ 354.62 | $ 354.62 |
| | 3129 Pierce Avenue | Phone | | | | | | | |
| | | Gas | So Cal Gas | | $ 16.57 | $ 7.51 | $ 5.93 | $ 4.77 | $ 8.70 |

Sure Haven, Inc. - Utility Reports

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SURE HAVEN** | | Electricity | So Cal Edison | $ | 65.85 | $ | 56.55 | $ | 58.89 | $ | 15.86 | $ | 49.29 |
| | | Water | Mesawater Distric | $ | 134.82 | $ | 128.39 | $ | 135.22 | $ | 148.25 | $ | 136.67 |
| | | Sewer | CR&R Incorporated | $ | 48.00 | $ | 48.00 | $ | 48.00 | $ | 48.00 | $ | 48.00 |
| | | Cable | Directv | $ | 380.15 | $ | 380.15 | $ | 380.15 | $ | 380.15 | $ | 380.15 |
| | | Internet | Time Warner | $ | 134.99 | $ | 134.99 | $ | 134.99 | $ | 134.99 | $ | 134.99 |
| **SURE HAVEN** | **697 Plumer Street** | Phone | | | | | | | | | | | |
| | | Gas | So Cal Gas | $ | 97.30 | $ | 112.08 | $ | 92.72 | $ | 84.25 | $ | 96.59 |
| | | Electricity | So Cal Edison | $ | 168.00 | $ | 360.14 | $ | 224.70 | $ | 195.21 | $ | 237.01 |
| | | Water | Mesawater Distric | $ | 208.91 | $ | 166.71 | $ | 123.47 | $ | 160.56 | $ | 164.91 |
| | | Sewer | | | | | | | | | | | |
| | | Cable | Directv | $ | 203.97 | $ | 203.97 | $ | 203.97 | $ | 203.97 | $ | 203.97 |
| | | Internet | Time Warner | $ | 189.99 | $ | 189.99 | $ | 189.99 | $ | 189.99 | $ | 189.99 |
| **SURE HAVEN** | **2900 Bristol Street, Suite B300** | Phone | Ring Central | $ | 4,486.50 | $ | 4,687.00 | $ | 2,897.94 | $ | 2,897.34 | $ | 3,742.20 |
| | | Cell Phone | Verizon | $ | 6,799.20 | $ | 11,983.23 | $ | 4,965.75 | $ | 4,913.96 | $ | 7,165.54 |
| | | Gas | | | | | | | | | | | |
| | | Electricity | So Cal Edison | $ | 944.19 | $ | 861.93 | $ | 799.40 | $ | 662.77 | $ | 817.07 |
| | | Water | | | | | | | | | | | |
| | | Sewer | | | | | | | | | | | |
| | | Cable | Time Warner | $ | 485.00 | $ | 485.00 | $ | 485.00 | $ | 485.00 | $ | 485.00 |
| | | Internet | | | | | | | | | | | |

**TOTAL:**                          $         23,512.40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "3"

[Summary of Insurance Policies]

**Solid Landings Behavioral Health, Inc., *et al.***
**Summary of Insurance Policies 2017-2018**

| Coverage Type | Policy Period | Policy Number | Carrier | Annual Premium** | Premium Payment Structure | Deductible | Limits of Insurance |
|---|---|---|---|---|---|---|---|
| Property | 3/01/2017 - 3/01/2018 | 01LX0664179341 | New Hampshire Insurance Co. (NSM) | $9,579.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $1,000 | $2,700,000 Blkt Building<br>$435,000 Blkt Personal Property<br>$2,400,000 Blkt Bus Income with Extra Expense |
| General Liability | 3/01/2017 - 3/01/2018 | 01LX0664179341 | New Hampshire Insurance Co. (NSM) | $20,692.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $1,000 (applies to Employee Benefits Liability Coverage Only) | $3M Prod/Comp Ops Agg & Gen Agg<br>$1M Bodily Injury & Prop Damage<br>$100k Damage to Rented Premises<br>$1M Pers/Adv Injury<br>$5k Med Payments<br>(PL/GL are Occurrence) |
| Professional Liability | 3/01/2017 - 3/01/2018 | 01LX0664179341 | New Hampshire Insurance Co. (NSM) | $20,213.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $0 | $1M Each Wrongful Act<br>$3M Aggregate |
| Crime | 3/01/2017 - 3/01/2018 | 01LX0664179341 | New Hampshire Insurance Co. (NSM) | $1,127.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $1,000 | $100k Employee Theft |
| Inland Marine | 3/01/2017 - 3/01/2018 | 01LX0664179341 | New Hampshire Insurance Co. (NSM) | $253.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $1,000 | $13,000 for all Covered Property in any one "loss" at all locations |
| Automobile/Ambulances | 3/01/2017 - 3/01/2018 | 02CA0699683740 | Granite State Insurance Company (NSM) | $88,658.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $500 Comp/Coll | $1M Covered Autos<br>$5k Auto Medical Payments<br>$1M Uninsured Motorists<br>Comp/Coll ACV minus Deductible |
| Umbrella Liability | 3/01/2017 - 3/01/2018 | 29UD0428670301 | National Union Fire Insurance Co of PA (AIG) | $58,457.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | Retained Limit: $10,000 | $10M ea Occ/Gen agg/Prod-Comp Ops |
| Cyber Liability | 3/3/2017 - 3/3/2018 | ESF02242453 | Lloyd's of London | $23,994.00 | Premiums Financed through First Insurance Funding Acct #900-3080637 | $25,000 | $1,000,000 Cyber and Privacy<br>$1,000,000 Breach Notification Costs<br>$1,000,000 Cyber Threats and Extortion<br>$250,000 Computer Crime and Identity Theft |
| Professional Liability / General Liability / Abuse (EMS Toxicology) | 12/14/2016 - 12/14/2017 | CE16HCP055829NC | Navigators Specialty Insurance Company (CRC) | $5,195.00 | Premium Paid | $0 | **PL - Claims Made**<br>$1,000,000 each Claim/$3,000,000 Aggregate<br><br>**GL - Occurrence**<br>$1,000,000 per Occ./$3,000,000 Aggregate<br>$1,000,000 Damage to Premises/Pers. Adv. Injury<br>$5,000 Medical Payments |
| Total Premium | | | | $237,012.00 | | | |

1
2
3
4
5
6

# EXHIBIT "4"

[Pre-Petition Insurance Premium Financing Agreement]

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LENDER:

**COMMERCIAL**
**PREMIUM FINANCE AGREEMENT**

450 Skokie Blvd, Ste 1000

FIRST INSURANCE
— OF CALIFORNIA — FUNDING

Northbrook, IL 60062-7917
P:(800) 837-2511 F:(800) 837-3709
www.firstinsurancefunding.com

A WINTRUST COMPANY

**Quote #: 10451888**

| **INSURED/BORROWER** (Name and Address as shown on Policy) | Customer ID: N/A | **AGENT or BROKER** (Name and Business Address) |
|---|---|---|
| Sure Haven Inc DBA Rock Solid Recovery<br>2900 Bristol Street<br>Suite B300<br>Costa Mesa, CA 92626 | | DENVER SERIES OF LOCKTON COMPANIES LLC<br>8110 E UNION AVE STE 700<br>DENVER, CO 80237 |

## LOAN DISCLOSURE

| Total Premiums, Taxes and Fees | Cash Down Payment | Unpaid Premium Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 222,973.00 | $1,668.79 | 171,304.21 | 0.00 | 171,304.21 | 4,108.67 | 175,412.88 | 5.720 % |

*YOUR PAYMENT SCHEDULE WILL BE:*   Mail Payments to: FIRST Insurance Funding Corp., PO Box 7000, Carol Stream, IL 60197-7000

| Number of Payments | Amount of Each Payment | First Installment Due | 04/01/2017 |
|---|---|---|---|
| 9 | 19,490.32 | Installment Due Dates | 1st (Monthly) |

**SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns LENDER a security interest in the financed policies and any additional premiums required under the financed policies, including (but only to the extent permitted by applicable law) all return premiums, dividend payments (not applicable in KY), and loss payments which reduce unearned premium, subject to any mortgagee or loss payee interest. If any circumstances exist in which premiums related to any financed policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.
**FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the policies listed in the Schedule of Policies. The finance charge may include a nonrefundable service charge equal to the maximum amount permitted by law($10 in AK, DE, NY & PA; $25 in NV; $12 in NJ; $15 in NC, RI & VA; $16 in MA; $20 in FL). The finance charge is computed using a 365-day calendar year.
**LATE PAYMENT.** A late charge will be assessed on any installment at least 5 days in default (7 days in VA; 10 days in MA & TX; or later date as required by law.). This late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less (greater of $10 or 5% in FL; greater of $25 or 1.5% in NJ; $5 maximum in DE, MT and ND; $100 maximum in MD; 5% in VA).
**PREPAYMENT.** Insured is entitled to a refund of the unearned finance charge if the loan is prepaid in full. The refund shall be computed according to applicable law. In VA the refund shall be calculated using the short rate method. In CA the rebate is in compliance with Cal Fin Code § 18629.

### SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| 01LX0664179341 | C00129-NEW HAMPSHIRE INSURANCE CO<br>G00071-NSM INSURANCE GROUP<br>[CX:0]  [AU, PR] | PKG | 12 | 03/01/2017<br>ERN TXS/FEES<br>FIN TXS/FEES | 51,864.00<br>0.00<br>0.00 |
| 02CA0699683740 | C00066-GRANITE STATE INSURANCE CO<br>G00071-NSM INSURANCE GROUP<br>[CX:0]  [PR] | AUTO | 12 | 03/01/2017<br>ERN TXS/FEES<br>FIN TXS/FEES | 88,658.00<br>0.00<br>0.00 |
| (Policies continued on next page.) | | | | TOTAL | 222,973.00 |

Q# 10451888, PRN: 030617, CFG: 0Internal - No Restrictions, RT: A05263-15, DD: 15, BM: Invoice, Qtd For: A05263 Original, Memo 1
**INSURED'S AGREEMENT:**
1. In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies, their representative or the Agent or Broker listed above, Insured promises to pay, to the order of LENDER, the Total of Payments subject to all of the provisions of this Agreement.
2. **POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (i) cancel the financed policies in accordance with the provisions contained herein, (ii) receive all sums assigned to LENDER, and (iii) execute and deliver on behalf of Insured all documents relating to the insurance policies listed on the Schedule of Policies ("Financed Policies") in furtherance of this Agreement (clauses (ii) and (iii) are not applicable in Florida).  This right to cancel will terminate only after Insured's indebtedness under this Agreement is paid in full.
3. **SIGNATURE & ACKNOWLEDGEMENT.** Insured has signed and received a copy of this Agreement.  If Insured is not an individual, the undersigned is authorized to sign this Agreement on behalf of Insured.  All named Insured(s), jointly and severally if more than one, agree to all provisions set forth in this Agreement. Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.
**NOTICE TO INSURED:** (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space. (2) You are entitled to a completely filled-in copy of this Agreement. (3) Under the law, you have the right to pay off in advance the full amount due and under certain conditions to receive a partial refund of the finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.
4. **EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER.

Signature of Insured or Authorized Agent    Date: 3/9/17

FEIN or SSN  XX-XXX3961

Signature of Agent: Mary E Bode    Date: 3/9/17
The undersigned hereby warrants and agrees to the Agent or Broker Representations and Warranties set forth herein.

FIF0216P

Insured:  Sure Haven Inc DBA Rock !

## ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT

Quote #: 10451888

**5. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) a payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement; provided, however, when required by law, Insured may be deemed in default only under clause (a) above. Clauses (b) and (c) are not applicable in FL, MD, NV, NC or VA. At any time after default, LENDER can demand and has the right to receive immediate payment of the total unpaid amount due under this Agreement even if LENDER has not received any refund of unearned premium. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in cancellation of the Financed Policies, Insured agrees to pay a cancellation charge where allowed by law (not permitted in AK, FL, KS, KY, NV, NY, NC, PA, SC, TX or VA). If cancellation or default occurs, where permitted by law, Insured agrees to pay LENDER interest on the balance due at the contract rate or at the maximum lawful rate, whichever is less, until the balance is paid in full or until such other date as provided by law.

**6. LIMITATION OF LIABILITY. Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER, except in KY.**

**7. RETURNED CHECK CHARGE.** If Insured's check is dishonored for any reason and if permitted by law, Insured will pay LENDER a returned check charge equal to the maximum fee permitted by law ($0 in KY; $15 in FL & NV; $20 in VA; maximum of $25 in MD).

**8. REINSTATEMENT.** Once a Notice of Cancellation has been sent to any insurance company, LENDER has no duty to ask that the Financed Policy be reinstated, even if LENDER later receives a payment from Insured. If LENDER requests reinstatement, such request does not guarantee coverage will be reinstated by the insurance company. Payments that LENDER receives after sending a Notice of Cancellation may be applied to Insured's account without changing any of LENDER's rights under this Agreement.

**9. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER (in VA, only to this Agreement). Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation will be credited to the balance due with any excess paid to Insured; the minimum refund is the greater of $1.00 or the minimum amount allowed by law (no minimum in VA). Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the financed policies.

**10. ASSIGNMENT.** Insured may not assign any Financed Policy without LENDER's written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**11. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the policies or through whom the policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker may receive from LENDER $2,141.30 for aiding in the administration of this Agreement relating to the Financed Policies (not applicable in VA), and in NY the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**12. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes (not permitted in KY or MD).

**13. GOVERNING LAW.** This Agreement is governed by and interpreted under the laws of the state where Insured resides, except for conflict of laws principles thereof. If any court finds any part of this Agreement to be invalid, such finding shall not affect the remaining provisions of this Agreement.

**14. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge (i) the Financed Policies are in full force and effect and that Insured has not and will not assign any interest in the policies except for the interest of mortgagees and loss payees, (ii) that none of the Financed Policies are for personal, family or household purposes, (iii) the Cash Down Payment and any past due payments have been paid in full to the Agent or Broker in cash or other immediately available funds, (iv) all information provided herein or in connection with this Agreement is true, correct, complete and not misleading, (v) Insured is not insolvent nor presently involved in any insolvency proceeding, (vi) Insured has no indebtedness to the insurers issuing the Financed Policies, and (vii) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of such policies.

**15. ADDITIONAL PREMIUMS.** Insured agrees to fully and timely comply with all audits and pay to the insurance company any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. Insured, or Agent/Broker, may request that LENDER finance additional policies and/or additional premium during the term of this Agreement, and if LENDER agrees, this Agreement shall be deemed amended accordingly. Should LENDER assign an account number to further extensions of credit, then a) this Agreement and loan documents identified by the assigned account number(s) shall be deemed to comprise a single and indivisible loan transaction, b) Insured shall irrevocably appoint LENDER as its attorney in fact in connection with additional amount financed, c) default under any component of the transaction shall constitute a default under the entire transaction, and d) unearned premium relating to any component of the transaction may be collected and applied to the entire loan transaction balance.

**16. CORRECTIONS.** LENDER may insert the names of the insurance companies and policy numbers, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement (not applicable in KY or VA).

**17. NON-WAIVER.** Not Applicable.

**18. THIRD PARTY FEE.** Not Applicable.

**19. ELECTRONIC STATEMENT AND NOTICE DELIVERY. By executing this Agreement, Insured agrees to receive all billing statements, notices, and other communications via electronic delivery in PDF format as permitted by applicable law. It is Insured's responsibility to provide LENDER with true, accurate, and complete e-mail and contact information related to this Agreement and to maintain and update promptly any changes to this information. If Insured wishes to (i) opt out of electronic statement and notice delivery, or (ii) update contact information, Insured can log into Insured's account on www.firstinsurancefunding.com or call (800) 837-2511.**

---

Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that is granted a loan. LENDER will require such information as LENDER deems reasonably necessary for proper identification, such as your name, street address, FEIN, SSN or date of birth. LENDER will use this information only to process this Agreement and will not share this information with outside parties except to the extent necessary to complete this transaction.

## AGENT OR BROKER REPRESENTATIONS AND WARRANTIES

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, Insured's signature is genuine, and the cash down payment has been received from Insured, (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the policies listed in the Schedule of Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will hold harmless and indemnify LENDER and its successors and assigns against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

NC License #482.   CA License #1850.   VA License #PF146.   California Borrowers:  **FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL INSTITUTIONS, STATE OF CALIFORNIA**

FIF0216P

**SCHEDULE OF POLICIES**

Insured:  Sure Haven Inc DBA Rock
Quote #: 10451888

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| 29UD0428670301 | C00069-NATIONAL UNION FIRE INS CO PA<br>G00071-NSM INSURANCE GROUP<br>[CX:0]   [PR] | UMB | 12 | 03/01/2017<br>ERN TXS/FEES<br>FIN TXS/FEES | 58,457.00<br>0.00<br>0.00 |
| ESF02242453 | C00005-LLOYDS OF LONDON<br>G02718-LOCKTON COMPANIES LLP<br>[CX:0]   [PR] | CY LIAB | 12 | 03/01/2017<br>ERN TXS/FEES<br>FIN TXS/FEES | 22,750.00<br>500.00<br>744.00 |

FIF0214P-SCH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "5"

[Initial Approved Budget]

**Solid Landings Behavioral Health, Inc.**

DIP Budget

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| Loan +/(-) Ckg balance at the start of each week: | (9,988,407) | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (9,988,407) |
| **Collections** | | | | | | | | | | | |
| Collection of receivables-clinical | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| Deductibles and Copayments | - | - | - | - | - | - | - | - | - | - | - |
| Collection of receivables-lab | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 150,000 |
| DIP Financing Advance, net | - | | | | | | | | | | - |
| **Total Collections** | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 1,150,000 |
| **Disbursements** | | | | | | | | | | | |
| 1 Salaries, Wages  PR Tax & WC Ins, health & other benefits (PEO pre-funding) | 100,000 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 915,400 |
| 2 Treatment Expense | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 62,811 |
| 3 Electronic Medical Records & IT Services | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 144,000 |
| 4 Contract Services - Clinical Staff | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 108,842 |
| 5 Lab Expense | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 30,056 |
| 6 Supplies & Food | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 7 Other Operating Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 8 Business Insurance | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 175,000 |
| 9 State & County taxes (Franchise, Income, property, etc.) | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 20,379 |
| 10 Postage & office supplies | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 12,500 |
| 11 Rent | 183,700 | | | | 183,700 | | | | | 183,700 | 551,100 |
| 12 Utilities (incl. deposits) | 48,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 129,000 |
| 13 Marketing | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 334,516 |
| 14 House and Equipment R&M | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 15 Pro Serv fees (incl CRO, Bankruptcy Counsel & Oth Legal) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 300,000 |
| 16 License and fees | - | - | - | - | - | - | - | - | - | - | - |
| 17 Misc. Items | - | - | - | - | - | - | - | - | - | - | - |
| 18 Travel, meals & accommodations | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

**Solid Landings Behavioral Health, Inc.**

**DIP Budget**

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| 19 Bank Interest | | | | | 86,708 | | | | 92,744 | | 179,452 |
| 20 Bank fees | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |
| 21 Auto leases & operating expenses | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 22 Other financing items | - | - | - | - | - | - | - | - | - | - | - |
| 23 CapEx | - | - | - | - | - | - | - | - | - | - | - |
| 24 Items not anticipated | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,000 |
| 26 Trustee Fees | - | - | - | - | - | - | | | 32,500 | - | 32,500 |
| **Total disbursements** | **462,510** | **230,410** | **230,410** | **230,410** | **500,818** | **230,410** | **230,410** | **230,410** | **355,655** | **414,110** | **3,115,556** |
| Net weekly cash | (347,510) | (115,410) | (115,410) | (115,410) | (385,818) | (115,410) | (115,410) | (115,410) | (240,655) | (299,110) | (1,965,556) |
| Loan +/(-) Ckg balance at week end | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (11,953,964) | (11,953,964) |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT "6"</u>**

[DIP Stipulation]

1    BUCHALTER, a Professional Corporation
     Jeffrey K. Garfinkle CA Bar #153496
2    E-mail: *jgarfinkle@buchalter.com*
     18400 Von Karman Avenue
3    Suite 800
     Irvine, CA 92612
4    Telephone: (949-760-1121)

5    BURR & FORMAN LLP
     David W. Houston IV TN Bar #020802
6    J. Patrick Warfield TN Bar #30502
     E-mail:*dhouston@burr.com*
7    Email: *pwarfield@burr.com*
     511 Union Street, Suite 2300
8    Nashville, TN  37219
     Telephone: (615) 724-3200
9    Facsimile: (615) 724-3290

10
     Attorneys for CAPSTAR BANK
11

12              **UNITED STATES BANKRUPTCY COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                   **SANTA ANA DIVISION**

15   IN RE:                          )   Case No. 8:17-bk-12213-CB
                                      )
16   **SOLID LANDINGS BEHAVIORAL**    )   Joint Administration Proposed With:
     **HEALTH, INC.; CEDAR CREEK**    )   Case No. 8:17-bk-12218-CB
17   **RECOVERY, INC.; EMS TOXICOLOGY;** )   Case No. 8:17-bk-12221-CB
     **SILVER ROCK RECOVERY; and SURE** )   Case No. 8:17-bk-12222-CB
18   **HAVEN, INC.,**                 )   Case No. 8:17-bk-12223-CB
                                      )
19           **Debtors.**             )
                                      )   **STIPULATION RE: DEBTOR- IN -**
20                                    )   **POSSESSION FINANCING AND USE**
                                      )   **OF CASH COLLATERAL**
21                                    )
                                      )   Date:      June 5, 2017
22                                    )   Time:      2:00 p.m.
                                      )   Place:     Courtroom "5D"
23                                    )              411 West Fourth Street
                                      )              Santa Ana, California
24                                    )
                                      )
25                                    )
                                      )
26   ─────────────────────────────── )

27

28

This **STIPULATION RE: DEBTOR IN POSSESSION FINANCING AND USE OF CASH COLLATERAL** ("Stipulation"), dated as of June 1, 2017, is made and entered into on the terms and conditions hereinafter set forth, by and among SOLID LANDINGS BEHAVIORAL HEALTH, INC., a California corporation, CEDAR CREEK RECOVERY, INC., a Texas corporation, EMS TOXICOLOGY, a Nevada corporation, SILVER ROCK RECOVERY, a Nevada corporation, and SURE HAVEN, INC., a California corporation, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors," each individually a "Debtor"), and CAPSTAR BANK, a Tennessee state-chartered banking corporation ("CapStar" or the "Pre-Petition Secured Lender").

## R E C I T A L S:

(A)    On June 1, 2017 ("Petition Date"), Debtors each commenced a voluntary Chapter 11 case, proposed jointly administered in the SOLID LANDINGS BEHAVIORAL HEALTH, INC. Chapter 11 case (with the SOLID LANDINGS BEHAVIORAL HEALTH, INC. case being the "Lead Chapter 11 Case," and the proposed jointly administered cases of Debtors, being collectively the "Chapter 11 Cases," with each individually being a "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). No Trustee (as defined below) or committee has been appointed and Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

(B)    Prior to the petition date, CapStar provided financing to Debtors pursuant to, among other documents and instruments: (1) a *Loan and Security Agreement* among CapStar, Debtors and certain non-debtor affiliates of the Debtors and Guarantors (as defined below), dated as of November 20, 2015 ("Loan Agreement")[1]; and (2) the *Revolving Note* issued jointly and severally by Debtors to the order of CapStar in the principal sum of $7,500,000, dated as of November 20, 2015 ("Note").

---

[1] Although not specifically described herein, these non-debtor affiliates of Debtors are also parties to certain other Pre-Petition Loan Documents (such as the Note, the Forbearance Agreement, *et cetera*).

2

(C)     In order to ensure repayment of their obligations to CapStar, Debtors granted CapStar a first-priority perfected security interest in substantially all of Debtors' assets ("Pre-Petition Collateral"), documented in the Loan Agreement, among other documents. CapStar perfected its security interest in the Pre-Petition Collateral, among other means, by filing UCC-1 financing statements with the Secretaries of State of the Debtors' respective states of incorporation (California, Nevada and Texas).  In order to further ensure a repayment of the obligations, the Debtors' shareholders, Mark Shandrow, Steve Fennelly, and Elizabeth Perry (collectively, the "Guarantors"), executed written guaranties dated November 20, 2015 ("Guaranties") and pledged 100% of their ownership interests pursuant to several *Pledge and Security Agreements* dated August 30, 2016, and Stock Powers, for Silver Rock Recovery, EMS Toxicology, LLC, and Cedar Creek Recovery, Inc. (collectively, the "Stock Pledge Documents").

(D)     The Debtors and CapStar are also parties to that certain *Forbearance Agreement* dated as of August 30, 2016 ("Original Forbearance Agreement"), as amended by that certain *First Amendment to Forbearance Agreement* dated as of September 14, 2016 ("First Amendment"), and further amended by that certain *Second Amendment to Forbearance Agreement* dated as of December 22, 2016 ("Second Amendment"), pursuant to which CapStar agreed to forbear, subject to certain terms and conditions, from exercising its remedies under the Pre-Petition Loan Documents (as defined below).

(E)     Contemporaneously with the Original Forbearance Agreement, Debtors executed that certain *Amended and Restated Revolving Note* in the original principal amount of $9,200,000, payable to the order of CapStar ("Amended Note").

(F)     On or around December 22, 2016, Debtors and CapStar entered into that certain *Letter Agreement* regarding a $345,000 Overadvance ("Letter Agreement").

(G)     On January 31, 2017, Debtors and CapStar entered into a *Third Amendment to Forbearance Agreement* ("Third Amendment" collectively with the Original Forbearance Agreement, First Amendment, and Second Amendment, as the same heretofore has been amended, restated, supplemented, extended, renewed, replaced or otherwise modified from time to time, the "Forbearance Agreement")). The Third Amendment terminated by its terms on February 15, 2017.

(H)    The Loan Agreement, Note, Trademark Security Agreement, Forbearance Agreement, Amended Note, Stock Pledge Documents, Guaranties, plus all other documents related thereto or executed in connection therewith, are collectively referred to as the "Pre-Petition Loan Documents,"[2] with each individually being referred to as a "Pre-Petition Loan Document." The obligations, including the Indebtedness (as defined below), and duties owed by Debtors, among others, under the Pre-Petition Loan Documents, are referred to herein as the "Pre-Petition Obligations." The liens and security interests granted under the Pre-Petition Loan Documents are referred to herein as the "Pre-Petition Liens."

(I)    Under the Pre-Petition Loan Documents, Debtors and Guarantors, jointly and severally, are justly indebted to CapStar in a principal amount of not less than $10,296,266.99 as of May 30, 2017, plus interest, costs, and expenses (including professional and attorney fees and expenses), which continue to accrue under the Pre-Petition Loan Documents ("Indebtedness").

(J)    The Debtors have requested, subject to Bankruptcy Court approval, and CapStar (also known as the "DIP Lender") has agreed: (1) to provide post-petition debtor-in-possession financing ("DIP Financing"); and (2) to consent to Debtors' use of the Pre-Petition Secured Lender's cash collateral (as that term is defined in section 363 of the Bankruptcy Code, the "Cash Collateral") for the purposes described in the operating budget attached hereto as **Exhibit "B"** (the Budget) until the occurrence of an Event of Default (as defined below) and subject to the terms and conditions set forth herein.

WHEREFORE, Debtors and CapStar hereby stipulate and agree as follows:

## **AGREEMENT**

1.    Accuracy of Recitals.  The foregoing recitals are true and correct and are binding for all purposes upon Debtors and any succeeding Chapter 11 or Chapter 7 Trustee.

2.    DIP Financing.  The parties hereby agree on the following findings related to the DIP Financing and Debtors' use of the Pre-Petition Collateral, which includes the Cash Collateral:

---

[2] Unless otherwise defined herein or cross-referenced to another document, all capitalized terms have such meaning as set forth in the DIP Credit Agreement (as defined herein).

4

(a)    Good cause has been shown for the entry of an order approving this Stipulation.

(b)    The Debtors require post-petition financing and continued use of the Pre-Petition Collateral, including the Cash Collateral, in order to, among other things, fund their operations and pay for the costs and expenses related to the administration of the Chapter 11 Cases. Absent granting the relief set forth in this Order, Debtors' estates and their businesses will be immediately and irreparably harmed.

(c)    The Debtors are unable to obtain financing on more favorable terms and conditions from sources other than DIP Lender pursuant to, and for the purposes set forth in, the DIP Financing Documents (as defined below) and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors also are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) without granting priming liens under Bankruptcy Code section 364(d)(1) and a DIP Super-Priority Claim (as defined below) on the terms and conditions set forth in this Stipulation and the DIP Financing Documents.

(d)    The terms upon which Debtors will be permitted to continue to use Cash Collateral and the terms of the DIP Financing pursuant to this Stipulation and DIP Financing Documents: (1) are fair and reasonable; (2) reflect Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (3) constitute reasonably equivalent value and fair consideration.

(e)    The Pre-Petition Secured Lender has consented to, conditioned upon the entry of interim and final orders approving this Stipulation, Debtors' entry into the DIP Financing Documents (as defined below), including the granting of priming liens and claims in connection therewith, and the continued use of Cash Collateral, on the terms and conditions set forth in this Stipulation.

(f)    The DIP Financing Documents and the terms for the use of the Pre-Petition Collateral, including the Cash Collateral, have been the subject of negotiations conducted in good faith and at arms' length among Debtors and DIP Lender. The DIP Obligations (as defined below),

5

and this Stipulation, upon Court approval, are deemed to have been extended by DIP Lender in "good faith" as such term is used in Bankruptcy Code sections 363(m) and 364(e), and in express reliance upon the protections set forth therein, and the DIP Lender is entitled to the full protections of Bankruptcy Code sections 363(m) and 364(e) in the event that this Stipulation, following Court approval, or any provision hereof or order related thereto is vacated, reversed, or modified on appeal or otherwise.

3.    Authorization of the DIP Loan and the DIP Financing Documents.

(a)    Upon entry of interim and final orders granting this Stipulation, the DIP Financing Documents are approved without further action from this Court. Upon entry of an interim order granting this Stipulation, Debtors are authorized and empowered to enter into and perform under the DIP Financing Documents and to borrow, subject to the terms and conditions of this Stipulation and the DIP Financing Documents, against the DIP Loan (as defined below) in an aggregate principal amount not to exceed $2,000,000.00 solely for the purposes specified in that certain *Debtor-in-Possession Loan and Security Agreement* attached hereto as **Exhibit "A"** (the "DIP Credit Agreement"). The DIP Credit Agreement, along with all other documents or agreements associated therewith and executed in connection therewith, are collectively referred to herein as the "DIP Financing Documents," with each individually being a "DIP Financing Document." The obligations and duties owed by Debtors under this Stipulation, including any order associated therewith, and the DIP Financing Documents, are referred to herein as the "DIP Obligations." The loans and extensions of credit owed by Debtors under the DIP Financing Documents, including all principal, interest, fees (including professional and attorney fees and expenses), and other charges, are referred to herein as the "DIP Loan."

(b)    Further, following entry of interim and final orders granting this Stipulation, and without further approval of this Court, each Debtor is authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified) and to execute and deliver all instruments and documents that DIP Lender determines to be reasonably required or necessary for Debtors' performance of their obligations under the DIP Financing Documents, including without limitation:

6

1    (i) the execution, delivery, and performance of the DIP Financing Documents;

2    (ii) any fees, costs, and expenses as may be due from time to time as provided

3 in this Stipulation and the DIP Financing Documents, including, but not limited to,

4 reasonable attorneys' fees and expenses and the fees and expenses of financial advisors,

5 consultants, and other professionals as provided in the DIP Financing Documents;

6    (iii) the granting of all liens, allowance of all claims, and the making of any

7 payments with respect to the Adequate Protection Obligations (as defined herein) to the

8 extent provided for in this Stipulation; and

9    (iv) the performance of all other acts required under or in connection with this

10 Stipulation and/or the DIP Financing Documents.

11   (c) Upon entry of a final order granting this Stipulation, the DIP Financing

12 Documents constitute legal, valid, binding, and non-avoidable obligations of Debtors, enforceable

13 against each of the Debtors and their respective bankruptcy estates in accordance with the terms of

14 this Stipulation and the DIP Financing Documents. The failure to specifically include any

15 particular provision of the DIP Financing Documents in this Stipulation does not diminish or

16 impair the efficacy of such provision, it being the intent of Debtors and CapStar, Pre-Petition

17 Secured Lender, and the DIP Lender (collectively with CapStar and Pre-Petition Secured Lender,

18 the "Lender Parties," each individually a "Lender Party") that the DIP Financing Documents be

19 authorized and approved in their entirety.

20   (d) No obligation, payment, transfer or grant of security or allowance of any

21 super-priority claim by Debtors under the DIP Financing Documents, this Stipulation and order

22 related thereto, or the use of any cash collateral, is subject to contest, attack, objection,

23 recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification,

24 reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the

25 Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise), or

26 other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

27

28

4.      Except as otherwise agreed to by DIP Lender, or as expressly permitted herein or in the DIP Credit Agreement, Debtors' use of the DIP Loan and Cash Collateral is only permitted pursuant to the terms of, and in accordance with, the Budget subject to any permitted variances.

5.      <u>DIP Claims and Liens</u>. Upon entry of interim and final orders approving this Stipulation, and without further approval of the Court, DIP Lender is hereby granted the following allowed claims, liens, and security interests (as described in (a) and (b) below, collectively, the "<u>DIP Claims and Liens</u>") as security for the DIP Obligations:

(a)      *DIP Super-Priority Claim*.  Pursuant to Bankruptcy Code section 364(c)(1), an allowed joint and several super-priority administrative expense claim against each Debtor on account of the DIP Obligations (collectively, the "<u>DIP Super-Priority Claim</u>"), with priority over and above any and all administrative expenses and claims asserted against any Debtor or its respective "estate" (as created pursuant to Bankruptcy Code section 541(a)), at any time existing or hereafter arising, of any kind or nature whatsoever, including, but not limited to the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject and subordinate only to the Carve-Out (as defined below).

(b)      *DIP Liens*.  Pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d), a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected first-priority senior priming lien on and security interest in (such liens and security interests, the "<u>DIP Liens</u>") on (1) all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's estate, of any kind or nature, whatsoever, whether the property is real, personal, tangible, intangible, or mixed, whether now existing or hereafter acquired or created, including without limitation, all cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance

8

proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests held by any Debtor, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, choses in action, causes of action (but excluding any pre-petition avoidance causes of action under 11 U.S.C. §§ 547 and 548, collectively referred to herein as "Avoidance Actions"), Pre-Petition Collateral, including Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, but not limited to, the products, proceeds and supporting obligations thereof, whether in existence on or before the Petition Date or thereafter created, acquired, or arising and wherever located, pursuant to 11 U.S.C. § 364(c)(2), all unencumbered pre-petition and post-petition property of each Debtor, and all present and after-acquired property of each Debtor that is subject to a lien granted or recorded on or after the Petition Date, wherever located, and all other Collateral, all of the foregoing now owned or in which any Debtor has any interest (and without regard to whether acquired prior or subsequent to the Petition Date) or hereafter acquired or in which any Debtor obtains an interest, and the products and proceeds thereof (all such property, the "DIP Collateral"), which liens and security interests are senior to any and all other liens and security interests (other than such liens and security interests as may have been duly-perfected and which were senior to the lien and security interest of CapStar prior to the Petition Date), including the Adequate Protection Liens (as defined below) and the liens and security interests granted to the Pre-Petition Secured Lender under the Pre-Petition Loan Documents, other than the Carve-Out. The DIP Liens are not: (i) subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of Debtors and their estates under Bankruptcy Code section 551, or any lien or security interest arising on or after the Petition Date, but subject to the Carve-Out; or (ii) subordinated to or made *pari passu* with, except to the extent set forth

herein, any other lien, claim, or security interest under Bankruptcy Code sections 363 or 364 or otherwise,

(c)    For purposes of this Order, "Carve-Out" means the sum of: (A) fees required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code; (B) to the extent allowed, whether by interim order, procedural order, or otherwise, reasonable fees and expenses of the Debtors' professionals (collectively, the "Professional Persons") in an amount not exceeding $150,000.00; (C) reasonable fees and expenses of any professionals of the Creditors' Committee (if one is appointed) in an amount not to exceed $50,000.00. Notwithstanding the foregoing, the Carve-Out does not include, does not apply to, and is not available for any fees or expenses incurred by any party in connection with (1) the investigation, preparation, initiation, or prosecution of any claims, causes of action, proceeding, adversary proceeding, or other litigation against any Lender Party, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations, liens and security interests granted under the Pre-Petition Loan Documents, in favor of any Lender Party, the DIP Financing Documents, or under this Stipulation, including, without limitation, for lender liability or pursuant to Bankruptcy Code section 105, 510, 544, 547, 548, 549, 550 or 552, applicable non-bankruptcy law, or otherwise; (2) attempts to modify any of the rights granted to any Lender Party under this Stipulation, including any order related thereto, or other cash collateral order; (3) any attempt to prevent, hinder, or otherwise delay any Lender Party's enforcement or realization upon any collateral in accordance with the Pre-Petition Loan Documents, the DIP Financing Documents, this Stipulation, or any other document or order in connection therewith; or (4) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court, or otherwise included in the Budget.

6.    Events of Default.  Upon entry of interim and final orders granting this Stipulation, and without further approval of this Court, each of the following constitutes an event of default (each, an "Event of Default" and collectively, the "Events of Default"):

(a)    any Debtor's failure to: (i) use the DIP Loan and DIP Collateral, including but not limited to Cash Collateral, in a manner consistent with the Budget and otherwise comply in any respect with any provision of this Stipulation and/or the DIP Financing Documents; or (ii) comply with any other covenant or agreement specified in this Stipulation or order related thereto;

(b)    the filing of an application, motion, pleading, or other document by any Debtor seeking to amend, stay, supplement, vacate, extend, or modify in any manner any Lender Party's rights or benefits granted under this Stipulation or order related thereto without such Lender Party's prior written consent;

(c)    the entry of an order reversing, amending, supplementing, extending, staying, vacating, or otherwise modifying in any manner this Stipulation without the prior written consent of the Lender Parties, which such consent may be withheld in their sole discretion and for any reason whatsoever;

(d)    any provision of this Stipulation for any reason ceases to be valid and binding or any Debtor so asserts in any filing or document filed in any court;

(e)    (i) any Chapter 11 Case of any Debtor is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor files a motion or other filing seeking the dismissal or conversion of any Chapter 11 Case pursuant to Bankruptcy Code section 1112 or otherwise; (ii) a trustee, responsible officer, or an examiner (other than a fee examiner) pursuant to Bankruptcy Code section 1104 is appointed or elected, as applicable, in any Chapter 11 Case; or (iii) any Debtor applies for, consents to, or acquiesces in, the appointment a trustee, responsible officer, or an examiner (other than a fee examiner), or the Court enters an order providing for such appointment, in any of Chapter 11 Case without the prior written consent of the Lender Parties, which can be withheld in their sole discretion and for any reason whatsoever;

(f)    the Court enters an order(s) granting relief from the automatic stay, including order(s) granting the right to foreclose (or the granting of a deed in lieu of foreclosure or the like) to any holder or holders of any security interest to proceed against, any asset of any Debtor that serves as Collateral for the obligations of the Debtors to the Lender Parties;

11

(g)     any Debtor files a motion or application for the approval of any super-priority claim, lien, or security interest in any Chapter 11 Case (other than such claim, lien, or security interest granted or permitted pursuant to this Stipulation), which is *pari passu* with, or senior to, the DIP Liens, DIP Super-Priority Claim, Pre-Petition Liens, or Adequate Protection Liens, without the prior written consent of the Lender Parties, which can be withheld in their sole discretion and for any reason whatsoever;

(h)     other than with respect to the Carve-Out and the claims, liens and security interests granted herein to the DIP Lender, any Debtor creates or incurs, or the Court enters an order granting, any claim, lien, or security interest that is *pari passu* with, or senior to, any of the DIP Liens, DIP Super-Priority Claim, Pre-Petition Liens, or Adequate Protection Liens (as defined below), granted pursuant to an order approving this Stipulation, without the prior written consent of the Lender Parties, which can be withheld in their sole discretion and for any reason whatsoever;

(i)     the consummation of a sale or disposition of any material assets of Debtors other than in the ordinary course of business, unless otherwise agreed to in writing by the Lender Parties, which such consent may be withheld in their sole discretion and for any reason whatsoever;

(j)     the commencement of any action, including the filing of any pleading, by any Debtor, or direct or indirect non-debtor affiliate or subsidiary of any Debtor, against any Lender Party with respect to any of the DIP Obligations, DIP Liens, DIP Super-Priority Claim, Adequate Protection Obligations (as defined below), Adequate Protection Liens (as defined below), Pre-Petition Obligations, or Pre-Petition Liens, as may be applicable; or

(j)     the occurrence of any "Event of Default" set forth in the DIP Credit Agreement or any other DIP Financing Document.

7.     <u>Use of Cash Collateral and DIP Financing</u>.  The Debtors are authorized to use Cash Collateral and the proceeds of the DIP Financing in compliance with and as specified in the DIP Financing Documents.

8.    <u>Entitlement to Adequate Protection</u>.  The Pre-Petition Secured Lender is entitled to adequate protection of its respective interests in the Pre-Petition Collateral (including, but not limited to, the Cash Collateral) on which the Pre-Petition Secured Lender holds a perfected first-priority security interest(s) as of the Petition Date in an amount equal to the aggregate post-petition diminution in value of the Pre-Petition Collateral, including any Cash Collateral, from and after the Petition Date (such diminution in value, the "<u>Diminution in Value</u>"), including, without limitation, to the extent such diminution results from the sale, lease, or use by any Debtor of the Pre-Petition Collateral, including any Cash Collateral, the subordination of the Pre-Petition Liens to the Carve-Out and the DIP Claims and Liens, Debtors' incurrence of the DIP Loan, or the imposition of the automatic stay pursuant to Bankruptcy Code section 362 (such adequate protection, as set forth in paragraph 9 below, the "<u>Adequate Protection Obligations</u>").

9.    <u>Adequate Protection Granted to Pre-Petition Secured Lender</u>.

(a)    *First Lien Super-Priority Claim and Adequate Protection Liens*.  The Pre-Petition Secured Lender is hereby granted the following claims, liens, and security interests:

(i)    **First Lien Super-Priority Claim**.  The Adequate Protection Obligations due to the Pre-Petition Secured Lender ("<u>Adequate Protection Obligations</u>") constitutes an allowed joint and several super-priority claim against each Debtor as provided in Bankruptcy Code section 507(b) (collectively, the "<u>First Lien Super-Priority Claims</u>"), with priority over any and all administrative expenses and all other claims asserted against any Debtor or its estate, at any time existing or arising, of any kind or nature whatsoever, including, but not limited to, the administrative expenses and other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject to and subordinate in all respects to the Carve-Out and the DIP Super-Priority Claim.

(ii)    **Adequate Protection Liens**.  As security for the Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the

13

execution by Debtors (or recordation or other filing) of security agreements, control agreements, assignment of rents, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by any Lender Party, the Pre-Petition Secured Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interest in/on, the DIP Collateral ("Adequate Protection Liens"), subject and subordinate only to the (a) Carve-Out, (b) DIP Liens and Claims, (c) and certain permitted liens as set forth the DIP Credit Agreement, including purchase money security interests granted to, and liens properly perfected by, secured creditors of the Debtors prior to the Petition Date, if any. The Adequate Protection Liens are not subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of Debtors and their estates under Bankruptcy Code section 551, but are subject to the DIP Liens.

(b)    Additional Adequate Protection Granted to Pre-Petition Secured Lender.

(i) **Access to Records/Financial Reporting**. In addition to, and without limiting, whatever rights of access the Pre-Petition Secured Lender has under the Pre-Petition Loan Documents, Debtors are required to permit representatives and agents of the Lender Parties (i) to have reasonable access to and inspect Debtors' properties, (ii) to examine Debtors' books and records, and (iii) to discuss Debtors' affairs, finances, and condition with Debtors' officers and financial advisors. In addition, Debtors are required to provide to Lender Parties on a weekly basis, reports setting forth (i) substantive details of Debtors' operating performance, and (ii) a detailed comparison, including commentary to the extent available, of the weekly actual operating performance against the projections, substantially in form and substance satisfactory to each Lender Party.

(ii) **Right to Seek Additional Adequate Protection**.  This Stipulation, and any order confirming this Stipulation, is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of any Lender Party to request additional forms of adequate protection at any time.

14

10.    <u>Release</u>.    Upon approval by the Court of the terms and conditions of this Stipulation on an interim basis, each Debtor and each Debtor's estate, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "<u>Releasors</u>"), to the maximum extent permitted by applicable law, unconditionally, irrevocably, fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge each Lender Party and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, but not limited to, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that existed as of the date that any order confirming this Stipulation becomes final, relating to any of the Pre-Petition Loan Documents, the DIP Financing Documents, or the transactions contemplated under such documents, or the Chapter 11 Cases, as applicable, including, but not limited to, (i) any so-called "lender liability," equitable subordination, equitable disallowance, or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or non-avoidability of the liens or claims of any Lender Party.

11.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    Lender Parties are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to it hereunder. Irrespective of whether any Lender Party, in its sole discretion, chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar

instruments, such liens and security interests are deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, re-characterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment, subordination (whether equitable, contractual, or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law as of the Petition Date. If any Lender Party determines to file any financing statements, notices of liens or similar instruments, Debtors will cooperate and assist in any such filings as reasonably requested by any Lender Party and the automatic stay is, without further order of the Court, deemed modified to allow such filings.

(b)    Any Lender Party may cause a certified copy of this Stipulation and the orders approving this Stipulation to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Stipulation and any order approving this Stipulation for filing and recording.

(c)    The Debtors must execute and deliver to any Lender Party all such agreements, financing statements, instruments, and other documents as each such party may reasonably request to evidence, confirm, validate, or perfect the DIP Liens and the Adequate Protection Liens, as applicable.

(d)    Upon entry of interim and final orders approving this Stipulation, in no event shall the DIP Collateral or Pre-Petition Collateral include or the DIP Liens or the Adequate Protection Liens granted under this Stipulation attach to, any lease, license, permit, contract, or agreement (including any operating and joint venture agreements) or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (i) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, agreement, or other property right pursuant to any provision thereof, unless, in

16

the case of each of clauses (i) and (ii), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "Specified Contracts"); *provided*, *that* the foregoing does not preclude any counterparty to a Specified Contract from an opportunity to be heard by this Court on notice with respect to whether applicable non-bankruptcy law or the Bankruptcy Code renders such provision ineffective. Notwithstanding the foregoing, the DIP Liens and the Adequate Protection Liens, in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of any and all Specified Contracts.

       12.    <u>Preservation of Rights Granted Under this Order</u>.

       (a)    Notwithstanding any order dismissing any Chapter 11 Case under Bankruptcy Code section 1112 or otherwise entered at any time, (i) the DIP Claims and Liens, the Pre-Petition Secured Lender's First Lien Super-Priority Claims, the Adequate Protection Liens, the other administrative claims granted pursuant to this Stipulation, and the Carve-Out continue in full force and effect and maintain their priorities as provided in this Stipulation until all DIP Obligations, Adequate Protection Obligations, Pre-Petition Obligations, and the Carve Out have been indefeasibly paid and satisfied in full in cash (and such DIP Claims and Liens, Pre-Petition Secured Lender's First Lien Super-Priority Claims, other administrative claims granted pursuant to this Stipulation, Carve-Out, and Adequate Protection Liens, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court retains jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (i) above.

       (b)    Upon entry of interim and final orders approving this Stipulation, if any or all of the provisions of such orders are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur will not affect: (i) the validity, priority, or enforceability of any DIP Claims and Liens, DIP Obligations, Pre-Petition Secured Lender's First-Lien Super-Priority Claims, and Adequate Protection Obligations incurred prior to the date of the entry of an order granting such reversal, stay, modification, or vacatur ("Reversal Order"); or (ii) the validity,

priority, or enforceability of the DIP Liens and the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification, or vacatur, any borrowings under the DIP Loan and DIP Financing Documents, use of the Pre-Petition Collateral (including the Cash Collateral) or DIP Collateral, or the DIP Obligations or the Adequate Protection Obligations incurred by any Debtor hereunder prior to the date of the entry of the Reversal Order is governed in all respects by the original provisions of this Stipulation, and the DIP Lender and the Pre-Petition Secured Lender is entitled to all of the rights, remedies, privileges, and benefits granted in Bankruptcy Code sections 363(m) and 364(e) with respect to all uses of the Pre-Petition Collateral and DIP Collateral, all DIP Obligations, and Adequate Protection Obligations for periods prior to the date of the entry of the Reversal Order.

(c)    Upon entry of interim and final orders approving this Stipulation, except as expressly provided in this Stipulation or in the DIP Financing Documents, the DIP Claims and Liens, the Adequate Protection Liens, and Pre-Petition Secured Lender's First Lien Super-Priority Claims and all other rights, claims, security interests, and remedies of the Lender Parties granted by the provisions of this Stipulation and/or the DIP Financing Documents survive, and may not be modified, impaired, or discharged by the entry of an order (i) converting any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or dismissing any of the Debtors' bankruptcy cases, or by any other act or omission, or (ii) confirming a plan of reorganization in any Chapter 11 Case, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, Debtors have waived any discharge as to any remaining DIP Claims and Liens, Adequate Protection Liens or the Pre-Petition Secured Lender's First Lien Super-Priority Claims. The terms and provisions of this Stipulation continue in each Chapter 11 Case and in any successor cases, including any Chapter 7 cases. If any Chapter 11 Case ceases to be jointly administered, or in any successor or superseding Chapter 7 case under the Bankruptcy Code, and the DIP Claims and Liens, Adequate Protection Liens, the administrative claims granted pursuant this Stipulation, and all other rights, claims, security interests, and remedies of the Lender Parties granted by the provisions of this Stipulation, or any order related thereto, continue in full force and effect as provided herein. To remove any doubt, this Stipulation, and subsequent orders approving this Stipulation, is an order for "cause" under

section 349 of the Bankruptcy Code, the terms of which, unless specified herein, shall not be vacated under section 349 of the Bankruptcy Code.

13.    <u>Effect of Stipulations on Third Parties</u>.  Upon entry of interim and final orders approving this Stipulation, the stipulations, releases, and admissions contained herein, are be binding upon: (1) each Debtor and any successor thereto; and (2) all other parties in interest, including any Creditors' Committee or any Chapter 7 or Chapter 11 trustee appointed or elected for any Debtor (a "<u>Trustee</u>"). Notwithstanding the foregoing sentence, the binding effect of this Stipulation, and any order related thereto, will not be held against any Creditors' Committee, if within 30 days from the Petition Date, any Creditors' Committee has duly filed an adversary proceeding challenging the validity, enforceability, priority, or extent of the Pre-Petition Obligations or the liens on the Pre-Petition Collateral against the Pre-Petition Secured Lender in connection with any matter related to the Pre-Petition Obligations, or the Pre-Petition Collateral, or the Pre-Petition Liens. Nothing in this Stipulation vests or confers on any party-in-interest, including the Creditors' Committee or Trustee, standing or authority to pursue any cause of action belonging to any Debtor or its respective estate.

14.    <u>506(c) Waiver</u>.  Upon entry of interim and final orders approving this Stipulation, except to the extent of the Carve-Out, no costs or expenses of administration of any Chapter 11 Case or any successor cases, including any Chapter 7 cases, that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against or recovered from (i) any Lender Party or the DIP Obligations, (ii) any Lender Party, (iii) any Lender Party's Pre-Petition Collateral, or (iv) the DIP Collateral or Pre-Petition Collateral pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of Lender Parties, which such consent may be withheld in their sole discretion and for any reason whatsoever, and no such consent may be implied from any other action, inaction, or acquiescence by any Lender Party or their representatives.

15.    <u>Section 552(b)</u>.  Upon entry of interim and final orders approving this Stipulation, each Lender Party is entitled to all of the rights and benefits of Bankruptcy Code section 552(b). The "equities of the case" exception under Bankruptcy Code section 552(b) does not apply to

19

Lender Parties with respect to (i) proceeds, products or profits of any of the Pre-Petition Collateral, including Cash Collateral, or DIP Collateral, as applicable or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Pre-Petition Collateral.

16. <u>No Marshaling</u>. Upon entry of interim and final orders approving this Stipulation, none of the collateral pledged to any Lender Party is subject to the equitable doctrine of "marshaling" or any other similar doctrine.

17. <u>Information and Other Covenants</u>. Upon entry of interim and final orders approving this Stipulation, and without abrogating anything stated herein, in the Pre-Petition Loan Documents, or in the DIP Financing Documents, each Debtor must comply with the reporting requirements set forth in the DIP Credit Agreement and the Pre-Petition Loan Documents, as applicable, together with such additional information as Lender Parties may reasonably request from time to time.

18. <u>Restrictions on Transfer of DIP Collateral or Pre-Petition Collateral to Non-Debtor Affiliates</u>. The Debtors are prohibited from transferring or using any DIP Collateral or Pre-Petition Collateral, including Cash Collateral, to or for the benefit of any direct or indirect foreign or non-debtor affiliate or subsidiary of Debtors, except as may be specifically authorized by the Lender Parties in writing prior to any such transfer or use.

19. <u>Indemnification and Expenses</u>. Upon the entry of interim and final orders approving this Stipulation, each Debtor, jointly and severally, is/are required to indemnify and hold harmless each Lender Party, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of the foregoing (each, an "<u>Indemnified Person</u>") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel, but subject to the limitations set forth below) and liabilities of such Indemnified Person arising out of or relating to any investigation, claim, or any litigation, or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by any Debtor or any of its affiliates) that relates to the DIP Financing Documents or this Stipulation or the transactions contemplated thereby and hereby or the exercise of any of their

rights provided in the DIP Financing Documents or this Stipulation; *provided, that* no Indemnified Person will be indemnified for any cost, expense, or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. No Indemnified Person will have any liability (whether direct or indirect, in contract, tort, or otherwise) to any Debtor or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, willful misconduct, or material breach of its obligations under the DIP Financing Documents or this Stipulation. In no event, however, will any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages. In addition, (a) all out-of-pocket expenses (including, but not limited to, reasonable and documented fees, disbursements and other charges of outside counsel, financial advisors, and other professionals) of any Lender Party, in connection with any Chapter 11 Case or any other insolvency or bankruptcy proceedings of any Debtor, the DIP Loan, the DIP Obligations, the DIP Financing Documents, and the transactions contemplated thereby and hereby, must be paid by Debtors, jointly and severally, from time to time (b) all out-of-pocket expenses (including, but not limited to, fees, disbursements and other charges of outside counsel, financial advisors, and other professionals) of any Lender Party for enforcement costs and documentary taxes associated with the DIP Loan, the DIP Obligations, the DIP Financing Documents, and the transactions contemplated thereby and hereby, must be paid by Debtors, jointly and severally. Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the each Lender Party in the DIP Financing Documents and/or Pre-Petition Loan Documents, which indemnity will be approved and authorized following the entry of an order approving this Stipulation. For the avoidance of doubt, this Paragraph does not limit or otherwise affect any indemnification rights or obligations in respect of the Pre-Petition Secured Lender under the Pre-Petition Loan Documents.

20.    <u>Limitation on Use of the DIP Loan, the DIP Collateral, and the Pre-Petition Collateral (including the Cash Collateral)</u>. Upon entry of interim and final orders approving this

21

Stipulation, Debtors may only use the DIP Loan, the DIP Collateral, and the Pre-Petition Collateral (including the Cash Collateral), solely as provided in this Stipulation, the Budget (subject to permitted variances), and the DIP Financing Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, Debtors are not authorized to use the DIP Loan, the DIP Collateral, or the Pre-Petition Collateral, including the Cash Collateral, to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the DIP Obligations, the Pre-Petition Obligations or the liens, claims or rights granted under this Stipulation, or order related thereto, the DIP Financing Documents, or the Pre-Petition Loan Documents, or take any action purporting to do any of the foregoing; (ii) investigate, assert, or prosecute any claims and defenses against any Lender Party or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or take any action purporting to do the foregoing in respect of the DIP Loan, Pre-Petition Obligations, DIP Claims and Liens, Pre-Petition Liens, the Adequate Protection Obligations, Adequate Protection Liens, and/or Super-Priority Claims granted to the Pre-Petition Secured Lender under this Stipulation, or order related thereto; (iii) prevent, hinder, or otherwise delay any Lender Party from enforcement, or realization on the DIP Obligations, DIP Collateral, Pre-Petition Obligations, Pre-Petition Collateral, and the liens, claims, and rights granted to such parties under this Stipulation (including any order related thereto), in accordance with the DIP Financing Documents, the Pre-Petition Loan Documents, any other cash collateral order or this Stipulation, or order related thereto, as applicable; (iv) seek to modify any of the rights granted to any Lender Party hereunder (other than with the consents contemplated hereunder), or as provided in the DIP Financing Documents or the Pre-Petition Loan Documents; (v) apply to the Court for authority to approve super-priority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Claims and Liens, Adequate Protection Liens, Pre-Petition Secured Lender's First Lien Super-Priority Claims or Pre-Petition Liens, unless all DIP Obligations, Pre-Petition Obligations, Adequate Protection Obligations, and claims granted to any Lender Party have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by Lender Parties in their sole discretion, which can be

22

withheld for any reason whatsoever; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved in writing by Lender Parties, in their sole discretion, which can be withheld for any reason whatsoever), or are otherwise included in the Budget.

21.    <u>Binding Effect; Successors and Assigns</u>.    Upon entry of an order approving this Stipulation, the provisions of this Stipulation, the DIP Credit Agreement, and the other DIP Financing Documents are binding upon all parties in interest in the Chapter 11 Cases and any successor cases, including any Chapter 7 cases, including the Lender Parties, any creditors' committee, each Debtor and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any Debtor, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of Debtor or with respect to the property of the estate of any of Debtors) as provided herein.

22.    <u>Limitation of Liability</u>.    Upon entry of an order approving this Stipulation, in determining to make any loan under the DIP Financing Documents, permitting use of the Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Stipulation, or order related thereto, the DIP Financing Documents, or the Pre-Petition Loan Documents, Lender Parties are not, and may not be, deemed to be in control of the operations of any Debtor, nor do they owe any fiduciary duty to any Debtor, its creditors or estate, or constitute or be deemed to constitute a joint venture or partnership with any Debtor. Furthermore, nothing in this Stipulation, the DIP Financing Documents or the Pre-Petition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon any Lender Party any liability for any claims arising from the pre-petition or post-petition activities of any of any Debtor and its respective affiliates (as defined in Bankruptcy Code section 101(2)).

23.    <u>Automatic Stay Modified</u>.    Upon entry of an order approving the Stipulation, and without any further order of this Court, in the event of an uncured Event of Default the automatic stay is modified and lifted as to the DIP Collateral; *provided, however*, Lender Parties shall comply with the terms of the DIP Financing Documents in exercising their rights and remedies

23

provided thereunder, at law, and/or in equity. No further order of this Court is required prior to any Lender Party exercising any rights and remedies.

24. <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of an order approving this Stipulation is without prejudice to, and will not constitute a waiver, expressly or implicitly, of any Lender Party's rights to seek any other or supplemental relief in respect of any Debtor. The entry of an order approving this Stipulation does not relieve any Debtor of any obligations under federal, state, or local police or regulatory law.

[Remainder of page left intentionally blank]

24

1    IN WITNESS WHEREOF, the parties hereto have caused this Stipulation to be duly

2    executed by their respective authorized signatories.

3    Dated:  June 1, 2017                    BUCHALTER, a Professional Corporation

4

5

6                                        By:  */s/ Jeffrey K. Garfinkle*

7                                        Jeffrey K. Garfinkle (Cal. Bar No. 153496)
                                         18400 Von Karman Avenue, Suite 800
8                                        Irvine, CA 92612
                                         Telephone:  (949) 760-112
9                                        E-Mail:  jgarfinkle@buchalter.com

10                                       *and*

11                                       BURR & FORMAN LLP

12                                       David W. Houston IV TN Bar #020802
                                         J. Patrick Warfield TN Bar #30502
13                                       E-mail:    dhouston@burr.com
                                         Email: pwarfield@burr.com
14                                       511 Union Street, Suite 2300
                                         Nashville, TN  37219
15                                       Telephone: (615) 724-3200

16                                       Counsel for CAPSTAR BANK

17

18   Dated:  June 1, 2017                    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

19

20                                       By:  */s/ David L. Neale*

21                                       David L. Neale, Esq. (Cal. Bar No. 141225)
                                         Juliet Y. Oh, Esq. (Cal. Bar No. 211414)
22                                       10250 Constellation Blvd., Suite 1700
                                         Los Angeles, CA 90067
23                                       Telephone:  (310) 229-1234
                                         E-Mail:  DLN@lnbyb.com
24                                       E-Mail:  JYO@lnbyb.com

25                                       Counsel for Debtors and Debtors in Possession SOLID
                                         LANDINGS BEHAVIORAL HEALTH, INC.; CEDAR
26                                       CREEK RECOVERY, INC.; EMS TOXICOLOGY;
                                         SILVER ROCK RECOVERY and SURE HAVEN, INC.
27

28

                                            25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit "A" to DIP Stipulation

[Debtor-In-Possession Loan and Security Agreement
and Promissory Note]

# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is made and effective as of the 1st day of June, 2017 (the "Effective Date"), by and among **SURE HAVEN, INC.**, a California corporation ("Sure Haven"), **SOLID LANDINGS BEHAVIORAL HEALTH, INC.**, a California corporation ("Solid Landings"), **CEDAR CREEK RECOVERY, INC.**, a Texas corporation ("Cedar Creek"), **SILVER ROCK RECOVERY**, a Nevada corporation ("Silver Rock"), and **EMS TOXICOLOGY**, a Nevada corporation ("EMS," and together with Sure Haven, Solid Landings, Cedar Creek and Silver Rock, individually and collectively, the "Borrower"), and **CAPSTAR BANK**, a Tennessee state chartered banking corporation ("Lender").

## R E C I T A L S :

**WHEREAS**, on June 1, 2017 (as of the actual time of filing, the "Petition Date"), Sure Haven, Solid Landings, Cedar Creek, Silver Rock and EMS each filed a voluntary petition with the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), initiating cases under Chapter 11 of the Bankruptcy Code, jointly administered under Case No. _____ (collectively, the "Case"), and the Borrower has continued in possession of its assets and in the operation and management of its businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrower and Alpine Behavioral Holdco, LLC, a Delaware limited liability company ("Alpine Holdco"), Alpine Behavioral California, LLC, a California limited liability company ("Alpine California"), Alpine Behavioral Nevada, LLC, a Nevada limited liability company ("Alpine Nevada"), Alpine Behavioral Texas, LLC, a Texas limited liability company ("Alpine Texas"), and Alpine Behavioral Toxicology, LLC, a Nevada limited liability company ("Alpine Toxicology" and together with Alpine Holdco, Alpine California, Alpine Nevada and Alpine Texas, the "Purchasers") have entered into that certain Asset Purchase Agreement dated as of June 1, 2017 (as such agreement may be modified or amended from time to time, the "APA"), pursuant to which Buyer has agreed to purchase certain assets of the Borrower's bankruptcy estate in a sale pursuant to Section 363 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court; and

**WHEREAS**, Borrower has requested that the Lender enter into this Agreement to provide to Borrower a debtor-in-possession ("DIP") a revolving credit facility in the amount of up to $2,000,000.00 to be used for general working capital and liquidity purposes and for the payment of Administrative Expenses as herein described, all of the Borrower's obligations under which are to be secured as provided herein and in the Financing Orders (as herein defined), the proceeds of which may only be used as expressly permitted by the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby mutually promise and agree as follows:

Debtor-in-Possesssion
Loan and Security Agreement

# AGREEMENT
## ARTICLE ONE - DEFINITIONS

Section 1.1    Definitions.  In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, when used in this Agreement, the following terms shall have the following respective meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

"Accounts", "Account Debtor", "Chattel Paper", "Deposit Accounts", "Documents", "Equipment", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter of Credit Rights", "Proceeds" and "Promissory Notes" shall have the same respective meanings as are given to those terms in the UCC.

"Administrative Expenses" shall collectively mean, to the extent approved by the Bankruptcy Court if such approval is required under the Bankruptcy Code, (i) all fees payable pursuant to 28 U.S.C. § 1930, (ii) all fees and expenses incurred by Borrower's Professional Persons, (iii) all fees and expenses incurred by Professional Persons retained by any statutory committee appointed in the Case, including the Committee, (iv) the actual and necessary costs and expenses involved in preserving the bankruptcy estate of the Borrower, including wages, salaries and other general administrative expenses incurred by the Borrower, (v) all fees and expenses of the notice and claims agent in the Case (if any), (vi) all fees and expenses of the United States Trustee (the "US Trustee"), and (vii) all such other expenses incurred by the Borrower in connection with the Case as may be permitted by the Bankruptcy Code or approved by the Bankruptcy Court.

"Advance" means each principal disbursement or deemed principal disbursement, as applicable, of DIP Loan proceeds made to Borrower in accordance with this Agreement.

"Affiliate" shall have the meaning set forth in the Bankruptcy Code.

"Anti-Terrorism Laws" shall mean any laws, ordinances, statutes, rules, regulations, order, injunctions, writs or decrees of any government or political subdivision or agency thereof relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act, and the Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced).

"APA Contingency"  Any contingency in the APA, including, without limitation, to Purchasers' financing contingency listed in Section 13.06 of the APA.

"Approved Budget" means the Borrower's operating budget as submitted to and approved by Lender and Purchasers from time to time pursuant to Section 2.8 of this Agreement.

"Auction" has the meaning set forth in the definition of Sale Procedures Order.

"Availability Period" means the period during which Advances of the DIP Loan shall be available hereunder, which period shall commence upon the entry of the Interim Order and end on the Termination Date.

Debtor-in-Possesssion
Loan and Security Agreement

"<u>Avoidance Actions</u>" has the meaning given such term in <u>Section 3.1</u> hereof.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as heretofore and hereafter amended, and codified as 11 U.S.C. §§ 101, *et seq.*

"<u>Borrower</u>" means each of the borrower parties identified in the preamble to this Agreement severally and individually, and all of the borrower parties identified in the preamble to his Agreement jointly and collectively, it being the intention of the parties that the term "Borrower" shall for all purposes mean and refer to each such party, *mutatis mutandis*, with full and equal force and effect on both an individual and collective basis.

"<u>Borrower's Business</u>" means the business of behavioral healthcare services, treatment of addictions, substance abuse, and mental illness and businesses reasonably ancillary thereto.

"<u>Borrower's Schedules</u>" means the bankruptcy schedules and statements of financial affairs filed by each Borrower in each Case on or around the Petition Date.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or recognized holiday on which commercial banks in Tennessee are authorized or required to be closed for business.

"<u>Capital Stock</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, membership interests in a limited liability company, partnership interests in a partnership, or any and all similar ownership interests in any Person, and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Capitalized Lease</u>" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"<u>Carve-Out</u>" means an amount equal to the aggregate sum of: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930 of title 28 of the United States Code; (b) to the extent allowed, whether by Financing Orders, procedural order or otherwise, reasonable fees and expenses of the Borrower's Professional Persons in an amount not exceeding $150,000.00; (c) reasonable fees and expenses of any Committee's Professional Persons that are in an amount not exceeding $50,000.00. Notwithstanding anything herein to the contrary, the Carve-Out does not include, apply to or be available for any fees or expenses incurred by any party in connection with (1) the investigation, preparation, initiation, or prosecution of any claims, causes of action, proceeding, adversary proceeding, or other litigation against Lender, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations, Liens and security interests granted under the Pre-Petition Loan Documents in favor of Lender, the DIP Financing Documents, or under the Financing Orders, including, without limitation, for lender liability or pursuant to Bankruptcy Code sections 105, 510, 544, 547, 548, 549, 550 or 552, applicable non-bankruptcy law, or otherwise; (2) attempts to modify any of the rights granted to hereunder or under the Financing Orders, including any order related thereto, or other cash collateral order; (3) any attempt to prevent, hinder, or otherwise delay Lender's enforcement or realization upon any collateral in accordance with the Pre-Petition Loan Documents, the DIP Financing Documents, the Financing Orders, or any other document or order in connection therewith; or (4) paying any amount on account of any claims arising before the Petition Date unless such

Debtor-in-Possesssion
Loan and Security Agreement

payments are approved by Lender, by order of the Bankruptcy Court, or are otherwise included in the Approved Budget.

"Change in Management" means the occurrence of any event whereby Katie S. Goodman shall cease to serve as the CRO of Borrower, either by death, disability, retirement, termination of employment or otherwise.

"Change of Control" means (i) at least two (2) of any of (A) Steve Fennelly (or any revocable trust established by him for his own benefit or that of his immediate family members), (B) Elizabeth Perry (or any revocable trust established by her for her own benefit or that of her immediate family members) and (C) Mark Shandrow (or any revocable trust established by him for his own benefit or that of his immediate family members) collectively shall cease to beneficially own, directly or indirectly, at least a majority of the issued and outstanding Capital Stock of Borrower or shall cease to have control of the board of directors or similar governing body of Borrower, or (ii) any Borrower shall own less than all of the outstanding equity interests of its Subsidiaries; except pursuant to a transaction otherwise permitted by order of the Bankruptcy Court or this Agreement.

"Closing Date" means the date upon which a sale pursuant to Section 363 of the Bankruptcy Code shall be consummated pursuant to the Sale Order to the winning bidder (or back-up bidder) chosen at the Auction.

"Collateral" shall have the meaning set forth in Section 3.1 of this Agreement.

"Committee" means any statutory committee appointed by the Bankruptcy Court in the Case.

"Credit Amount" means a principal amount of Two Million and No/100 Dollars ($2,000,000.00), in DIP Loan proceeds available to be advanced to Borrower pursuant to this Agreement.

"CRO" means the person from time to time serving as the Chief Restructuring Officer of the Borrower, if any.

"Default" means the occurrence or existence of any event, circumstance, state of facts or condition which, but for the giving of any required notice, the expiration of any applicable grace or cure period or the satisfaction of any other condition precedent, would constitute an Event of Default hereunder.

"Default Rate" means the maximum rate of interest from time to time allowed to be charged by applicable law.

"DIP Claims and Liens" means the allowed claims, liens, and security interests granted to Lender as security for the DIP Obligations, including the DIP Super-Priority Claim, pursuant to the terms of the Financing Orders.

"DIP Financing Documents" means this Agreement, the DIP Loan Note, the Security Documents and all other agreements, documents and instruments heretofore, now or hereafter

delivered to Lender in connection with or pursuant to this Agreement, all as the same may from time to time be amended, modified, extended or renewed. For the avoidance of doubt, the Pre-Petition Loan Documents are not DIP Financing Documents.

"DIP Loan" means the credit facility made available to the Borrower pursuant to Article Two of this Agreement in an outstanding principal amount not exceeding the Credit Amount.

"DIP Loan Note" means that certain Promissory Note of even date herewith evidencing the DIP Loan and payable by Borrower to Lender in a principal amount equal to the Credit Amount.

"DIP Obligations" means, without duplication, any and all present and future Indebtedness (including, without limitation, principal of the DIP Loan, interest thereon, fees, collection costs and expenses, attorneys' fees and other agreed charges under the DIP Financing Documents), joint and several liabilities and obligations of the Borrower evidenced by or arising under or in connection with this Agreement or any other DIP Loan Document, whether direct or contingent, due or to become due or now existing or hereafter arising.

"DIP Super-Priority Claim" means, subject to the Carve-Out, an allowed joint and several Super-Priority Claim against Borrower in favor of Lender in the amount of, and on account of the DIP Loan and the DIP Obligations.

"Dollars" and "$" means legal tender of the United States of America.

"Effective Date" has the meaning set forth in the first paragraph of this Agreement.

"Environmental Law" means any federal, state or local statute, law, rule, regulation, order, consent decree, judgment, permit, license, code, deed restriction, common law, treaty, convention, ordinance or other governmental requirement, domestic or foreign, relating to public health, safety or the environment, including, without limitation, those relating to releases, discharges or emissions to air, water, land or groundwater, to the use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, treatment, storage or management of hazardous or solid waste, hazardous substances or crude oil, or any fraction thereof, to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of gaseous or liquid hazardous substances, in each case applicable to any of the Property owned, leased or operated by Borrower or any Subsidiary or the operation, construction or modification of any such Property, including, without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, the Hazardous Materials Transportation Act, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Safe Drinking Water Control Act, the Clean Air Act of 1966, the Toxic Substances Control Act of 1976, the Occupational Safety and Health Act of 1977, the Emergency Planning and Community Right-to-Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, and any amendments to these laws and any rules and regulations promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time.

"Event of Default" has the meaning ascribed thereto in Section 8.1 of this Agreement.

"Final Order" means an order of the Bankruptcy Court, satisfactory to Lender in its sole discretion, approving the DIP Financing Documents and granting Lender the DIP Super-Priority Claim with respect to the DIP Loan and Liens upon the Collateral described in Article 3 of this Agreement, which Final Order (i) shall have been entered upon an application or motion of the Borrower satisfactory in form and substance to Lender in all material respects, on such prior notice to such parties as may in each case be entitled to notice under the Bankruptcy Code, (ii) shall be in full force and effect, and (iii) shall not have been stayed, reversed, modified or amended in any respect; and, if the Final Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Financing Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"First Day Orders" means all orders entered by the Bankruptcy Court based upon the following first-day motions filed by the Borrower in the Case, including, without limitation, the Joint Administration Motion, Cash Management Motion, Utilities Motion, Insurance Motion, Wages and Benefits Motion, and Cash Collateral and DIP Financing Motion.

"GAAP" means the consistent application of such generally accepted accounting principles as may then be applicable in the United States of America.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision of any thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, regulation or compliance, including, without limitation, any federal, state or local public utility commission, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing. Governmental Authority shall include, without limitation, any agency, branch or other governmental body charged with the responsibility and/or vested with the authority to administer and/or enforce, for example, any Environmental Laws or any Healthcare Laws.

"Guarantee Obligation" means with respect to any Person, any contract, agreement or understanding of such Person pursuant to which such Person guarantees, or in effect guarantees, any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, agreements (a) to purchase such Indebtedness or any asset constituting security therefor, (b) to advance or supply funds for the purchase or payment of such Indebtedness, or otherwise to advance or make available funds for the purchase or payment of such Indebtedness, (c) to purchase an asset or service primarily for the purpose of assuring the holder of such Indebtedness of the ability of the primary obligor to make payment of the Indebtedness, or (d) otherwise to assure the holder of the Indebtedness of

the primary obligor against loss with respect thereto; *provided, however*, that such term shall not include the endorsement by such Person of negotiable instruments or documents for deposit or collection in the ordinary course of business.

"Guarantors" or "Guarantor" means collectively or individually, Mark Shandrow, an individual resident of the State of California, Steve Fennelly, an individual resident of the State of California, and Elizabeth Perry, an individual resident of the State of Texas.

"Indebtedness" means, as to any Person, all of the following obligations (without duplication) of such Person as of such date: (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations to pay the deferred purchase price of property, except trade accounts payable arising in the ordinary course of business, (d) all obligations as lessee under Capitalized Leases (which, for the avoidance of doubt, shall not include operating leases for real estate or personal property), (e) all obligations to purchase securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or property, such as bankers acceptances or similar instruments, (f) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (g) all non-contingent obligations to reimburse any bank or other person in respect of amounts payable or paid under a letter of credit or similar instrument, (h) all contingent obligations with respect to Indebtedness of others referred to in clauses (a) through (g) above or clause (i) below, (i) all debt of others secured by a lien on any asset of such Person, whether or not such debt is assumed, (j) any Guarantee Obligation, (k) "earnouts" and similar payment obligations of such Person once such obligation becomes a liability on the balance sheet of such Person as determined in accordance with GAAP and (l) all Capital Stock of such Person subject to repurchase or redemption otherwise than at the sole option of such Person.

"Interest Determination Date" shall mean (i) initially, the first day of the Availability Period and thereafter (ii) the first Business Day of each subsequent Loan Week.

"Interim Order" means an interim order of the Bankruptcy Court approving the DIP Loan to be made by Lender upon the entry of an interim order in accordance with this Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time with the express written consent of Lender, and granting the DIP Super-Priority Claim with respect to the DIP Loan and Liens upon the Collateral described in Article 3 of this Agreement, which Interim Order (i) shall be in full force and effect, and (ii) shall not have been stayed, reversed, or, without Lender's consent, modified or amended in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Financing Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Investment" means any investment by Borrower in any Person, whether payment therefor is made in cash, in kind, or in capital stock of Borrower, and whether such investment is by acquisition of stock or Indebtedness, or by loan, advance, transfer of property out of the

ordinary course of business, capital contribution, equity or profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business, guaranteeing or otherwise becoming liable (contingently or otherwise) in respect of the Indebtedness of any Person, or otherwise.

"IRS Code" means the Internal Revenue Code of 1986, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of the IRS Code shall be construed to also refer to any successor sections.

"Lien" means any lien (statutory or other), security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or other security agreement or similar preferential arrangement (including, without limitation, the interest of a vendor or lessor under any conditional sale, Capitalized Lease or other title retention agreement).  The term "Lien" shall include reservations, exceptions, encroachments, easements, servitudes, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting Property.

"Loan Week" means each calendar week from and after the Petition Date.

"Material Adverse Effect" means a material adverse effect on the Properties, rights, duties, obligations, liabilities, business, operations, income, condition or prospects (financial or otherwise) of Borrower, or on any Liens or other rights granted to Lender under the DIP Financing Documents or the Financing Orders; *provided, however*, that the commencement and maintenance of the Case and the existence of those liabilities and litigations set forth in Borrower's Schedules (as of the Petition Date) shall not, in and of themselves, be deemed as having a Material Adverse Effect, but any future event which materially worsens the effect of any such matters shall not be excluded from resulting in Material Adverse Effect.

"Operating Account" means the Borrower's DIP deposit account held at _____ and bearing account number _____, or such other debtor in possession operating account opened by Borrower at the direction of the Bankruptcy Court.

"Permitted Liens" means any of the following: (a) Liens for property taxes and assessments or governmental charges or levies, provided that payment thereof is not then required by Subsection 6.1(c) of this Agreement; (b) (i) deposits to secure the performance of bids, tenders, trade contracts or leases (other than Capitalized Leases) or to secure statutory obligations, surety or appeal bonds or other Liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money or the acquisition of inventory or other Property, and (ii) Liens (other than any Liens imposed by ERISA) arising in the ordinary course of business or incidental to the operation of Borrower's Business or the ownership of Properties and assets (including Liens in connection with worker's compensation, unemployment insurance and other like laws, carrier's, mechanic's, materialmen's, repairmen's, vendor's, warehousemen's and attorneys' liens and statutory landlords' liens); provided in each case that payment thereof is not then required by Subsection 6.1(d) of this Agreement; (c) Survey exceptions, issues with regard to the merchantability of title, easements or reservations, or rights of others for rights-of-way, servitudes, utilities and other similar purposes, or zoning or other

restrictions as to the use of real properties, which could not reasonably be expected to have a Material Adverse Effect; (d) Liens permitted by Lender in writing; (e) Liens on Properties in respect of judgments or awards, the Indebtedness with respect to which is permitted by Subsection 6.2(a)(iv); and (f) Pre-Petition Liens in favor of Lender under the Pre-Petition Loan Documents.

"Person" means any natural person or recognized legal entity of any kind whatsoever, including, without limitation, any individual, sole proprietorship, partnership, joint venture, trust, trustee, unincorporated organization, association, corporation, limited liability company, institution, entity or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

"Permitted Variance" has the meaning set forth in Subsection 2.9(b) of this Agreement.

"Permitted Variance Exception" has the meaning set forth in Subsection 2.9(b) of this Agreement.

"Post-Petition" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence on or after the Petition Date.

"Pre-Petition" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence prior to the Petition Date.

"Pre-Petition Collateral" means all Property of the Borrower which was, as of the Petition Date, subject to a valid and perfected Lien in favor Lender as security for the Pre-Petition Obligations.

"Pre-Petition Liens" means all Liens and security interests granted to Lender under the Pre-Petition Loan Documents as security for the Pre-Petition Obligations.

"Pre-Petition Loan Documents" collectively means those certain documents and instruments described on Exhibit A hereto, evidencing the Pre-Petition Obligations, together with all other instruments, documents and agreements otherwise evidencing or securing the Pre-Petition Obligations, and all amendments, modifications, supplements or restatements of any of the foregoing.

"Pre-Petition Obligations" means the Indebtedness of Borrower owing to Lender, whether owed jointly or severally with any other Borrower or any non-borrower, evidenced or secured by the Pre-Petition Loan Documents, together with all Pre-Petition amendments, modifications, extensions or renewals thereof.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Lender as its prime rate in then in effect at its principal office in Nashville, Tennessee (which is not necessarily the best or lowest rate of interest charged by Lender in connection with extensions of credit to borrowers).

Debtor-in-Possesssion
Loan and Security Agreement

29746819 v4

"Professional Persons" means the attorneys, accountants, financial advisors and other professional consultants retained by any Person to provide representation or advice in connection with the Case, the Borrower's Business, the DIP Loan, the DIP Financing Documents, any sale transaction or any other transaction contemplated hereby or thereby, and the Collateral; provided that in the case of Borrower such term shall refer only to Professional Persons retained Post-Petition by the Borrower or the Committee pursuant to order of the Bankruptcy Court.

"Property" means any interest of any kind whatsoever in any form of tangible or intangible property, asset, right, claim, benefit or entitlement, whether real, personal or mixed, and which shall include the Collateral with respect to Borrower. "Properties" means the plural of Property.

"Requirements of Law" means as to any Person, provisions of the constituent, formation, or organizational documents of such Person, or any law, treaty, code, rule, regulation, right, privilege, qualification, license or franchise, or any determination of an arbitrator or a court or other Governmental Authority, in each case applicable to such Person or any of such Person's property or to which such Person or any of such Person's property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

"Restricted Investment" means any Investment, or the incurrence of any liability to make any expenditure for an Investment, other than (i) Investments made Pre-Petition, (ii) Investments permitted by the First Day Orders or any other order of the Bankruptcy Court approved by Lender, and (iii) Investments in any Subsidiaries of Borrower existing on the Effective Date.

"Sale Motion" means, collectively (i) a motion filed by Borrower in the Case seeking Bankruptcy Court approval to sell all Borrower's Property at auction, free and clear of all liens, claims and encumbrances under Section 363 of the Bankruptcy Code, and (ii) a motion filed by Borrower in the Case seeking Bankruptcy Court approval of all sale and bidding procedures in connection with the such sale, and (iii) such other motions in the Case as Borrower shall reasonably deem necessary or appropriate in order to effectuate an auction sale of all of Borrower's Property (other than assets excluded or rejected pursuant to the APA or the successful bidder's purchase agreement) pursuant to Section 363 of the Bankruptcy Code, each of which shall be reasonably acceptable to Borrower, Purchaser and Lender in form and substance.

"Sale Order" means, collectively, one or more orders of the Bankruptcy Court in form and substance reasonably acceptable to Borrower, Purchaser and Lender, entered pursuant to the Sale Motion (i) approving the sale of Borrower's Property to Purchaser pursuant to the APA or such other winning bidder chosen at the Auction pursuant to an asset purchase agreement submitted by such other winning bidder, (ii) approving the back-up bidder chosen at the Auction and the asset purchase agreement submitted by such back-up bidder, and (iii) authorizing consummation of the transactions contemplated thereby.

"Sale Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Borrower, Purchaser and Lender, entered pursuant to the Sale Motion approving (i) sales and bidding procedures pursuant to Section 363 of the Bankruptcy Code for the solicitation of higher or better offers to purchase Borrower's Property, and (ii) the conduct of

an auction for the sale of Borrower's Property in the event of receipt of any such offers (the "Auction").

"Security Documents" shall have the meaning set forth in Section 3.3(b) of this Agreement.

"Subsidiary" means, with respect to any Person, a corporation or other entity of which more than fifty percent (50%) of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Super-Priority Claim" means a claim against Borrower in the Case that is a super-priority Administrative Expense claim having priority over any and all Administrative Expenses, diminution claims and all other claims, now existing or hereafter arising, of any kind whatsoever including, without limitation, any and all Administrative Expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and any and all Administrative Expenses or other claims arising under Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552, 726, 1113 and/or 1114 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Termination Date" means the earliest to occur of (i) ninety (90) days from the Petition Date, (ii) the date upon which the automatic stay expires in the Case, (iii) the Closing Date, (iv) the date of an entry of a final order of the Bankruptcy Court confirming a plan of reorganization or liquidation in the Case, and (v) the date upon which Lender shall elect to terminate the Availability Period and accelerate the DIP Obligations in accordance with Section 8.2 of this Agreement following the occurrence and continuance of an Event of Default.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of Tennessee, as it may be amended from time to time; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of a security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Tennessee, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"Variance Report" has the meaning set forth in Subsection 2.9(b) of this Agreement.

Section 1.2    Accounting Terms and Determinations.    Except as otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent (except for changes accompanied by a concurrence from Borrower's independent certified public accountants) with the most recent audited financial statements of Borrower delivered to Lender.

Section 1.3    Certain Matters of Construction.    The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any

particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Article and section headings, tables of contents and lists of exhibits or schedules appear as matters of convenience only and shall not affect the interpretation of this Agreement.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  All references to any of the DIP Financing Documents shall include any and all amendment or modifications thereto and any and all restatements, extensions or renewals thereof. All references to any Person shall mean and include the successors and permitted assigns of such Person.  All references to "including" and "include" shall be understood to mean "including, without limitation".  All references to the time of day shall mean the time of day on the day in question in Nashville, Tennessee, unless otherwise expressly provided in this Agreement.  All references to any Property of Borrower shall mean and include all Property of Borrower's estate (as created pursuant to Bankruptcy Code section 541(a)).  A Default shall be deemed to exist and shall "continue" or be "continuing" at all times during the period commencing on the date that such Default occurs and ending on the date that such Default is either waived in writing by Lender or is cured by Borrower within any period of cure expressly provided in this Agreement; an Event of Default shall exist and shall "continue" or be "continuing" at all times commencing on the date such Event of Default occurs and ending (if at all) on the date that such Event of Default has been waived (permanently or temporarily) in writing by Lender.

## ARTICLE TWO - THE DIP LOAN

Section 2.1    Advances of the DIP Loan.  Subject to the terms and conditions set forth in this Agreement, and so long as no Default or Event of Default has occurred and is continuing, during the Availability Period, Lender shall make Advances to Borrower from time to time in an aggregate principal amount at any one time outstanding not to exceed the sum of the Credit Amount.  Advances of the Credit Amount may be borrowed, repaid and re-borrowed by Borrower on a revolving basis during the Availability Period.

Section 2.2    Use of Proceeds.

(a)    Operating Expenses and Costs Related to the Case.  Proceeds of the Credit Amount shall be available exclusively for the purpose of funding costs and expenses set forth in the Approved Budget including, without limitation: (i) Post-Petition costs and expenses related to the continued operation of Borrower's Business in the ordinary course and consistent with past practices, as set forth in the Approved Budget, (ii) fees, costs and expenses incurred in connection with the administration of the DIP Loan as provided in this Agreement, and (iii) Administrative Expenses incurred by Borrower in connection with the Case, the APA and the Auction.  No other Administrative Expense of the Case or any further proceeding resulting therefrom shall be charged against or recovered from the DIP Loan or the Collateral pursuant to section 105(a) or 506(c) or otherwise without the prior written consent of Lender, which such consent may be withheld in Lender's sole discretion and for any reason whatsoever, and no such consent shall be implied from any other action, inaction, or acquiescence by Lender or its representatives.  Any and all payments or proceeds remitted to Lender pursuant to the provisions the Financing Orders or any subsequent order of the Bankruptcy Court shall be received free and

clear of any claim, charge, assessment, or other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) or 552(b).

(b)    <u>Protective Advances</u>.  Notwithstanding any contrary provision herein set forth, Lender shall at all times have the right, but not the obligation, to fund Advances to or for the benefit of Borrower in excess of amounts required under the Approved Budget, or in excess of the limitations set forth in this <u>Section 2.2</u>, if deemed necessary or appropriate by Lender. Any amounts advanced by Lender under this Section 2.2(b) shall be added to the DIP Obligations owing hereunder, shall be secured by the Collateral and entitled to DIP Super-Priority Claim status, and if any such Advance exceeds any amounts available under the DIP Loan, such amounts shall be be immediately due and payable by Borrower upon demand by Lender, whether or not a Default or Event of Default has occurred or is continuing.  Any unpaid amounts shall accrue interest at the rate set forth in <u>Section 2.6</u> hereof.

(c)    Nothing herein shall limit the right of Lender to make such Advances as may from time to time be necessary for the protection and preservation of the Collateral.

(d)    <u>Restricted Use of Proceeds</u>.  Notwithstanding anything herein or in any Financing Order to the contrary, Borrower shall not use the DIP Loan or the Collateral to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the DIP Obligations or the DIP Claims and Liens or rights granted herein or under the Financing Orders, the DIP Financing Documents, or the Pre-Petition Loan Documents, or take any action purporting to do any of the foregoing; (ii) investigate, assert, or prosecute any claims and defenses against Lender or its predecessors-in-interest, agents, affiliates, representatives, attorneys, advisors or Professional Persons, or take any action purporting to do the foregoing in respect of the DIP Obligations, the Pre-Petition Obligations, the DIP Claims and Liens, the Pre-Petition Liens, the Collateral, any adequate protection obligations, adequate protection Liens granted hereunder or under the Financing Orders; (iii) prevent, hinder, or otherwise delay Lender from enforcement, or realization on the DIP Obligations, the Pre-Petition Obligations, the Collateral and/or the DIP Claims and Liens granted hereunder or under the Financing Orders in accordance with the DIP Financing Documents, the Pre-Petition Loan Documents, the Financing Orders or any other cash collateral order, as applicable; (iv) seek to modify any of the rights granted to Lender under the Financing Orders (other than with the consents contemplated thereunder), or as provided in the DIP Financing Documents or the Pre-Petition Loan Documents; (v) apply to the Court for authority to approve Super-Priority Claims or grant Liens or security interests in the Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Claims and Liens (including Lender's DIP Super-Priority Claim) or Pre-Petition Liens, unless all DIP Obligations, Pre-Petition Obligations, adequate protection obligations and claims granted to Lender have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing Lender in its sole discretion, which can be withheld for any reason whatsoever; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved in writing by Lender, in its sole discretion (which can be withheld for any reason whatsoever), or are otherwise included in the Approved Budget.

29746819 v4

Section 2.3        Draw Requests; Representations.

(a)        Borrower shall be entitled to not more than one (1) Advance each calendar week.  Each request for an Advance shall be submitted to Lender not less than four (4) Business Days prior to the date upon which funding of such Advance is sought by Borrower, and shall be in the form of the Notice of Borrowing attached hereto as Exhibit B.

(b)        Each request for an Advance hereunder shall be deemed to constitute the Borrower's contemporaneous representation and warranty (i) that on the date of, and after giving effect to, such Advance, no Default or Event of Default has occurred and is continuing; and (ii) that on the date of, and after giving effect to, such Advance, all of the representations and warranties of the Borrower contained in this Agreement and the other DIP Financing Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of the Borrower set forth in, the Approved Budget.

Section 2.4        Delivery of Advances.  Each Advance shall be delivered to Borrower by wire transfer to the Operating Account pursuant to wiring instructions set forth in the Notice of Borrowing.

Section 2.5        DIP Loan Note.  The DIP Loan, all Advances thereof, and all interest accruing thereon, shall be evidenced by and payable in accordance with this Agreement and the DIP Loan Note.

Section 2.6        Interest.  Prior to the occurrence of an Event of Default, the outstanding principal balance of the DIP Loan shall bear interest at a rate equal to the Prime Rate plus six percent (6.0%) per annum.  On each Interest Determination Date, the interest rate will be raised or lowered to reflect changes in the Prime Rate. Upon the occurrence of any Event of Default, and for as long as the same shall remain outstanding, at the option of Lender all DIP Obligations of Borrower shall bear interest at the Default Rate.  All interest accruing on the DIP Loan or on any other DIP Obligation hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed.

Section 2.7        Term, Payments and Maturity.

(a)        Commencing on August 1, 2017, and on the first day of each month thereafter, the Borrower shall pay to Lender all accrued interest with respect to the outstanding principal amount of the DIP Loan calculated in accordance with Section 2.6 above.

(b)        Notwithstanding anything to the contrary, all DIP Obligations of Borrower shall be due and payable in full, without notice or demand, on the Termination Date.  Upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations, subject to Section 8.3, Lender shall be entitled to immediate payment of such DIP Obligations without further application to or order of the Bankruptcy Court; *provided, however*, that amounts necessary to fund the Carve-Out shall be retained by Borrower in the Operating Account, with any excess to

be returned to Lender by Borrower upon the entry of a final decree dismissing the last bankruptcy case commenced by a Borrower.

(c)     The outstanding principal balance of the DIP Loan or any may be prepaid by Borrower at any time and from time to time, in whole or in part, without premium or penalty.

(d)     All payments shall first be applied first to any outstanding fees and expenses (including attorney fees and expenses, and other Professional Persons' fees and expenses), second to any accrued and unpaid interest, and third, with any balance remaining being applied to reduce the principal amount owed.

Section 2.8    Submission and Approval of Budgets; Variance Reports.

(a)     Proceeds of the DIP Loan will be advanced in accordance with, and for the purposes set forth in, the Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions).  The Approved Budget as of the Effective Date is attached hereto as Exhibit C.  Commencing on the first 1st day (*i.e.*, Monday) following the end of the 1st Loan Week, and on each Monday thereafter, Borrower shall submit to Lender and Purchasers a rolling weekly update of the prior Approved Budget (each, a "Proposed Budget") showing the projected receivables (including an aging report), cash needs (including a projection of accounts payable demonstrating aging), and liquidity of Borrower for the applicable periods.  Such budget, and any interim changes thereto, shall be subject to review and approval by both Lender and Purchasers in their respective sole discretion before being deemed an Approved Budget hereunder, and shall include, at a minimum, the Borrower's good faith projection of all payroll costs, operating expenses, general and administrative expenses, debt service payments, adequate protection payments, Administrative Expenses and other expenses to be incurred by Borrower for the applicable period, together with an aging of accounts receivable, projected cash receipts and estimate of gross and net operating income for the applicable period.  Upon approval of any Proposed Budget, the same shall constitute the Approved Budget hereunder, but until such Proposed Budget shall have been approved, the prior Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions) shall continue in full force and effect.

(b)     Commencing on the first 1st day (*i.e.*, Monday) following the end of the 1st Loan Week and continuing on each 1st day of each week thereafter, Borrower shall deliver to Lender and to Purchaser (i) a comparison of actual to budgeted results of operations for the preceding three (3) Loan Week(s), (ii) a report of all income and expense variance on a line-item basis for the preceding three (3) Loan Week(s) in a form reasonably acceptable to lender (the "Variance Report").  If any Variance Report shall indicate that the Borrower's cumulative net cash flow and/or liquidity for the trailing Loan Week shall be less than eighty-five percent (85%) of the amount of net cash flow and/or liquidity projected in the Approved Budget(s) covering such period (such negative variance of fifteen percent (15%) or less being "Permitted Variance" hereunder), then an Event of Default shall be deemed to exist at the option of Lender and without further notice to Borrower; provided that Lender may, in its sole discretion, waive any violation of the Permitted Variance limit set forth herein or authorize Borrower to exceed the Permitted Variance by written notice to Borrower (each a "Permitted Variance Exception").

Debtor-in-Possessison
Loan and Security Agreement

Section 2.9    <u>Effect on Pre-Petition Loan Documents</u>.    Borrower hereby ratifies and reaffirms its obligations under the Pre-Petition Loan Documents, and agrees and covenants that the obligations thereunder are valid, legal, binding, and enforceable against Borrower without defense, counterclaim, or offset of any kind.    Upon entry of the Interim Order, the Pre-Petition Loan Documents and all liens and security interests granted thereby in the Pre-Petition Collateral shall continue in full force and effect, and Borrower shall perform all of the provisions, including payment obligations, of the Pre-Petition Loan Documents.

<h2 style="text-align:center">ARTICLE THREE- SECURITY</h2>

Section 3.1    <u>Grant of Security Interest</u>.    As security for the prompt satisfaction of all DIP Obligations, subject to the entry of the Financing Orders, Borrower hereby grants, bargains, sells, conveys, mortgages, assigns, transfers, sets over and delivers to Lender, and grants to Lender a valid, binding, continuing, enforceable, non-avoidable, fully perfected, automatically and properly perfected senior priming Lien upon and security interest in, all right, title and interest of the Borrower in and to all property of Borrower and Borrower's estate of every kind, nature and description whatsoever, whether the property is real, personal, tangible, intangible, or mixed, whether now owned or hereafter acquired or existing and wherever located, whether now existing or hereafter acquired or created, together with all replacements therefor, additions and accessions thereto, and Proceeds (including, but without limitation, insurance proceeds) and products thereof (the foregoing, the "<u>Collateral</u>"), which Liens and security interests shall have the priorities set forth in the Financing Order.    For the avoidance of doubt, and by way of explanation and not limitation, the Collateral shall include:

All cash, Accounts, Inventory, Goods, contract rights, mineral rights, Instruments, Documents, Chattel Paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, General Intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, Letter-of-Credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding Capital Stock held by each Borrower, other equity or ownership interests held by any Borrower, including equity interests in Subsidiaries and non-wholly-owned Subsidiaries, money, investment property, choses in action, causes of action (excluding any pre-petition avoidance causes of action under 11 U.S.C. §§ 547 and 548, collectively referred to herein as "<u>Avoidance Actions</u>"), Pre-Petition Collateral, including "cash collateral", and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the Collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and Capital Stock, including, but not limited to, the products, proceeds and supporting obligations thereof, whether in existence on or before the Petition Date or thereafter created, acquired, or arising and wherever located, pursuant to 11 U.S.C. § 364(c)(2), all unencumbered Pre-Petition and Post-Petition property of each Borrower, and all present and after acquired property of each Borrower that is subject to a Lien on or after the Petition Date, wherever located, and all other

16

Collateral, all of the foregoing now owned or in which any Borrower has any interest (and without regard to whether acquired prior or subsequent to the Petition Date) or hereafter acquired or in which any Borrower obtains an interest, and the products and Proceeds thereof.

Section 3.2    Identification of Collateral.  No submission by the Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to grant to Lender a Lien upon or to vest in Lender security title to and a security interest in each and every item of Collateral now existing or hereafter created or acquired, but rather such Lien, security title, and security interest shall vest in Lender immediately upon the creation or acquisition or any item of Collateral hereafter created or acquired, without the necessity for any other or further action by Borrower or by Lender.

Section 3.3    Perfection and Maintenance of Liens.

(a)    Pursuant to the terms of the Financing Orders, the Lien and security interest of Lender in and to all Collateral described herein or in any other Security Document shall be perfected automatically, notwithstanding UCC 9-204(b), and without further action by Lender or Borrower.  No filing, possession, or registration of any kind shall be required in order to perfect the Liens granted herein or in any other Security Document.  Nevertheless, Lender may elect, from an abundance of caution and in order to remove uncertainty, to file or record all such financing statements, mortgages, deeds of trust, deeds to secure debt, security agreements, fixture filings, assignments, memoranda or other instruments or evidences of perfection as Lender may deem appropriate, and no such filing or recording shall in any manner alter, diminish or otherwise limit the automatic perfection of all Liens granted by the Financing Orders.

(b)    In order to further evidence and perfect the security interest of Lender in the Collateral, the Borrowers agree that they shall execute and deliver to Lender all such mortgages, deeds of trust, deeds to secure debt, assignments, pledge agreements, security agreements, affidavits, documents, and instruments with respect to the Collateral as Lender may from time to time request (collectively referred to herein as the "Security Documents").

(c)    Borrower further agrees to take any other action reasonably requested by Lender to insure the attachment, perfection and first priority of, and the ability of Lender to enforce, Lender's security interest in any and all of the Collateral, including (a) authorizing, executing (to the extent that Borrower's signature is required), delivering and filing financing statements and amendments relating thereto under the UCC, (b) causing Lender's name to be noted as secured party on any certificate of title for titled goods if such notation is a condition to attachment, perfection or priority of, or ability of Lender to enforce, Lender's security interest in such Collateral, (c) complying, to the extent possible and/or permitted under the Bankruptcy Code, with any provision of any statute, rule, regulation or treaty of any jurisdiction as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, Lender's security interest in such Collateral, (d) using Borrower's best effort to obtain any governmental and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other person obligated on Collateral, and (e) endorsing, assigning and delivering to Lender any certificated Capital Stock owned by

17

Borrower or any promissory note or other instrument held by Borrower, now or hereafter acquired, accompanied by such instruments of transfer or assignment duly executed in favor of Lender or in blank.

(d)    Borrower authorizes Lender to prepare, record, or file all such notices or instruments of perfection as may be necessary or desirable, in the sole discretion of Lender, to establish, perfect and maintain Lender's Lien upon the Collateral including, without limitation, UCC financing statements (collectively referred to herein as the "Perfection Documents").

(e)    Borrower hereby appoints Lender as its true and lawful attorney-in-fact (without requiring Lender to act as such), which power shall be coupled with an interest and irrevocable, to prepare, execute (to the extent that Borrower's signature is required) and record or file any Security Documents or Perfection Documents, and to perform all other acts that Lender deems appropriate, to establish, perfect, maintain and continue Lender's Lien upon the Collateral and to protect and preserve the Collateral.

Section 3.4    Costs of Perfection.    Borrower shall pay, or reimburse Lender upon demand for the payment of, all costs, expenses and taxes of any kind or character incurred in connection with filing or recording the Security Documents or the Perfection Documents in such jurisdictions as Lender may designate.   All such costs and expenses may be funded through Advances hereunder in Lender's sole discretion.

Section 3.5    Further Assurances.    Upon request by Lender, Borrower will make, execute and deliver or cause to be made, executed and delivered to the Lender and, where appropriate, cause to be recorded or filed, as applicable, and from time to time thereafter to be re-recorded or refiled, as applicable, at such time and in such offices and places as shall be deemed necessary by Lender, any and all such instruments of further assurance, certificates, and other documents as may, in the opinion of Lender, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve, the operation and effect of this Agreement and the Security Documents.

Section 3.6    Priority of Liens.    Borrower hereby covenants, represents, and warrants that, upon entry of the Financing Orders and in accordance with the Financing Orders, the DIP Obligations and the Liens against the Collateral securing the DIP Obligations shall, subject to the Carve-Out: (i) constitute the DIP Super-Priority Claim; and (ii) pursuant to Section 364(d)(1) of the Bankruptcy Code, constitute perfected first priority priming Liens on all Collateral which shall prime any Liens existing on the Petition Date (other than such Liens as may have been duly-perfected and which were senior to the Lender's Pre-Petition Liens prior to the Petition Date).

Section 3.7    No Discharge; Survival of Claims.    Borrower agrees that (i) its obligations hereunder and under the other DIP Financing Documents shall not be discharged by the entry of an order confirming any plan of reorganization under the Bankruptcy Code, dismissing the Case, or converting the Case to a case under Chapter 7 of the Bankruptcy Code (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge with respect to such obligations), and (ii) the Super-Priority Claims granted to the Lender pursuant to the Financing Orders and described in Article Three of this Agreement and the DIP Claims and

Liens granted to the Lender pursuant to the Financing Orders and described in Article Three of this Agreement shall not be affected in any manner by the entry of an order confirming any plan of reorganization, dismissing the Case, or converting the Case to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE FOUR - CONDITIONS TO ADVANCES

Section 4.1     <u>General Conditions</u>.    Unless otherwise indicated herein, prior to making any Advance hereunder Lender shall be entitled, in its sole discretion, to require that any one or more of the following requirements be satisfied as of the date of such Advance (unless waived by Lender in its sole discretion):

(a)     This Agreement and all other DIP Financing Documents, each duly authorized and executed, shall have been delivered to Lender.

(b)     [**RESERVED**]

(c)     [**RESERVED**]

(d)     All Security Documents required by Lender shall have been filed or recorded in such offices as Lender shall direct, and all fees, taxes or other charges in connection with such filing or recording shall have been paid.  Lender confirms that, as of the Effective Date, no Security Documents are presently required.

(e)     All information, approvals, documents, or other instruments as the Lender may reasonably request shall have been received by Lender.

(f)     On the date of and immediately after giving effect to each Advance, no Default or Event of Default shall have occurred and be continuing.

(g)     No change resulting in a Material Adverse Effect shall have occurred since the Effective Date.

(h)     Prior to making the initial Advance, all of the First Day Orders shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender;

(i)     The Interim Order, and when required hereunder the Final Order, shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender.

## ARTICLE FIVE - REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

Section 5.1    <u>Existence and Power</u>.    Borrower (i) is a legal business entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization set forth in the preamble to this Agreement; (ii) has all requisite powers and all governmental and regulatory licenses, authorizations, consents and approvals required to carry on Borrower's Business as now conducted; and (iii) is qualified to transact business as a foreign entity in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.

Section 5.2    <u>Ownership Structure</u>.    The identity of the holders of the Capital Stock of each of Borrower and the percentage of their fully diluted ownership of the Capital Stock of each as the Effective Date is as set forth on <u>Schedule 5.2</u>.  All issued and outstanding Capital Stock of Borrower and its Subsidiaries (if any) is duly authorized and validly issued, fully paid, non-assessable, free and clear of all Liens other than those in favor of Lender, and such Capital Stock was issued in compliance with all applicable laws.  No shares of the Capital Stock of Borrower or its Subsidiaries (if any), other than those described above, are issued and outstanding as of the Effective Date.  Except as set forth on <u>Schedule 5.2</u>, as of Effective Date there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from Borrower or its Subsidiaries (if any) of any Capital Stock of any such entity.

Section 5.3    [**RESERVED**]

Section 5.4    <u>Governmental Approvals</u>.  Except for the entry of the Interim Order (and, where applicable, the Final Order), no consent or approval of any governmental agency or authority is required in connection with the execution, delivery and performance by Borrower of the DIP Financing Documents.

Section 5.5    <u>Binding Effect</u>.  Subject in each case to the entry of the Interim Order (or, where applicable, the Final Order), all DIP Financing Documents to which it is a party are legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms, and all future DIP Financing Documents not executed contemporaneously with the execution of this Agreement, when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms.

Section 5.6    <u>ERISA</u>.  To the extent applicable, Borrower has fulfilled its obligations under the minimum funding standards of ERISA and the IRS Code with respect to each plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the IRS Code, and has not incurred any liability to the Pension Benefit Guaranty Corporation or to a plan under Title IV of ERISA which the failure to comply with could have a Material Adverse Effect.

Section 5.7      [**RESERVED**]

Section 5.8      <u>Liabilities, Litigation</u>.  Borrower has no material (individually or in the aggregate) liabilities, direct, or contingent, except as disclosed in the Borrower's Schedules. Borrower has not received any written notice of any material (individually or in the aggregate) litigation, legal, or administrative proceeding, investigation, or other action of any nature pending or, to the knowledge of Borrower, threatened against or affecting Borrower.

Section 5.9      [**RESERVED**]

Section 5.10      <u>Title to Property</u>.  Borrower is the sole and absolute owner of, or has the legal right to use and occupy, all Property it claims to own which is necessary for Borrower to conduct Borrower's Business.  Borrower enjoys peaceful and undisturbed possession in all material respects under all leases under which it is operating as lessee which are necessary for the conduct of Borrower's Businesses free and clear of all Liens other than Permitted Liens.

Section 5.11      <u>Compliance With Laws</u>.  Other than any non-compliance that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Borrower has complied in all material respects with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all federal, state, county, municipal, and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials, and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all requirements of ERISA; (iii) all Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

Section 5.12      [**RESERVED**]

Section 5.13      <u>Approved Budget</u>.  The Approved Budget as of the Effective Date reflects, and each Proposed Budget hereafter submitted by Borrower shall reflect, the Borrower's good faith estimate and projection of (i) all operating expenses to be incurred by Borrower in the ordinary course of business, consistent with past practices, (ii) all Administrative Expenses to be incurred by Borrower in connection with the Case, and (iii) all income expected by Borrower, in each case during the periods covered thereby.

Section 5.14      <u>Investment Company</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 5.15      <u>Margin Stock</u>.  No proceeds of the DIP Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be

inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Requirements of Law or by the terms and conditions of this Agreement or the other DIP Financing Documents.

Section 5.16    Anti-Terrorism Laws.    No Borrower, nor any of its Subsidiaries or its Affiliates, is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. No Borrower, nor any of its respective Affiliates, or its respective agents acting or benefiting in any capacity in connection with the DIP Loan or other transactions under the DIP Financing Documents, is any of the following (each a "Blocked Person"):

(a)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(b)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(c)    a Person or entity with which the Bank is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(d)    a Person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224; or

(e)    a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or a person or entity who is affiliated or associated with a person or entity listed above.

To Borrower's knowledge, no Borrower nor any of their respective Subsidiaries or Affiliates, (i) conducts any business or engages in making or receiving any contribution of funds, goods, or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

## ARTICLE SIX - COVENANTS

Section 6.1    Affirmative Covenants of Borrower.    At all times prior to payment in full of the DIP Obligations, Borrower covenants and agrees as follows:

(a)    Notice of Default.    Upon becoming aware of the occurrence of any event which constitutes a Default, Borrower shall immediately deliver written notice thereof to Lender together with a detailed statement by a responsible officer of Borrower outlining the steps being taken to cure such Default.

(b)    Compliance with Laws.    To the extent the failure to comply could have a Material Adverse Effect, Borrower will observe and comply with all laws, statutes, codes, acts,

ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions, and requirements of all federal, state, county, municipal, and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials, and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all applicable requirements of ERISA, (iii) all applicable Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

(c)    Payment of Taxes.    Borrower will pay and discharge all Post-Petition taxes, assessments and governmental charges or levies imposed upon it, or upon its income and profits, prior to the date on which penalties might attach thereto and all lawful claims which, if unpaid, might become a Lien upon the assets of Borrower; *provided, however*, that Borrower shall not be required to pay and discharge any such tax, assessment, charge, levy or claim so long as the legality thereof shall be contested in good faith and by appropriate proceedings and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such taxes, assessments and governmental charges forthwith upon the commencement of proceedings to sell, seize or collect any Property attached as security therefor, unless such sale, seizure or collection is stayed by the filing of an appropriate bond.

(d)    Payment of Claims.    To the extent set forth in the Approved Budget, the Financing Orders or otherwise agreed in writing by Lender, Borrower will promptly pay and discharge all Post-Petition (i) trade accounts payable in accordance with usual and customary business practices, and (ii) claims for work, labor or materials which if unpaid might become a Lien upon any of its Property or assets; *provided, however*, that Borrower shall not be required to pay any such account payable or claim the payment of which is being contested in good faith and, if necessary, by appropriate proceedings and for which adequate provision as determined in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such accounts payable and claims forthwith upon the commencement of proceedings to foreclose any Lien which is attached as security therefor, unless such foreclosure is stayed by the filing of an appropriate bond.

(e)    Insurance.    Borrower shall maintain, and shall cause each of its Subsidiaries, if any, to maintain, with financially sound and reputable insurance companies, insurance on all its Properties in such amounts and against such risks as Lender shall reasonably require, which shall at least be equal to such coverage and amounts as are usually insured against in the same general area by companies engaged in the same or a similar business; *provided, however*, such requirements shall not exceed those set forth in the Pre-Petition Loan Documents. All such insurance may be subject to reasonable deductible amounts. Borrower shall deliver to Lender certificate(s) of insurance on the date hereof and upon the annual (or other shorter period of time) renewal of such policies specifying the details of all insurance then in effect, together with a certificate of an officer of Borrower that all premiums then due have been paid. Borrower shall notify Lender immediately in writing of any material fire or other casualty to or accident involving any of the Collateral, whether or not such fire, casualty or accident is covered by insurance. Borrower shall notify promptly the insurance company and submit an appropriate claim and proof of claim to the insurance company if any Collateral is damaged or destroyed by fire or other casualty. Borrower shall not declare or agree with underwriters that any Collateral

23

is a compromised, agreed, arranged or constructive total loss without the prior written consent of Lender. All such policies of insurance shall cover the interest of Lender as mortgagee, loss payee, or additional insured in accordance with the requirements of the Pre-Petition Loan Documents.

(f)     <u>Maintenance of Property</u>. Borrower will at all times maintain, protect and keep in good repair, working order, and condition (ordinary wear and tear excepted), all Property necessary to the operation of Borrower's Business.

(g)     <u>Maintenance of Intellectual Property</u>. Borrower will obtain or maintain in full force and effect, all licenses, franchises, patents, trademarks, copyrights, intellectual property, permits, authorizations, and other rights as are necessary for the conduct of Borrower's Business.

(h)     <u>Existence</u>. Borrower will do all things necessary to (i) preserve and keep in full force and effect at all times its legal existence, and (ii) be duly qualified to do business in all jurisdictions where the nature of its business or its ownership of Property requires such qualification.

(i)     <u>Notice of Claims</u>. Upon becoming aware of any adverse claim herein described, Borrower shall immediately provide written notice to Lender of (i) the filing of any Lien against any Property of Borrower, or (ii) the existence of any material dispute under any contract or agreement to which Borrower is a party, or (iii) the filing of any lawsuit by or against Borrower, or (iv) the entry of any judgment against Borrower.

(j)     <u>Maintenance of Books and Records, Consultations, Audits and Inspections, and Reporting</u>. Borrower will maintain books and records in accordance with GAAP and in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities. Borrower will permit Lender and Lender's Professional Persons to discuss the affairs, finances, and accounts of Borrower with the CRO and other officers of Borrower and its independent public accountants, all at such reasonable times and as often as Lender may request. Borrower shall also permit inspection of its Properties, books, and records by Lender (and any Person appointed by Lender) during normal business hours and at other reasonable times. In general, Borrower shall at all times cooperate fully with Lender and Lender's Professional Persons in the delivery of any and all such information related to Borrower's Business or any Properties of Borrower as may be reasonably requested.

(k)     <u>Further Assurances</u>. Borrower will execute and deliver to Lender, at any time and from time to time, any and all further agreements, documents and instruments, and take any and all further actions which may be required under applicable law, or which Lender may from time to time reasonably request, in order to effectuate the transactions contemplated by this Agreement and the other DIP Financing Documents.

(l)     <u>Use of Proceeds</u>. Borrower shall use the proceeds of the DIP Loan solely for the purposes permitted by this Agreement.

Debtor-in-Possesssion
Loan and Security Agreement

(m)    <u>Collection of Receivables.</u>    Keep accurate and complete records of its accounts receivables in all material respects, consistent with sound business practices and collect all such receivables in the ordinary course of business.

(n)    <u>Compliance Program.</u> Maintain, and cause its Subsidiaries to maintain, an appropriate corporate compliance program which shall include, without limitation, the designation of a compliance officer, HIPAA privacy and security officer(s), policies and procedures designed to ensure compliance with HIPAA privacy and security rules, a compliance committee, ethics and risk area policy materials, fraud and abuse prevention, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies.

Section 6.2    <u>Negative Covenants of Borrower</u>.    At all times prior to payment in full of the DIP Obligations, Borrower, covenants and agrees as follows:

(a)    <u>Limitation on Indebtedness.</u>    Borrower will not incur or be obligated on any Indebtedness other than: (i) obligations to Lender under the DIP Financing Documents; (ii) Indebtedness relating to employee benefit plans; (iii) Indebtedness in respect of taxes, assessments, governmental charges or levies and claims for labor, materials, and supplies to the extent that payment therefor shall not then be required to be made in accordance with this Agreement; (iv) Indebtedness in respect of judgments or awards (which do not constitute an Event of Default) that have been in force for less than the applicable period for taking an appeal and for which adequate provision as determined in accordance with GAAP has been made so long as execution is not levied thereunder and in respect of which Borrower shall at the time in good faith be prosecuting an appeal or proceedings for review and a suspending appeal bond in the full amount of such judgment or award shall have been obtained by Borrower with respect thereto; (v) current liabilities of Borrower incurred in the ordinary course of Borrower's Business or in connection with Borrower's prosecution of the Case and not incurred through (A) the borrowing of money, or (B) the obtaining of credit except for credit on an open account basis customarily extended and in fact extended in connection with normal purchases of goods and services; (vi) endorsements for collection, deposits, or negotiation and warranties of products or services, in each case incurred in the ordinary course of business; (vii) Indebtedness in respect of performance, surety or appeal bonds obtained in the ordinary course of Borrower's Business; and (viii) Indebtedness existing as of the Petition Date, as disclosed in writing to Lender.

(b)    <u>Consolidation, Merger, Sale of Assets, Dissolution, Etc</u>.    Except in connection with any transaction approved by the Bankruptcy Court in connection with the Sale Order, Borrower will not (i) directly or indirectly merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it or (ii) sell, assign, lease, transfer, abandon, or otherwise dispose of any of its Property, except for sales permitted under this Agreement.

(c)    <u>Changes in Nature of Business</u>.    Borrower will not engage in any business if, as a result, the general nature of the business which would then be engaged in by Borrower, considered as a whole, would be substantially changed from Borrower's Business.

(d)    <u>Change of Control</u>.   Borrower shall not allow any Change of Control to occur.

(e)    <u>Liens</u>.    Except with respect to Permitted Liens, Borrower will not mortgage or encumber any of its Property or suffer any Liens to exist on any of its Property without the prior written consent of the Lender.

(f)    <u>No Contest</u>.   Borrower will not contest the validity, legality, binding effect or priority of the Pre-Petition Loan Documents, the DIP Financing Documents or any Liens in favor of Lender upon the Collateral.

(g)    <u>Restricted Investments</u>.   Borrower will not, directly or indirectly, make or hold any Post-Petition Restricted Investments.

(h)    <u>Critical Vendors</u>.    Borrower will not pay any critical vendors for Pre-Petition claims without (i) the prior written consent of Lender, and (ii) an appropriate order from the Court.  Notwithstanding the foregoing, Lender agrees that Borrower shall be permitted to pay any Pre-Petition claims to critical vendors which are included in the Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions) and authorized by the First Day Orders.

(i)    <u>Change in Management</u>.   Without the prior written consent of Lender, Borrower will not permit any Change in Management.

(j)    <u>Executive Compensation</u>.    Borrower shall not increase the gross compensation or benefits paid to, for or on behalf of any executive officer or senior management employee of Borrower without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion.

(k)    <u>Agreements</u>.    Borrower shall not contest or reject in the Case any Pre-Petition indenture, contract, agreement, lease, or other instrument which is necessary to the continued conduct of Borrower's Business, other than with the prior written consent of Lender and/or as may be required by the APA.

(l)    <u>State of Organization; Location of Chief Executive Office</u>.  Borrower shall not change its state of organization, principal place of business, or chief executive office, unless Borrower has obtained Lender's prior written consent and has taken such action as is necessary to cause the security interest of Lender in the Collateral to continue to be a first-priority perfected security interest subject only to Permitted Liens.

(m)    <u>Other Borrowings</u>.   Borrower irrevocably waives any right it may have, and hereby agrees that at no time shall it seek authority from the Bankruptcy Court (i) to obtain any secured or unsecured Post-Petition loans or other financial accommodations, including without limitation, loans and financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than the DIP Loan on the terms and conditions set forth herein, or (ii) to propose or support any plan of reorganization or liquidation with respect to Borrower that does not provide for the indefeasible payment in full and satisfaction of all DIP Obligations and Pre-Petition Obligations.

Debtor-in-Possesssion
Loan and Security Agreement

(n)    <u>Anti-Terrorism Laws</u>. Borrower, its Subsidiaries, Affiliates and agents shall not knowingly (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law.

## ARTICLE SEVEN- HEALTHCARE MATTERS.

Section 7.1    For the purposes of this Article VII, the following terms shall have the following respective meanings:

"<u>CHAMPVA</u>" means, collectively, the Civilian Health and Medical Program of the Department of Veteran Affairs, and all laws, rules, regulations, manuals, orders, guidelines or requirements pertaining to such program including, without limitation (a) all federal statutes (whether set forth in 38 U.S.C. § 1713 or elsewhere) affecting such program, and (b) all rules, regulations (including 38 C.F.R. § 17.54), manuals, orders and administrative, reimbursement and other guidelines of all Governmental Authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to times.

"<u>CMS</u>" means the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services or any successor or predecessor thereto, including the United States Healthcare Financing Administration.

"<u>Federal Healthcare Programs</u>" mean Medicaid, Medicare, TRICARE, CHAMPVA and any other federal healthcare program, as defined in 42 U.S.C. § 1320a-7b(f).

"<u>Healthcare Laws</u>" means, to the extent applicable, any federal, state and municipal statutes, regulations, rules and orders and other requirements of any Governmental Authority with respect to healthcare laws, healthcare regulatory and fraud and abuse matters applicable to providers of healthcare services, the provision of and supervision of medical or nursing or other professional healthcare services, billing and collection practices relating to the payment for healthcare services, insurance law and workers' compensation law as they relate to the provision of, and billing and payment for, healthcare services, patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, the practice of medicine, the corporate practice of medicine, telemedicine, fee splitting, including, without limitation (as may be amended from time to time):

(i)    all federal and state fraud and abuse laws relating to third party reimbursement, the Federal Healthcare Program anti-kickback law, 42 U.S.C. §§ 1320a-7b *et seq.* and the regulations promulgated thereunder (commonly referred to as the "<u>Federal Anti-Kickback Law</u>") and any applicable state or local anti-kickback law, the federal physician self-referral law, 42 U.S.C. §§ 1395nn *et seq.*

and the regulations promulgated thereunder (commonly referred to as the "Stark Law") and any similar state or local self-referral law, the federal civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, the federal criminal false claims statutes, 18 U.S.C. §§ 287 and 1001, (ii) the Health Insurance Portability and Accountability Act of 1996 including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transactions Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164) promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and any regulations promulgated thereunder (commonly and collectively referred to as "HIPAA"), (iii) 18 U.S.C. § 1347 (commonly referred to as the "Healthcare Fraud and Scheme Law"), (iv) the federal Food, Drug & Cosmetics Act, 21 U.S.C. § 360aaa, (v) applicable sections of the Social Security Act, including 42 U.S.C. §§ 1320a-7, 1320a-7a and 1320a-7c, (vi) the Patient Protection and Affordable Care Act, Pub. L. No. 111-152, (vii) the Medicare regulations, the Medicaid program and any Medicaid provider manuals governing suppliers/providers generally, (viii) any participation, claims submission and reimbursement requirements for providers of healthcare services, (ix) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, (x) 42 CFR Part 2 (confidentiality of alcohol and drug abuse patient records), (xi) all applicable requirements to maintain DEA registration and any and all same or similar state law counterparts, (xii) the Occupational Safety and Health Act of 1970 ("OSHA") and all laws pertaining to precautions against the spread of bloodborne pathogens in the workplace, (xiii) quality, safety and accreditation standards and requirements of all applicable state Governmental Authorities or accreditation agencies, and (xiv) any and all comparable state or local laws and other applicable healthcare laws, regulations, manual provisions policies, and administrative guidance. All references to "healthcare" in this definition include, without limitation, mental and behavioral healthcare treatment and services, and addiction treatment services.

"Healthcare Permit" means, with respect to any Person, a governmental license, authorization, registration, permit consent or approval (a) issued or required under Healthcare Laws applicable to the business of Borrower or its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services applicable to the business of Borrower or its Subsidiaries and/or (b) issued or required under Healthcare Laws applicable to the ownership or operation of its business, including, without limitation, certifications or licenses issued by the California Department of Healthcare Services.

"Licensed Professional" means any duly licensed healthcare professional employed or engaged by Borrower or Subsidiary thereof in the conduct of such Borrower's or Subsidiary's business.

Debtor-in-Possesssion
Loan and Security Agreement

"Medicaid" means that means-tested entitlement program under Title XIX of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth at Section 1396, et seq. of Title 42 of the United States Code.

"Medical Reimbursement Programs" means, collectively, any Federal Healthcare Program, and any other healthcare programs operated by or financed in whole or in part by any foreign or domestic federal, state or local government, and any private or commercial insurance companies or plans, managed care plans, health maintenance organizations, preferred provider organizations, alternative delivery systems, government contracting agencies and all other non-government funded Medical Reimbursement Programs.

"Medicare" means that government-sponsored entitlement program under Title XVIII of the Social Security Act, which provides for a health insurance system for eligible elderly and disabled individuals, as set forth at Section 1395, *et seq*. of Title 42 of the United States Code.

Section 7.2    Without limiting the forgoing warranties, representations and/or covenants, at all times prior to payment in full of the DIP Obligations, Borrower hereby agrees, warrants, represents, and covenants with Lender, as follows:

(a)    Other than matters disclosed in the Borrower's Schedules, there is no material litigation, claim, audit, proceeding or investigation currently pending or, to the knowledge of Borrower, threatened against Borrower or any Subsidiary, or any officer, director, member of senior management or employee (in each instance, as relates to such individual's employment or engagement by any Borrower or any Subsidiary) of any Borrower or any Subsidiary, relating to Borrower's or any Subsidiary's business for any material violation of any Healthcare Laws. Neither Borrower nor any Subsidiary has received written notice of any threat of any material suit, action, claim, dispute, investigation, inquiry, audit, agency review or other proceeding pursuant to or involving, Healthcare Laws. Borrower, each Subsidiary, and each Licensed Professional (in each instance, as relates to such individual's employment or engagement by any Borrower) is in material compliance with all Healthcare Laws. There is no plan, intention, or actual notification, or filing by Borrower, any Subsidiary or, to Borrower's knowledge, or any of its owners, employees, agents and contractors (in their capacities as such) self-disclosing any material violations of any Requirements of Law with any Governmental Authority, including, but not limited to disclosures filed pursuant to the Self-Referral Disclosure Protocol established by CMS with respect to the Stark Law, the Self-disclosure Protocol established by the Office of Inspector General or any similar disclosure to any Government Authority.

(b)    Other than matters disclosed in the Borrower's Schedules, no Borrower or Subsidiary is a party to a corporate integrity agreement, settlement agreement, deferred prosecution agreement, consent decree, or other similar agreement with or imposed by any Governmental Authority. Other than matters disclosed in the Borrower's Schedules, no Borrower has, to the knowledge of such Borrower, been a defendant in any *qui tam*/False Claims Act litigation. Other than matters disclosed in the Borrower's Schedules, no Borrower has been served with or received any search warrant, subpoena, civil investigative demand, or other written correspondence by or from any Governmental Authority regarding any actual or alleged violation of any Healthcare Laws.

Debtor-in-Possesssion
Loan and Security Agreement

(c)    Borrower and each Subsidiary are in material compliance with HIPAA. Borrower has developed and has implemented policies and procedures and training programs to help assure ongoing compliance with HIPAA's privacy, security, and standard transactions regulations and state privacy and security laws. To the knowledge of Borrower, no material violation of HIPAA has been alleged or threatened against Borrower or any Subsidiary by any Governmental Authority, a patient or any other Person in the past four years. Each Borrower and Subsidiary has entered into all necessary "business associate" agreements as required under HIPAA (a "Business Associate Agreement"). No Borrower or Subsidiary is in material breach of any Business Associate Agreement. To the knowledge of Borrower, no Borrower or Subsidiary is under investigation by any Governmental Authority for a material violation of HIPAA or any similar state privacy laws, including the receipt of any notices from the United States Department of Health and Human Services Office of Civil Rights, relating to any such violations.

(d)    [**RESERVED**]

(e)    The execution and delivery of this Agreement, or other DIP Financing Documents, Borrower's performance thereunder, or the recordation of any instruments or documents in connection therewith will not adversely affect any material Healthcare Permit held by Borrower or any Subsidiary.

(f)    (i) No Borrower or Subsidiary, nor any of its respective officers, directors, members of senior management, or to the knowledge of Borrower, its employees, Licensed Professional, contractors or agents (A) is excluded, suspended or otherwise declared ineligible to participate in any Federal Healthcare Program or other Medical Reimbursement Program or by any Governmental Authority, or (B) has committed any offense related to the provision of healthcare services that may reasonably serve as the basis for any such exclusion, suspension, disbarment or other ineligibility, and (ii) no "final adverse action," as such term is defined under 42 U.S.C. § 1320a-7e(g), has occurred or is pending or, to Borrower's knowledge, threatened against Borrower, or any of its respective officers, directors, members of senior management, or to the knowledge of Borrower, its employees, Licensed Professional, contractors or agents (collectively "Exclusion/Adverse Actions"). To the knowledge of Borrower, each Person (including, without limitation, each physician or other medical or nursing professional) employed or engaged by Borrower to provide services has obtained and maintains all necessary licensure, registration, accreditation, and/or certification to provide such services in compliance with all applicable Healthcare Laws and requirements of Medical Reimbursement Programs, as applicable. The applicable Borrower has made commercially reasonable efforts to verify that all such persons providing services on behalf of Borrower has valid and current licenses, permits, and credentials as applicable, and has undergone appropriate background checks, including criminal background checks.

(g)    No Borrower currently is enrolled or previously has been enrolled in any Federal Healthcare Program, nor submits claims to any Federal Healthcare Program.

(h)    Borrower, to the extent applicable, has all material Healthcare Permits from, and has made all material declarations and filings with, all applicable Governmental Authorities necessary to engage, respectively, in the management or operation of, or provision of

services at, each of the locations from which it provides or furnishes goods or services governed by Healthcare Laws.

(i)    Each Healthcare Permit issued to Borrower is valid and in full force and effect, and Borrower is in material compliance with the terms and conditions of all such Healthcare Permits.

(j)    No Borrower has received written notice from any Governmental Authority with respect to the involuntary revocation, suspension, restriction, limitation or termination of any material Healthcare Permit nor, to the knowledge of Borrower, is any such action proposed or threatened in writing.

(k)    Immediately upon any officer or director of Borrower obtaining knowledge, Borrower shall provide written notice to Lender of the following: (a) of the institution of any investigation, review or proceeding against Borrower, any Affiliate of Borrower, or Licensed Professional to suspend, revoke or terminate (or that may reasonably be expected to result in the termination of) any Medical Reimbursement Program provider agreement, or any such investigation or proceeding that could reasonably be expected to result in the exclusion of Borrower, Affiliate of Borrower, or Licensed Professional from any Medical Reimbursement Program; (b) any written notice of loss or threatened loss of any Healthcare Permit; (c) that Borrower, any Affiliate of Borrower or Licensed Professional has become subject to any federal, state, local governmental, or private payor civil or criminal investigations or audits involving and/or related to its compliance with Healthcare Laws (including, without limitation, an inquiry or investigation of any Person having "ownership, financial or control interest" (as that phrase is defined in 42 C.F.R. § 420.201 et seq.)) in Borrower or Affiliate (other than routine payor audits in the ordinary course of business that are not the result of any actual or alleged violations of Healthcare Laws); (d) that an owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Borrower or Affiliate: (i) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (ii) has been excluded from participation in a Federal Healthcare Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (iii) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (iv) has been involved or named in a U.S. Attorney complaint made or any other action filed pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731, including any qui tam action brought pursuant to 31 U.S.C. § 3729 *et seq.*; (v) of any revocation, suspension, termination, probation, restriction, limitation, denial, or nonrenewal of a material Healthcare Permit; or (vi) of Borrower enrolling with or submitting claims to any Federal Healthcare Program.

## ARTICLE EIGHT - EVENTS OF DEFAULT AND REMEDIES

Section 8.1    The occurrence of any of the following events or circumstances shall constitute an "Event of Default" hereunder:

(a)     Upon three (3) days' written notice, Borrower shall fail to pay any DIP Obligation when such DIP Obligation is due and payable.

(b)     Any representation or warranty of Borrower made in this Agreement, in any other DIP Loan Document or in any certificate, agreement, instrument, or statement furnished or made or delivered pursuant hereto or thereto shall prove to have been untrue or incorrect in any material respect (or in the case of any representation or warranty qualified by a materiality standard, in any respect) when made or effected.

(c)     Borrower shall fail to perform or observe any term, covenant, condition or agreement contained in this Agreement or in any other DIP Loan Document, or if there shall at any time exist any event, occurrence, condition or state of facts which constitutes a breach or violation of any term, covenant, condition, or agreement contained in this Agreement or in any other DIP Loan.

(d)     If there shall occur or exist any "Default" or "Event of Default" under, and as defined in, any DIP Financing Document other than this Agreement and Borrower and/or Guarantors (if applicable) shall not have cured such "Default" or "Event of Default" within any notice, grace or cure period specified with respect thereto in such other DIP Financing Document.

(e)     (i) The loss, denial, suspension, revocation, termination, restriction, lapse, or voluntary relinquishment of any material license required to permit Borrower or any Subsidiary to conduct and operate its business or the initiation of any such action, (ii) the indictment or conviction of Borrower, any Subsidiary, any Guarantor, or any of their respective officers, directors, or members of senior management for a criminal offense related to the provision of healthcare services, (iii) the occurrence of any Exclusion/Adverse Action or notice of any intent to or proposed Exclusion/Adverse Action with respect to any Borrower, Subsidiary, any Guarantor, or any of their respective officers, directors, or members of senior management, (iv) any complaint, investigation, or inquiry by any Governmental Authority or Medical Reimbursement Program that finds a material violation of Healthcare Laws.

(f)     This Agreement or any other DIP Loan Document shall at any time for any reason (other than permitted cancellation by Lender) cease to be in full force and effect or shall be declared to be null and void by a court, or if the validity or enforceability hereof or thereof shall be contested or denied by Borrower and/or any Guarantor, or if the transactions contemplated hereunder or thereunder shall be contested by Borrower and/or any Guarantor, or if Borrower and/or any Guarantor shall repudiate or deny any liability or obligation hereunder or thereunder.

(g)     If any enforcement action, including adversary proceedings in bankruptcy court, is brought against Borrower with respect to any Pre-Petition or Post-Petition Indebtedness owing to any other creditor.

(h)     If any judgment, decree, arbitration award, or ruling shall be entered against Borrower involving, in the aggregate, a Pre-Petition or Post-Petition liability (not paid or

Debtor-in-Possesssion
Loan and Security Agreement

covered by insurance), and the enforcement or collection in respect of such judgment, decree, award or ruling shall not have been vacated, paid, discharged, stayed, or suspensively appealed.

(i)        The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or Borrower, any Guarantor, or any party-in-interest shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer, or an examiner with powers relating to the operation of the business under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case; or an application shall be filed by Borrower, any Guarantor, or any party-in-interest for the approval of any other Super-Priority Claim (other than the DIP Super-Priority Claim and the Carve-Out) in the Case, which is proposed to be in *pari passu* with or senior to the claims of Lender with respect to the Collateral granted hereunder or granted to Lender under the Pre-Petition Loan Documents or cash collateral order, or there shall arise or be granted any such *pari passu* or senior Super Priority Claim with respect to the Collateral granted hereunder or granted to Lender under the Pre-Petition Loan Documents or cash collateral order.

(j)        The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Collateral, or an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying any Financing Order, as applicable.

(k)        Except as permitted by the Approved Budget, any Lender approved Proposed Budget, the Financing Orders or the First Day Orders, Borrower shall make any payment (in cash, in kind, or otherwise) of any Pre-Petition Indebtedness (other than indebtedness owing under the Pre-Petition Loan Documents).

(l)        Other than as permitted by the Carve-Out and subject to entry of the Final Order, Borrower or any Guarantor (or any successor in interest to Borrower, including, without limitation, any trustee in the Case) shall assert any claim for Administrative Expenses against any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

(m)        Any change having a Material Adverse Effect shall have occurred since the Effective Date.

(n)        Borrower shall fail to file the Sale Motion with the Bankruptcy Court on or before June 9, 2017, or such later date as may be agreed to in writing by Lender in its sole discretion.

(o)        **[RESERVED]**

(p)        Subject to the Bankruptcy Court's availability, the Final Order shall not have been entered by the Bankruptcy Court on or before June 26, 2017, or such later date as may be agreed to in writing by Lender in its sole discretion.

(q)    Subject to the Bankruptcy Court's availability, the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before June 9, 2017, or such later date as may be agreed to in writing by Lender in its sole discretion.

(r)    The Auction shall not have been held on or before July 7, 2017. Subject to the Bankruptcy Court's availability, the "Sale Order" contemplated by the APA shall not have been entered by the Bankruptcy Court on or before July 14, 2017.

(s)    The Closing Date shall not have occurred on or before July 28, 2017.

(t)    Borrower shall be in material default of its obligations under the APA, the Financing Orders, the Sale Order, or any other orders of the Bankruptcy Court.

(u)    The APA shall be rescinded, terminated, repudiated, declared to be null and void by Borrower, Purchaser, or a court of competent jurisdiction, or otherwise cease to be in full force and effect for any reason.

(v)    The sale transaction between Borrower and Purchaser (or the successful bidder) at such sale shall fail to close in accordance with its terms as approved by order of the Bankruptcy Court.

(w)    If any Variance Report shall reflect a negative variance exceeding the Permitted Variance or Permitted Variance Exception, as applicable.

(x)    If Borrower shall challenge the application of any payments authorized by the Financing Orders pursuant to Section 506(b) of the Bankruptcy Code.

(y)    If Borrower shall seek any relief under the Bankruptcy Code including, without limitation, Section 105 of the Bankruptcy Code, to the extent such relief would in any way restrict or impair the rights and remedies of Lender provided in the Financing Orders, the Pre-Petition Loan Documents, or in any DIP Financing Document.

(z)    Any failure of any party to the APA to timely satisfy any APA Contingency or condition contained in the APA, or there is an occurrence of a default under the APA.

Section 8.2    <u>Termination and Acceleration</u>.    Upon the occurrence and during the existence of any Event of Default, Lender shall be under no obligation to fund any Advance hereunder.    If an Event of Default shall have occurred, then without further order of or application to the Bankruptcy Court, and without notice to any Person, Lender may, in its sole and absolute discretion, terminate the Availability Period and declare all DIP Obligations to be immediately due and payable, whereupon all of the DIP Obligations shall become and be immediately due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower; *provided, however,* that upon the occurrence of any event described in <u>Subsections 8.1(i)</u> of this Agreement, the discretion of Lender to make Advances under this Agreement shall automatically terminate and all DIP Obligations shall automatically become immediately due and payable, without presentment,

Debtor-in-Possesssion
Loan and Security Agreement

demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower.

Section 8.3    Remedies; Relief from Stay.  Borrower acknowledges that, pursuant to the Financing Orders, upon the occurrence of any Event of Default, the automatic stay is deemed modified and lifted as to the Collateral and Pre-Petition Collateral to permit Lender to pursue any and all remedies to which it may be entitled, including the right to demand immediate possession of the Collateral and the Pre-Petition Collateral and to liquidate the same in the manner provided by applicable law, all without further order of or application to the Bankruptcy Court.  Upon the occurrence of any Event of Default, Lender shall be entitled to the exercise of any and all rights and remedies available to it under the DIP Financing Documents and the Pre-Petition Loan Documents, at law or in equity.  All such rights and remedies may be exercised successively or concurrently in such order and manner as Lender may in its sole discretion elect, and no such election shall constitute a waiver by Lender of any other right or remedy.  Without limiting the generality of the foregoing, Lender may, without notice, take any or all of the following actions at the same or different times:

(a)    Cancel Lender's obligations arising under the DIP Financing Documents.

(b)    Institute appropriate proceedings to specifically enforce performance of the terms and conditions of the DIP Financing Documents.

(c)    Take immediate possession of the Collateral.

(d)    Appoint or seek appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement and the other DIP Financing Documents.  All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving any Collateral shall be charged against the Borrower and shall be secured by Lender's Liens hereunder.

(e)    Perform any and all of the duties and obligations and exercise all the rights and remedies of Borrower contained in any contracts of Borrower as fully as Borrower could itself.

(f)    Notify customers that Accounts have been assigned to Lender, demand, and receive information from customers with respect to Accounts, forward invoices to customers directing them to make payments to Lender, collect all Accounts in Lender's or Borrower's name and take control of any cash or non-cash proceeds of Collateral.

(g)    Enforce payment of any Accounts, prosecute any action or proceeding with respect to any Accounts, extend the time of payment of any Accounts, make allowances and adjustments with respect thereto and issue credits against Accounts in the name of Lender or Borrower.

(h)    Settle, compromise, extend, renew, release, terminate, or discharge, in whole or in part, any Account or deal with the same as Lender may deem advisable.

(i)    Require the Borrower to open all mail only in the presence of a representative of Lender, who may take therefrom any remittance on Collateral.

(j)    Exercise any and all rights and remedies of Borrower under or in connection with any contracts or otherwise in respect of the Collateral, including, without limitation, any and all rights of Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, any assigned agreement.

(k)    Enter upon the premises of Borrower or any other place or places where any Collateral is located and kept, and through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, without any pre-seizure hearing as a condition to repossession through court action and without any obligation to pay rent to Borrower, remove the Collateral therefrom to the premises of Lender or of any agent of Lender, for such time as Lender may desire, in order effectively to collect or liquidate the Collateral.

(l)    Collect, receive, appropriate, repossess, foreclose upon and realize upon the Collateral, or any part thereof, and to sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more lots or parcels, at public or private sale or sales, at any exchange broker's board or at any of Lender's offices or elsewhere, at such prices as Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, and to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any exemption rights, or any right or equity of redemption or any similar applicable rights or laws with respect to the foreclosure of any Collateral, which equity of redemption, if available, Borrower hereby releases.  In no way limiting the foregoing, Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral.

(m)    Use, and permit any purchaser of any of the Collateral from Lender to use, without charge, any intellectual property, promotional, or advertising materials or other property of a similar nature which pertains to, or is included in, any of the Collateral, in advertising for sale, preparing for sale, and selling any Collateral, and all of Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit.

(n)    Send any written notice to Borrower required by law in the manner set forth in this Agreement; and any notice sent by Lender in such manner at least ten (10) days (counting the date of sending) prior to the date of a proposed disposition of the Collateral shall be deemed to be reasonable notice; *provided, however*, that nothing contained herein shall be deemed to require 10 days' notice if, under the applicable circumstances, a shorter period of time would be allowed under applicable law.

(o)    Exercise, in addition to all other rights which it has under this Agreement, the Pre-Petition Loan Documents, or other applicable law, all of the rights and remedies of a secured party upon default under the UCC or other applicable law.

Debtor-in-Possesssion
Loan and Security Agreement

29746819 v4

(p)    Borrower acknowledges that upon any sale or liquidation of the Collateral or the Pre-Petition Collateral pursuant to non-bankruptcy remedies under state law as permitted hereby, Lender shall be entitled (but shall not be required) to credit bid the DIP Obligations hereunder and the Indebtedness of Borrower owing under the Pre-Petition Loan Documents on a combined basis in such order and manner as Lender may elect.

Section 8.4    <u>No Limitation on Rights and Remedies</u>.  The enumeration of the powers, rights and remedies in this Article shall not be construed to limit the exercise thereof to such time as an Event of Default occurs if, under applicable law or any other provision of this Agreement or any other DIP Financing Document, Lender has any of such powers, rights, and remedies regardless of whether an Event of Default has occurred, and any limitation contained herein or in any of the other DIP Financing Documents as to Lender's exercise of any power, right or remedy for a period of time only during the continuance of an Event of Default shall only be applicable at such time as Lender shall have actual knowledge that such Event of Default is no longer continuing and for a reasonable time thereafter as may be necessary for Lender to cease the exercise of such powers, rights, and remedies (it being expressly understood and agreed that until such time as Lender shall obtain such knowledge and after the expiration of such reasonable time, Lender shall have no liability whatsoever for the commencement of or continuing exercise of any such power, right or remedy).

Section 8.5    <u>Attorney-in-Fact</u>.  Subject to entry of the Financing Orders, Borrower hereby constitutes and appoint Lender, or any other Person whom Lender may designate, as Borrower's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until Lender's Liens and claims shall have been satisfied), at Borrower's sole cost and expense, to exercise any one or more of the rights, powers, or remedies, including, without limitation, to those set forth below at any time after the occurrence and during the continuance of any Event of Default (and all acts of such attorney-in-fact or designee taken pursuant to this <u>Section 8.5</u> are hereby ratified and approved by Borrower, and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law):

(a)    To take or to bring, in the name of Lender or in the name of Borrower, all steps, action, suits or proceeding deemed by Lender necessary or desirable to effect collection of Accounts.

(b)    To settle, adjust, compromise, extend, renew, discharge, terminate, or release any Accounts in whole or in part.

(c)    To settle, adjust, or compromise any legal proceedings brought to collect any Accounts.

(d)    To notify customers to make payments on the Accounts directly to Lender or to a lockbox designated by Lender.

(e)    To transmit to customers notice of Lender's interest in the Accounts and to demand and receive from such customers at any time, in the name of Lender or of Borrower or of the designee of Lender, information concerning the Accounts and the amounts owing thereon.

Debtor-in-Possesssion
Loan and Security Agreement

(f)     To sell or assign any of the Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable, and to execute and deliver in the name of Borrower any deeds, bills of sale, assignments, or other instruments of transfer in connection therewith.

(g)     To take control, in any manner, of any item of payment on, or proceeds of, Collateral.

(h)     To prepare, file, and sign Borrower's name on any proof of claim in bankruptcy or similar document against any customer of Borrower.

(i)     To prepare, file, and sign Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral.

(j)     To sign or endorse the name of Borrower upon any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, warehouse receipt or similar document or agreement relating to the Collateral.

(k)     To use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access.

(l)     To enter into contracts or agreements for the management of the Collateral and the further construction or completion thereof as said attorney-in-fact or designee or Lender may from time to time deem appropriate and charge any costs thereby incurred to Borrower's account.

(m)     To receive, take, endorse, assign, and deliver in Lender's name or in the name of Borrower any and all checks, notes, drafts, and other instruments.

(n)     To do all acts and things reasonably necessary, in Lender's discretion, to fulfill Borrower's obligations under this Agreement and to otherwise carry out the purposes of this Agreement.

## ARTICLE NINE - MISCELLANEOUS

Section 9.1     No Waiver.  No failure or delay by the Lender in exercising any right, remedy, power, or privilege hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The remedies provided herein and in the other DIP Financing Documents are cumulative and not exclusive of any remedies provided by law.  Nothing herein contained shall in any way affect the right of Lender to exercise any statutory or common law lien or right of setoff.

Section 9.2     Right of Setoff.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or

demand, provisional or final) at any time held by Lender and any and all other indebtedness at any time owing by Lender to or for the credit or account of Borrower against any and all of the DIP Obligations.  The rights of Lender under this <u>Section 9.2</u> are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which the Lender may have. Nothing contained in this Agreement or any other DIP Loan Document shall impair the right of Lender to exercise any right of setoff or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of Borrower unrelated to this Agreement or the other DIP Financing Documents.

Section 9.3    <u>Costs and Expenses</u>.    Borrower shall reimburse Lender for all fees and expenses of any kind or character whatsoever reasonably incurred by Lender in connection with the Case including, without limitation, fees and expenses of Lender's Professional Persons and fees and expenses in connection with (i) the negotiation and preparation of any of the DIP Financing Documents or any amendment or modification thereto, (ii) the preparation of any motions, orders, or other pleadings in the Case, (iii) responding to any requests for waiver, restructuring, or forbearance with respect to the DIP Obligations, (iv) the administration of the DIP Financing Documents and the transactions contemplated thereby, (v) any action taken to perfect or maintain the perfection or priority of any Liens with respect to any of the Collateral, including any intangibles taxes, documentary stamp taxes, or other taxes or costs which may be payable in connection therewith, (vi) any inspections or audits conducted with respect to Borrower's books and records or any of the Collateral, (vii) any effort to verify, protect, preserve, or restore any of the Collateral, or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral, (viii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, Borrower or any other Person) in any way arising out of or relating to any of the Collateral or the validity, perfection, or priority of any Liens thereon, or to any of the DIP Financing Documents or the validity, allowance or amount of any of the DIP Obligations, (ix) the protection or enforcement of any rights or remedies of Lender, and (x) any other action taken by Lender to enforce any of the rights or remedies of Lender.  All amounts chargeable to Borrower under this <u>Section 9.3</u> shall constitute DIP Obligations that are secured by all of the Collateral and shall be payable to Lender on the Termination Date.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the DIP Financing Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

Section 9.4    <u>Environmental Indemnity</u>.    Borrower hereby agrees to indemnify the Lender, and the shareholders, officers, directors, employees, agents and Affiliates of the Lender (collectively, the "<u>Indemnitees</u>"), and hold the Indemnitees harmless from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including, without limitation, reasonable court costs and attorneys' fees and expenses), which at any time or from time to time may be paid, incurred or suffered by the Indemnitees, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Laws; or with respect to, or as a direct or indirect result of the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from, properties owned or operated by Borrower of any hazardous substances or any other hazardous or toxic waste, substance or constituent or other substance (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under the Environmental Laws); and the provisions of and undertakings and indemnification set out in this

29746819 v4

<u>Section 9.4</u> shall survive the satisfaction and payment of the DIP Obligations and the termination of this Agreement; provided that the Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee.

Section 9.5    <u>General Indemnity</u>.  In addition to the payment of expenses pursuant to <u>Section 9.3</u>, Borrower hereby agrees to indemnify and pay the Indemnitees and hold the Indemnitees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees, in any manner relating to or arising out of this Agreement, any of the other DIP Financing Documents or any other agreement, document or instrument executed and delivered by Borrower in connection herewith or therewith, the statements contained in any commitment letters delivered by the Lender, the agreement of Lender to make the DIP Loan hereunder, or the use or intended use of the proceeds of any Advance hereunder, and the management and operation of the Borrower's Business (collectively, the "<u>Indemnified Liabilities</u>"); provided that the Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. The provisions of the undertakings and indemnification set out in this <u>Section 9.5</u> shall survive satisfaction and payment of the DIP Obligations and the termination of this Agreement.

Section 9.6    <u>Notices</u>.  Any notices or consents required or permitted by this Agreement shall be in writing and shall be deemed delivered when delivered in person, or when sent by certified mail, postage prepaid, return receipt requested, by overnight courier service to the address as follows, unless such address or number is changed by written notice hereunder.

(a)    If to Borrower:
c/o Solid Landings Behavioral Health
The Waters at Creekside
2900 Bristol St. Suite B-300
Costa Mesa, CA 92626
Attn: Katie S. Goodman, CRO

(b)    With a copy to:
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Attn:   David L. Neale
        Juliet Y. Oh

(c)    If to Lender:
Capstar Bank
201 4th Avenue North, Suite 950
Nashville, TN 37219
Attn: Scott McGuire

(d)    With a copy to:
Burr & Forman LLP
511 Union Street, Suite 2300
Nashville, TN 37219
Attn: David W. Houston, IV
    J. Patrick Warfield

(e)    And in any case, with a copy to Purchasers and their counsel as follows:
c/o Alpine Behavioral Holdco, LLC
23 Corporate Plaza, Suite 215
Newport Beach, CA 92660
Attention:  Gerik Degner

Massumi + Consoli LLP
2029 Century Park E, Suite 280
Los Angeles, CA  90067
Attention:  Anthony Consoli

Section 9.7    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Tennessee, without reference to principles of conflict of laws.

Section 9.8    <u>Amendments and Waivers</u>.  Any provision of this Agreement or any of the other DIP Financing Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Lender.

Section 9.9    <u>Successors and Assigns</u>.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or otherwise transfer any of its rights or delegate any of its obligations under this Agreement.

Section 9.10  <u>NO ORAL AGREEMENTS, ENTIRE AGREEMENT</u>.    ORAL AGREEMENTS OR COMMITMENTS TO LEND MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE.   TO PROTECT BORROWER, GUARANTORS, AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS REACHED BY BORROWER, GUARANTORS, AND LENDER COVERING SUCH MATTERS ARE CONTAINED IN THIS AGREEMENT, THE OTHER DIP FINANCING DOCUMENTS, AND FINAL AND INTERIM ORDERS, WHICH COLLECTIVELY COMPRISE A COMPLETE AND EXCLUSIVE STATEMENT OF

THE AGREEMENT BETWEEN BORROWER, GUARANTORS, AND LENDER. THIS AGREEMENT EMBODIES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES HERETO AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS (ORAL OR WRITTEN) RELATING TO THE SUBJECT MATTER HEREOF

Section 9.11    Severability.  In the event any one or more of the provisions contained in this Agreement should be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

Section 9.12    Counterparts; Electronic Delivery.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  It shall not be necessary that all parties execute the same counterpart.  Counterparts of this Agreement or of any other DIP Loan Document may be executed and delivered by facsimile or email transmission, and any such facsimile or email signature shall be deemed fully effective as an original signature of the party delivering the same.

Section 9.13    Resurrection of the DIP Obligations.  To the extent that Lender receives any payment on account of any of the DIP Obligations, and any such payment or any part thereof is subsequently invalidated, declared to be fraudulent, or preferential, set aside, subordinated or required to be repaid to a trustee, receiver or any other Person under any contract, bankruptcy act, state or federal law, common law or equitable cause (each instance being a "Clawback," with such amounts being "clawed back" referred to herein as the "Repayments"), then: (a) to the extent of such payment received, the DIP Obligations or part thereof intended to be satisfied and any and all Liens upon or pertaining to any Property or assets of Borrower and theretofore created or existing in favor of Lender as security for the payment of such DIP Obligations shall be revived and continue in full force and effect, as if such payment had not been received by Lender and applied on account of the DIP Obligations; and (b) the liability of Borrower to Lender evidenced by the DIP Financing Documents reverts to a principal amount equal to the outstanding balance of the DIP Obligations at the time of the ordering of the Clawback, plus an amount equal to the Repayments and all accrued interest and expenses thereon (including reasonable attorney fees) computed from the Effective Date forward ("Reverted Amount").  The Reverted Amount shall then accrue interest at the Default Rate.

Section 9.14    No Third Party Beneficiary.  This Agreement is solely for the benefit of the parties and, except as specifically provided in Sections 9.4, 9.5, 9.17 and 9.18 of this Agreement, is not intended to be for the benefit of any other Person except for any successor or assignee of Lender.

Section 9.15    Independence of Covenants.  All of the covenants contained in this Agreement and the other DIP Financing Documents shall be given independent effect so that if a particular action, event, or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the provisions of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken, such event occurs or such condition exists.

Debtor-in-Possesssion
Loan and Security Agreement

Section 9.16   <u>Conflicting Provisions</u>.  In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any other DIP Financing Document, the terms and provisions of this Agreement shall govern.  In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any Financing Order, the terms and provisions of such Financing Order shall govern.

Section 9.17   <u>General Release of Claims</u>.  In consideration of the agreements of Lender set forth herein, as of the Effective Date, and as a material inducement therefor, each Borrower, each Borrower as a "debtor-in-possession", and the Borrower's estate, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "<u>Releasors</u>") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge Lender and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, Professional Persons, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>"), of and from any and all present, past, and/or future claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, but not limited to, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that existed as of the date of any Interim Order or Final Order, whichever occurs later in time (collectively, "<u>Claims</u>"), including, without limitation to, Claims relating to any of the Pre-Petition Loan Documents, the DIP Financing Documents, or the transactions contemplated under such documents, the Case, as applicable, including, but not limited to, (i) any so-called "lender liability," equitable subordination, equitable disallowance, or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or non avoidability of the Liens or claims of Lender.

Section 9.18   <u>Acknowledgement of Joint and Several Obligation</u>

(a)   Each Borrower is accepting joint and several liability hereunder and under the other DIP Financing Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the DIP Obligations.

(b)   Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the performance of all of the DIP Obligations (including, without limitation, any obligations arising under this <u>Section 9.18</u>), it being the intention of the parties hereto that all the DIP Obligations shall be the joint and several obligations of each Borrower without preference or distinction among them and that all of the representations, warranties, covenants, obligations, conditions, agreements, and other terms

contained in the DIP Financing Documents shall be applicable to and be binding upon each Borrower.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the DIP Obligations as and when due or to perform any of the DIP Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such DIP Obligation.

(d)    The DIP Obligations of each Borrower under the provisions of this Section 9.18 constitute the full recourse DIP Obligations of each Borrower enforceable against each Borrower to the full extent of its respective properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or the other DIP Financing Documents or any other circumstance whatsoever as to any other Borrower.

(e)    Except as otherwise expressly provided herein, each Borrower hereby waives promptness, diligence, presentment, demand, protest, notice of acceptance of its joint and several liability, notice of any and all Advances under the DIP Loan, notice of occurrence of any Default or Event of Default (except to the extent notice is expressly required to be given pursuant to the terms of this Agreement or any of the DIP Financing Documents), or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender or under or in respect of any of the DIP Obligations hereunder, any requirement of diligence and, generally, all demands, notices and other formalities of every kind in connection with this Agreement and other DIP Financing Documents. Each Borrower hereby waives all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshaling of assets of a Borrower and any other entity or Person primarily or secondarily liable with respect to any of the DIP Obligations, and all suretyship defenses generally. Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment, or place or manner for payment, compromise, refinancing, consolidation, or renewals of any of the DIP Obligations hereunder, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by a Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement and the other DIP Financing Documents, any and all other indulgences whatsoever by Lender in respect of any of the DIP Obligations hereunder, and the taking, addition, substitution or release, in whole or in part, of any Borrower, any Guarantor, or any other entity or Person primarily or secondarily liable for any DIP Obligation. Each Borrower further agrees that its DIP Obligations shall not be released or discharged, in whole or in part, or otherwise affected by the adequacy of any rights which the Lender may have, including, without limitation, any other act or omission which might in any manner or to any extent vary the risk of a Borrower, or otherwise operate as a release or discharge of a Borrower, all of which may be done without notice to either Borrower. If for any reason any Borrower has no legal existence or is under no legal obligation to discharge any of the DIP Obligations, or if any of the DIP Obligations have become irrecoverable from any Borrower by reason of any insolvency, bankruptcy or reorganization or by other operation of law or for any reason, this Agreement and the other DIP Financing Documents to which it is a party shall nevertheless be binding on each other Borrower to the same extent as if such Borrower at all times had been the sole obligor on such DIP Obligations. Without limiting the generality of the foregoing, each Borrower assents to any other action or

Debtor-in-Possesssion
Loan and Security Agreement

delay in acting or failure to act on the part of Lender, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder which might, but for the provisions of this Section 9.18, afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its obligations under this Section 9.18, it being the intention of Borrower that, so long as any of the DIP Obligations hereunder remain unsatisfied, the obligations of each and every Borrower under this Section 9.18 shall not be discharged except by performance and then only to the extent of such performance. The obligations of Borrower under this Section 9.18 shall not be diminished or rendered unenforceable by any winding up, reorganization, amalgamation, arrangement, liquidation, reconstruction, or similar proceeding with respect to any other Borrower or the Lender. The joint and several liability of each Borrower hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation, or any other change whatsoever in the name, ownership, membership, constitution or place of formation of any Borrower or the Lender. Each Borrower acknowledges and confirms that it has established its own adequate means of obtaining from any other Borrower on a continuing basis all information desired by such Borrower concerning the financial condition of the other Borrower and that such Borrower will look to the other Borrower and not to Lender for such Borrower to keep adequately informed of changes in each of the other Borrower's respective financial conditions.

(f)    The provisions of this Section 9.18 are made for the benefit of the Lender and its permitted successors and assigns, and may be enforced by it from time to time against the Borrower or any Borrower as often as occasion may arise without requirement on the part of Lender or such successor or assign first to marshal any of its claims or to exercise any of its rights against any other Borrower or to exhaust any remedies available to it against any other Borrower or Guarantor or to resort to any other source or means of obtaining payment of any of the DIP Obligations hereunder or to elect any other remedy. The provisions of this Section 9.18 shall remain in effect until all of the DIP Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the DIP Obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, or reorganization of any Borrower, or otherwise, the provisions of this Section 9.18 will forthwith be reinstated in effect, as though such payment had not been made.

(g)    Each Borrower hereby agrees that it will not enforce any of its rights of reimbursement, contribution, subrogation or the like against the any other Borrower with respect to any liability incurred by it hereunder or under any of the other DIP Financing Documents, any payments made by it to Lender with respect to any of the DIP Obligations or any collateral security therefor until such time as all of the DIP Obligations have been indefeasibly satisfied. Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder or under other DIP Financing Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the DIP Obligations arising hereunder or thereunder, to the prior payment in full of the DIP Obligations, and all such DIP Obligations shall be paid in full before any payment or distribution of any character, whether in cash, securities, or other property, shall be made to any other Borrower or the Guarantor therefor.

Debtor-in-Possesssion
Loan and Security Agreement

(h)     Each Borrower hereby agrees that the payment of any amounts due with respect to the indebtedness owing by a Borrower to any other Borrower and/or Guarantor is hereby subordinated to the prior payment in full in cash of the DIP Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, no Borrower will demand, sue for, or otherwise attempt to collect any indebtedness of any other Borrower or Guarantor owing to such Borrower until the DIP Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, if a Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender and be paid over to Lender to be applied to repay the DIP Obligations.

Section 9.19     <u>Waiver of Jury Trial</u>.  **THE PARTIES HEREBY MUTUALLY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, OR IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATING TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING WAIVER FORMS A MATERIAL PART OF THE CONSIDERATION RECEIVED BY LENDER AS AN INDUCEMENT TO ENTER INTO THE DIP FINANCING DOCUMENTS.**

Section 9.20     TIME IS OF THE ESSENCE HEREUNDER.

**THE UNDERSIGNED PARTIES AGREE THAT SO LONG AS NO CASE HAS BEEN DISMISSED, LENDER HAS NOT OBTAINED STAY RELIEF, OR HAD THE AUTOMATIC STAY LIFTED AS PROVIDED HEREIN, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN LENDER AND BORROWER PERTAINING TO THIS AGREEMENT, ANY OTHER DIP FINANCING DOCUMENT, OR THE DIP OBLIGATIONS; _PROVIDED, THAT_ LENDER AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; _PROVIDED FURTHER, THAT_ NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT, EXERCISING ITS REMEDIES, OR TAKING ANY OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY COLLATERAL, ANY OTHER SECURITY FOR THE DIP OBLIGATIONS, OR THE PRE-PETITION COLLATERAL, OR TO ENFORCE THE PRE-PETITION OBLIGATIONS, THE TERMS OF THE PRE-PETITION LOAN DOCUMENTS, OR A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.**

**[No further text this page; Signature page follows.]**

46

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be properly executed and delivered as of the Effective Date.

**BORROWER:**

**SURE HAVEN INC.,** a California corporation
**SOLID LANDINGS BEHAVIORAL HEALTH, INC.,** a California corporation,
**CEDAR CREEK RECOVERY, INC.,** a Texas corporation
**SILVER ROCK RECOVERY,** a Nevada corporation
**EMS TOXICOLOGY,** a Nevada corporation

By: _K. Goodman_____

Title: _Chief Restructuring Officer_

STATE OF _____    )
                             )
COUNTY OF _____    )

Before me, _____, a Notary Public of said County and State, personally appeared _____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged ___self to be _____ of the above-listed Debtors, the within-named bargainor, and that ___ executed the within instrument for the purposes therein contained by signing the name of the above-listed Debtors by ___self as _____.

Witness my hand and seal, at office in _____, this ___ day of _____, 2017.

_____
Notary Public
My Commission Expires:_____

**LENDER**:

**CAPSTAR BANK**, a Tennessee state chartered banking corporation

SCOTT MCGUIRE, Vice President


STATE OF TENNESSEE          )
                            )
COUNTY OF DAVIDSON          )

Before me, _Jennifer Ruiz_____, a Notary Public of said County and State, personally appeared SCOTT MCGUIRE, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be a Vice President of CAPSTAR BANK, a Tennessee state chartered banking corporation, the within-named bargainor, and that he executed the within instrument for the purposes therein contained by signing the name of the bank by himself as Vice President.

Witness my hand and seal, at office in _Nashville_____, this _1_ day of _June_, 2017.

Notary Public
My Commission Expires: _March 23, 2021_

## EXHIBIT A
## PRE-PETITION LOAN DOCUMENTS

1.    *Loan and Security Agreement* executed by and among, Borrower, Rock Solid Recovery, a California corporation ("Rock Solid"), Long Beach Recovery, Inc., a California corporation ("Long Beach"), Hope's Landing, a California corporation ("Hope's"), EMS Management, Inc., a California corporation ("EMS Mgmt."), Asana Recovery, a California corporation ("Asana"), Milo's Way, a California corporation ("Milo's"), Recovery Information Services, LLC, a Delaware limited liability company ("RIS"), H&J Toxicology, LLC, a Delaware limited liability company ("H&J"), Recovery Advisors, LLC, a Delaware limited liability company ("RA"), Sage Creek Toxicology, Inc., a Texas corporation ("Sage Creek"), The Breakers Rental @ Long Beach, a California corporation ("Breakers"), Mauna Loa Management, Inc., a California corporation ("Mauna Loa," collectively with Borrower, Rock Solid, Long Beach, Hope's, EMS Mgmt., Asana, Milo's, RIS, H&J, RA, Sage Creek, and Breakers, the "Pre-Petition Borrowers"), dated as of November 20, 2015.

2.    *Revolving Note* issued jointly and severally by the Pre-Petition Borrowers, to the order of the Lender in the principal sum of $7,500,000.00 dated as of November 20, 2015.

3.    *Guaranty Agreement* executed by Steve Fennelly in favor of the Lender dated November 20, 2015.

4.    *Guaranty Agreement* executed by Elizabeth Perry in favor of the Lender dated November 20, 2015.

5.    *Guaranty Agreement* executed by Mark Shandrow in favor of the Lender dated November 20, 2015.

6.    *Forbearance Agreement* by and among Lender and Pre-Petition Borrowers, dated August 30, 2016, as amended by the certain *First Amendment to Forbearance Agreement* dated September 14, 2016, and that *Second Amendment to Forbearance Agreement* dated December 22, 2016.

7.    *Guarantor's Consent, Reaffirmation, Subordination, and Release* executed by Guarantors dated August 30, 2016.

8.    *Amended and Restated Revolving Note* issued jointly and severally by the Pre-Petition Borrowers, to the order of the Lender in the principal sum of $9,200,000.00 dated August 30, 2016.

9.    *Pledge & Security Agreement* executed by and among Mark Shandrow and Lender dated August 30, 2016, and related documents thereto, including without limitation, the *Stock Power*.

10.    *Pledge & Security Agreement* executed by and among Elizabeth Perry dated August 30, 2016, and related documents thereto, including without limitation, the *Stock Power*.

11.     *Pledge & Security Agreement* executed by and among Steve Fennelly dated August 30, 2016, and related documents thereto, including without limitation, the *Stock Power*.

12.     *Guarantor's Consent, Reaffirmation, and Release* executed by Guarantors dated September 14, 2016.

13.     *Letter Agreement regarding $345,000 Overadvance* executed by and among Pre-Petition Borrowers, Guarantors, and Lender, on or around December 22, 2016.

14.     *Guarantor's Consent, Reaffirmation, and Release* executed by Guarantors dated December 22, 2016.

## EXHIBIT B - NOTICE OF BORROWING

_____, 2017

_____
_____
_____

RE:    Debtor in Possession Loan and Security Agreement dated _____, 2017, by and among by SURE HAVEN, INC., a California corporation ("Sure Haven"), SOLID LANDINGS BEHAVIORAL HEALTH, INC., a California corporation ("Solid Landings"), CEDAR CREEK RECOVERY, INC., a Texas corporation ("Cedar Creek"), SILVER ROCK RECOVERY, a Nevada corporation ("Silver Rock") and EMS TOXICOLOGY, a Nevada corporation ("EMS", and together with Sure Haven, Solid Landings, Cedar Creek and Silver Rock, individually and collectively, the "Borrower") and CAPSTAR BANK, a Tennessee banking corporation ("Lender"), among other parties (as at any time amended, the "DIP Loan Agreement")

Ladies and Gentlemen:

This Notice of Borrowing is delivered to you pursuant to Section 2.3(a) of the DIP Loan Agreement. Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the DIP Loan Agreement. Borrower hereby requests an Advance of DIP Loan proceeds as follows:

Principal Amount:    $_____
Funding Date:        _____, 2017
Wiring Instructions: _____
                     _____
                     _____
                     _____

Attached hereto is a copy of the most recent Proposed Budget and Variance Report.

Borrower hereby certifies that (i) on the date of, and after giving effect to, the Advance requested hereby, no Default or Event of Default has occurred and is continuing; and (ii) on the date of, and after giving effect to, the Advance requested hereby, all of the representations and warranties of the Borrower contained in the DIP Loan Agreement and the other DIP Financing Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of the Borrower set forth in, the Approved Budget; and (iv) all prior Advances have been applied by Borrower in compliance with and for the purposes set forth in

the DIP Loan Agreement and the Notice of Borrowing pursuant to which the same were disbursed.  Borrower hereby ratifies and reaffirms all of the DIP Financing Documents and all DIP Obligations arising thereunder.

IN WITNESS WHEREOF, Borrower has caused this Notice of Borrowing to be executed and delivered this _____ day of _____, 2017.

# EXHIBIT C - APPROVED BUDGET

SEE ATTACHED

**Solid Landings Behavioral Health, Inc.**

DIP Budget

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| Loan +/(-) Ckg balance at the start of each week: | (9,988,407) | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (9,988,407) |
| **Collections** | | | | | | | | | | | |
| Collection of receivables-clinical | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| Deductibles and Copayments | - | - | - | - | - | - | - | - | - | - | - |
| Collection of receivables-lab | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 150,000 |
| DIP Financing Advance, net | - | | | | | | | | | | - |
| **Total Collections** | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 1,150,000 |
| **Disbursements** | | | | | | | | | | | |
| 1 Salaries, Wages  PR Tax & WC Ins, health & other benefits (PEO pre-funding) | 100,000 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 915,400 |
| 2 Treatment Expense | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 62,811 |
| 3 Electronic Medical Records & IT Services | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 144,000 |
| 4 Contract Services - Clinical Staff | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 108,842 |
| 5 Lab Expense | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 30,056 |
| 6 Supplies & Food | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 7 Other Operating Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 8 Business Insurance | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 175,000 |
| 9 State & County taxes (Franchise, Income, property, etc.) | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 20,379 |
| 10 Postage & office supplies | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 12,500 |
| 11 Rent | 183,700 | | | | 183,700 | | | | | 183,700 | 551,100 |
| 12 Utilities (incl. deposits) | 48,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 129,000 |
| 13 Marketing | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 334,516 |
| 14 House and Equipment R&M | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 15 Pro Serv fees (incl CRO, Bankruptcy Counsel & Oth Legal) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 300,000 |
| 16 License and fees | - | - | - | - | - | - | - | - | - | - | - |
| 17 Misc. Items | - | - | - | - | - | - | - | - | - | - | - |
| 18 Travel, meals & accommodations | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

**Solid Landings Behavioral Health, Inc.**

**DIP Budget**

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| 19 | Bank Interest | | | | | 86,708 | | | | 92,744 | | 179,452 |
| 20 | Bank fees | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |
| 21 | Auto leases & operating expenses | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 22 | Other financing items | - | - | - | - | - | - | - | - | - | - | - |
| 23 | CapEx | - | - | - | - | - | - | - | - | - | - | - |
| 24 | Items not anticipated | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,000 |
| 26 | Trustee Fees | - | - | - | - | - | - | | | 32,500 | - | 32,500 |
| | **Total disbursements** | **462,510** | **230,410** | **230,410** | **230,410** | **500,818** | **230,410** | **230,410** | **230,410** | **355,655** | **414,110** | **3,115,556** |
| | Net weekly cash | (347,510) | (115,410) | (115,410) | (115,410) | (385,818) | (115,410) | (115,410) | (115,410) | (240,655) | (299,110) | **(1,965,556)** |
| | **Loan +/(-) Ckg balance at week end** | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (11,953,964) | (11,953,964) |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

# SCHEDULE 5.2

<u>Cedar Creek Recovery, Inc.</u>
| | |
|---|---|
| Stephen J. Fennelly: | 33.34% |
| Elizabeth Perry: | 33.33% |
| Mark Shandrow: | 33.33% |

<u>EMS Toxicology</u>
| | |
|---|---|
| Stephen J. Fennelly: | 33.34% |
| Elizabeth Perry: | 33.33% |
| Mark Shandrow: | 33.33% |

<u>Silver Rock Recovery</u>
| | |
|---|---|
| Stephen J. Fennelly: | 33.34% |
| Elizabeth Perry: | 33.33% |
| Mark Shandrow: | 33.33% |

<u>Solid Landings Behavioral Health, Inc.</u>
| | |
|---|---|
| Stephen J. Fennelly: | 33.34% |
| Elizabeth Perry: | 33.33% |
| Mark Shandrow: | 33.33% |

<u>Sure Haven, Inc.</u>
| | |
|---|---|
| Stephen J. Fennelly: | 33.34% |
| Elizabeth Perry: | 33.33% |
| Mark Shandrow: | 32.33% |
| John Case: | 1.0% |

Debtor-in-Possesssion
Loan and Security Agreement

29746819 v4

# PROMISSORY NOTE

**$2,000,000.00**                                                                                                                              **June 1, 2017**

  **FOR VALUE RECEIVED,** the undersigned **SURE HAVEN, INC.,** a California corporation ("Sure Haven"), **SOLID LANDINGS BEHAVIORAL HEALTH, INC.,** a California corporation ("Solid Landings"), **CEDAR CREEK RECOVERY, INC.,** a Texas corporation ("Cedar Creek"), **SILVER ROCK RECOVERY,** a Nevada corporation ("Silver Rock") and **EMS TOXICOLOGY,** a Nevada corporation ("EMS", and together with Sure Haven, Solid Landings, Cedar Creek and Silver Rock, individually and collectively, the "Borrower"), hereby promises to pay to the order of **CAPSTAR BANK,** a Tennessee state charted banking corporation ("Lender"), at such office as Lender may direct, in lawful money of the United States and in immediately available funds, the principal amount of up to **TWO MILLION AND NO/100 DOLLARS ($2,000,000.00)**, or so much thereof as may from time to time be outstanding under that certain *Debtor-In-Possession Loan and Security Agreement* of even date herewith by and between Borrower and Lender, among other parties (as amended, extended, modified, renewed or restated, the "DIP Loan Agreement"; all capitalized terms used herein and not otherwise defined shall have the meanings ascribed in the DIP Loan Agreement), on the dates and in the amounts provided in the DIP Loan Agreement, and to pay interest on the unpaid principal amount owing hereunder at the rates and on the dates provided in the DIP Loan Agreement.

  This instrument is the "DIP Loan Note" referred to in, and is entitled to the benefits of, the DIP Loan Agreement. All of the terms, conditions, covenants and agreements set forth in the DIP Loan Agreement are expressly made a part of this instrument and are incorporated herein by this reference in the same manner and with the same effect as if set forth herein *verbatim* and in full, and any holder of this instrument shall be entitled to the benefits of and remedies provided in the DIP Loan Agreement and the other DIP Loan Documents. Reference is made to the DIP Loan Agreement for provisions relating to the interest rate, maturity, payment, prepayment, and acceleration of this instrument.

  In the event of an acceleration of the maturity of the DIP Loan, this DIP Loan Note and all other Obligations of Borrower to Lender under the DIP Loan Documents shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower.

  In the event this instrument is not paid when due at any stated or accelerated maturity, Borrower agrees to pay, in addition to the principal and interest, all costs of collection, including reasonable attorneys' fees and expenses.

  The Obligations evidenced by this instrument are secured by the Collateral, all as more particularly described in the DIP Loan Agreement and the other DIP Loan Documents.

**IN WITNESS WHEREOF,** Borrower has caused this instrument to be properly executed and delivered as of the day and year first above written.

> **BORROWER:**
>
> **SURE HAVEN INC.,** a California corporation
> **SOLID LANDINGS BEHAVIORAL HEALTH, INC.,** a California corporation,
> **CEDAR CREEK RECOVERY, INC.,** a Texas corporation
> **SILVER ROCK RECOVERY**, a Nevada corporation
> **EMS TOXICOLOGY**, a Nevada corporation
>
> By: _K.J. Goodman_
> Name: _K. Goodman_
> Title: _Chief Restructuring Officer_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit "B" to DIP Stipulation

[Initial Approved Budget]

**Solid Landings Behavioral Health, Inc.**

DIP Budget

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| Loan +/(-) Ckg balance at the start of each week: | (9,988,407) | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (9,988,407) |
| **Collections** | | | | | | | | | | | |
| Collection of receivables-clinical | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| Deductibles and Copayments | - | - | - | - | - | - | - | - | - | - | - |
| Collection of receivables-lab | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 150,000 |
| DIP Financing Advance, net | - | | | | | | | | | | - |
| **Total Collections** | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 1,150,000 |
| **Disbursements** | | | | | | | | | | | |
| 1  Salaries, Wages  PR Tax & WC Ins, health & other benefits (PEO pre-funding) | 100,000 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 915,400 |
| 2  Treatment Expense | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 62,811 |
| 3  Electronic Medical Records & IT Services | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 144,000 |
| 4  Contract Services - Clinical Staff | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 108,842 |
| 5  Lab Expense | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 30,056 |
| 6  Supplies & Food | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 7  Other Operating Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 8  Business Insurance | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 175,000 |
| 9  State & County taxes (Franchise, Income, property, etc.) | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 20,379 |
| 10  Postage & office supplies | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 12,500 |
| 11  Rent | 183,700 | | | | 183,700 | | | | | 183,700 | 551,100 |
| 12  Utilities (incl. deposits) | 48,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 129,000 |
| 13  Marketing | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 334,516 |
| 14  House and Equipment R&M | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 15  Pro Serv fees (incl CRO, Bankruptcy Counsel & Oth Legal) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 300,000 |
| 16  License and fees | - | - | - | - | - | - | - | - | - | - | - |
| 17  Misc. Items | - | - | - | - | - | - | - | - | - | - | - |
| 18  Travel, meals & accommodations | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

**Solid Landings Behavioral Health, Inc.**

**DIP Budget**

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

|  |  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Total |
|  |  | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 |  |
| 19 | Bank Interest |  |  |  |  | 86,708 |  |  |  | 92,744 |  | 179,452 |
| 20 | Bank fees | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |
| 21 | Auto leases & operating expenses | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 22 | Other financing items | - | - | - | - | - | - | - | - | - | - | - |
| 23 | CapEx | - | - | - | - | - | - | - | - | - | - | - |
| 24 | Items not anticipated | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,000 |
| 26 | Trustee Fees | - | - | - | - | - | - |  |  | 32,500 | - | 32,500 |
|  | **Total disbursements** | **462,510** | **230,410** | **230,410** | **230,410** | **500,818** | **230,410** | **230,410** | **230,410** | **355,655** | **414,110** | **3,115,556** |
|  | Net weekly cash | (347,510) | (115,410) | (115,410) | (115,410) | (385,818) | (115,410) | (115,410) | (115,410) | (240,655) | (299,110) | **(1,965,556)** |
|  | **Loan +/(-) Ckg balance at week end** | **(10,335,918)** | **(10,451,328)** | **(10,566,739)** | **(10,682,149)** | **(11,067,967)** | **(11,183,377)** | **(11,298,788)** | **(11,414,198)** | **(11,654,853)** | **(11,953,964)** | **(11,953,964)** |

DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "7"

[Interim Order]

1  DAVID L. NEALE (SBN 141225)
2  JULIET Y. OH (SBN 211414)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
   Email: DLN@LNBYB.com, JYO@LNBYB.com
5
6  Proposed Attorneys for Chapter 11 Debtors
   and Debtors in Possession
7

8              UNITED STATES BANKRUPTCY COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                   SANTA ANA DIVISION

11

12

13  In re                                    )  Case No. 8:17-bk-12213-CB
                                             )
14  SOLID LANDINGS BEHAVIORAL                 )  Joint Administration Proposed With:
    HEALTH, INC., *et al.*,                   )  Case No. 8:17-bk-12218-CB
15                                            )  Case No. 8:17-bk-12221-CB
           Debtors and                       )  Case No. 8:17-bk-12222-CB
16         Debtors in Possession.            )  Case No. 8:17-bk-12223-CB
                                             )
17  _____      )  Chapter 11
                                             )
18  ___ Affects Cedar Creek Recovery, Inc.   )  **INTERIM ORDER: (I) AUTHORIZING**
19  Only                                     )  **THE DEBTORS TO (A) OBTAIN**
    ___ Affects EMS Toxicology Only          )  **POSTPETITION FINANCING FROM**
20  ___ Affects Silver Rock Recovery Only    )  **CAPSTAR BANK PURSUANT TO 11**
    ___ Affects Solid Landings Behavioral    )  **U.S.C. §§ 105, 361, 362 AND 364, AND**
21  Health, Inc. Only                        )  **(B) UTILIZE CASH COLLATERAL OF**
    ___ Affects Sure Haven, Inc. Only        )  **PREPETITION SECURED PARTIES**
22   X  Affects All Debtors                  )  **PURSUANT TO 11 U.S.C. §§ 361, 362,**
23                                           )  **363 AND 364; (II) GRANTING**
                                             )  **ADEQUATE PROTECTION TO**
24                                           )  **PREPETITION SECURED PARTIES**
                                             )  **PURSUANT TO 11 U.S.C. §§ 361, 362,**
25                                           )  **363 AND 364; (III) SCHEDULING A**
                                             )  **FINAL HEARING PURSUANT TO**
26                                           )  **BANKRUPTCY RULES 4001(b) AND**
                                             )  **4001(c); AND (IV) GRANTING**
27                                           )  **RELATED RELIEF**
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

)
)  DATE:        June 5, 2017
)  TIME:        2:00 p.m.
)  PLACE:       Courtroom "5D"
)                    411 West Fourth Street
)                    Santa Ana, California
)
)
)

Upon the motion (the "Motion") of Solid Landings Behavioral Health, Inc. ("Solid Landings"), Cedar Creek Recovery, Inc. ("Cedar Creek"), EMS Toxicology ("EMS Toxicology"), Silver Rock Recovery ("Silver Rock"), and Sure Haven, Inc. ("Sure Haven," and collectively with Solid Landings, Cedar Creek, EMS Toxicology, and Silver Rock, the "Debtors"), the debtors and debtor-in-possession in the above-captioned Chapter 11 bankruptcy cases,[1] for entry of an interim order (this "Interim Order") and a final order (a "Final Order"), under sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2081-1 and 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), seeking, among other things:

(i)    approval of that certain *Stipulation Re: Debtor In Possession Financing And Use Of Cash Collateral* (the "Stipulation") by and among the Debtors and CapStar Bank, a Tennessee state-chartered banking corporation ("CapStar" or "Lender"), a true and correct copy of which Stipulation is attached as **Exhibit "6"** to the Omnibus Declaration of Katie S. Goodman filed concurrently with and in support of the Motion (the "Goodman Declaration");

(ii)    authorization for the Debtors to obtain post-petition financing in the form of delayed draw term loans drawn under a revolving credit facility in the aggregate principal amount not to exceed $2,000,000 (the "DIP Loan"), pursuant to the terms of this Interim Order and subject to the terms and conditions of the DIP Financing Documents (as defined below);

(iii)    approval of the terms thereof, and authorization for the Debtors to execute and enter into, that certain *Debtor-In-Possession Loan And Security Agreement* in substantially the form attached as Exhibit "A" to the Stipulation (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement") and that certain Promissory Note related thereto (together with the DIP Credit Agreement and any

---

[1] Concurrently herewith, the Debtors have filed a motion seeking to have their bankruptcy cases jointly administered.

1

related documents and instruments delivered pursuant to or in connection therewith, the "DIP Financing Documents")[2], and to perform such other and further acts as may be required in connection with the DIP Financing Documents;

(iv)    authorization for the Debtors' use of proceeds of the DIP Loan and cash collateral, as such term is defined in 11 U.S.C. § 363(a), and the collection and application of cash collateral, in accordance with the Debtors' ten-week cash flow forecast setting forth all projected cash receipts and cash disbursements following the Petition Date (the "Initial Approved Budget"), a true and correct copy of which is attached as **Exhibit "5"** to the Goodman Declaration, and in accordance with the terms and conditions set forth in this Interim Order, the Stipulation, and the DIP Financing Documents, as applicable;

(v)    the grant of (i) valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) all DIP Collateral (as that term is defined below) to CapStar (such liens and security interests, the "DIP Liens"), which liens and security interests are senior to any and all other liens and security interests (other than such pre-petition liens and security interests as may have been duly-perfected and which were senior to the pre-petition lien and security interest of CapStar), to secure all obligations of the Debtors under and with respect to the DIP Loan (collectively, the "DIP Obligations"), subject and subordinate only to the Carve-Out (as that term is defined below); and (ii) super-priority administrative expense priority claims against the Debtors to CapStar (collectively, the "DIP Super-Priority Claim"), with priority over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate, subject and subordinate only to the Carve-Out;

(vi)    the grant of adequate protection to CapStar under that certain *Loan and Security Agreement* dated as of November 20, 2015 (as amended, restated, supplemented or otherwise

---

[2] All capitalized terms not specifically defined herein shall have the same meanings ascribed to them in thee DIP Credit Agreement.

modified from time to time and in effect on the date hereof, the "<u>Loan Agreement</u>," and together with all security agreements, pledge agreements, and other security and ancillary documents executed by the Debtors, their non-debtor affiliates and/or any guarantor in favor of CapStar, the "<u>Pre-Petition Loan Documents</u>"), entered into by and among CapStar, the Debtors, certain non-debtor affiliates of the Debtors, and certain guarantors, on account of (i) the Debtors' use of cash collateral as defined in 11 U.S.C. § 363(a), and (ii) the priming of the pre-petition liens and security interests (the "<u>Pre-Petition Liens</u>") held by CapStar in substantially all of the Debtors' assets (the "<u>Pre-Petition Collateral</u>") under the Pre-Petition Loan Documents, as more fully set forth in the Stipulation, which adequate protection shall be granted to CapStar in the form of (x) valid, enforceable, non-avoidable and fully perfected replacement liens on, and security interests in, the DIP Collateral (the "<u>Adequate Protection Liens</u>"), to the extent of any diminution in value in CapStar's interest in the Debtors' pre-petition collateral, and subject and subordinate only to the Carve-Out, DIP Liens, and certain permitted liens as set forth in the DIP Credit Agreement, including purchase money security interests granted to, and liens properly perfected by, secured creditors of the Debtors prior to the date of the filing of the Debtors' bankruptcy cases (the "<u>Petition Date</u>"); and (y) super-priority administrative expense priority claims against the Debtors (collectively, the "<u>First Lien Super-Priority Claim</u>"), with priority over any and all administrative expenses and claims asserted against any Debtor or its respective bankruptcy estate, subject and subordinate only to the Carve-Out and the DIP Super-Priority Claim;

(vii)    the grant of adequate protection to any other party holding a valid, properly perfected security interest in and lien against the Debtors' assets (a "<u>Pre-Petition Secured Party</u>," and collectively, the "<u>Pre-Petition Secured Parties</u>"), on account of the Debtors' use of cash collateral, in the form of a valid, binding, enforceable and perfected second-priority Adequate Protection Lien in and to the DIP Collateral, to the extent of any diminution in value in such Pre-Petition Secured Party's interest in the Debtors' pre-petition collateral;

(viii)    the grant of rights under section 552(b) of the Bankruptcy Code, including a determination that the "equities of the case" exception under section 552(b) shall not apply;

3

(ix)    subject to entry of a Final Order, the waiver by the Debtors of any right to surcharge the Pre-Petition Collateral (as defined in the Stipulation) or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or other applicable law;

(x)    pursuant to Bankruptcy Rule 4001, the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order, which, among other things, (i) authorizes the Debtors to obtain from CapStar the DIP Loan in the aggregate principal amount not to exceed $2,000,000, on an interim basis, (ii) authorizes the Debtors' use of the cash collateral; and (iii) grants the liens and claims provided for in the Stipulation and herein;

(xi)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the twenty-first (21st) day following the entry of this Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis;

(xii)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and CapStar to implement the terms of this Interim Order; and

(xiii)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

Upon due and sufficient notice of the Motion and Interim Hearing having been provided by the Debtors; and after considering all the pleadings filed with this Court; and upon the record made by the Debtors at the Interim Hearing; and the Court having found and determined that the relief sought in the Motion on an interim basis is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**.    On June 1, 2017, the Debtors filed their respective voluntary petitions with this Court commencing these Chapter 11 bankruptcy cases.    The Debtors are continuing to operate their businesses and manage their respective properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.    **Jurisdiction; Venue**.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).    The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b) and 9014 and Local Rule 4001-2.    Venue of the Debtors' Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Notice**.    The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001-2.    Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on June 1, 2017, to certain parties in interest, including: (a) the Office of the United States Trustee for the Central District of California, (b) CapStar and its counsel of record, (c) the 20 largest non-insider unsecured creditors of each of the Debtors, (d) all other parties known by the Debtors to assert liens or security interests in the assets of the Debtors, and (e) all parties requesting special notice (collectively, the "Noticed Parties").    Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D.    **Debtors' Stipulations With Respect to Pre-Petition Loan Documents**.    The Debtors hereby ratify and reaffirm their obligations under the Pre-Petition Loan Documents, and agree and covenant that the obligations thereunder are valid, legal, binding, and enforceable against the Debtors without defense, counterclaim, or offset of any kind.    The Debtors further acknowledge, agree and stipulate that, upon entry of this Interim Order, the Pre-Petition Loan

5

Documents and all liens and security interests granted thereby in the Pre-Petition Collateral (as that term is defined in the Stipulation) shall continue in full force and effect, and the Debtors shall perform all of the provisions, including payment obligations, of the Pre-Petition Loan Documents.

E.    **Budget**.  Attached as Exhibit "5" to the Goodman Declaration filed concurrently with the Motion and attached as **Exhibit "A"** hereto is the Initial Approved Budget for the period beginning on the Petition Date through and including August 5, 2017.   The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by CapStar and the Pre-Petition Secured Parties in consenting to this Interim Order, to provide the DIP Loan, and to permit the Debtors' use of cash collateral.   The Debtors represent and warrant to CapStar, the Pre-Petition Secured Creditors and this Court that the Initial Approved Budget includes and contains the Debtors' good faith projection of all payroll costs, operating expenses, general and administrative expenses, administrative expenses and other expenses to be incurred by the Debtors during the period covered by the Initial Approved Budget, together with projected cash receipts and estimate of gross and net operating income for such period.

F.    **Immediate Need For Funding**.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their business without the DIP Loan and authorized use of cash collateral.  As a result of the Debtors' financial condition, the use of cash collateral alone will be insufficient to meet the Debtors' immediate post-petition liquidity needs.   The Debtors' ability to maintain business relationships with their vendors, suppliers and clients, pay their employees, and otherwise finance their operations post-petition is essential to maintaining the going-concern value of the Debtors' business and preserving the value of the Debtors' assets.   In the absence of the DIP Loan and the authority of this Court to use cash collateral, the Debtors' businesses and estates would suffer immediate and irreparable harm, including, without limitation, an immediate cessation of their business operations.  The preservation and maintenance of the value of the Debtors' businesses and assets are of the utmost

significance and importance to a successful sale of substantially all of the Debtors' assets and the Debtors' emergence from these Chapter 11 cases.

G.     **No Credit On More Favorable Terms**.    The Debtors are unable to obtain financing on more favorable terms and conditions from sources other than CapStar pursuant to, and for the purposes set forth in, the DIP Financing Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.    The Debtors also are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) without granting priming liens under Bankruptcy Code section 364(d)(1) and a DIP Super-Priority Claim on the terms and conditions set forth in the Stipulation and the DIP Financing Documents

H.     **Reasonable; Good Faith**.    CapStar has indicated a willingness to provide the Debtors with post-petition secured financing but solely on the terms and conditions set forth in this Interim Order and the DIP Financing Documents.    After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loan to be provided by CapStar, in conjunction with the authorization to use cash collateral to be provided by CapStar, represents the best financing presently available to the Debtors. Accordingly, the Debtors represent that (i) the terms and conditions of the DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the terms of the DIP Loan, as set forth in the Stipulation and the DIP Financing Documents, and the terms for the use of the Pre-Petition Collateral (including cash collateral), have been the subject of negotiations conducted in good faith and at arms' length among the Debtors and CapStar; and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by CapStar have been extended, issued or made, as the case may be, in "good faith" within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code.

I.     **Use Of Cash Collateral.**    An immediate and critical need exists for the Debtors to use cash collateral (in addition to the DIP Loan) to continue to operate their businesses, pay

wages, maintain business relationships with vendors, suppliers and clients, and generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets.

J.    **Consent By Pre-Petition Secured Parties**.    The Pre-Petition Secured Parties have consented to, conditioned on the entry of this Interim Order (i) the financing arrangements contemplated by this Interim Order and the DIP Financing Documents, and (ii) the Debtors' proposed use of cash collateral, on the terms and conditions set forth in this Interim Order and the Stipulation, and such consent is binding on all Pre-Petition Secured Parties.

K.    **Adequate Protection.**    The adequate protection provided to the Pre-Petition Secured Parties for any diminution in the value of such parties' respective interests in the Pre-Petition Collateral from and after the Petition Date, pursuant to the provisions of this Interim Order, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Pre-Petition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.    The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Pre-Petition Secured Parties from the diminution in value of the Pre-Petition Collateral and (ii) obtain the foregoing consents and agreements.

L.    **Good Cause Shown; Best Interests**.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.    Absent entry of this Interim Order and the granting of the relief sought herein, the Debtors' estates will be immediately and irreparably harmed.    Good cause has been shown and entry of this Interim Order is in the best interest of the Debtors' estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for the successful sale of all or substantially all of their assets pursuant to any subsequent orders of this Court.

M.    **Section 552(b).**    In light of the consents and agreements provided for in this Interim Order, the Stipulation, and the DIP Financing Documents, CapStar is entitled to all of the

rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case"
exception shall not apply.

Based on the foregoing, and upon the record made before this Court at the Interim
Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Approval of Interim Order.**    The Motion is approved on the terms and
conditions set forth in this Interim Order.    Any objections that have not previously been
withdrawn are hereby overruled.    This Interim Order shall become effective immediately upon
its entry.

2.    **Approval Of DIP Financing Documents; Authority Thereunder**.    The Debtors
are expressly authorized and empowered to enter into and perform under the DIP Financing
Documents and to borrow, subject to the terms and conditions of the Stipulation and the DIP
Financing Documents, against the DIP Loan in an aggregate principal amount not to exceed
$2,000,000.00 solely for the purposes specified in the DIP Credit Agreement.    The Debtors are
authorized and directed to perform all acts (and to the extent such acts have already occurred,
such acts are hereby ratified) and to execute and deliver all instruments and documents that
CapStar determines to be reasonably required or necessary for the Debtors' performance of their
obligations under the DIP Financing Documents, including without limitation:  (i) the execution,
delivery, and performance of the DIP Financing Documents; (ii) any fees, costs, and expenses as
may be due from time to time as provided in the Stipulation and the DIP Financing Documents,
including, but not limited to, reasonable attorneys' fees and expenses and the fees and expenses
of financial advisors, consultants, and other professionals as provided in the DIP Financing
Documents; (iii) the granting of all liens, allowance of all claims, and the making of any
payments with respect to the Adequate Protection Obligations (as defined below) to the extent
provided for in the Stipulation; and (iv) the performance of all other acts required under or in
connection with the Stipulation and/or the DIP Financing Documents.  No obligation, payment,
transfer or grant of security or allowance of any super-priority claim by the Debtors under the

1   DIP Financing Documents, the Stipulation and this Interim Order, or the use of any cash

2   collateral, is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim,

3   avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement,

4   attachment, "claim" (as defined in the Bankruptcy Code), impairment, or subordination (whether

5   equitable, contractual, or otherwise), or other challenge of any kind pursuant to the Bankruptcy

6   Code or applicable non-bankruptcy law.

7       **3.**    **Interest On The DIP Loan**.   The rate of interest to be charged for the DIP Loan

8   shall be six percent (6%) per annum, calculated on the basis of a 360-day year for actual days

9   elapsed.   Upon and during the occurrence of an Event of Default (as defined in the DIP Credit

10  Agreement), the outstanding principal amount of the DIP Loan (including any overdue interest)

11  shall bear interest at a default rate equal to the maximum rate of interest allowed to be charged by

12  applicable law.   Accrued interest on the DIP Loan shall be payable to CapStar commencing on

13  August 1, 2017, and on the first day of each calendar month thereafter.

14      **4.**    **Approval Of Budget**.   The Initial Approved Budget attached as **Exhibit "A"**

15  hereto is approved.  The Initial Approved Budget may be modified or supplemented from time to

16  time by additional budgets (covering any time period covered by a prior budget or covering

17  additional time periods) prepared by the Debtors and approved by CapStar and the Purchaser,

18  without subsequent notice to or order of this Court (each such additional budget, a "Proposed

19  Budget," and together with the Initial Approved Budget, the "Approved Budget").   Upon

20  approval of any Proposed Budget, the same shall constitute the Approved Budget hereunder, but

21  until such Proposed Budget shall have been approved, the prior Approved Budget (subject to

22  Permitted Variances and Permitted Variance Exceptions, as defined below) shall continue in full

23  force and effect.   In accordance with the DIP Credit Agreement, commencing on the first day

24  (*i.e.*, Monday) following the end of the first Loan Week and continuing on each first day of each

25  week thereafter, the Debtors shall deliver to CapStar and to Purchaser (i) a comparison of actual

26  to budgeted results of operations for the preceding three (3) Loan Week(s), (ii) a report of all

27  income and expense variance on a line-item basis for the preceding three (3) Loan Week(s) in a

28

form reasonably acceptable to lender (the "Variance Report").  If any Variance Report shall indicate that the Debtors' cumulative net cash flow and/or liquidity for the trailing Loan Week shall be less than eighty-five percent (85%) of the amount of net cash flow and/or liquidity projected in the Approved Budget(s) covering such period (such negative variance of fifteen percent (15%) or less being "Permitted Variance" hereunder), then an Event of Default shall be deemed to exist at the option of CapStar and without further notice to the Debtors; provided that CapStar may, in its sole discretion, waive any violation of the Permitted Variance limit set forth herein or authorize the Debtors to exceed the Permitted Variance by written notice to the Debtors (each a "Permitted Variance Exception").

**5.    Use Of The DIP Loan, The DIP Collateral, And The Pre-Petition Collateral (Including Cash Collateral).**  The Debtors may only use the DIP Loan, the DIP Collateral, and the Pre-Petition Collateral (including cash collateral) in accordance with the Initial Approved Budget (subject to Permitted Variances) and the terms and conditions set forth in the Stipulation and the DIP Financing Documents, through and including the Termination Date (as defined in the DIP Credit Agreement) unless terminated earlier pursuant to the terms of the Stipulation and/or the DIP Credit Agreement.

**6.    Limitation On Use Of The DIP Loan, The DIP Collateral, And The Pre-Petition Collateral (Including Cash Collateral).**  Notwithstanding anything herein or in any other order of this Court to the contrary, the Debtors are not authorized to use the DIP Loan, the DIP Collateral, or the Pre-Petition Collateral (including cash collateral) to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the DIP Obligations, the obligations and duties owed by the Debtors under the Pre-Petition Loan Documents (the "Pre-Petition Obligations") or the liens, claims or rights granted under the Stipulation or this Interim Order, the DIP Financing Documents, or the Pre-Petition Loan Documents, or take any action purporting to do any of the foregoing; (ii) investigate, assert, or prosecute any claims and defenses against CapStar or any of its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or take any action purporting to do the foregoing

in respect of the DIP Loan, the Pre-Petition Obligations, the DIP Liens, the DIP Super-Priority Claim, the Pre-Petition Liens, the Adequate Protection Obligations, Adequate Protection Liens, and/or the First Lien Super-Priority Claim granted to CapStar under the Stipulation or this Interim Order; (iii) prevent, hinder, or otherwise delay CapStar from enforcement, or realization on the DIP Obligations, DIP Collateral, Pre-Petition Obligations, Pre-Petition Collateral, and the liens, claims, and rights granted to such parties under the Stipulation and this Interim Order, in accordance with the DIP Financing Documents, the Pre-Petition Loan Documents, the Stipulation, or any other cash collateral order or other order related thereto (including this Interim Order), as applicable; (iv) seek to modify any of the rights granted to CapStar under the Stipulation (other than with the consents contemplated thereunder), or as provided in the DIP Financing Documents or the Pre-Petition Loan Documents; (v) apply to the Court for authority to approve super-priority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Liens, the DIP Super-Priority Claim, Pre-Petition Liens, Adequate Protection Liens or First Lien Super-Priority Claim, unless all DIP Obligations, Pre-Petition Obligations, Adequate Protection Obligations, and claims granted to CapStar have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by CapStar in its sole discretion, which can be withheld for any reason whatsoever; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved in writing by CapStar, in its sole discretion, which can be withheld for any reason whatsoever), or are otherwise included in the Approved Budget.

7.      **DIP Claims And Liens**.  Upon entry of this Interim Order, CapStar is hereby granted the following allowed claims, liens, and security interests (as described below, collectively, the "<u>DIP Claims and Liens</u>") as security for the DIP Obligations:

a.      *DIP Super-Priority Claim*:  Pursuant to Bankruptcy Code section 364(c)(1), CapStar is granted the DIP Super-Priority Claim as security for the DIP Obligations, which DIP Super-Priority Claim shall have priority over and above any and all administrative

1    expenses and claims asserted against any Debtor or its respective bankruptcy estate, at any

2    time existing or hereafter arising, of any kind or nature whatsoever, including, but not

3    limited to the administrative expenses of the kinds specified in or ordered pursuant to

4    Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506,

5    507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy

6    Code, whether or not such expenses or claims may become secured by a judgment lien or

7    other non-consensual lien, levy, or attachment, subject and subordinate only to the Carve-

8    Out.

9          b.    _DIP Liens_:  Pursuant to Bankruptcy Code sections 361, 362, 364(c)(2),

10   364(c)(3), and 364(d), CapStar is granted the DIP Liens on all property, whether now

11   owned or hereafter acquired or existing and wherever located, of each Debtor and each

12   Debtor's estate, of any kind or nature, whatsoever, whether the property is real, personal,

13   tangible, intangible, or mixed, whether now existing or hereafter acquired or created,

14   including without limitation, all cash, accounts, inventory, goods, contract rights, mineral

15   rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses

16   therefor, accounts receivable, receivables and receivables records, general intangibles,

17   payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts,

18   owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort

19   claims, securities accounts, instruments, investment property, letter-of-credit rights,

20   supporting obligations, machinery and equipment, real property, leases (and proceeds from

21   the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other

22   equity or ownership interests held by any Debtor, including equity interests in subsidiaries

23   and non-wholly-owned subsidiaries, money, investment property, choses in action, causes

24   of action (but excluding any pre-petition avoidance causes of action under 11 U.S.C. §§

25   547 and 548, collectively referred to herein as "Avoidance Actions"), CapStar's pre-

26   petition collateral, including cash collateral, and all cash and non-cash proceeds, rents,

27   products, substitutions, accessions, and profits of any of the collateral described above,

28

13

documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, but not limited to, the products, proceeds and supporting obligations thereof, whether in existence on or before the Petition Date or thereafter created, acquired, or arising and wherever located, pursuant to 11 U.S.C. § 364(c)(2), all unencumbered pre-petition and post-petition property of each Debtor, and all present and after-acquired property of each Debtor that is subject to a lien granted or recorded on or after the Petition Date, wherever located, and all other collateral, all of the foregoing now owned or in which any Debtor has any interest (and without regard to whether acquired prior or subsequent to the Petition Date) or hereafter acquired or in which any Debtor obtain an interest, and the products and proceeds thereof (all such property, the "DIP Collateral"), with such DIP Liens to be senior to any and all other liens and security interests (other than such liens and security interests as may have been duly-perfected and which were senior to the lien and security interest of CapStar prior to the Petition Date), subject and subordinate only to the Carve-Out, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lock box or control agreements, mortgages, financing statements, or any other instruments or otherwise.

**8.    Carve-Out**.  Upon entry of this Interim Order, the professional fee carve-out from the DIP Collateral and the Pre-Petition Collateral agreed to by CapStar (the "Carve-Out"), is approved for the sum of: (a) fees required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code; (b) to the extent allowed, whether by interim order, procedural order, or otherwise, reasonable fees and expenses of the Debtors' professionals in an amount not exceeding $150,000.00; and (c) reasonable fees and expenses of any professionals of any  official committee of unsecured creditors appointed in the Debtors' cases (the "Creditors' Committee") in an amount not to exceed $50,000.00.  Notwithstanding the foregoing, the Carve-Out does not include, does not apply to, and is not available for any fees or expenses incurred by any party in connection with

(i) the investigation, preparation, initiation, or prosecution of any claims, causes of action, proceeding, adversary proceeding, or other litigation against CapStar, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations, liens and security interests granted under the Pre-Petition Loan Documents, in favor of CapStar, the DIP Financing Documents, or under the Stipulation, including, without limitation, for lender liability or pursuant to Bankruptcy Code section 105, 510, 544, 547, 548, 549, 550 or 552, applicable non-bankruptcy law, or otherwise; (ii) attempts to modify any of the rights granted to CapStar under the Stipulation, including any order related thereto, or other cash collateral order; (iii) any attempt to prevent, hinder, or otherwise delay CapStar's enforcement or realization upon any collateral in accordance with the Pre-Petition Loan Documents, the DIP Financing Documents, the Stipulation, or any other document or order in connection therewith; or (iv) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of the Court, or otherwise included in the Approved Budget

9.    **Adequate Protection Granted To CapStar**.  CapStar is entitled to adequate protection of its interests in the Pre-Petition Collateral (including, but not limited to, cash collateral) on which CapStar holds a perfected first-priority security interest as of the Petition Date in an amount equal to the aggregate post-petition diminution in value of the Pre-Petition Collateral, including any cash collateral, from and after the Petition Date (such diminution in value, the "Diminution in Value"), including, without limitation, to the extent such diminution results from the sale, lease, or use by any of the Debtors of the Pre-Petition Collateral, including any cash collateral, the subordination of the Pre-Petition Liens to the Carve-Out and the DIP Claims and Liens, Debtors' incurrence of the DIP Loan, or the imposition of the automatic stay pursuant to Bankruptcy Code section 362 (such adequate protection, as set forth in the Stipulation, the "Adequate Protection Obligations").

a.      *First Lien Super-Priority Claim.*  CapStar is hereby granted the First Lien Super-Priority Claim, which shall have priority over any and all administrative expenses and all other claims asserted against any of the Debtors or its respective estate, at any time existing or arising, of any kind or nature whatsoever, including, but not limited to, the administrative expenses and other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, subject to and subordinate in all respects to the Carve-Out and the DIP Super-Priority Claim.

b.      *Adequate Protection Liens.*  Effective as of the Petition Date and perfected without the necessity of the execution by Debtors (or recordation or other filing) of security agreements, control agreements, assignment of rents, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by CapStar, CapStar is hereby granted the Adequate Protection Liens, subject and subordinate only to the (i) Carve-Out, (ii) DIP Liens and Claims, (iii) and certain permitted liens as set forth the DIP Credit Agreement, including purchase money security interests granted to, and liens properly perfected by, secured creditors of the Debtors prior to the Petition Date, if any. The Adequate Protection Liens are not subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of Debtors and their estates under Bankruptcy Code section 551, but are subject to the DIP Lien.

/ / /

/ / /

/ / /

/ / /

/ / /

c.    *Additional Adequate Protection Granted to CapStar.*  In addition to, and without limiting, whatever rights of access CapStar has under the Pre-Petition Loan Documents, the Debtors are required to permit representatives and agents of CapStar (i) to have reasonable access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors. In addition, the Debtors are required to provide to CapStar on a weekly basis, reports setting forth (i) substantive details of the Debtors' operating performance, and (ii) a detailed comparison, including commentary to the extent available, of the weekly actual operating performance against the projections, substantially in form and substance satisfactory to CapStar.    The Stipulation and this Interim Order approving the Stipulation are without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of CapStar to request additional forms of adequate protection at any time.

10.    **Adequate Protection Granted To Any Other Pre-Petition Secured Parties**. Effective as of the Petition Date and perfected without the necessity of the execution by Debtors (or recordation or other filing) of security agreements, control agreements, assignment of rents, pledge agreements, financing statements, mortgages, or other similar documents, or possession or control, any Pre-Petition Secured Party other than CapStar is hereby granted a valid, binding, enforceable and perfected second-priority Adequate Protection Lien in and to the DIP Collateral, to the extent of any Diminution in Value in such Pre-Petition Secured Party's interest in the Pre-Petition Collateral from and after the Petition Date.

11.    **Events of Default and Remedies; Modification Of Automatic Stay**.  Upon entry of the Interim Order and the Final Order, and without any further order of this Court, upon the occurrence of any Event of Default (as set forth in the Stipulation and the DIP Credit Agreement), the automatic stay is deemed modified and lifted as to the DIP Collateral and Pre-Petition Collateral to permit CapStar to pursue any and all remedies to which it may be entitled, including the right to demand immediate possession of the DIP Collateral and Pre-Petition

1   Collateral and to liquidate the same in the manner provided by applicable law, all without further

2   order of or application to the Bankruptcy Court.  Upon the occurrence of any Event of Default,

3   CapStar shall be entitled to the exercise of any and all rights and remedies available to it under

4   the DIP Financing Documents and the Pre-Petition Loan Documents, at law or in equity.  All

5   such rights and remedies may be exercised successively or concurrently in such order and

6   manner as CapStar may in its sole discretion elect, and no such election shall constitute a waiver

7   by CapStar of any other right or remedy.

8       **12.    <u>Release</u>**.  Upon the entry of this Interim Order, each of the Debtors and its

9   bankruptcy estate, on its own behalf and on behalf of its past, present and future predecessors,

10  successors, heirs, subsidiaries, and assigns (collectively, the "<u>Releasors</u>"), to the maximum

11  extent permitted by applicable law, shall be deemed to unconditionally, irrevocably, fully and

12  forever release, remise, acquit, relinquish, irrevocably waive, and discharge CapStar and its

13  former, current, or future officers, employees, directors, agents, representatives, owners,

14  members, partners, financial advisors, legal advisors, shareholders, managers, consultants,

15  accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>"), of

16  and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of

17  action, indebtedness, obligations, rights, assertions, allegations, actions, suits, controversies,

18  proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every

19  type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued,

20  unaccrued, fixed, contingent, pending, or threatened including, but not limited to, all legal and

21  equitable theories of recovery, arising under common law, statute or regulation or by contract, of

22  every nature and description that existed as of the date of the entry of the Final Order, relating to

23  any of the Pre-Petition Loan Documents, the DIP Financing Documents, or the transactions

24  contemplated under such documents, or the Debtors' Chapter 11 cases, as applicable, including,

25  but not limited to, (i) any so-called "lender liability," equitable subordination, equitable

26  disallowance, or recharacterization claims or defenses, (ii) any and all claims and causes of

27  action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action

28

1    regarding the validity, priority, perfection or non-avoidability of CapStar's liens or claims.

2    **13.    Perfection Of DIP Liens And Adequate Protection Liens**.  CapStar is hereby

3    authorized, but not required, to file or record financing statements, intellectual property filings,

4    mortgages, notices of lien, or similar instruments in any jurisdiction in order to validate and

5    perfect the liens and security interests granted to it under this Interim Order.  Irrespective of

6    whether CapStar, in its sole discretion, chooses to file such financing statements, intellectual

7    property filings, mortgages, notices of lien or similar instruments, such liens and security

8    interests are deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to

9    challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff,

10    counterclaim, avoidance, re-characterization, reclassification, reduction, disallowance, recovery,

11    disgorgement, attachment, "claim" (as defined in the Bankruptcy Code), impairment,

12    subordination (whether equitable, contractual, or otherwise), or other challenge of any kind

13    pursuant to the Bankruptcy Code or applicable non-bankruptcy law as of the Petition Date.  If

14    CapStar determines to file any financing statements, notices of liens or similar instruments, the

15    Debtors will cooperate and assist in any such filings as reasonably requested by CapStar and the

16    automatic stay is, without further order of the Court, deemed modified to allow such filings

17    **14.    Effect of Stipulation on Third Parties**.  Upon entry of this Interim Order and the

18    Final Order, the stipulations, releases, and admissions contained in the Stipulation, will be

19    deemed binding upon: (1) each of the Debtors and any successor thereto; and (2) all other parties

20    in interest, including any Creditors' Committee or any Chapter 7 or Chapter 11 trustee appointed

21    or elected for any of the Debtors (a "Trustee").  Notwithstanding the foregoing, the binding

22    effect of the Stipulation, this Interim Order, and the Final Order will not be held against any

23    Creditors' Committee, if within thirty (30) days from the Petition Date, any Creditors'

24    Committee has duly filed an adversary proceeding challenging the validity, enforceability,

25    priority, or extent of the Pre-Petition Obligations or the liens on the Pre-Petition Collateral

26    against CapStar in connection with any matter related to the Pre-Petition Obligations, or the Pre-

27    Petition Collateral, or the Pre-Petition Liens.  Nothing in the Stipulation vests or confers on any

28

1  party-in-interest, including the Creditors' Committee or Trustee, standing or authority to pursue

2  any cause of action belonging to any of the Debtors or its respective estate.

3    15.    **Section 506(c) Waiver; No Marshaling.**  Upon entry of this Interim Order and the

4  Final Order approving the Stipulation, except to the extent of the Carve-Out, no costs or

5  expenses of administration of any of the Debtors' Chapter 11 case or any successor cases,

6  including any Chapter 7 cases, that may result therefrom, including liquidation in bankruptcy or

7  other proceedings under the Bankruptcy Code, may be charged against or recovered from

8  CapStar, the Pre-Petition Collateral, the DIP Obligations, and/or the DIP Collateral pursuant to

9  Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of

10 CapStar, which such consent may be withheld in CapStar's sole discretion and for any reason

11 whatsoever, and no such consent may be implied from any other action, inaction, or

12 acquiescence by CapStar or its representatives.  In no event shall CapStar be subject to the

13 equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP

14 Collateral or the Prepetition Collateral (as applicable).

15    16.    **Section 552(b).**  Upon entry of this Interim Order and the Final Order approving

16 the Stipulation, CapStar is entitled to all of the rights and benefits of Bankruptcy Code section

17 552(b).  The "equities of the case" exception under the Bankruptcy Code section 552(b) does not

18 apply to CapStar with respect to (i) proceeds, products or profits of any of the Pre-Petition

19 Collateral, including cash collateral, or DIP Collateral (as applicable) or (ii) the extension of the

20 Adequate Protection Liens to cover proceeds of the Pre-Petition Collateral.

21    17.    **Restrictions On Transfer Of DIP Collateral Or Pre-Petition Collateral To**

22 **Non-Debtor Affiliates**.  The Debtors are prohibited from transferring or using any DIP

23 Collateral or Pre-Petition Collateral, including cash collateral, to or for the benefit of any direct

24 or indirect foreign or non-debtor affiliate or subsidiary of the Debtors, except as may be

25 specifically authorized by CapStar in writing prior to any such transfer or use.

26

27

28

18.    **Indemnification And Expenses.**  Upon the entry of this Interim Order and the Final Order approving the Stipulation, each Debtor, jointly and severally, is/are required to indemnify and hold harmless CapStar, its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of the foregoing (each, an "Indemnified Person") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel, but subject to the limitations set forth below) and liabilities of such Indemnified Person arising out of or relating to any investigation, claim, or any litigation, or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by any Debtor or any of its affiliates) that relates to the DIP Financing Documents or the Stipulation or the transactions contemplated thereby and hereby or the exercise of any of their rights provided in the DIP Financing Documents or the Stipulation; provided, that no Indemnified Person will be indemnified for any cost, expense, or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct.  No Indemnified Person will have any liability (whether direct or indirect, in contract, tort, or otherwise) to any Debtor or any of its/their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, willful misconduct, or material breach of its obligations under the DIP Financing Documents or the Stipulation. In no event, however, will any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.  In addition, (a) all out-of-pocket expenses (including, but not limited to, reasonable and documented fees, disbursements and other charges of outside counsel, financial advisors, and other professionals) of CapStar, in connection with any of the Debtors' Chapter 11 cases or any other insolvency or bankruptcy proceedings of any Debtor, the DIP Loan, the DIP Obligations, the DIP Financing Documents, and the transactions contemplated thereby and

hereby, must be paid by the Debtors, jointly and severally, from time to time (b) all out-of-pocket expenses (including, but not limited to, fees, disbursements and other charges of outside counsel, financial advisors, and other professionals) of CapStar for enforcement costs and documentary taxes associated with the DIP Loan, the DIP Obligations, the DIP Financing Documents, and the transactions contemplated thereby and hereby, must be paid by Debtors, jointly and severally.  Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the CapStar in the DIP Financing Documents and/or Pre-Petition Loan Documents, which indemnity is approved and authorized upon the entry of this Interim Order and the Final Order

19.    **Limitation of Liability**.  Upon entry of this Interim Order, in determining to make any loan under the DIP Financing Documents, permitting use of the cash collateral, or exercising any rights or remedies as and when permitted pursuant to the Stipulation, or order related thereto, the DIP Financing Documents, or the Pre-Petition Loan Documents, CapStar is not, and may not be, deemed to be in control of the operations of any of the Debtors, nor does it owe any fiduciary duty to any of the Debtors, its respective creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the Stipulation, the DIP Financing Documents or the Pre-Petition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon CapStar any liability for any claims arising from the pre-petition or post-petition activities of any of any of the Debtors and its respective affiliates (as defined in Bankruptcy Code section 101(2)).

20.    **Binding Effect.**  Upon entry of this Interim Order and the Final Order, the provisions of the Stipulation, the DIP Credit Agreement, and the other DIP Financing Documents shall be binding upon all parties in interest in the Debtors' Chapter 11 bankruptcy cases and any successor cases, including any Chapter 7 cases, including CapStar, any Creditors' Committee, each of the Debtors and its respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed

1  pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal

2  representative of any of the Debtors or with respect to the property of the estates of any of the

3  Debtors).

4          21.    **Survival**.  Upon entry of this Interim Order and the Final Order approving the

5  Stipulation, except as expressly provided in the Stipulation or in the DIP Financing Documents,

6  the DIP Claims and Liens, the Adequate Protection Liens, and First Lien Super-Priority Claim

7  and all other rights, claims, security interests, and remedies of CapStar granted by the provisions

8  of the Stipulation, amd the DIP Financing Documents shall survive, and may not be modified,

9  impaired, or discharged by the entry of an order (i) converting any of the Debtors' Chapter 11

10  cases to a case under Chapter 7 of the Bankruptcy Code, or dismissing any of the Debtors'

11  bankruptcy cases, or by any other act or omission, or (ii) confirming a plan of reorganization in

12  any of the Debtors' Chapter 11 cases, and, pursuant to section 1141(d)(4) of the Bankruptcy

13  Code, the Debtors have waived any discharge as to any remaining DIP Claims and Liens,

14  Adequate Protection Liens or the First Lien Super-Priority Claims. The terms and provisions of

15  this Stipulation continue in each Chapter 11 Case and in any successor cases, including any

16  Chapter 7 cases. If any Chapter 11 Case ceases to be jointly administered, or in any successor or

17  superseding Chapter 7 case under the Bankruptcy Code, and the DIP Claims and Liens,

18  Adequate Protection Liens, the administrative claims granted pursuant to the Stipulation, and all

19  other rights, claims, security interests, and remedies of CapStar granted by the provisions of the

20  Stipulation, or any order related thereto, shall continue in full force and effect as provided herein.

21  To remove any doubt, this Interim Order and the Final Order approving the Stipulation, is an

22  order for "cause" under section 349 of the Bankruptcy Code, the terms of which, unless specified

23  herein, shall not be vacated under section 349 of the Bankruptcy Code.

24          22.    **Controlling Effect of Interim Order.**  To the extent any provision of this Interim

25  Order conflicts or is inconsistent with any provision of the Motion, any Pre-Petition Loan

26  Document, the Stipulation, or any DIP Financing Document, the provisions of this Interim Order

27  shall control.

28

23.     **Final Hearing**.  The Final Hearing on the Motion shall be heard before this Court on _____, 2017 at _____.m. at the United States Court, 411 West Fourth Street, Courtroom ____ , Santa Ana, California 92701.  Any objections shall be filed with the Court on or before _____, 2017 at 5:00 p.m. (Pacific Time), and served upon counsel for the Debtors and CapStar.

###

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

[Initial Approved Budget]

**Solid Landings Behavioral Health, Inc.**

DIP Budget

**Combined Solid Landings Behavioural Health, Inc.**

Weeks 1 thru 10 starting with WE 6/4/17

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| | Loan +/(-) Ckg balance at the start of each week: | (9,988,407) | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (9,988,407) |
| | **Collections** | | | | | | | | | | | |
| | Collection of receivables-clinical | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,000,000 |
| | Deductibles and Copayments | - | - | - | - | - | - | - | - | - | - | - |
| | Collection of receivables-lab | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 150,000 |
| | DIP Financing Advance, net | - | | | | | | | | | | - |
| | **Total Collections** | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 1,150,000 |
| | **Disbursements** | | | | | | | | | | | |
| 1 | Salaries, Wages  PR Tax & WC Ins, health & other benefits (PEO pre-funding) | 100,000 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 90,600 | 915,400 |
| 2 | Treatment Expense | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 6,281 | 62,811 |
| 3 | Electronic Medical Records & IT Services | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 14,400 | 144,000 |
| 4 | Contract Services - Clinical Staff | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 10,884 | 108,842 |
| 5 | Lab Expense | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 3,006 | 30,056 |
| 6 | Supplies & Food | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 7 | Other Operating Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| 8 | Business Insurance | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 175,000 |
| 9 | State & County taxes (Franchise, Income, property, etc.) | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 2,038 | 20,379 |
| 10 | Postage & office supplies | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 12,500 |
| 11 | Rent | 183,700 | | | | 183,700 | | | | | 183,700 | 551,100 |
| 12 | Utilities (incl. deposits) | 48,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 129,000 |
| 13 | Marketing | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 33,452 | 334,516 |
| 14 | House and Equipment R&M | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 15 | Pro Serv fees (incl CRO, Bankruptcy Counsel & Oth Legal) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 300,000 |
| 16 | License and fees | - | - | - | - | - | - | - | - | - | - | - |
| 17 | Misc. Items | - | - | - | - | - | - | - | - | - | - | - |
| 18 | Travel, meals & accommodations | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |

*DIP Budget updated to July 31 revd 5-30-17 bc  Bdgt to July 31*

**Solid Landings Behavioral Health, Inc.**
**DIP Budget**
**Combined Solid Landings Behavioural Health, Inc.**
Weeks 1 thru 10 starting with WE 6/4/17

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | |
| | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 | Total |
| 19 Bank Interest | | | | | 86,708 | | | | 92,744 | | 179,452 |
| 20 Bank fees | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |
| 21 Auto leases & operating expenses | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| 22 Other financing items | - | - | - | - | - | - | - | - | - | - | - |
| 23 CapEx | - | - | - | - | - | - | - | - | - | - | - |
| 24 Items not anticipated | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,000 |
| 26 Trustee Fees | - | - | - | - | - | - | | | 32,500 | - | 32,500 |
| **Total disbursements** | **462,510** | **230,410** | **230,410** | **230,410** | **500,818** | **230,410** | **230,410** | **230,410** | **355,655** | **414,110** | **3,115,556** |
| Net weekly cash | (347,510) | (115,410) | (115,410) | (115,410) | (385,818) | (115,410) | (115,410) | (115,410) | (240,655) | (299,110) | (1,965,556) |
| **Loan +/(-) Ckg balance at week end** | (10,335,918) | (10,451,328) | (10,566,739) | (10,682,149) | (11,067,967) | (11,183,377) | (11,298,788) | (11,414,198) | (11,654,853) | (11,953,964) | (11,953,964) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "8"

[Asset Purchase Agreement]

*Execution Version*

ASSET PURCHASE AGREEMENT


BY AND AMONG


SOLID LANDINGS BEHAVIORAL HEALTH, INC.,
SURE HAVEN, INC.,
CEDAR CREEK RECOVERY, INC.,
SILVER ROCK RECOVERY,
EMS TOXICOLOGY,


ALPINE BEHAVIORAL HOLDCO, LLC,
ALPINE BEHAVIORAL CALIFORNIA, LLC,
ALPINE BEHAVIORAL NEVADA, LLC,
ALPINE BEHAVIORAL TEXAS, LLC,
ALPINE BEHAVIORAL TOXICOLOGY, LLC,


MARK SHANDROW,
ELIZABETH PERRY,


AND


CAPSTAR BANK


dated as of June 1, 2017

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.................................................. 1
    **Section 1.01.**    Definitions ................................................................................................. 1

ARTICLE II. TRANSFERRED ASSETS ............................................................................................ 2
    **Section 2.01.**    Transferred Assets ..................................................................................... 2
    **Section 2.02.**    Retained Assets .......................................................................................... 4

ARTICLE III. OBLIGATIONS AND LIABILITIES ........................................................................... 4
    **Section 3.01.**    Assumed Liabilities .................................................................................... 4
    **Section 3.02.**    Excluded Liabilities ................................................................................... 5
    **Section 3.03.**    Assumed Contracts; Cure Costs ................................................................ 5

ARTICLE IV. CONSIDERATION; CLOSING ..................................................................................... 5
    **Section 4.01.**    Consideration ............................................................................................. 5
    **Section 4.02.**    Transfer Taxes ........................................................................................... 5
    **Section 4.03.**    The Closing ................................................................................................ 5
    **Section 4.04.**    Allocation of Transferred Assets and Assumed Liabilities ...................... 6
    **Section 4.05.**    Items to be Delivered by the Debtors at the Closing ................................ 6
    **Section 4.06.**    Items to be Delivered by Purchasers to the Debtors at the Closing.................. 7
    **Section 4.07.**    Items to be Delivered by Purchasers to Lender at the Closing ........................... 7
    **Section 4.08.**    Items to be Delivered by Lender to Purchasers at the Closing ........................ 8
    **Section 4.09.**    Items to be Delivered by Lender to the Equityholders at the Closing ............... 8
    **Section 4.10.**    Items to be Delivered by the Equityholders to Lender at the Closing .......... 8
    **Section 4.11.**    Disclaimer of Warranties .......................................................................... 8
    **Section 4.12.**    Withholding ............................................................................................... 8

ARTICLE V. ACTIONS IN THE BANKRUPTCY CASES ................................................................ 9
    **Section 5.01.**    Sale Motion, Bidding Procedures and Sale Milestones ...................................... 9
    **Section 5.02.**    Break-Up Fee ............................................................................................. 9
    **Section 5.03.**    Bankruptcy Filings .................................................................................... 9

ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF THE DEBTORS................................ 10
    **Section 6.01.**    Power and Authorization ........................................................................... 10
    **Section 6.02.**    Binding Agreement .................................................................................... 10
    **Section 6.03.**    Organization and Good Standing ............................................................... 10
    **Section 6.04.**    Non-Contravention .................................................................................... 10
    **Section 6.05.**    Compliance with Legal Requirements....................................................... 10
    **Section 6.06.**    Environmental Matters .............................................................................. 11
    **Section 6.07.**    Title to Assets ............................................................................................ 11
    **Section 6.08.**    No Assets Held by Non-Debtor Affiliates................................................. 11
    **Section 6.09.**    Brokers and Finders................................................................................... 11
    **Section 6.10.**    Statements Not Misleading........................................................................ 11

ARTICLE VII. REPRESENTATIONS AND WARRANTIES OF PURCHASERS................................ 11
    **Section 7.01.**    Power and Authorization ........................................................................... 11
    **Section 7.02.**    Binding Agreement .................................................................................... 11

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

Section 7.03.    Organization and Good Standing ...... 12
Section 7.04.    Non-Contravention ...... 12
Section 7.05.    Brokers and Finders ...... 12

ARTICLE VIII. REPRESENTATIONS AND WARRANTIES OF THE EQUITYHOLDERS ...... 12
Section 8.01.    Power and Authorization ...... 12
Section 8.02.    Binding Agreement ...... 12
Section 8.03.    Non-Contravention ...... 12
Section 8.04.    Brokers and Finders ...... 12

ARTICLE IX. REPRESENTATIONS AND WARRANTIES OF LENDER ...... 13
Section 9.01.    Power and Authorization ...... 13
Section 9.02.    Binding Agreement ...... 13
Section 9.03.    Organization and Good Standing ...... 13
Section 9.04.    Non-Contravention ...... 13
Section 9.05.    Brokers and Finders ...... 13

ARTICLE X. COVENANTS OF THE DEBTORS AND THE EQUITYHOLDERS ...... 13
Section 10.01.    Required Approvals; Change in Ownership Applications ...... 13
Section 10.02.    Consents to Assignment ...... 14
Section 10.03.    Conduct of the Business ...... 14
Section 10.04.    Notice to Purchaser ...... 14
Section 10.05.    Confidentiality ...... 15
Section 10.06.    Termination of Debtor Employee Plans ...... 15
Section 10.07.    No Third Party Beneficiaries ...... 15
Section 10.08.    Stayed Tax Liens ...... 15
Section 10.09.    Non-Competition;    Non-Solicitation    and    No-Hire;    Non-Disparagement ...... 15
Section 10.10.    Release by the Equityholders ...... 17
Section 10.11.    Name Changes ...... 18

ARTICLE XI. COVENANTS OF PURCHASERS ...... 18
Section 11.01.    Required Governmental Approvals and Accrediting Approvals; Change of Ownership Applications ...... 18
Section 11.02.    Employees ...... 19
Section 11.03.    Non-Disparagement ...... 19

ARTICLE XII. CONDITIONS TO THE DEBTORS' OBLIGATIONS AT THE CLOSING ...... 19
Section 12.01.    Representations and Warranties ...... 20
Section 12.02.    Performance ...... 20
Section 12.03.    Absence of Government Orders ...... 20
Section 12.04.    Required Approvals ...... 20
Section 12.05.    Other Instruments and Documents ...... 20

ARTICLE XIII. CONDITIONS TO PURCHASERS' OBLIGATIONS AT THE CLOSING ...... 20
Section 13.01.    Representations and Warranties ...... 20

ii

# TABLE OF CONTENTS
## (CONTINUED)

<u>Page</u>

**Section 13.02.**    Performance .................................................................. 20
**Section 13.03.**    Absence of Government Orders ...................................... 20
**Section 13.04.**    Material Adverse Effect.................................................. 20
**Section 13.05.**    Court Approval ............................................................... 21
**Section 13.06.**    Financing ........................................................................ 21
**Section 13.07.**    Other Instruments and Documents ................................ 21

ARTICLE XIV. TERMINATION ............................................................... 21
**Section 14.01.**    Termination ..................................................................... 21
**Section 14.02.**    Termination Consequences.............................................. 22

ARTICLE XV. TAX MATTERS ................................................................. 23
**Section 15.01.**    Tax Matters; Allocation of Purchase Price; Periodic Taxes ........................... 23

ARTICLE XVI. POST-CLOSING MATTERS........................................... 23
**Section 16.01.**    Retained Assets and Excluded Liabilities...................... 23
**Section 16.02.**    Preservation and Access to Records After the Closing ................................... 24
**Section 16.03.**    Consents; Provision of Benefits of Certain Assumed Contracts ..................... 24
**Section 16.04.**    Accounts Receivable; Collections ................................. 25
**Section 16.05.**    Further Assurances .......................................................... 25

ARTICLE XVII. MISCELLANEOUS ....................................................... 25
**Section 17.01.**    Expenses .......................................................................... 25
**Section 17.02.**    Notices ............................................................................. 25
**Section 17.03.**    Succession and Assignment; Third-Party Beneficiaries................................. 27
**Section 17.04.**    Disclosure Schedules, Exhibits and Schedules.............. 27
**Section 17.05.**    Amendments and Waivers ............................................... 27
**Section 17.06.**    Entire Agreement ............................................................ 28
**Section 17.07.**    Counterparts; Electronic Signature ................................ 28
**Section 17.08.**    Severability ..................................................................... 28
**Section 17.09.**    Governing Law; Jurisdiction .......................................... 28
**Section 17.10.**    Publicity........................................................................... 28
**Section 17.11.**    Waiver of Jury Trial ....................................................... 29
**Section 17.12.**    Specific Performance ...................................................... 29
**Section 17.13.**    Service of Process........................................................... 29
**Section 17.14.**    Disclosure Schedules....................................................... 29
**Section 17.15.**    Conflicts with Ancillary Agreements ............................. 29
**Section 17.16.**    No Consents Regarding DIP Funding ............................. 29

## LIST OF EXHIBITS

| Exhibit | Description of Exhibit |
| --- | --- |
| A | Definitions; Certain Rules of Construction |
| B | Bidding Procedures |
| C | Form of Interim Management Agreement |

## LIST OF SCHEDULES

| <u>Schedule</u> | <u>Description of Schedule</u> |
| --- | --- |
| 2.01(a)-1 | Assumed Real Property (Tenant) Leases |
| 2.01(a)-2 | Rejected Real Property (Tenant) Leases |
| 2.01(b) | Other Real Property Interests |
| 2.01(c)-1 | Assumed Personal Property Leases |
| 2.01(c)-2 | Rejected Personal Property Leases |
| 2.01(k) | Licenses |
| 2.01(q)-1 | Assumed Contracts |
| 2.01(q)-2 | Rejected Contracts |
| 2.01(t) | Causes of Action |
| 2.02(a) | Retained Assets |
| 3.01 | Assumed Liabilities |
| 3.02 | Excluded Liabilities |
| 6.05(a) | Compliance with Legal Requirements |
| 6.05(b) | Violations of Legal Requirements |
| 10.01(c) | Regulatory Filings |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as June 1, 2017 (the "Effective Date"), by and among (a) Solid Landings Behavioral Health, Inc., a California corporation ("Solid Landings"), (b) Sure Haven, Inc., a California corporation ("Sure Haven"), (c) Cedar Creek Recovery, Inc., a Texas corporation ("Cedar Creek"), (d) Silver Rock Recovery, a Nevada corporation ("Silver Rock"), (e) EMS Toxicology, a Nevada corporation ("EMS Toxicology" and together with Solid Landings, Sure Haven, Cedar Creek, and Silver Rock, the "Debtors"), (f) Alpine Behavioral Holdco, LLC, a Delaware limited liability company ("Alpine Holdco"), (g) Alpine Behavioral California, LLC, a California limited liability company ("Alpine California"), (h) Alpine Behavioral Nevada, LLC, a Nevada limited liability company ("Alpine Nevada"), (i) Alpine Behavioral Texas, LLC, a Texas limited liability company ("Alpine Texas"), (j) Alpine Behavioral Toxicology, LLC, a Nevada limited liability company ("Alpine Toxicology" and together with Alpine Holdco, Alpine California, Alpine Nevada and Alpine Texas, "Purchasers"), (k) Mark Shandrow ("Shandrow"), (l) Elizabeth Perry ("Perry" and together with Shandrow, the "Equityholders" and each of them individually, an "Equityholder"), and (m) CapStar Bank, a Tennessee banking corporation ("Lender"). The Debtors, Purchasers, the Equityholders and Lender are sometimes referred to in this Agreement collectively as the "Parties" or individually as a "Party."

## RECITALS

WHEREAS, the Debtors own and operate the Business (as defined below), and own or control the businesses, rights, titles and assets collectively comprising the Business;

WHEREAS, following the execution of this Agreement, the Debtors shall file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Bankruptcy Cases");

WHEREAS, it is anticipated that the Debtors shall continue in the possession of their respective assets and in the management of their respective businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors have determined that it is in each of their respective best interests to sell the operations of the Debtors and the Transferred Assets (as defined below) to qualified and experienced purchasers that will continue to operate the Business and ensure continuity of care to clients; and

WHEREAS, Purchasers desire to purchase from the Debtors and the Debtors desire to sell to Purchasers, at the Closing, the Transferred Assets, for the consideration, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

**Section 1.01.**    Definitions.  Defined terms used herein shall have the meanings set forth on Exhibit A attached hereto, in addition to the other terms defined throughout this Agreement.  Exhibit A also contains certain rules regarding the construction and interpretation of this Agreement.

## ARTICLE II.
## TRANSFERRED ASSETS

**Section 2.01.**      <u>Transferred Assets</u>.  As of and on the Closing Date and subject to the terms and conditions of this Agreement, the Debtors agree to sell, assign, transfer, convey and deliver to Purchasers, free and clear of all Liens (other than the Assumed Liabilities), in accordance with and to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, after giving effect to the Bidding Procedures, the Bidding Procedures Order and the Sale Order, and Purchasers agree to purchase, acquire, receive and accept, all of the right, title and interest of the Debtors in and to the Transferred Assets. "<u>Transferred Assets</u>" shall mean all of the right, title and interest of the Debtors on the Closing Date to all assets used in the operation of the Business (other than Retained Assets) including, without limitation, the following:

(a)      all of the leasehold interests of the Debtors in the real property leased to the Debtors as lessee or tenant identified on <u>Schedule 2.01(a)-1</u> (collectively, the "<u>Assumed Real Property (Tenant) Leases</u>") pursuant to any lease, sublease, or other contractual obligation, it being expressly agreed that through the Closing Date Purchasers may, in their sole and absolute discretion without the consent of the Debtors, elect to request that the Debtors, or any of them, and the Debtors, or any of them, immediately upon such request, shall reject any such lease, sublease, or other contractual obligation by deleting such lease, sublease, or other contractual obligation from <u>Schedule 2.01(a)-1</u> and adding such lease, sublease, or other contractual obligation to <u>Schedule 2.01(a)-2</u> (the "<u>Rejected Real Property (Tenant) Leases</u>");

(b)      all of the interests of the Debtors as lessor in and to each lease, sublease, or other contractual obligation under which the Real Property is occupied or used by a third-party with respect to the operation of the Debtors identified on <u>Schedule 2.01(b)</u> (collectively, the "<u>Other Real Property Interests</u>").

(c)      all of the interests of the Debtors as lessee in and to each lease, sublease, license or other contractual obligation under which the Personal Property is used by the Debtors exclusively with respect to the operation of the Business or identified on <u>Schedule 2.01(c)-1</u> (collectively, the "<u>Assumed Personal Property Leases</u>"), it being expressly agreed that through the Closing Date Purchasers may, in their sole and absolute discretion without the consent of the Debtors, elect to request that the Debtors, or any of them, and the Debtors, or any of them, immediately upon such request, shall reject any such lease, sublease or other contractual obligation by deleting such lease, sublease or other contractual obligation from <u>Schedule 2.01(c)(i)-1</u> and adding such lease, sublease or other contractual obligation to <u>Schedule 2.01(c)-2</u> (the "<u>Rejected Personal Property Leases</u>");

(d)      all of the tangible personal property owned, leased, subleased or licensed by the Debtors and used with respect to the operation of the Business, including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (collectively, the "<u>Personal Property</u>");

(e)      all inventories of usable supplies, medications, medical supplies, food, janitorial and office supplies and other disposables and consumables that are owned by the Debtors for use in the Business (collectively, the "<u>Inventory</u>");

(f)      all advance payments, prepayments, prepaid expenses, and deposits (other than such payments, prepayments or deposits in respect of Taxes that are Excluded Liabilities or prepaid insurance premiums, if any) made by the Debtors with respect to the Debtors and other Transferred Assets as of the Closing Date (collectively the "<u>Prepaid Expenses</u>");

2

(g)      all uncollected accounts, notes, interest and other health care or other receivables generated in connection with the operation of the Debtors and other Transferred Assets by the Debtors before or on the Closing Date, whether billed or unbilled, recorded or unrecorded, or payable by a medically indigent assistance program, private Payors or any other Payor (including an insurance company), health care provider, independent practice association network (such as a health maintenance organization, preferred provider organization or any other managed care program), any fiscal intermediary of the foregoing, private pay clients, private insurance or any other source (collectively "Debtor Accounts Receivable");

(h)      all rights, claims and choses of action of the Debtors related to and/or arising out of Debtor Accounts Receivable, and any payments, awards or other proceeds arising therefrom and any other choses in action not expressly designated as a Retained Asset, and all rights and legal privileges and confidential information related thereto;

(i)      all insurance proceeds arising in connection with the ownership or operation of the Transferred Assets and the Debtors before or on the Closing Date;

(j)      all Records except the Retained Records (collectively, the "Transferred Records"); provided, that the Debtors shall provide Purchasers (at Purchasers' sole expense) with true, correct and complete copies of all Retained Records that are Tax Returns (other than income Tax Returns) related to the Business or the Transferred Assets;

(k)      to the extent permissible under applicable law or regulation, all of the rights of the Debtors, to all licenses (including all licenses issued by or received from a Governmental Authority), provider numbers, permits, approvals, certificates of exemption, franchises, accreditations, registrations, authorizations, filings, consents, permits or approvals issued to the Debtors and used by the Debtors with respect to the operation of the Debtors, together with all waivers which the Debtors have of any such requirements, if any (collectively, the "Licenses"), including, without limitation, the licenses listed on Schedule 2.01(k);

(l)      all (i) patents, patent applications, trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know-how, and trade secrets including any common law, registered or other rights in the trademark and/or service name(s), excluding, in each case, any Intellectual Property included in the Retained Assets, (collectively, the "Intellectual Property") and (ii) computer software and code and licenses for computer software and code, excluding in each case any computer software or code, or any licenses or contracts included in the Retained Assets (collectively, the "Software" and together with the Intellectual Property, the "Transferred Intellectual Property"), together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any Transferred Intellectual Property accruing after the Closing Date;

(m)      all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned or licensed by the Debtors and used by the Debtors;

(n)      all telephone numbers, domain names and facsimile numbers that are used exclusively with respect to the operation of the Business;

3

(o)    all goodwill of the Debtors evidenced by the Transferred Assets or otherwise in the Business;

(p)    all transferable unclaimed property of any Person in the Debtors' possession as of the Closing Date, including property which is subject to applicable escheat Legal Requirements;

(q)    all right and interest of the Debtors in and to all contracts and agreements to which any Debtor is a party, as identified on Schedule 2.01(q)-1 (collectively, the "Assumed Contracts"); it being expressly agreed that through the Closing Date Purchasers may, in their sole and absolute discretion without the consent of the Debtors, elect to exclude any such contract by deleting such contract from Schedule 2.01(q)-1 and adding such contract to Schedule 2.01(q)-2 (the "Rejected Contracts");

(r)    all warranties on the Transferred Assets in favor of any Debtor or the Business;

(s)    all regulatory settlements, rebates, adjustments, refunds or group appeals, including pursuant to any cost reports arising out of time periods prior to or after the Closing Date;

(t)    all claims, causes of action, choses in action, rights of recovery, rights of set-off, and rights of recoupment, including those set forth on Schedule 2.01(t) and all rights and legal privileges and confidential information related thereto; and

(u)    all claims and rights under non-disclosure or confidentiality, non-compete, or non-solicitation, employment, assignment of inventions or similar agreements with any current of former employee, consultant, independent contractor or non-employee director of any Debtor.

**Section 2.02.**    Retained Assets.  Notwithstanding anything to the contrary in Section 2.01, the Debtors shall retain all assets identified below (collectively, the "Retained Assets"):

(a)    those certain assets listed on Schedule 2.02(a);

(b)    subject to Purchasers' rights under Section 16.02, (i) the Retained Records and (ii) all procedures, marketing materials, standard operating procedures, studies, analyses and Software to the extent relating to the Retained Assets or the operations of the Debtors other than with respect to the operation of the Business;

(c)    all causes of action arising under Sections 544, 545, 547, 548 and 549, inclusive, of the Bankruptcy Code; and

(d)    (i) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates, and other documents relating to the organization, maintenance, and existence of the Debtors as corporations or limited liability companies, as applicable, and (ii) any of the rights of the Debtors under this Agreement (or under any side agreement between any Debtor, on the one hand, and Purchasers, on the other hand, entered into on or after the date of this Agreement).

### ARTICLE III.
### OBLIGATIONS AND LIABILITIES

**Section 3.01.**    Assumed Liabilities.  At the Closing, Purchasers shall assume and agree to pay, perform, and discharge when due only those liabilities and obligations expressly identified herein

(collectively, the "Assumed Liabilities") and no liabilities of any kind which are not expressly identified in this Section 3.01. Assumed Liabilities are limited solely to those liabilities set forth on Schedule 3.01.

Section 3.02. Excluded Liabilities. Notwithstanding anything to the contrary in Section 3.01, Purchasers shall not assume or become responsible for any liabilities or obligations other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, Excluded Liabilities shall include, without limitation, (a) those liabilities set forth on Schedule 3.02, as prepared by Purchasers, and (b) Taxes (i) imposed on any Debtor for any period (including, without limitation, Taxes arising out of or related to the Contemplated Transactions) or (ii) arising out of or related to the Business or the Transferred Assets for all Tax periods (or portions thereof) ending on or prior to the Closing Date.

Section 3.03. Assumed Contracts; Cure Costs. The Debtors shall, pursuant to Section 363 or 365 of the Bankruptcy Code, as applicable, transfer, assume and assign to Purchasers all of the Debtors' rights and obligations under the Assumed Contracts, Assumed Real Property (Tenant) Leases and Assumed Personal Property Leases. The Purchasers shall bear all Cure Costs; provided, that all such Cure Costs may, at the sole discretion of the Purchasers, be funded from proceeds of the revolving credit facility contemplated by the Revolver Documents. Purchasers shall provide adequate assurance of future performance under the Assumed Contracts, Assumed Real Property (Tenant) Leases and Assumed Personal Property Leases, as the same may be required by the Bankruptcy Court.

## ARTICLE IV.
## CONSIDERATION; CLOSING

Section 4.01. Consideration. Subject to the terms and conditions of this Agreement, the aggregate consideration for the sale, conveyance assignment, transfer and delivery of the Transferred Assets shall consist of the following (collectively, the "Purchase Price"): (i) $3,750,000 in immediately available funds with no setoffs, deductions or offsets (subject to Section 4.12) (the "Cash Consideration"), paid to Lender, (ii) a $3,250,000 secured term promissory note payable by Purchasers to the order of Lender or its assignee that shall mature on the first anniversary of the Closing Date, in form and substance reasonably acceptable to Purchasers and Lender (the "Term Note"), (iii) Purchasers' share of the Cure Costs pursuant to Section 3.03, and (iv) monies paid by or on behalf of Purchasers to Lender pursuant to the Make-Whole Documents.

Section 4.02. Transfer Taxes. To the extent applicable, the Debtors shall use their commercially reasonable efforts to obtain an exemption, under Section 1146 of the Bankruptcy Code, from any and all sales, use, transfer, documentary, stamp, recording and all other similar non-income Taxes arising out of or in connection with the purchase and sale of the Transferred Assets as contemplated in this Agreement including any penalties and interest (the "Transfer Taxes"). To the extent an exemption is not available under Section 1146 of the Bankruptcy Code, Purchasers and the Debtors shall cooperate in the preparation and timely delivery of any certificate or instrument that would entitle either party to claim an exemption from a Transfer Tax. To the extent a Transfer Tax is still payable after giving effect to Section 1146 of the Bankruptcy Code and any available exemption, Purchasers shall pay the Transfer Taxes, if any, and the costs of preparing any related Tax Returns. Purchasers shall file all necessary Tax Returns and other documents required to be filed with respect to such Transfer Taxes at Purchasers' sole expense.

Section 4.03. The Closing. The consummation of the Contemplated Transactions (the "Closing") will be held by electronic exchange of documents (provided that if the Debtors and Purchasers mutually agree to a physical closing then the Closing shall take place at 10:00am Pacific Time at the offices of Massumi + Consoli LLP as promptly as practicable following, but in no event later than the third (3rd) Business Day following the satisfaction or waiver of each of the conditions set forth in ARTICLE XII and

ARTICLE XIII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or such other time and place as the Debtors, Purchasers and Lender may agree. Subject to the provisions of Section 14.01, the failure to consummate the Closing on the date and time determined pursuant to this Section 4.03 shall not result in the termination of this Agreement and shall not relieve any Party to this Agreement of any obligation under this Agreement.

Section 4.04.    Allocation of Transferred Assets and Assumed Liabilities. Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that those certain Transferred Assets and Assumed Liabilities, if applicable, of (a) each of Solid Landings and Sure Haven shall be transferred to and assumed by Alpine California, (b) Cedar Creek shall be transferred to and assumed by Alpine Texas, (c) Silver Rock shall be transferred to and assumed by Alpine Nevada and (d) EMS Toxicology shall be transferred to and assumed by Alpine Toxicology. In furtherance of the foregoing, the applicable Debtor shall deliver to the applicable Purchaser each of the applicable documents contemplated by Section 4.05 and the applicable Purchaser shall deliver to the applicable Debtor each of the applicable documents contemplated by Section 4.06.

Section 4.05.    Items to be Delivered by the Debtors at the Closing. At the Closing, the Debtors shall deliver to Purchasers the following, duly executed by the applicable Debtor(s) where appropriate:

(a)    a counterpart to each Bill of Sale, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "Bills of Sale");

(b)    a counterpart to each Assignment and Assumption of each Assumed Real Property (Tenant) Lease, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "Real Estate Assignments");

(c)    a counterpart to each Assignment and Assumption of Assumed Personal Property Leases, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "Personal Property Assignments");

(d)    a counterpart to each Assignment and Assumption of Assumed Contracts, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "Contract Assignments");

(e)    a counterpart to each Assignment of Intellectual Property, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "IP Assignments");

(f)    a counterpart to each Assignment of Domain Names, in form and substance reasonably acceptable to Purchasers, dated and effective as of the Closing Date (the "Domain Name Assignments");

(g)    a duly completed and executed certificate in respect of each Debtor, confirming such Debtor's non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations sufficient to exempt such Debtor from the requirements of Section 1445(a) of the Code;

(h)    certificates of title and title transfer documents to all titled motor vehicles;

(i)    the Plan Termination Evidence;

(j)      unless Purchasers have received the requisite Governmental Approvals with respect to the continued operation of the Business in the State of Texas, a counterpart to an Interim Management Agreement duly executed by Cedar Creek;

(k)      unless Purchasers have received the requisite Governmental Approvals with respect to the continued operation of the Business in the State of California, a counterpart to an Interim Management Agreement duly executed by Solid Landings and Sure Haven; and

(l)      such other instruments and other documents which are reasonably requested by Purchasers to effect the intent of this Agreement.

**Section 4.06.**    <u>Items to be Delivered by Purchasers to the Debtors at the Closing</u>.   At the Closing, Purchasers shall execute and deliver or cause to be delivered to the Debtors the following, duly executed by Purchasers where appropriate:

(a)      the portion of the Cure Costs allocated to Purchasers pursuant to <u>Section 3.03</u>;

(b)      a counterpart to each of the Bills of Sale;

(c)      a counterpart to each of the Real Estate Assignments;

(d)      a counterpart to each of the Personal Property Assignments;

(e)      a counterpart to each of the Contract Assignments;

(f)      a counterpart to each of the IP Assignments;

(g)      a counterpart to each of the Domain Name Assignments;

(h)      unless Purchasers have received the requisite Governmental Approvals with respect to the continued operation of the Business in the State of Texas, a counterpart to an Interim Management Agreement duly executed by Alpine Texas; and

(i)      unless Purchasers have received the requisite Governmental Approvals with respect to the continued operation of the Business in the State of California, a counterpart to an Interim Management Agreement duly executed by Alpine California.

**Section 4.07.**    <u>Items to be Delivered by Purchasers to Lender at the Closing</u>.  At the Closing, Purchasers shall execute and deliver or cause to be delivered to Lender the following, duly executed by Purchasers where appropriate:

(a)      the Cash Consideration, by means of wire transfer of immediately available funds to an account designated by Lender in writing;

(b)      counterparts to the Revolver Documents;

(c)      counterparts to the Term Note Documents; and

(d)      counterparts to the Make-Whole Documents.

**Section 4.08.**　　Items to be Delivered by Lender to Purchasers at the Closing.  At the Closing, Lender shall execute and deliver or cause to be delivered to Purchasers the following, duly executed by Lender:

      (a)　　counterparts to the Revolver Documents;

      (b)　　counterparts to the Term Note Documents;

      (c)　　counterparts to the Make-Whole Documents; and

      (d)　　an original Internal Revenue Service Form W-9, certifying that Lender is exempt from U.S. federal backup withholding tax.

**Section 4.09.**　　Items to be Delivered by Lender to the Equityholders at the Closing.  At the Closing, Lender shall execute and deliver or cause to be delivered to the Equityholders the Mutual Release, duly executed by Lender.

**Section 4.10.**　　Items to be Delivered by the Equityholders to Lender at the Closing.  At the Closing, the Equityholders shall execute and deliver or cause to be delivered to Lender the Mutual Release, duly executed by each Equityholder.

**Section 4.11.**　　Disclaimer of Warranties.  Except as expressly provided in this Agreement and the Ancillary Agreements, including the Debtors' representations set forth in ARTICLE VI, the Debtors have not made or do not make and specifically disclaim, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to the nature, quality, sufficiency or condition of the Business or the Transferred Assets.  Subject only to the Debtors' representations and warranties set forth in ARTICLE VI, the Transferred Assets will be acquired by Purchasers in their physical condition on the Closing Date, "AS IS," "WHERE IS" AND "WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS," THAT IS, IN THEIR PRESENT CONDITION AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, WITH NO WARRANTY OF NONINFRINGEMENT, AND NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION with respect to the Real Property, including the land, the buildings and the improvements and fixtures thereon, and WITH NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE with respect to the physical condition of the Real Property, the Personal Property and the Inventory, any and all of which warranties (both express and implied) Debtors hereby disclaim.

**Section 4.12.**　　Withholding.  Purchasers shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Purchasers are required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deductions and withholding was made.  Purchasers shall use reasonable efforts to provide notice to Lender of any expected Tax withholding (other than any backup withholding or any such Tax that is imposed on consideration that is properly treated as compensation for applicable income, employment and/or payroll Tax purposes) as promptly as reasonably practicable (and the notice will include the legal authority and the calculation method for the expected withholding), and Purchasers will use reasonable efforts to enable the Person with respect to which the withholding is to be made to provide the requisite form, certification or documents to minimize or eliminate the amount of the withholding to the extent allowable under applicable law.

8

## ARTICLE V.
## ACTIONS IN THE BANKRUPTCY CASES

**Section 5.01.**    <u>Sale Motion, Bidding Procedures and Sale Milestones</u>.  The Debtors shall take the following actions, or shall cause them to occur, by the following deadlines (collectively, the "<u>Sale Milestones</u>"):

(a)    Within two (2) Business Days after the execution of this Agreement, the Debtors will file for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (such filing date, the "<u>Petition Date</u>").

(b)    On the Petition Date, the Debtors shall file an expedited motion with the Bankruptcy Court, in form and substance approved by Purchasers and Lender (the "<u>Bidding Procedures Motion</u>"), for entry of an order, in form and substance approved by Purchasers and Lender (the "<u>Bidding Procedures Order</u>"), approving the procedures for selling the Transferred Assets and bidding at the Auction (as defined in the Bidding Procedures) in the form attached hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures</u>").

(c)    Within two (2) Business Days following the entry of the Bidding Procedures Order, the Debtors will file a motion with the Bankruptcy Court, in form and substance approved by Purchasers and Lender, approving the Contemplated Transactions (the "<u>Sale Motion</u>").

(d)    Subject to availability of the Bankruptcy Court, on or before such date that is fourteen (14) days after filing of the Sale Motion, the Debtors will use their commercially reasonable best efforts to obtain entry by the Court of the Bidding Procedures Order.

(e)    The Debtors shall require that any and all Qualified Bids (as defined in the Bidding Procedures) shall be submitted on or before the Bid Deadline (as defined in the Bidding Procedures).

(f)    In accordance with the Bidding Procedures Order and the Bidding Procedures approved pursuant thereto, in the event a Qualified Bid, other than the Stalking Horse Proposal (as defined in the Bidding Procedures), is timely received prior to the Bid Deadline, the Debtors will conduct the Auction (as defined in the Bidding Procedures) no later than two (2) Business Days prior to the hearing on the Sale Motion (the "<u>Auction Deadline Date</u>").

(g)    If Purchasers are collectively the Successful Bidder (as defined in the Bidding Procedures), the Debtors shall use their commercially reasonable best efforts to (i) obtain entry by the Bankruptcy Court of an order approving the Contemplated Transactions as soon as reasonably possible, and (ii) cause the Closing to occur.

**Section 5.02.**    <u>Break-Up Fee</u>.  Recognizing Purchasers' expenditure of time, energy and resources, and the benefit that these efforts provided to the Debtors' bankruptcy estates, if the condition set forth in <u>Section 13.06</u> has been timely satisfied or waived, Purchasers shall be entitled to the Breakup Fee from the Debtors on the terms and conditions contained herein and in the Bidding Procedures.  The Break-up Fee shall be payable, if applicable, in accordance with <u>Section 14.02</u>.

**Section 5.03.**    <u>Bankruptcy Filings</u>.  The Debtors shall deliver or cause to be delivered to Purchasers and Lender for review and comment, as soon as commercially reasonable and, in any event, not less than one (1) Business Day prior to the filing thereof, all documents to be filed on behalf of the Debtors with the Bankruptcy Court, including all motions, applications, petitions, schedules and supporting papers prepared by the Debtors (including forms of orders and notices to interested parties) that relate to the Contemplated Transactions. All motions, applications, petitions, schedules and supporting papers prepared

9

by the Debtors and relating to the Contemplated Transactions to be filed with the Bankruptcy Court on behalf of the Debtors must be reasonably satisfactory in form and substance to Purchasers and Lender.

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Except as set forth in the Disclosure Schedules delivered by the Debtors to Purchasers in accordance with the terms of this Agreement, the Debtors hereby, jointly and severally, represent and warrant to Purchasers that the statements contained in this ARTICLE VI are true and correct as of the Effective Date and as of the Closing Date, except to the extent that any such representation and warranty expressly relates to any other specified date or time (including those that speak only as to the date hereof).

Section 6.01.    Power and Authorization.  Each Debtor has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and each applicable Ancillary Agreement and to perform its obligations hereunder and thereunder, including with respect to the Contemplated Transactions, subject only to approval by the Bankruptcy Court.

Section 6.02.    Binding Agreement.  All actions required to be taken by each Debtor to authorize the execution, delivery and performance of this Agreement, each Ancillary Agreement and the Contemplated Transactions have been duly and properly taken or obtained by each Debtor.  This Agreement and each applicable Ancillary Agreement has been, or will be, as applicable, duly and validly executed and delivered by each Debtor and, assuming due and valid execution by each other Party, this Agreement and each applicable Ancillary Agreement constitutes a valid and binding obligation of such Debtor enforceable in accordance with its terms, subject only to approval by the Bankruptcy Court.

Section 6.03.    Organization and Good Standing.  Each Debtor is duly organized, validly existing and in good standing under the Legal Requirements of the jurisdiction in which such Debtor is organized and in good standing under the Legal Requirements of each other jurisdiction in which such qualification would be required to conduct the Business.

Section 6.04.    Non-Contravention.  To the best of the Debtors' knowledge as of the date hereof, neither the execution and delivery by the Debtors of this Agreement and each Ancillary Agreement nor performance of any of the material provisions hereof by the Debtors, will violate, conflict with or result in a breach of any (a) material provision of the organizational documents of the Debtors, (b) Legal Requirement or (c) of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, License, franchise, agreement or other instrument or obligation to which any Debtor is a party or by which any of the Transferred Assets are or will be bound, or any Lien upon any of the Transferred Assets whatsoever.

Section 6.05.    Compliance with Legal Requirements.

(a)    To the best of the Debtors' knowledge as of the date hereof, and except as set forth in Schedule 6.05(a), the Debtors, with respect to the operations of the Debtors and the Business, are and have always been in compliance in all material respects with all Legal Requirements.

(b)    Except as set forth in Schedule 6.05(b), with respect to the operations of the Debtors and the Business, no Debtor has been given written notice of, and none of them are under investigation with respect to, any violation of any applicable Legal Requirements.  To the best of the Debtors' knowledge as of the date hereof, the Debtors are and have been in compliance in all material respects with any and all Government Orders governing the conduct or operation of its business (including the Business).

10

**Section 6.06.**     Environmental Matters.  To the best of the Debtors' knowledge as of the date hereof, the operations of the Business are not, and have not been, in material violation of any Legal Requirements related to any Environmental Laws and related orders of any court or other Governmental Authority.  There are no pending or, to the knowledge of any Debtor, threatened actions, suits, claims, investigations, inquiries or proceedings by or before any court or any other Governmental Authority directed against any Debtor that pertain or relate to any material (i) remedial obligations under any applicable Environmental Laws, (ii) violations by any Debtor of any Environmental Laws, or (iii) personal injury or property damage claims relating to a release of or exposure to Hazardous Materials.

**Section 6.07.**     Title to Assets.  The Debtors have good and marketable title to, and own and possess all rights and interests in, including the right to use, each of the Transferred Assets.  Subject to Bankruptcy Court approval, the Debtors have the power and the right to sell, assign and transfer and, at the Closing, the Debtors will sell and deliver to Purchasers and Purchasers will acquire from the Debtors, good and marketable title to, the Transferred Assets, free and clear of all Liens.

**Section 6.08.**     No Assets Held by Non-Debtor Affiliates.  None of the Non-Debtor Affiliates own any property or assets material to the Business.

**Section 6.09.**     Brokers and Finders.  None of the Debtors nor any of their respective Affiliates nor any officer or director of any of them have engaged or incurred any liability to any finder, broker or agent in connection with the Contemplated Transactions.

**Section 6.10.**     Statements Not Misleading.  No representation or warranty by any Debtor in this Agreement or any Ancillary Agreement, or any certificate or schedule furnished or to be furnished to Purchasers by any Debtor pursuant to this Agreement or any Ancillary Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained in this Agreement and therein not misleading.  Except as disclosed in this Agreement, there have been no events or transactions or facts coming to the attention of any Debtor which could have a Material Adverse Effect after the Closing.

## ARTICLE VII.
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Each Purchaser hereby, jointly and severally, represents and warrants to the Debtors that the statements contained in this ARTICLE VII are true and correct as of the Effective Date and the Closing Date, except to the extent that any such representation and warranty expressly relates to any other specified date or time (including those that speak only as to the date hereof).

**Section 7.01.**     Power and Authorization.  Each Purchaser has full power and authority (including full limited liability company power and authority) to execute and deliver this Agreement and each applicable Ancillary Agreement and to perform its obligations hereunder and thereunder, including with respect to the Contemplated Transactions.

**Section 7.02.**     Binding Agreement.  All actions required to be taken by each Purchaser to authorize the execution, delivery and performance of this Agreement and each Ancillary Agreement, and the Contemplated Transactions, have been duly and properly taken or obtained by such Purchaser.  This Agreement and each applicable Ancillary Agreement has been, or will be duly and validly executed and delivered by such Purchaser and, assuming due and valid execution by each other Party, this Agreement and each applicable Ancillary Agreement constitute valid and binding obligations of such Purchaser enforceable in accordance with their terms.

**Section 7.03.**    Organization and Good Standing.  Each Purchaser is a limited liability company duly organized, validly existing and in good standing under the Legal Requirements of its jurisdiction of organization.

**Section 7.04.**    Non-Contravention.  To the best of Purchasers' knowledge as of the date hereof, neither the execution and delivery by any Purchaser of this Agreement and the applicable Ancillary Agreements, nor the consummation of the Contemplated Transactions nor compliance with any of the provisions hereof by such Purchaser will violate, will constitute a violation of, or be in conflict with, or constitute or create a default or accelerate or adversely affect any obligations under (a) the organizational documents of such Purchaser or (b) any Legal Requirement.

**Section 7.05.**    Brokers and Finders.  No Purchaser nor any officer or director thereof, has engaged or incurred any liability to any finder, broker or agent in connection with the Contemplated Transactions.

**ARTICLE VIII.**
**REPRESENTATIONS AND WARRANTIES OF THE EQUITYHOLDERS**

Each Equityholder hereby, severally (and not jointly), represents and warrants to Purchasers that the statements contained in this ARTICLE VIII are true and correct as of the Effective Date and the Closing Date.

**Section 8.01.**    Power and Authorization.  Such Equityholder has full power and authority to execute and deliver this Agreement and each applicable Ancillary Agreement and to perform such Equityholder's obligations hereunder and thereunder, including with respect to the Contemplated Transactions.

**Section 8.02.**    Binding Agreement.  This Agreement and each applicable Ancillary Agreement has been or will be duly and validly executed and delivered by such Equityholder and, assuming due and valid execution by each other Party, this Agreement and each applicable Ancillary Agreement constitute valid and binding obligations of such Equityholder enforceable in accordance with their terms.  Such Equityholder represents and warrants that (a) such Equityholder's execution and delivery of this Agreement is conclusive evidence of such Equityholder's acceptance and approval of the form, terms and conditions hereof and thereof, including, without limitation, for purposes of any approvals required under the Approving Resolutions and (b) the Approving Resolutions have not been rescinded, amended or modified in any way.

**Section 8.03.**    Non-Contravention.  Neither the execution and delivery by such Equityholder of this Agreement and the applicable Ancillary Agreements, nor the consummation of the Contemplated Transactions nor compliance with any of the provisions hereof and thereof by such Equityholder will violate, will constitute a violation of, or be in conflict with, or constitute or create a default or accelerate or adversely affect any obligations under any Legal Requirement.

**Section 8.04.**    Brokers and Finders.  None of such Equityholder nor any of such Equityholder's Affiliates have engaged or incurred any liability to any finder, broker or agent in connection with the Contemplated Transactions.

## ARTICLE IX.
## REPRESENTATIONS AND WARRANTIES OF LENDER

Lender hereby represents and warrants to Purchasers that the statements contained in this ARTICLE IX are true and correct as of the Effective Date and the Closing Date.

Section 9.01.    Power and Authorization.  Lender has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and the applicable Ancillary Agreements and to perform its obligations hereunder and thereunder, including with respect to the Contemplated Transactions.

Section 9.02.    Binding Agreement.  All actions required to be taken by Lender to authorize the execution, delivery and performance of this Agreement, the applicable Ancillary Agreements and the Contemplated Transactions, have been duly and properly taken or obtained by Lender.  This Agreement and the applicable Ancillary Agreements have been duly and validly executed and delivered by Lender and, assuming due and valid execution by each other Party, this Agreement and the applicable Ancillary Agreements constitute valid and binding obligations of Lender enforceable in accordance with their terms.

Section 9.03.    Organization and Good Standing.  Lender is a banking corporation organized, validly existing and in good standing under the Legal Requirements of the State of Tennessee.

Section 9.04.    Non-Contravention.  To the best of Lender's knowledge as of the date hereof, neither the execution and delivery by Lender of this Agreement and the applicable Ancillary Agreements, nor the consummation of the Contemplated Transactions nor compliance with any of the provisions hereof and thereof by Lender will violate, will constitute a violation of, or be in conflict with, or constitute or create a default or accelerate or adversely affect any obligations under (a) the organizational documents of Lender or (b) any Legal Requirement.

Section 9.05.    Brokers and Finders.  None of Lender nor any of its Affiliates nor any officer or director of any of them have engaged or incurred any liability to any finder, broker or agent in connection with the Contemplated Transactions.

## ARTICLE X.
## COVENANTS OF THE DEBTORS AND THE EQUITYHOLDERS

Section 10.01.    Required Approvals; Change in Ownership Applications.

(a)    Subject to the terms and conditions of this Agreement, from the Effective Date to the Closing, or the earlier termination of this Agreement pursuant to ARTICLE XIV, the Debtors shall (i) cooperate with Purchasers to do or cause to be done all other things necessary, proper or advisable, in order to consummate and make effective the Contemplated Transactions as soon as practicable following the Effective Date and (ii) use commercially reasonable efforts to cause the conditions specified in ARTICLE XII and ARTICLE XIII over which the Debtors have reasonable control to be satisfied as soon as reasonably practicable, but in any event prior to the Closing.

(b)    Without limitation of the foregoing, the Debtors shall (i) use diligent efforts, as reasonably requested by Purchaser, to assist Purchasers in the securing of, as promptly as practicable after Court Approval of the Bidding Procedures Motion and before the Closing Date, all Governmental Approvals, and (ii) provide such other information and communications to Governmental Authorities and accrediting and certifying bodies as Purchasers or such authorities and bodies may reasonably request.  The Debtors shall also reasonably assist Purchasers to complete change of ownership applications and notices

13

with respect to Licenses and other permits relating to the Debtors for each of the functions at the Debtors which require approval of the change of ownership by a Governmental Authority or by a Payor (an "Application"). The Debtors shall provide Purchasers in a timely manner with such information about the Debtors as may be needed for the completion and filing of each Application.

(c)    Within fifteen (15) days after Court entry of the Sale Order, the Debtors shall file all necessary regulatory filings set forth on Schedule 10.01(c).

(d)    Notwithstanding any provision of this Agreement to the contrary, to the extent that Purchasers have not received the requisite Governmental Approvals to continue to operate the Business in California and/or Texas following the Closing and the Purchasers reasonably determine in good faith that the Purchasers are unlikely to receive such Governmental Approvals on or prior to the Closing Date, the applicable Debtor(s) and the applicable Purchaser(s) shall enter into an Interim Management Agreement to facilitate the Closing.

(i)    Until the date on which Purchasers receive the requisite Governmental Approvals to continue to operate the Business in the applicable jurisdiction, each Debtor that is party to an Interim Management Agreement shall retain all assets necessary for the operation of the Business in the applicable jurisdiction in which such Debtor is organized and shall remain duly organized, validly existing and in good standing under the Legal Requirements of the jurisdiction in which such Debtor is organized; provided, however, that upon the date on which such Interim Management Agreement is terminated in accordance with its terms, such Debtor shall immediately deliver any Transferred Assets otherwise retained by such Debtor in accordance with this Section 10.01(d)(i) to the applicable Purchaser in accordance with the terms of this Agreement and the applicable Ancillary Agreements.

(ii)    Any Debtor that is party to an Interim Management Agreement shall retain all required authority and responsibility as is required by the applicable Governmental Authority to continue to hold the applicable Licenses and shall take all necessary actions to maintain the applicable Licenses in good standing, in accordance with applicable Legal Requirements, and shall surrender the applicable Licenses upon the date on which the applicable Interim Management Agreement is terminated in accordance with its terms.

**Section 10.02.**    Consents to Assignment. The Debtors shall cooperate with Purchasers to obtain prior to the Closing any and all required consents to assign any Assumed Contracts and Assumed Real Property (Tenant) Leases. In addition, the Debtors shall obtain Court Approval of the assumption and assignment, pursuant to Section 365 of the Bankruptcy Code, of Assumed Contracts designated by Purchaser as set forth in Schedule 2.01(q)-1.

**Section 10.03.**    Conduct of the Business. From the Effective Date until the Closing, or the earlier termination of this Agreement in accordance with ARTICLE XIV, unless otherwise agreed in writing in advance by Purchaser, the Debtors shall use reasonable efforts to maintain and preserve intact the organization and advantageous business relationships of the Business and retain the services of its key employees. Without limiting the generality of the foregoing, the Debtors shall (a) carry on their operation of the Business in compliance with applicable Legal Requirements and (b) timely pay all Tax liabilities of the Debtors.

**Section 10.04.**    Notice to Purchaser. From the Effective Date until the Closing; or the earlier termination of this Agreement in accordance with ARTICLE XIV, the Debtors shall (a) notify Purchasers in writing (with any such writing to include a written update to the Disclosure Schedules to the extent applicable) of any Material Adverse Effect of which any Debtor has knowledge or that any Debtor is aware

14

is reasonably likely to develop and (b) promptly upon becoming aware of any material breach by any Debtor of any provision of this Agreement, give written notice to Purchasers thereof.

Section 10.05.    Confidentiality.    Following the Closing, except as may be necessary for the continued administration of the Bankruptcy Cases or pursuant to order of the Bankruptcy Court, the Debtors and the Equityholders shall, and shall cause each of their respective Affiliates, and each such Person's respective directors, officers, employees and representatives, as applicable, to, maintain as confidential and not use or disclose (except as required by applicable Legal Requirements or as authorized in writing by Purchasers) any (a) information or materials relating to the Transferred Assets or (b) materials developed by Purchasers or any of their respective representatives (including its accountants, advisors, consultants and legal counsel).  Except as otherwise permitted by this Section 10.05, in the event any Debtor or Equityholder is required by applicable Legal Requirements to disclose any such confidential information after the Closing other than in connection with the continued administration of the Bankruptcy Cases or pursuant to order of the Bankruptcy Court, such Debtor or Equityholder, as applicable, shall promptly notify Purchasers in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with Purchasers to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Legal Requirements. Information subject to this Section 10.05 does not include any information which (i) at the time of disclosure is generally available to or known to the public (other than as a result of its disclosure in breach of this Agreement or any other confidentiality obligation or (ii) becomes available on a non-confidential basis from a Person who is not known to be bound by a confidentiality agreement or obligation with respect to the disclosed information.

Section 10.06.    Termination of Debtor Employee Plans.    Effective as of the day immediately preceding the Closing Date, the Debtors shall terminate all Debtor Employee Plans, with the exception of the claims and rights described in Section 2.01(u), all of which claims and rights are assigned to Purchasers. The Debtors shall take all such actions as are necessary or advisable under Legal Requirements and under the plan documents and agreements comprising the Debtor Employee Plans to effectuate the termination of the Debtor Employee Plans in accordance with the preceding sentence, including, as applicable, and without limitation, (a) timely delivering notices to plan participants or Governmental Authorities, (b) vesting plan participants in accrued benefits under tax qualified retirement plans, (c) paying or providing for accrued benefits, including accrued but unused vacation, and (d) filing reports with the Internal Revenue Service, the Department of Labor, the Pension Benefit Guaranty Corporation, or other applicable Governmental Authorities.  The Debtors shall provide Purchasers with written evidence that the Debtor Employee Plans have been terminated in accordance with the preceding two sentences (the "Plan Termination Evidence"). The Debtors and the Equityholders shall also take such other actions in furtherance of terminating the Debtor Employee Plans as Purchasers may reasonably require and shall use their reasonable best efforts to ensure that the Sale Order shall provide that Purchasers are acquiring the Transferred Assets free and clear of any and all liabilities and obligations arising out of the Debtor Employee Plans and the 401(k) Plan.

Section 10.07.    No Third Party Beneficiaries.    Nothing in Section 10.06, express or implied, shall (a) confer upon any employee or former employee of the Debtors or any other Person not a party to this Agreement any right or remedy of any nature or (b) be construed to establish, amend or modify any Debtor Employee Plan or any other employee benefit plan, program, policy, arrangement or agreement of the Debtors or Purchasers, including, without limitation the 401(k) Plan.

Section 10.08.    Stayed Tax Liens.    Prior to the Closing, the Debtors shall notify Purchasers and Lender within three (3) Business Days after any Stayed Tax Lien arises.

Section 10.09.    Non-Competition; Non-Solicitation and No-Hire; Non-Disparagement.

15

(a)      Non-Competition.  In consideration of the payment of all amounts hereunder by Purchasers and as a condition precedent to Purchasers' consummation of the Contemplated Transactions, during the period of five (5) years commencing on the Closing Date (the "Restrictive Covenant Period"), each Equityholder shall not, and shall cause such Equityholder's Affiliates and each of their respective representatives acting on such Person's behalf to not, directly or indirectly, render services or assistance to, own, manage, operate, control, invest or acquire an interest in, whether as a proprietor, partner, equityholder, member, director, officer, manager, employee, consultant, joint venturer, debt or equity investor, lessor, agent or other representative, any Person that engages in a Competing Business (including directly or indirectly as a division or group of a larger organization) or otherwise engage in or conduct (whether as an owner, operator, employee, officer, director, manager, consultant, advisor, representative or otherwise) a Competing Business.  Notwithstanding any other provision of this Section 10.09(a), Shandrow shall be permitted to operate a Competing Business located at 2065 Republic Ave, Costa Mesa, CA 92627 without restriction hereunder, provided that such Competing Business does not expand to any additional locations within Orange County, California.  This Section 10.09(a) shall also not prohibit the Equityholders from obtaining employment with any Competing Business, provided that no Equityholder shall be permitted to serve in an executive-level or managerial position nor own, directly or indirectly, any equity interest in any such Competing Business, except as expressly set forth herein.

(b)      Non-Solicitation; No-Hire.  In consideration of the payment of all amounts hereunder by Purchasers and as a condition precedent to Purchasers' consummation of the Contemplated Transactions, during the Restrictive Covenant Period, each Equityholder shall not, and shall cause such Equityholder's Affiliates and each of their respective representatives to not, directly or indirectly, (i) recruit, solicit or otherwise induce or attempt to induce any employee or independent contractor of Purchasers or any of their respective Affiliates to leave the employ or services of Purchasers or any of their respective Affiliates, as applicable, or in any way interfere with the relationship between Purchaser or any of their respective Affiliates and any employee, consultant or independent contractor thereof, (ii) employ, hire or otherwise retain any Person who is an employee, consultant or independent contractor of Purchasers or any of their respective Affiliates while such Person has any relationship with Purchasers or any of their respective Affiliates, as applicable, and for one hundred eighty (180) days thereafter or (iii) recruit, solicit or otherwise induce or attempt to induce any client, prospective client, supplier, licensee, licensor, franchisee or other business relation of any of Purchasers or any of their respective Affiliates to terminate, reduce or adversely modify its business with Purchasers or any of their respective Affiliates, as applicable, or in any way interfere with the relationship between any such client, supplier, licensee or business relation and Purchasers or any of their respective Affiliates, as applicable.  Notwithstanding any other provision of this Section 10.09(b), Shandrow shall be permitted to employ each of Adam Shandrow and Yesenia Umana without restriction hereunder.

(c)      Non-Disparagement.  In consideration of the payment of all amounts hereunder by Purchasers and as a condition precedent to Purchasers' consummation of the Contemplated Transactions, to the maximum extent permitted under applicable Legal Requirements, each Equityholder agrees that such Equityholder shall, and shall cause each of such Equityholder's Affiliates to, refrain from making any disparaging statements or communications regarding (i) the Business and (ii) Purchasers and any of their respective Affiliates and any of their respective services, products or practices, or any of their respective directors, managers, officers, agents, representatives, direct or indirect equityholders of Affiliates, either orally or in writing, at any time from and after the Closing.

(d)      Severability.  If the final judgment of a court of competent jurisdiction declares that any term or provision of Section 10.05 or this Section 10.09 invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of such term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that

16

comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(e)    _Additional Acknowledgements_.    Each Equityholder hereby agrees and acknowledges as follows:

(i)    Immediately prior to the Closing, each Equityholder and each of their respective Affiliates have accrued substantial goodwill related to the Debtors, and Purchasers would be substantially compromised should such Equityholder or any such Equityholder's Affiliates be permitted to engage in any activity prohibited by Section 10.05, Section 10.09(a), Section 10.09(b) or Section 10.09(c).

(ii)    At the Closing, each Equityholder and each of such Equityholder's Affiliates shall receive valuable consideration for their interest in the Business, including in respect of the goodwill related to the Business, and such Person therefore has material economic interests in the consummation of the Contemplated Transactions (provided, however, that for purposes of clarity, the consideration to be received by the Equityholders as a result of the consummation of the Contemplated Transactions will not include any direct payment of cash from the Purchasers pursuant to the terms of this Agreement).

(f)    Each Equityholder, on behalf of itself and each of such Equityholder's Affiliates, agrees that the confidentiality, non-competition, non-solicitation and no-hire, and non-disparagement covenants contained in this Agreement are reasonable with respect to period, geographical area and scope and are each essential parts of the Contemplated Transactions in order to protect Purchasers' legitimate interests in the Contemplated Transactions and the Business (including the goodwill related to the Business).

**Section 10.10.**    Release by the Equityholders.

(a)    Effective upon the Closing Date or the date upon which an Alternative Transaction closes, as applicable, each Equityholder, on behalf of such Equityholder and each of such Equityholder's Affiliates, hereby releases and forever discharges Purchasers and each of their respective Affiliates, and any individual, joint or mutual, past, present and future representatives, agents, financial advisors, attorneys, other consultants, employees, officers, directors, managers, equityholders, partners, members, controlling persons, subsidiaries, successors and assigns of any of the foregoing (individually, a "Releasee" and, collectively, "Releasees"), from any and all Actions, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Equityholder or any of such Equityholder's Affiliates, or any of such Equityholder's heirs, executors, administrators or assigns, now has, has ever had, or may hereafter have against any Releasee arising contemporaneously with or prior to the Closing Date or the date upon which an Alternative Transaction closes, as applicable, or on account of or arising out of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Closing Date or the date upon which an Alternative Transaction closes, as applicable (all of the foregoing collectively referred to herein as the "Released Claims").  Each Equityholder represents that such Equityholder has not made any assignment or transfer of any Released Claim or other matter covered by this Section 10.10(a).  Each Equityholder hereby irrevocably covenants to refrain from, directly or indirectly, asserting any Released Claim, or commencing, instituting, or causing to be commenced, any Action of any kind against any Releasee, based upon any matter released hereby.

(b)    Each Equityholder hereby acknowledges and intends that the release set forth in this Section 10.10 (the "Release") shall be effective as a bar to each and every one of the Released Claims. Each Equityholder expressly consents that this Release shall be given full force and effect in accordance

with each and every express term or provision, including those relating to (i) any Released Claims or (ii) unknown and unsuspected claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated claims).  Each Equityholder understands applicable Legal Requirements may give such Equityholder the right not to release existing claims of which such Equityholder is not aware, unless such Equityholder voluntarily chooses to waive this right.  Having been so apprised, each Equityholder nevertheless hereby voluntarily elects to and does waive such rights, and elects to assume all risks for claims that exist, existed or may hereafter exist in such Equityholder's favor, known or unknown, arising out of or related to liabilities arising from any claims or other matters purported to be released pursuant to the Release.  Each Equityholder acknowledges and agrees that the foregoing waiver is an essential and material term of this Agreement and that, without such waiver, Purchasers would not have agreed to the terms of this Agreement or the Contemplated Transactions.  Each Equityholder shall be deemed to relinquish, to the extent it is applicable, and to the full extent permitted by applicable Legal Requirements, the provisions, rights and benefits of Section 1542 of the California Civil Code ("Section 1542"), which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each Equityholder shall be deemed to relinquish, to the extent appliacble, and to the full extent permitted by applicable Legal Requirements, the provisions, rights and benefits conferred by any Legal Requirement of any state or territory of the United States, including, without limitation, any principle of common law, which is similar, comparable or equivalent to Section 1542.

Section 10.11.    Name Changes.  On the Closing Date, the Debtors shall take all necessary action to change their names and the names of all of their respective Affiliates to one or more names that do not include the words "Solid Landings," "Sure Haven," "Cedar Creek," "Silver Rock," "EMS" or any other name or mark included in the Intellectual Property included among the Transferred Assets or any translations, adaptations, derivations, variations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "Restricted Names").  The Debtors shall promptly notify Purchasers of such name changes and the new name(s) chosen by the Debtors and all of their respective Affiliates, as applicable.  From and after the Closing, except in furtherance of the consummation of the Bankruptcy Cases, the Debtors and all of their respective Affiliates shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets.  Notwithstanding the foregoing, to the extent any or all of Solid Landings, Sure Haven or Cedar Creek are required to execute and deliver an Interim Management Agreement, the applicable Debtor shall refrain from complying with this Section 10.11 until such time as the applicable Interim Management Agreement is terminated in accordance with its terms.

## ARTICLE XI.
## COVENANTS OF PURCHASERS

Section 11.01.    Required Governmental Approvals and Accrediting Approvals; Change of Ownership Applications.

(a)    Subject to the terms and conditions of this Agreement, from the Effective Date to the Closing, or the earlier termination of this Agreement pursuant to ARTICLE XIV, Purchasers shall (i) cooperate with the Debtors to do or cause to be done all other things necessary, proper or advisable, in order to consummate and make effective the Contemplated Transactions as soon as practicable following the Effective Date and (ii) use commercially reasonable efforts to cause the conditions specified in ARTICLE

18

XII and ARTICLE XIII over which Purchasers have reasonable control to be satisfied as soon as reasonably practicable, but in any event prior to the Closing.

(b)     Purchasers shall act diligently and reasonably to complete change of ownership applications and notices with respect to all Applications. Purchasers shall complete and file all Applications that are required by a Governmental Authority or by a Payor to be filed by the transferor. Purchasers shall pay the entirety of any fees charged by a Governmental Authority in connection with the filing of any Application including fees charged in connection with Applications that must be filed by the transferor.

Section 11.02.     Employees.

(a)     Purchasers (directly or through their respective Affiliates) shall, effective as of the Closing Date, offer to employ substantially all of the Debtor Employees who submit full and complete applications, and pass all screening and background checks as may be required by Purchasers in compliance with all applicable Legal Requirements (as further addressed below). Each Debtor Employee who accepts an offer of employment with a Purchaser as of or after the Closing Date shall be referred to in this Agreement as a "Hired Employee." On and after the Closing, each Hired Employee shall be eligible for (i) salary and (in the aggregate) employee benefits substantially similar to the salary and (in the aggregate) employee benefits provided to such Hired Employee by the applicable Debtor(s) as of the Closing Date and (ii) paid time-off credit in the amount existing with respect to such Hired Employee as of the Closing Date; provided, however, that such credit need not be given to the extent it would result in duplication of benefits.

(b)     Notwithstanding the foregoing, Purchasers' obligation to hire any Debtor Employee shall be conditioned upon satisfactory completion of an employment application (including authorization for Purchasers to review their employment file with Debtor), and passing each background check, drug testing and other customary screenings performed with respect to prospective employees of Purchaser.

(c)     The Parties acknowledge and agree that all provisions contained in this Section 11.02 are included for the sole benefit of the respective Parties and shall not create any right, including any third party beneficiary right, (i) in any other Person, including any employee, former employee or any participant or any beneficiary thereof in any employee benefit plan, program or arrangement of Purchaser, or (ii) to employment or continued employment or any term or condition of employment with the Debtors or Purchaser, any of their respective Affiliates.

(d)     Purchasers' ability to hire any Debtor Employee shall not be a condition to Closing.

Section 11.03.     Non-Disparagement. To the maximum extent permitted under applicable Legal Requirements, each Purchaser agrees that such Purchaser shall, and shall cause each of such Purchaser's Affiliates to, refrain from making any disparaging statements or communications regarding the Equityholders and any of their respective Affiliates either orally or in writing, at any time from and after the Closing.

## ARTICLE XII.
## CONDITIONS TO THE DEBTORS' OBLIGATIONS AT THE CLOSING

The obligations of each Debtor to sell the Transferred Assets and to close the Contemplated Transactions are subject to the fulfillment of, or, to the extent permitted by applicable Legal Requirements, waiver in writing by the Debtors of each of the following conditions:

**Section 12.01.**    Representations and Warranties.    The representations and warranties of Purchasers contained in this Agreement that are qualified by materiality, Material Adverse Effect or a similar material qualifier will be true and correct at the Closing with the same force and effect as if made as of the Closing Date, in each case, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time, and all other representations and warranties of Purchasers contained in this Agreement are true and correct in all material respects.

**Section 12.02.**    Performance.  Purchasers will have performed and complied with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by Purchasers at or prior to the Closing.

**Section 12.03.**    Absence of Government Orders.   Unless otherwise disclosed in the Debtor's Bankruptcy Court filings, no Action will be pending which seeks a Government Order.  On the Closing Date, there will not be any Government Order in effect, which would (c) prevent consummation of any of the Contemplated Transactions or (b) require any of the Contemplated Transactions to be rescinded following their consummation.

**Section 12.04.**    Required Approvals.    The Bankruptcy Court shall have entered an order approving this Agreement and the consummation of the Contemplated Transactions.

**Section 12.05.**    Other Instruments and Documents.  Purchasers will have delivered to the Debtors and Lender each of the instruments and documents required to be delivered to it pursuant to Section 4.06 and Section 4.07, respectively.

## ARTICLE XIII.
## CONDITIONS TO PURCHASERS' OBLIGATIONS AT THE CLOSING

Purchasers' obligations to purchase the Transferred Assets and to close the Contemplated Transactions are subject to the fulfillment of, or, to the extent permitted by applicable Legal Requirements, written waiver by Purchasers of each of the following conditions:

**Section 13.01.**    Representations and Warranties.    The representations and warranties of the Debtors contained in this Agreement that are qualified by materiality, Material Adverse Effect, substantial compliance or a similar materiality qualifier will be true and correct at the Closing with the same force and effect as if made as of the Closing Date, other than such representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time, and all other representations and warranties of the Debtors contained in this Agreement are true and correct except in all material respects.

**Section 13.02.**    Performance.    The Debtors will have performed and complied with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by the Debtors at or prior to the Closing.

**Section 13.03.**    Absence of Government Orders.   Unless otherwise disclosed in the Debtors' Bankruptcy Court filings, no Action will be pending which seeks a Government Order.  On the Closing Date, there will not be any Government Order in effect, which would (a) prevent consummation of any of the Contemplated Transactions, (b) require any of the Contemplated Transactions to be rescinded following their consummation. or (c) have or reasonably be expected to result in a Material Adverse Effect.

**Section 13.04.**    Material Adverse Effect.  There shall not have been a Material Adverse Effect.

**Section 13.05.**    <u>Court Approval</u>.  The Debtors shall have obtained Court Approval of the Bidding Procedures by way of the Bidding Procedures Motion.  The Debtors shall have obtained Court Approval of the Sale Motion including entry of the Sale Order and the Sale Order shall have become a Final Order or contain language mooting any appeal pursuant to 11 U.S.C. § 363(m).  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall preclude Purchasers or the Debtors from consummating the Contemplated Transactions if Purchasers, in their sole discretion, waive the requirement that the Sale Order or any other Order shall have become Final Orders.

**Section 13.06.**    <u>Financing</u>.  On or before the date that is five (5) Business Days prior to the Bid Deadline (as defined in the Bidding Procedures), Purchasers shall have obtained a commitment for financing in an amount sufficient to consummate the Contemplated Transactions ("<u>Financing Contingency</u>").

**Section 13.07.**    <u>Other Instruments and Documents</u>.  The Debtors and Lender shall have delivered to Purchasers each of the instruments and documents reasonably required to be delivered by it pursuant to <u>Section 4.05</u> and <u>Section 4.08</u>, respectively.

## ARTICLE XIV.
## TERMINATION

**Section 14.01.**    <u>Termination</u>.  This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of Alpine Holdco, the Debtors and Lender;

(b)    by the Debtors in the event of a failure of any condition set forth in <u>ARTICLE XII</u> if failure has not been (i) waived in writing by the Debtors or, (ii) as applicable, cured by Purchasers within fourteen (14) calendar days after service by the Debtors upon Purchasers of a written notice which describes the nature of the breach causing such failure; provided, however, that the Debtors shall not be permitted to terminate the Agreement pursuant to this <u>Section 14.01(b)</u> if any Debtor is in material breach of this Agreement;

(c)    by Purchasers in the event of a failure of condition set forth in <u>ARTICLE XIII</u> if such failure has not been (i) waived in writing by Purchasers or (ii) cured (if capable of being cured) by the Debtors within fourteen (14) calendar days after service by Purchasers upon the Debtors of a written notice which describes the nature of such breach; provided, however, Purchasers shall not be permitted to terminate this Agreement pursuant to this <u>Section 14.01(c)</u> if any Purchaser is in material breach of this Agreement;

(d)    by Purchasers if the Bidding Procedures Order has not been entered on or before the date that is ten (10) days after the Petition Date;

(e)    by Purchasers if the Debtors fail to have held the Auction by not later than the Auction Deadline Date;

(f)    by Purchasers if the Sale Order has not been entered on or before the date that is forty-five (45) days after the Petition Date;

(g)    by Purchasers if the Bankruptcy Court shall have approved any Alternative Transaction or any Debtor has entered into any definitive agreement with respect to any Alternative Transaction;

(h)    by Purchasers or the Debtors if a Governmental Authority of competent jurisdiction shall have issued a judgment or taken any other action (including withholding any legally required consent), in each case, which has become final and non-appealable and which enjoins or otherwise prohibits the Contemplated Transactions prior to the Closing;

(i)    by Purchasers if there has been a material, uncured (if capable of being cured) default or event of default under the DIP Loan Documents that has not been waived by Lender or if the DIP Loan Documents are otherwise terminated;

(j)    by Purchasers if the Bankruptcy Cases are dismissed or converted into one or more cases under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the Contemplated Transactions, or a trustee is appointed for the Debtors and such trustee rejects the Contemplated Transactions; provided, that this Agreement shall not terminate if Purchasers are the movants or the cause of any actions stated in the preceding sentence; or

(k)    by the Debtors if Purchasers are not the winning bidders at the hearing on the Sale Motion; or

(l)    by Lender if the condition set forth in Section 13.06 has not been timely satisfied or waived.

With respect to Section 14.01(d), Section 14.01(e) and Section 14.01(f), the Parties acknowledge and agree that the compliance with these deadlines is subject to matters outside of the control of the Parties, and, to the extent that any of these deadlines are not met, the Parties hereby agree that the applicable deadline may be continued to a date reasonably requested by Purchasers, the Debtors or Lender, and each Party agrees that they shall not unreasonably withhold their consent to such extension, so long as such extension would not unreasonably prejudice such Party.  The foregoing sentence shall not be construed as Lender's consent to increase the borrowing capacity under the DIP Loan Documents, extend the terms thereof, or waive any default thereunder.

Section 14.02.    Termination Consequences.

(a)

(i)    Subject to Section 14.02(a)(ii), if this Agreement is terminated pursuant to Section 14.01, this Agreement will thereupon become void and of no effect and all further obligations of the Parties under this Agreement shall terminate, except that the obligations and provisions set forth in this Section 14.02, Section 17.01, Section 17.09, Section 17.11, Section 17.12 and Section 17.13 and those other obligations which explicitly provide for survival in the event of termination pursuant to Section 14.01 shall survive in accordance with their respective terms.

(ii)    If (A) this Agreement is terminated for any reason other than pursuant to Section 14.01(b), (B) the condition set forth in Section 13.06 has been timely satisfied or waived, and (C) the Debtors close an Alternative Transaction, then the Debtors shall (subject to entry of the Bidding Procedures Order), concurrently with the closing of any such Alternative Transaction, pay to Alpine Holdco in cash, by wire transfer of immediately available funds to an account designated in writing by Purchaser a break-up fee in the amount of $350,000 (the "Break-Up Fee").

(b)    The Parties acknowledge that the agreements contained in this Section 14.02 are an integral part of the Contemplated Transactions, and that, without these agreements, Purchasers would

not have entered into this Agreement.  For purposes of clarity, the Debtors' obligations to pay the Break-Up Fee as provided herein shall survive termination of this Agreement.

## ARTICLE XV.
## TAX MATTERS

**Section 15.01.**    Tax Matters; Allocation of Purchase Price; Periodic Taxes.

(a)    Cooperation on Tax Matters.  The Parties shall cooperate fully with each other, as and to the extent reasonably requested by the other Party, in connection with any Tax matter (including Tax Returns) related to the Transferred Assets or the operation of the Business (including by the provision of reasonably relevant Records or information subject to the other terms and conditions of this Agreement applicable to such Records).

(b)    Allocation.  As soon as reasonably practicable after the Closing Date, Purchasers shall deliver to the Debtors the final allocation of the Purchase Price (including the Assumed Liabilities and any other amounts properly included therein) among the Transferred Assets, which allocation shall be in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign Legal Requirements, as applicable) (the "Final Allocation").  Within sixty (60) days of any adjustment to the Purchase Price under any provision of this Agreement, Purchasers shall adjust the Final Allocation in a manner consistent with Code Section 1060 and the Treasury Regulations promulgated thereunder (as adjusted, the "Adjusted Allocation") and deliver a copy of the Adjusted Allocation to the Debtors.  The Parties agree to utilize the Final Allocation (or the Adjusted Allocation, as applicable) for Tax reporting purposes, including the filing of Form 8594 with the Internal Revenue Service.  No Party shall file any Tax Return or other document with, or make any statement or declaration to, any governmental entity that is inconsistent with the Final Allocation (or the Adjusted Allocation, as applicable).  If any state or federal taxing authority challenges such allocation, the Party receiving notice of the challenge shall promptly provide notice to the other Parties.

(c)    Periodic Taxes.  Real and personal property taxes, ad valorem taxes, and franchise fees or taxes (that are imposed on a periodic basis (as opposed to a net income basis)) (collectively, "Periodic Taxes") shall be prorated between the Debtors and Purchasers for any taxable periods beginning on or prior to and ending after the Closing Date (such taxable periods, "Straddle Periods").  Periodic Taxes attributable to Straddle Periods shall be prorated between Purchasers and the Debtors based on the relative periods that the Transferred Assets subject to such Periodic Taxes were owned by the Debtors or Purchasers during the fiscal period of the taxing jurisdiction for which such Taxes were imposed by such jurisdiction (as such fiscal period is or may be reflected on the bill rendered by such taxing jurisdiction).  The amount of all such prorations shall be settled on the Closing Date.

## ARTICLE XVI.
## POST-CLOSING MATTERS

**Section 16.01.**    Retained Assets and Excluded Liabilities.

(a)    Any asset, liability, remittance, mail and other communication that is a Retained Asset or an Excluded Liability (i) pursuant to the terms of this Agreement, (ii) as otherwise determined by the mutual written agreement of the Debtors and Purchasers or (iii) absent such agreement, as determined by adjudication by a Governmental Authority, in each case, which comes into the possession, custody or control of Purchaser, shall within ten (10) Business Days following receipt of such be transferred, assigned or conveyed by the applicable Purchaser to the applicable Debtor.  No Purchaser shall have any right, title or interest in or obligation or responsibility with respect to such Retained Assets or Excluded Liabilities

except that the applicable Purchaser shall hold such Retained Assets and Excluded Liabilities in trust for the benefit of the applicable Debtor.

(b)     Any asset, liability, remittance, mail and other communication that is a Transferred Asset or an Assumed Liability (i) pursuant to the terms of this Agreement, (ii) as otherwise determined by the mutual written agreement of the Debtors and Purchasers or (iii) absent such agreement, as determined by adjudication by a Governmental Authority, in each case, which comes into or remains in the possession, custody or control of any Debtor shall within ten (10) Business Days following receipt of such be transferred, assigned or conveyed by the applicable Debtor to the applicable Purchaser.  No Debtor shall have any right, title or interest in or obligation or responsibility with respect to such Transferred Assets or Assumed Liabilities except that the applicable Debtor shall hold such Transferred Assets and Assumed Liabilities in trust for the benefit of the applicable Purchaser.

Section 16.02.     Preservation and Access to Records After the Closing.

(a)     After the Closing, the Debtors shall grant to Purchasers access to and permit Purchasers, at Purchasers' sole expense, to make copies of any of the Retained Records in their possession as may be reasonably necessary for Purchasers (i) to provide client care, (ii) comply with any Legal Requirement or (iii) for any lawful purpose including actions by Purchasers in performance of their obligations, or the exercise of its rights, under this Agreement or any Ancillary Agreement.  Any Retained Records delivered to or made available to Purchasers shall be returned to the Debtors when such use therefor has terminated.

(b)     Notwithstanding any other term in this Agreement to the contrary, Purchasers shall have a right, after the Closing, to have access to, and to use, any communications, documents and analysis from attorneys engaged by the Debtors prior to Closing, to the extent related to the Business, including related to compliance with Legal Requirements, reimbursement rights, litigation, or governmental matters or investigations, accreditation and similar matters.  Purchasers' access to any such information shall not result in the waiver of any attorney-client, attorney work product or other applicable privilege.

(c)     To the maximum extent permitted by any Legal Requirement, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Retained Assets, promptly after receiving the request for such documents and prior to any disclosure of such documents, Purchasers shall notify the Debtors and shall provide the Debtors with the opportunity to object to, such request or demand.

(d)     To the maximum extent permitted by any Legal Requirement, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Transferred Assets or Assumed Liabilities, promptly after receiving the request for such documents and prior to any disclosure of such documents, the Debtors shall notify Purchasers and shall provide Purchasers with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

Section 16.03.     Consents; Provision of Benefits of Certain Assumed Contracts.  Following the Closing Date, the Parties, where applicable, shall each use reasonable best efforts and cooperate in good faith (i) to obtain any additional consents, approvals, authorizations, clearances and Licenses required to carry out the Contemplated Transactions (including, Governmental Approvals) or which the Debtors and Purchasers agree to be necessary or appropriate and which have not been obtained as of the Closing Date, (ii) in the preparation of any document or other material which may be required by any Governmental Authority or accrediting or certifying bodies as a predicate to or result of the Contemplated Transactions and (iii) to effectuate the assignment or provision of benefit of any additional Assumed Contracts or

24

Assumed Real Property (Tenant) Leases to Purchasers that have not already been assigned as of the Closing Date.

**Section 16.04.**    <u>Accounts Receivable; Collections</u>.  Following the Closing Date, the Debtors shall permit, and herby authorize, Purchasers to collect, in the name of any Debtor, all Debtor Accounts Receivable and to endorse with the name of any applicable Debtor for deposit in Purchasers' accounts any checks or drafts in payment thereof.  The Debtors shall promptly, but in any event within ten (10) Business Days, deliver to Purchasers any cash, checks or other property that it may receive after the Closing in respect of any Debtor Accounts Receivable or other asset constituting part of the Transferred Assets.  Upon the reasonable request of Purchasers, and at the reasonable cost of Purchasers, the Debtors shall assist Purchasers in the preparation and submission of any filings that may be required by any Payor or Governmental Authority.  Debtors shall also so assist Purchasers to satisfactorily resolve any pending or potential audit, administrative or judicial appeal, settlement, retroactive payment adjustment, dispute or contest pertaining to reimbursement or payments made with respect to the Debtors concerning periods ending on or before the Closing Date at Purchasers' sole expense.

**Section 16.05.**    <u>Further Assurances</u>.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Contemplated Transactions.

**ARTICLE XVII.**
**MISCELLANEOUS**

**Section 17.01.**    <u>Expenses</u>.  Except as otherwise provided in this Agreement, including, without limitation, pursuant to <u>Section 14.02</u>, each Party will pay its own respective financial advisory, legal, accounting and other expenses incurred by it or for its benefit in connection with the preparation and execution of this Agreement and the Ancillary Agreements.

**Section 17.02.**    <u>Notices</u>.  Any notice, request, demand, claim or other communication required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered personally, delivered by nationally recognized overnight courier service, sent by certified or registered mail, postage prepaid, or sent by email (subject to electronic confirmation of email transmission).  Any such notice, request, demand, claim or other communication shall be deemed to have been delivered and given (a) when delivered, if delivered personally, (b) the Business Day after it is deposited with such nationally recognized overnight courier service, if sent for overnight delivery by a nationally recognized overnight courier service, (c) the day of sending, if sent by email prior to 5:00 p.m. (Pacific time) on any Business Day or the next succeeding Business Day if sent by email after 5:00 p.m. (Pacific time) on any Business Day or on any day other than a Business Day or (d) five (5) Business Days after the date of mailing, if mailed by certified or registered mail, postage prepaid, in each case, to the following address or email address, or to such other address or addresses or  email address or addresses as such Party may subsequently designate to the other Parties by notice given hereunder:

If to any Debtor, to:

GGG Partners, LLC
c/o Solid Landings Behavioral Health, Inc.
2900 Bristol Street, Suite B-300
Costa Mesa, CA 92626
Attention:  Katie Goodman
Email:  kgoodman@gggmgt.com

25

with copies (which shall not constitute notice) to:

      Levene, Neale, Bender, Yoo & Brill L.L.P.
      10250 Constellation Blvd., Suite 1700
      Los Angeles, CA 90067
      Attention:  David Neale
      Email:  dln@lnbyb.com

If to any Purchaser, to:

      Alpine Behavioral Holdco, LLC
      23 Corporate Plaza, Suite 215
      Newport Beach, CA 92660
      Attention:  Gerik Degner
      Email:  gdegner@alpine-pacific.com

with copies (which shall not constitute notice) to:

      Massumi + Consoli LLP
      2029 Century Park E, Suite 280
      Los Angeles, CA  90067
      Attention:  Anthony Consoli, P.C.
      Email:  aconsoli@mcllp.com

If to Shandrow, to:

      Mark Shandrow
      19775 MacArthur Blvd., Suite 240
      Irvine, CA 92612
      Email:  mark@shandrowgroup.com

with copies (which shall not constitute notice) to:

      SulmeyerKupetz
      333 S. Hope Street, 35th Floor
      Los Angeles, CA 90071
      Attention:  Mark S. Horoupian
      Email:  mhoroupian@sulmeyerlaw.com

If to Perry, to:

      Elizabeth Perry
      1701 Brackenridge Street
      Austin, TX 78704
      Email:  eperry79@gmail.com

with copies (which shall not constitute notice) to:

> Fransen and Molinaro, LLP
> 4160 Temescal Canyon Road, Suite 306
> Corona, CA  92883
> Attention:  Nathan Fransen
> Email:  nathan@fmattorney.com

If to Lender, to:

> CapStar Bank
> 1201 Demonbreun Street, Main Level
> Nashville, TN 37203
> Attention:  Scott McGuire
> Email:  smcguire@capstarbank.com

with copies (which shall not constitute notice) to:

> Burr & Forman LLP
> 511 Union Street, Suite 2300
> Nashville, TN 37219
> Attention:  David W. Houston, IV
> Email:  dhouston@burr.com

Each of the Parties to this Agreement may specify a different address or addresses or email address or email addresses by giving notice in accordance with this Section 17.02 to each other Party.

**Section 17.03.**    Succession and Assignment; Third-Party Beneficiaries.  Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a Party for all purposes hereof.  No Party may assign or otherwise transfer either this Agreement or any of such Party's rights, interests or obligations hereunder without the prior written approval of the other Parties, and any attempt to assign obligations hereunder will be null and void *ab initio*.  Notwithstanding the foregoing, Purchasers may assign this Agreement to any Affiliate(s) without the Debtors' consent and Purchasers may assign, or concurrent with the Closing or thereafter resell the Transferred Assets; provided, however, that no such assignment of this Agreement will relieve Purchasers of any of its obligations hereunder.  This Agreement is for the sole benefit of the Parties and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the Parties and such successors and permitted assignees, any other right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 17.04.**    Disclosure Schedules, Exhibits and Schedules.  The Disclosure Schedules and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.

**Section 17.05.**    Amendments and Waivers.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No waiver by a Party of any breach or violation of, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach or violation of, default under, or inaccuracy in, any such representation, warranty or covenant hereunder or

27

affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of a Party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

Section 17.06.    Entire Agreement.    This Agreement, together with the Ancillary Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto, including, without limitation, the Letter of Intent. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for in this Agreement and in the Ancillary Agreements. The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations, warranties and agreements contained herein and no others.

Section 17.07.    Counterparts; Electronic Signature.    This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument. This Agreement will become effective when duly executed and delivered by each Party. Counterpart signature pages to this Agreement may be delivered by facsimile or electronic delivery (*i.e.*, by email of a PDF signature page) and each such counterpart signature page will constitute an original for all purposes.

Section 17.08.    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. Except as provided in Section 10.09(d), in the event that any provision hereof would, under applicable Legal Requirements, be invalid or unenforceable in any respect, each Party intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable Legal Requirements.

Section 17.09.    Governing Law; Jurisdiction.    This Agreement, the rights of the Parties hereunder and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed and enforced in accordance with the Legal Requirements of the State of California, without giving effect to any choice or conflict of law provision or rule that would cause the application of the Legal Requirements of any other jurisdiction. The Parties agree that any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Contemplated Transactions may only be brought in the United States District Court for the Central District of California, the Bankruptcy Court, or any California State court sitting in the county of Los Angeles, California, and the Parties hereby consent to the exclusive jurisdiction of such courts in any such Action and irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action which is brought in any such court has been brought in an inconvenient forum.

Section 17.10.    Publicity.    No public announcement or disclosure (including any general announcement to employees, customers or suppliers of the Debtors or Purchaser) will be made by the Debtors concerning this Agreement, the Ancillary Agreements, the Contemplated Transactions or the subject matter thereof without the prior written consent of Purchaser; provided, however, that the provisions of this Section 17.10 shall not prohibit any disclosure (a) required by any Legal Requirements (in which case the Debtors shall provide Purchasers with the opportunity to review and comment in advance of such disclosure) or (b) made as required or compelled in the enforcement of any right or remedy relating to this Agreement, the Ancillary Agreements or the Contemplated Transactions pursuant to Section 17.09.

**Section 17.11.**    Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE, TO THE EXTENT PERMISSIBLE UNDER APPLICABLE LEGAL REQUIREMENTS. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY.

**Section 17.12.**    Specific Performance.  Each of the Parties acknowledges and agrees that the non-breaching Parties would be damaged irreparably in the event any of the provisions of this Agreement, including, without limitation, Section 10.05 and Section 10.09, are not performed in accordance with their specific terms or otherwise are breached or violated or threatened to be breached or violated.  Accordingly, each of the Parties agrees that, without posting a bond or other undertaking, the non-breaching Parties will be entitled to an injunction or injunctions to prevent breaches or violations or threatened breaches or violations of the provisions of this Agreement, including, without limitation, Section 10.05 and Section 10.09, and to enforce specifically this Agreement and the terms and provisions hereof, including, without limitation, Section 10.05 and Section 10.09,  in addition to any other remedy to which the non-breaching Parties may be entitled, at law or in equity.  Each Party further agrees that, in the event of any Action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

**Section 17.13.**    Service of Process.  Each Party hereby (a) consents to service of process in any Action among any of the Parties relating to or arising in whole or in part under or in connection with this Agreement, any Ancillary Agreement or the Contemplated Transactions in any manner permitted by the Legal Requirements of the forum where such Action is commenced, provided that such Action must be commenced in a forum identified in Section 17.09, (b) agrees that service of process made in accordance with clause (a) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 17.02, will constitute good and valid service of process in any such Action and (c) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (a) or (b) does not constitute good and valid service of process.

**Section 17.14.**    Disclosure Schedules.  The information set forth in each section or subsection of the Disclosure Schedules shall be deemed to provide the information contemplated by, or otherwise qualify, the representations and warranties of the Debtors set forth in the corresponding section or subsection of this Agreement and any other section or subsection of ARTICLE VI but only to the extent that it is expressly stated on the face of the disclosure that it applies to such other section or subsection.

**Section 17.15.**    Conflicts with Ancillary Agreements.  In the event of any conflict or inconsistency between the terms of any Ancillary Agreement and the terms of this Agreement, the terms of this Agreement shall govern and control.

**Section 17.16.**    No Consents Regarding DIP Funding.  Nothing stated herein shall be construed as Lender's consent to increase the borrowing capacity under the DIP Loan Documents, extend the terms thereof, or waive any default thereunder.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

29

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**DEBTORS:**

SOLID LANDINGS BEHAVIORAL HEALTH, INC.

By: _____
Name: Katie Goodman
Its: CRO

SURE HAVEN, INC.

By: _____
Name: Katie Goodman
Its: CRO

CEDAR CREEK RECOVERY, INC.

By: _____
Name: Katie Goodman
Its: CRO

SILVER ROCK RECOVERY

By: _____
Name: Katie Goodman
Its: CRO

EMS TOXICOLOGY

By: _____
Name: Katie Goodman
Its: CRO

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**PURCHASERS:**

ALPINE BEHAVIORAL HOLDCO, LLC

By: _____
Name: Gerik Degner
Its: Chief Executive Officer


ALPINE BEHAVIORAL CALIFORNIA, LLC

By: _____
Name: Gerik Degner
Its: Chief Executive Officer


ALPINE BEHAVIORAL NEVADA, LLC

By: _____
Name: Gerik Degner
Its: Chief Executive Officer


ALPINE BEHAVIORAL TEXAS, LLC

By: _____
Name: Gerik Degner
Its: Chief Executive Officer


ALPINE BEHAVIORAL TOXICOLOGY, LLC

By: _____
Name: Gerik Degner
Its: Chief Executive Officer


[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**EQUITYHOLDER:**

Mark Shandrow

       IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**EQUITYHOLDER:**

Elizabeth Perry

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**LENDER:**

**CAPSTAR BANK**

By: _____

Name: Scott McGuire

Title: SVP, Special Assets

[Signature Page to Asset Purchase Agreement]

**EXHIBIT A**

Definitions; Certain Rules of Construction

"401(k) Plan" means the 401(k) plan maintained by or on behalf of the Debtors for the benefit of the Debtor Employees.

"Action" means any claim, controversy, action, cause of action, suit, litigation, inquiry, arbitration, investigation, opposition, interference, audit, assessment, hearing, complaint, demand or other legal proceeding (whether sounding in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involves, any Governmental Authority.

"Adjusted Allocation" has the meaning given in Section 15.01(b) of this Agreement.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For purposes of the foregoing, a Person shall be deemed to control a specified Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of management policies of such Person.

"Agreement" has the meaning given in the preamble of this Agreement.

"Alternative Transaction" means the sale or proposed sale of any part of the Business or the Transferred Assets to any Person other than Purchaser.

"Ancillary Agreements" means each of the agreements, certificates, instruments and documents to be executed and delivered by the Parties in connection with the Contemplated Transactions as set forth herein.

"Application" has the meaning given in Section 10.01(b) of this Agreement.

"Approving Resolutions" means those certain resolutions adopted by the boards of directors of each Debtor on April 11, 2017 authorizing, among other things, the filing of the Bankruptcy Cases.

"Assumed Contracts" has the meaning given in Section 2.01(q) of this Agreement.

"Assumed Liabilities" has the meaning given in Section 3.01 of this Agreement.

"Assumed Personal Property Leases" has the meaning given in Section 2.01(c) of this Agreement.

"Assumed Real Property (Tenant) Leases" has the meaning given in Section 2.01(a) of this Agreement.

"Auction Deadline Date" has the meaning given in Section 5.01(f) of this Agreement.

"Bankruptcy Cases" has the meaning given in the recitals of this Agreement

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California or such other United States Court exercising primary (and not appellate) jurisdiction over the Bankruptcy Cases in connection with the subject matter of this Agreement.

"Bidding Procedures" has the meaning given in Section 5.01(b) of this Agreement.

"Bidding Procedures Motion" has the meaning given in Section 5.01(b) of this Agreement.

"Bidding Procedures Order" has the meaning given in Section 5.01(b) of this Agreement.

"Bills of Sale" has the meaning given in Section 4.05(a) of this Agreement.

"Break-Up Fee" has the meaning given in Section 14.02(a)(ii) of this Agreement.

"Business" means, collectively, the business operations of the Debtors and the Non-Debtor Affiliates.

"Business Day" means any day other than a Saturday, Sunday or day on which banks are permitted to close in the State of California.

"Closing" has the meaning given in Section 4.03 of this Agreement.

"Closing Date" means the date on which the Closing actually occurs.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Business" means any business that operates or otherwise serves clients in Orange County, California that is competitive in any manner with the Business.

"Contemplated Transactions" means the transactions contemplated by this Agreement, including the purchase and sale of the Transferred Assets and the Business and the execution, delivery and performance of the Ancillary Agreements.

"Contract Assignments" has the meaning given in Section 4.05(d) of this Agreement.

"Cost Reports" means all cost and other reports filed by Purchasers for payment and/or reimbursement from Payors.

"Court Approval" means the entry of an order by the Bankruptcy Court, in form and substance satisfactory to Purchasers in their sole and absolute discretion.

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of the Debtors that must be paid or otherwise satisfied to cure all of the Debtors' monetary defaults under the Assumed Contracts, Assumed Real Property (Tenant) Leases and Assumed Personal Property Leases pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to a Purchaser as provided hereunder as such amounts are determined by the Bankruptcy Court.

"Debtors" has the meaning given in the preamble of this Agreement.

"Debtor Accounts Receivable" has the meaning given in Section 2.01(g) of this Agreement.

"Debtor Employees" means all employees of the Debtors immediately prior to the Effective Date, whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to the Debtors' policies or pursuant to Legal Requirements.

2

"<u>Debtor Employee Plans</u>" means (i) all "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) each loan to an employee, (iii) all stock option, stock purchase, phantom stock, stock appreciation right, restricted stock unit, supplemental retirement, severance, sabbatical, medical, dental, vision care, disability, employee relocation, cafeteria benefit, dependent care, life insurance or accident insurance plans, programs or arrangements, (iv) all bonus, pension, profit sharing, savings, severance, retirement, deferred compensation or incentive plans (including cash incentive plans), programs or arrangements, (v) all other fringe or employee benefit plans, programs or arrangements and (vi) all employment or executive compensation or severance agreements, written or otherwise, as to which any unsatisfied obligations of any Debtor remain for the benefit of, or relating to, any present or former employee, consultant, independent contractor or non-employee director of any Debtor.  Notwithstanding the foregoing, "Debtor Employee Plans" shall expressly exclude the 401(k) Plan.

"<u>DIP Loan Documents</u>" means that certain Debtor-In-Possession Loan and Security Agreement (the "<u>Dip Loan Agreement</u>"), dated as of the date hereof, by and among the Debtors and Lender, and each of the other DIP Financing Documents (as defined in the DIP Loan Agreement).

"<u>Disclosure Schedules</u>" means those schedules attached to this Agreement and referred to in one or more sections or subsections of this Agreement.

"<u>Domain Name Assignments</u>" has the meaning given in <u>Section 4.05(f)</u> of this Agreement.

"<u>Effective Date</u>" has the meaning given in the preamble of this Agreement.

"<u>Environmental Law</u>" means all federal, state, or local laws, rules or regulations (whether now existing or hereafter enacted or promulgated) and any judicial or administrative interpretation thereof, including any judicial or administrative orders or judgments, relating to the protection of human health, safety and environment.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>Equityholder(s)</u>" has the meaning given in the preamble of this Agreement.

"<u>Excluded Liabilities</u>" has the meaning given in <u>Section 3.02</u> of this Agreement.

"<u>Final Allocation</u>" has the meaning given in <u>Section 15.01(b)</u> of this Agreement.

"<u>Final Order</u>" means an order of the Bankruptcy Court the operation of which has not been modified or amended without the written consent of Purchaser, reversed or stayed, as to which order no appeal or motion, application, petition or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, a stay or similar relief is pending, and the time to file any such appeal or motion, application, petition or writ has expired.

"<u>Government Order</u>" means any order, writ, judgment, injunction, decree, stipulation, restriction, ruling, decision, verdict, determination or award made, issued or entered by or with any Governmental Authority.

"<u>Governmental Approval</u>" means any consent, waiver, approval, order or authorization of, accreditation by, clearance, certification, License, permit, entitlement, or approval from, registration, declaration or filing with, or notice to any Governmental Authority or accrediting or certifying body necessary for the consummation of the Contemplated Transactions.

3

"Governmental Authorities" means any and all agencies, authorities, bodies, boards, bureaus, commissions, courts, departments, directorates, instrumentalities, legislatures, officials, tribunals and offices of any nature whatsoever of any United States federal, state, or local government unit or political subdivision and any self-regulatory organization.

"Hazardous Materials" means any (a) toxic or hazardous materials or substances, including mold, (b) solid wastes, including asbestos, polychlorinated biphenyls, mercury, chemicals, flammable or explosive materials, (c) radioactive materials (including naturally-occurring radioactive materials), (d) petroleum or petroleum products (including crude oil), (e) medical waste and (f) any other chemical, pollutant, contaminant, substance or waste that is regulated by any Governmental Authority under any Environmental Laws.

"Hired Employee" has the meaning given in Section 11.02(a) of this Agreement.

"Intellectual Property" has the meaning given in Section 2.01(l) of this Agreement.

"Interim Management Agreement" means an interim management agreement contemplating certain comprehensive management services, including, without limitation, all billing and collection, by and between the applicable Debtor and the applicable Purchaser, in substantially the form attached hereto as Exhibit C.

"Inventory" has the meaning given in Section 2.01(e) of this Agreement.

"IP Assignments" has the meaning given in Section 4.05(e) of this Agreement.

"Legal Requirements" means, with respect to any Person, all constitutional provisions, statutes, laws, ordinances, bylaws, codes, rules, regulations, restrictions, Government Orders, judgments, orders, writs, permits, Licenses, injunctions, decrees, determinations, resolutions, rulings, promulgations, policies, interpretations, contractual obligations, awards or any similar provision having the force or effect of law of, or any guideline adopted or issued by, any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

"Lender" has the meaning given in the preamble of this Agreement.

"Letter of Intent" means that certain letter agreement, dated as of April 12, 2017, by and among the Debtors, the Non-Debtor Affiliates, Alpine Pacific Capital, LLC, Lender and the Equityholders.

"Licenses" has the meaning given in Section 2.01(k) of this Agreement.

"Lien" means any security interest, pledge, license, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, option, warrant, purchase right, commitment, right of first refusal, grant of a power to confess judgment, conditional sale and title retention agreement (including any lease in the nature thereof), charge, third-party claim, demand, equity, security title, lien, encumbrance or other similar arrangement or interest in real or personal property.

"Make-Whole Documents" means the written agreement or agreements memorializing the agreement between the Purchasers and Lender, each in form and substance mutually agreeable to Purchasers and Lender.

"Material Adverse Effect" means any event, fact, condition, change or effect that, individually or in the aggregate with other events, facts, conditions, changes or effects, has had or could be adverse to (a)

the Business, taken as a whole, (b) the operations, results of operations, condition (financial or otherwise), or prospects of the Debtors, taken as a whole, (c) the Transferred Assets, taken as a whole, (d) the Assumed Liabilities, taken as a whole or (e) the ability of the Debtors to perform their material obligations under this Agreement; provided, however, that none of the following (or the results thereof) shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) the filing and administration of the Bankruptcy Cases, (ii) events, facts, conditions, changes or effects generally affecting the health care industry, (iii) events, facts, conditions, changes or effects generally affecting the United States of America or world economy or the debt, credit or securities markets of the United States of America or world (including any decline in the price of any security or any market index) or the market or geographical area in which any Debtor is located or (iv) any outbreak or escalation of hostilities or declared or undeclared acts of war or terrorism.

"Mutual Release" means the mutual release contemplated by that certain Conditional Release Agreement, dated as of the date hereof, by and between Lender and the applicable Equityholders.

"Non-Debtor Affiliates" means, collectively, (a) Rock Solid Recovery, a California corporation, (b) Long Beach Recovery, Inc., a California corporation, (c) Hope's Landing, a California corporation, (d) EMS Management, Inc., a California corporation, (e) Recovery Information Services, LLC, a Delaware limited liability company, (f) H&J Toxicology, LLC, a Delaware limited liability company, (g) Sage Creek Toxicology, Inc., a Texas corporation, (h) FPS, LLC, a California limited liability company, and (i) 1965 Orange, LLC, a California limited liability company.

"Other Real Property Interests" has the meaning given in Section 2.01(b) of this Agreement.

"Parties" has the meaning given in the preamble of this Agreement.

"Payor" means any federal, state, municipal or non-governmental third party payor.

"Periodic Taxes" has the meaning set forth in Section 15.01(c) of this Agreement.

"Perry" has the meaning given in the preamble of this Agreement.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Personal Data" means all information concerning an identified or identifiable natural person, including a person's name, address, email address, Social Security Number, driver's license number or state-issued identification card number, financial account number, credit or debit card number, with or without the security code, access code, personal identification number or password, that would permit access to a person's financial account; provided, however, that "Personal Data" shall not include information that is lawfully obtained from publicly available information, or from federal, state or local government records lawfully made available to the general public.

"Personal Property" has the meaning given in Section 2.01(f) of this Agreement.

"Personal Property Assignments" has the meaning given in Section 4.05(c) of this Agreement.

"Petition Date" has the meaning give in Section 5.01(a) of this Agreement.

"Plan Termination Evidence" has the meaning given in Section 10.06 of this Agreement.

"Prepaid Expenses" has the meaning given in Section 2.01(f) of this Agreement.

"Purchase Price" has the meaning given in Section 4.01 of this Agreement.

"Purchasers" has the meaning given in the preamble of this Agreement.

"Real Estate Assignments" has the meaning given in Section 4.05(b) of this Agreement.

"Records" means all files, data, documents, records, correspondence, work papers, operating manuals and other documents, including Tax Returns, Debtor Employee records, financial records, equipment records, construction plans and specifications, client records, medical records and medical and administrative libraries, medical staff, peer review and physician credentialing records and files, and on-site regulatory compliance records, including in each case electronically stored files, data, documents and records.

"Rejected Contracts" has the meaning given in Section 2.01(q) of this Agreement.

"Rejected Personal Property Leases" has the meaning given in Section 2.01(c) of this Agreement.

"Rejected Real Property (Tenant) Leases" has the meaning given in Section 2.01(a) of this Agreement.

"Released Claims" has the meaning given in Section 10.10(a) of this Agreement.

"Release" has the meaning given in Section 10.10(b) of this Agreement.

"Releasee" has the meaning given in Section 10.10(a) of this Agreement.

"Restricted Names" has the meaning given in Section 10.11 of this Agreement.

"Restrictive Covenant Period" has the meaning given in Section 10.09(a) of this Agreement.

"Retained Assets" has the meaning given in Section 2.02 of this Agreement.

"Retained Records" means all Records relating to the Retained Assets or Excluded Liabilities.

"Revolver Documents" means the written agreement or agreements, including any applicable security documents, each in form and substance reasonably acceptable to Purchasers and Lender, memorializing the terms and conditions of a revolving credit facility with borrowing capacity of up to $2,000,000.00.

"Sale Milestones" has the meaning given in Section 5.01 of this Agreement.

"Sale Motion" has the meaning given in Section 5.01(c) of this Agreement.

"Sale Order" means the Bankruptcy Court order  which shall, among other things, (a) approve the sale of the Transferred Assets to Purchasers on the terms and conditions set forth in this Agreement and authorize the Debtors to proceed with this transaction, (b) include a specific finding that Purchasers are good faith purchasers of the Transferred Assets under section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of section 363(n) of the Bankruptcy Code, (c) state that the sale of the Transferred Assets to Purchasers shall be free and clear of all Liens, Claims,

and Interests of any nature whatsoever under section 363(f) of the Bankruptcy Code and (d) provide for a waiver of the stays contemplated by Bankruptcy Rules 6004(g) and 6006(d).

"Section 1542" has the meaning given in Section 10.10(b) of this Agreement.

"Shandrow" has the meaning given in the preamble of this Agreement.

"Software" has the meaning given in Section 2.01(l) of this Agreement.

"Stayed Tax Liens" means Liens that may arise to the extent payment of any Taxes is stayed as a result of the Bankruptcy Cases.

"Straddle Periods" has the meaning set forth in Section 15.01(c) of this Agreement.

"Tax" means (a) any and all foreign or United States federal, state, or local income, gross receipts, License, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, escheat, unclaimed property, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, tax on unrelated business income, alternative or add-on minimum, estimated, or other tax, charge, fee or assessment of any kind including any interest, penalty, or addition thereto, (b) any liability for the payment of any amounts of any of the foregoing as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (c) any liability for the payment of any such amounts as a result of being a party to any Tax Sharing Agreement or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person and (d) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Tax Sharing Agreement" means any agreement including any provision pursuant to which the any Debtor is obligated to indemnify any Person for, or otherwise pay, any Tax of another Person, or share any Tax benefit with another Person.

"Term Note" has the meaning given in Section 4.01 of this Agreement.

"Term Note Documents" means the Term Note and the written agreement or agreements memorializing the terms and conditions of the Term Note, including any applicable security documents, each in form and substance reasonably acceptable to Purchasers and Lender.

"Transfer Taxes" has the meaning given in Section 4.02 of this Agreement.

"Transferred Assets" has the meaning given in Section 2.01 of this Agreement.

"Transferred Intellectual Property" has the meaning given in Section 2.01(l) of this Agreement.

"Transferred Records" has the meaning given in Section 2.01(j) of this Agreement.

Certain Matters of Construction.

7

(a)     The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(b)     Section and subsection headings contained in this Agreement are not to be considered part of this Agreement, are included solely for convenience, are not intended to be full or accurate descriptions of the content of the sections or subsections of this Agreement and shall not affect the construction of this Agreement.

(c)     Except as otherwise explicitly specified to the contrary in this Agreement, (i) the words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement and reference to a particular section of this Agreement shall include all subsections thereof, (ii) references to a section, Disclosure Schedule, other schedule, or annex means a section of, or Disclosure Schedule, other schedule, or annex to this Agreement, unless another agreement is specified, (iii) definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender, (iv) the word "including" means including without limitation, (v) any reference to "$" or "dollars" means United States dollars and (vi) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, rule or regulation, in each case as amended or otherwise modified from time to time.

(d)     References in this Agreement to the "Debtors' knowledge", "knowledge of any Debtor" or words of substantially similar import, mean the actual knowledge of the equityholders, directors and officers of the Debtors, in each case, after reasonable review of their own offices and inquiry of personnel that directly report to them.

(e)     References in this Agreement to the "Purchasers' knowledge", "knowledge of any Purchaser" or words of substantially similar import, mean the actual knowledge of the equityholders, directors and officers of the Purchasers, in each case, after reasonable review of their own offices and inquiry of personnel that directly report to them.

(f)     Unless the context clearly requires otherwise, when used herein "or" shall not be exclusive (i.e., "or" shall mean "and/or").

(g)     Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

8

**EXHIBIT B**

Bidding Procedures

## Bidding Procedures

Set forth herein are the bidding procedures (the "Bidding Procedures") to be employed with respect to the transfer of substantially all of the assets ("Transferred Assets") of (i) Solid Landings Behavioral Health, Inc., a California corporation ("Solid Landings"), (ii) Sure Haven, Inc., a California corporation ("Sure Haven"), (iii) Cedar Creek Recovery, Inc., a Texas corporation ("Cedar Creek"), (iv) Silver Rock Recovery, a Nevada corporation ("Silver Rock"), (v) EMS Toxicology, a Nevada corporation ("EMS Toxicology" and together with Solid Landings, Sure Haven, Cedar Creek, and Silver Rock, the "Debtors"), each a debtor and debtor-in-possession in the chapter 11 cases (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), jointly consolidated under Case No. _____. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Agreement (as defined below).

On June 1, 2017, the Debtors entered into an *Asset Purchase Agreement* (the "Agreement") with Alpine Behavioral Holdco, LLC, a Delaware limited liability company ("Holdco"), Alpine Behavioral California, LLC, a California limited liability company ("Alpine CA"), Alpine Behavioral Nevada, LLC, a Nevada limited liability company ("Alpine NV"), Alpine Behavioral Texas, LLC ("Alpine TX"), a Texas limited liability company, Alpine Behavioral Toxicology, LLC, a Nevada limited liability company ("Alpine Toxicology," collectively with Holdco, Alpine CA, Alpine NV, and Alpine TX, the "Stalking Horse Bidder"), pursuant to which the Stalking Horse Bidder would provide consideration, among other items of consideration, for the Transferred Assets equal to the following (the "Stalking Horse Proposal"): (i) cash in the amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), (ii) a secured term promissory note in the amount of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000), (iii) Stalking Horse Bidder's share of the amounts required to be paid to cure the Debtors' monetary defaults under those executory contracts and unexpired leases sought by Stalking Horse Bidder to be assumed by the Debtors and assigned to it, and (iv) the Make-Whole Agreement. The Debtors have computed the total value of the Stalking Horse Proposal to be $9,050,000. The Stalking Horse Proposal is subject to competitive bidding as set forth herein and approved by the Bankruptcy Court pursuant to Section 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Potential bidders may structure competing bids in any manner, including, but not limited to, that proposed in the Agreement by the Stalking Horse Bidder or as a restructuring or a cash bid for the purchase of the Transferred Assets (each, a proposed "Transfer Transaction").

## Participation Requirements

Any person desiring to submit a competing Bid (as defined herein) in connection with a Transfer Transaction (a "Potential Bidder") will be required to deliver the following (the "Participation Requirements") to the Debtors, care of the Debtors' Chief Restructuring Officer: (a) an executed confidentiality agreement; and (b) a statement demonstrating a bona fide interest in purchasing the Transferred Assets; and (c) either (i) written evidence of available funds; or (ii) a firm commitment for financing sufficient for the Potential Bidder to timely consummate the

1

purchase of the Transferred Assets; or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purposes of acquiring the Transferred Assets, current audited financial statements and the latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to timely consummate the purchase of the Transferred Assets. Each of (a), (b), and (c)(i)-(iii) shall be in form and substance satisfactory to the Debtors.

### Due Diligence

Any Potential Bidder who satisfies the Participation Requirements will be afforded due diligence access and additional information through access to an online data room (the "Data Room").

Potential Bidders or Qualified Bidders (as defined below) requesting information in connection with their due diligence should contact Tricia Desmarais, Esq., Solid Landings Behavioral Health, Inc., 2900 Bristol Street, Suite B-300, Costa Mesa, California 92626 (tricia.desmarais@solidlandings.com)

Each Potential Bidder and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder or Qualified Bidder and its proposed Transfer Transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors, in consultation with the Committee (as defined below), if any, to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors, in consultation with the Committee, if any, to determine that a Bid (as defined herein) made by a Qualified Bidder is not a Qualified Bid (as defined below).

### Bid Deadline

The deadline for submitting written bids relating to a proposed Transfer Transaction (a "Bid" or "Bids") shall be July 3, 2017 at 4:00 p.m. (Pacific Time) (the "Bid Deadline"). Such Bids may be transmitted electronically and must be must be received on or before that date and time by each of the following:

(a) Solid Landings Behavioral Health, Inc., Attn: Katie S. Goodman, Chief Restructuring Officer, 3155 Roswell Road NW, Suite 120, Atlanta, GA 30305 (kgoodman@gggmgt.com);

(b) Counsel to the Debtors, David Neale, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067 (DLN@LNBYB.com );

(c) CapStar Bank (the "Senior Secured Lender"), Attn: Scott McGuire, 1201 Demonbreun Street, Main Level, Nashville, TN 37203 (smcguire@capstarbank.com);

(d) Counsel to the Senior Secured Lender, David W. Houston, IV and Patrick Warfield, Burr & Forman LLP, 511 Union Street, Suite 2300, Nashville, TN  37219 (dhouston@burr.com; pwarfield@burr.com); and

(e) Counsel to the Official Committee of Unsecured Creditors (the "Committee"), if a Committee is appointed by the Office of the United States Trustee.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless all of the above-referenced parties consent.

### Initial Bid at Auction

Currently, the Stalking Horse Proposal, on the terms set forth in the Agreement, is the highest and best Bid and the Stalking Horse Proposal shall be the Initial Bid (as defined herein) for the Auction.  The "Initial Bid" at the Auction will be as follows: (1) if there is an accepted All-Cash Bid (as defined herein), the Auction will start at the amount so bid; or (2) if there is no accepted All-Cash Bid, the Auction will start at the Same or Better Terms Bid (as defined herein). All bidding after the Initial Bid shall continue thereafter in subsequent bid increments of at least $100,000.00, subject to provisions contained herein.

### Bid Requirements

To be eligible to participate in the Auction, each Bid and each Potential Bidder submitting such a Bid (other than the Stalking Horse Bidder and its Bid, and the Senior Secured Lender and any credit bid) must be determined by the Debtors, in consultation with the Committee, if any, and the Senior Secured Lender, to satisfy the conditions listed below for each type of bid category:

(a)    Category 1:  The Same or Better Terms Bid.

(i)    *Terms.*  The Bid must be on terms that, in the Debtors' business judgment, in consultation with the Committee, if any, and the Senior Secured Lender, are substantially the same or more favorable to the Debtors and their estates than the terms of the Agreement, plus a cash component in the amount of the Minimum Overbid (a "Same or Better Terms Bid"). As used herein, the term "Minimum Overbid" shall mean cash in the amount $350,000.00 to account for a break-up fee (the "Break-Up Fee") to the Stalking Horse Bidder, plus an initial bid increment of $100,000.00, for a total of $450,000.00 (the "Minimum Overbid"). The Same or Better Terms Bid must include either: (i) a proposed asset purchase agreement marked against the form in the Data Room to show any proposed amendments thereto (the "Modified Agreement") and a clean and executed Modified Agreement; or, (ii) in the case of Bids proposing a structure other than an asset purchase or as specified in the Agreement, such other proposed documents evidencing the proposed Transfer Transaction.

(ii)    *Identity of Bidder.*  A Same or Better Terms Bid must disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid, including, without limitation, any current director, officer, equity holder, or other insider of the Debtors, and the complete terms of such participation or agreement entered into with such entity.

(iii)  *Contact Information*.  A Same or Better Terms Bid must include the names and contact information of authorized representatives of the bidder who will be available to answer questions regarding the Bid, including advisors and related parties.

(iv)  *Financing Sources*.  A Same or Better Terms Bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed Transfer Transaction with appropriate contact information for such financing sources.

(v)  *Deposit*.  A Same or Better Terms Bid must include a good-faith deposit in immediately available funds in the greater amount of either (A) the Break-Up Fee, or (b) ten percent (10%) of the proposed cash payment as stated in the Same or Better Terms Bid that will be paid at the closing of the Transfer Transaction ("Same or Better Terms Deposit"), which funds shall be wire-transferred to an escrow agent mutually acceptable to the Debtors and the Senior Secured Lender or, in the event an escrow is not established, to counsel for the Debtors, within one (1) business day following the delivery of a Same or Better Terms Bid.  If a Same or Better Terms Bid is identified as the Successful Bid (as defined below), and the Successful Bidder who submitted such Same or Better Terms Bid fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Same or Better Terms Deposit shall become non-refundable.

(b)  Category 2:  All-Cash Bid:

(i)  *Payment Obligation*.  A payment in immediately available funds in an amount not less than $9,500,000.00, which shall be paid at the closing of the Transfer Transaction (an "All-Cash Bid").

(ii)  *Contingencies*.  An All-Cash Bid must include a statement that there are no conditions precedent to the bidder's authority to enter into or consummate a definitive agreement.

(iii)  *Irrevocable*.  An All-Cash Bid must state that such offer is binding and irrevocable until the entry of an order approving the proposed Transfer Transaction.

(iv)  *Identity of Bidder*.  An All-Cash Bid must disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid, including, without limitation, any current director, officer, equity holder, or other insider of the Debtors, and the complete terms of such participation or agreement entered into with such entity.

(v)  *Contact Information*.  An All-Cash Bid must include the names and contact information of authorized representatives of the bidder who will be available to answer questions regarding the Bid, including advisors and related parties.

(vi)  *Earnest Money Deposit*.  An All-Cash Bid must include a good-faith deposit in immediately available funds in the amount of ten percent (10%) of the proposed consideration under the All-Cash Bid ("Earnest Money Deposit"), which funds shall be wire-transferred to an escrow agent mutually acceptable to the Debtors and the Senior Secured

4

Lender or, in the event an escrow is not established, to counsel for the Debtors, within one (1) business day following the delivery of an All-Cash Bid.  If an All-Cash Bid is identified as the Successful Bid (as defined below), and the Successful Bidder who submitted such All-Cash Bid fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Earnest Money Deposit shall become non-refundable.

(vii)    *Financing Sources*.    An All-Cash Bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed Transfer Transaction with appropriate contact information for such financing sources.

Each of the above requirements for both the Same or Better Terms Bid and the All-Cash Bid categories must be met to the reasonable satisfaction of the Debtors, the Committee, if any, and the Senior Secured Lender.

### Qualified Bidders and Bids

Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders" and Bids that contain all necessary Bid Requirements, as set out above, will be deemed "Qualified Bids," in each case, if the Debtors believe, in consultation with the Committee, if any, and the Senior Secured Lender, that such Bid would be consummated if selected as the Successful Bid (as defined below).  Assuming the Financing Contingency (as defined herein) is timely satisfied and/or waived, the Stalking Horse Bidder is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects. The Senior Secured Lender is deemed a Qualified Bidder and may participate in the Auction by credit bidding the indebtedness owed by the Debtors, plus any other amounts that the Senior Secured Lender may bid in cash.  Any bid that the Senior Secured Lender makes at the Auction will be considered a Qualified Bid.

Following consultation with the Committee, if any, and the Senior Secured Lender, the Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their Bid is a Qualified Bid before the Auction.  To the extent not provided directly by Potential Bidders, the Debtors will provide copies of the Qualified Bids to the Senior Secured Lender, the Committee, if any, the Stalking Horse Bidder and their respective counsel.

### Auction Participation

Unless otherwise agreed to by the Debtors or ordered by the Bankruptcy Court, only the Debtors, Qualified Bidders, the Committee (if any), the Senior Secured Lender, and their respective counsel and financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of these Bidding Procedures, if: (a) the Contingencies (as defined herein) are timely satisfied and/or waived by the Stalking Horse Bidder; (b) the Agreement is not terminated, and (c) the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid and Senior Secured Lender's right to credit bid, the Debtors will not hold an Auction and the Stalking Horse Bidder will be named the Successful Bidder.

**Auction**

If any Qualified Bid (other than the Stalking Horse Bid) for any of the Transferred Assets has been received and any Qualified Bidder (other than the Stalking Horse Bidder) has indicated its intent to participate in the Auction, the Debtors will conduct an auction (the "Auction") for the sale or other transfer of the Transferred Assets or for becoming the plan sponsor under a proposed restructuring (if applicable).  Notwithstanding the foregoing, Senior Secured Lender may cancel the Auction in the following two (2) situations: (1) the Agreement is terminated for any reason whatsoever; or (2) the condition to Stalking Horse Bidders' performance under the Agreement contained in Section 13.06 of the Agreement (the "Financing Contingency") is not timely satisfied or waived, and there is no other Qualified Bidder (excluding the Senior Secured Lender and the Stalking Horse Bidder).  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transfer Transaction.

The Auction shall take place at 10:00 a.m. (prevailing Pacific Time) on July 7, 2017 at the offices of counsel for the Debtors, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067.  At the Auction, only the Stalking Horse Bidder, the Senior Secured Lender, and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids.  The Debtors, following consultation with the Committee, if any, and the Senior Secured Lender, may conduct the Auction in the manner they reasonably determine, in their business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith, which such conduct and procedures may include, without limitation, selling the Transferred Assets as a whole, in lots, in piecemeal, or not selling certain portions of the Transferred Assets.

**Closing the Auction and Selection of the Back-Up Bid**

The Auction shall continue until there is only one offer that the Debtors (following consultation with the Committee, if any, and the approval of the Senior Secured Lender) determine, subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Stalking Horse Bidder and the Senior Secured Lender) submitted at Auction (the "Successful Bid").  The Qualified Bidder submitting the Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Agreement or other transaction documents, as applicable.

Immediately prior to the conclusion of the Auction, the Debtors, the Committee, if any, and the Senior Secured Lender shall (a) review each bid made at the Auction on the basis of financial and contractual terms, including any appropriate present value or discount, and such other factors as may be relevant to the process, and (b) identify the Successful Bid.

The Debtors (after consultation with the Committee, if any, and with the consent of the Senior Secured Lender) shall also select a back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the Transfer Transaction with the Successful Bidder or such later time as agreed to by the Qualified Bidder submitting such

Back-Up Bid. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtors (with the consent of the Senior Secured Lender) may elect to regard the Back-Up Bid as the highest or best bid for the Transferred Assets, and the Debtors will be authorized to consummate the Transfer Transaction contemplated by the Back-Up Bid without further order of the Bankruptcy Court.

### Acceptance of Qualified Bids

The Debtors, in consultation with the Committee, if any, and after the approval of the Senior Secured Lender may (a) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer and (b) reject at any time any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtors, their estates, and creditors.

After conclusion of the Auction, but prior to the Sale Hearing (as defined below), the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which their Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities.

### Hearings to Approve the Transfer Transaction

In the event the Successful Bidder proposes to acquire the Transferred Assets pursuant to an Agreement, the Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to be conducted no later than July 14, 2017 (at a time to be determined by the Court), to approve and authorize the Transfer Transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures. The Debtors shall file a notice with the Bankruptcy Court within two (2) business days of the Auction providing further guidance on the transaction proposed by the Successful Bidder, including actual or proposed dates of hearings to seek court approval of the Transfer Transaction.

### Back-Up Bidder and Return of Earnest Money Deposit

The Earnest Money Deposit (if any) of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the Transfer Transaction with the Successful Bidder. If the Successful Bidder fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Earnest Money Deposit delivered by the Successful Bidder (if any) shall become non-refundable.

### Payment of Expense Reimbursement and Break-Up Fee

The Break-Up Fee shall be paid, if applicable, in accordance with the terms and conditions stated in Sections 5.02 and 14.02 of the Agreement. For the avoidance of doubt, in the event that the Senior Secured Lender participates in the Auction by credit bidding, the Break-Up Fee shall be paid, if applicable, in accordance with the terms and conditions stated in Sections 5.02 and 14.02 of the Agreement.

7

**Modifications**

These Bidding Procedures may not be modified except with the express written consent of the Debtors and the Purchasers, in consultation with the Committee, if any, and the Senior Secured Lender.

At or before the Sale Hearing, the Debtors, in consultation with the Committee, if any, and the Senior Secured Lender, may impose, at or prior to the Auction, additional customary terms and conditions on proposed Transfer Transactions, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction and/or any hearing to consummate the Transfer Transaction with the Successful Bidder, in each case, without further notice to any Potential Bidder.

**EXHIBIT C**

Form of Interim Management Agreement

## [FORM OF] MANAGEMENT SERVICES AGREEMENT

This [FORM OF] MANAGEMENT SERVICES AGREEMENT (this "<u>Agreement</u>"), is entered into as of [_____], 2017 (the "<u>Effective Date</u>"), by and between [Alpine Behavioral Texas, LLC, a Texas limited liability company / Alpine Behavioral California, LLC, a California limited liability company] ("<u>Buyer</u>"), and [Cedar Creek Recovery, Inc., a Texas corporation / Solid Landings Behavioral Health, Inc., a California corporation / Sure Haven, Inc., a California corporation] (the "<u>Company</u>"). Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement (as defined below).

<u>RECITALS</u>

WHEREAS, the Company is in the business of developing, owning and operating residential and outpatient alcohol and substance abuse treatment centers in [Manor, Texas / Costa Mesa, California] (the "<u>Programs</u>");

WHEREAS, Buyer is in the business of acquiring, owning, operating and managing centers for the treatment of alcohol and substance abuse;

WHEREAS, Buyer is in the process of making applications ("<u>Buyer License Applications</u>") to the [Texas Department of State Health Services / California Department of Public Health / California Department of Health Care Services] the ("<u>Agency</u>") for the operation of the Programs;

WHEREAS, until such approval date of the Buyer License Applications, the Company desires to engage Buyer, and Buyer desires to accept such engagement, to provide the Services (as defined below) as more fully described herein;

WHEREAS, Buyer and the Company are parties to that certain Asset Purchase Agreement, dated as of June 1, 2017 (the "<u>Purchase Agreement</u>"), by and among [(a) Solid Landings Behavioral Health, Inc., a California corporation, (b) Sure Haven, Inc., a California corporation, (c) Cedar Creek Recovery, Inc., a Texas corporation, (d) Silver Rock Recovery, a Nevada corporation, (e) EMS Toxicology, a Nevada corporation, (f) Alpine Behavioral Holdco, LLC, a Delaware limited liability company, (g) Alpine Behavioral California, LLC, a California limited liability company, (h) Alpine Behavioral Nevada, LLC, a Nevada limited liability company, (i) Alpine Behavioral Texas, LLC, a Texas limited liability company, (j) Alpine Behavioral Toxicology, LLC, a Nevada limited liability company][1], (k) Mark Shandrow, (l) Elizabeth Perry, and (m) CapStar Bank, a Tennessee banking corporation; and

WHEREAS, the execution and delivery of this Agreement is contemplated by Section 10.01 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements herein made, the parties hereto hereby agree as follows:

<u>AGREEMENT</u>

## 1. Agreement to Provide Services

1.1    <u>Scope of Services</u>. The Company hereby engages Buyer as an independent contractor to provide management services, including office, administrative, supervisory, book-keeping and other

---

[1] NTD: Substitute "Buyer" and "the Company" for the full company name, as applicable.

services (collectively, the "<u>Services</u>") to the Company as may be necessary to operate the Programs consistent with the applicable standards of care under applicable law.  Subject to the terms of this Agreement, Buyer shall exercise reasonable skill and care in performing the Services.  During the Term, Buyer shall be in day-to-day charge of the Programs, and without limiting the foregoing, Buyer shall perform the following duties:

      a)      Manage the cash flow of the Programs including, without limitation, billing all patients or other third-party payors for all services provided by or at the Programs during the Term, collecting and depositing all net patient revenue in an operating account and paying operating expenses and other accounts payable related to the operation of the Programs during the Term from the operating account;

      b)      Maintain insurance policies with coverage terms and limits that are consistent with the policies in place at the time Buyer commences providing the Services, identifying the Company as a named insured;

      c)      Maintain all books and records relating to the operation of the Programs during the Term and prepare monthly and annual financial statements for the Programs;

      d)      Procure inventories and supplies and such other non-capital items, and any services from third-parties, as are necessary to keep, operate and maintain the Programs;

      e)      Establish prices, rates and charges for services provided at the Programs and negotiate all third party payor contracts;

      f)      Perform or retain professionals to perform necessary audit, accounting, legal, cost reporting, case management, verification services, and other professional services in connection with the operation of the Programs during the Term;

      g)      Market and advertise the Programs;

      h)      Execute, negotiate, renew and/or cancel agreements with patients at the Programs; and

      i)      Remain current on all operating expenses associated with the Programs, including, without limitation, rent, utilities, payroll and associated taxes, if any.

      1.2    <u>Independent Contractor</u>.  It is the intent of the parties hereto that Buyer be an independent contractor and not an employee, agent, joint-venturer, or partner of the Company.  Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employee and employer or agent and principal between Buyer and the Company or any employee or agent of the Company.

**2.      Authority of Buyer**

      2.1    <u>Disbursements</u>.  Subject to the terms of, this Agreement, Buyer shall, from funds received on behalf of the Company in the course of Buyer's performance of the Services, pay on behalf of the Company the expenses related to the Programs and activities of the Company to the extent incurred during the Term (as defined below).  Buyer shall have no obligation to advance out-of-pocket funds to pay the expenses of the Company, and Buyer shall not assume any liability for derelictions, defaults or other actions of the Company, arising by contract or by applicable Legal Requirements, including,

without limitation, liability for unpaid wages, bonuses, employment Taxes, severance pay, fringe benefits, other expenses or labor claims related to the employees of the Company or arising from any and all actions occurring prior to, concurrent with or following the Closing, nor shall Buyer hold the Company harmless of and from any such liability.

2.2    Authorization.  Subject to the terms of, this Agreement, Buyer shall be authorized to manage the programs and activities of the Company, including, without limitation, the Programs, negotiation of financial and legal matters incident to the operations of the Programs, and the settlement, release, forgiveness or waiver of outstanding liabilities, debts and obligations of the Company.

2.3    Limitations on Authority of Buyer.  Notwithstanding anything contained in this Agreement to the contrary, Company shall remain responsible for the operation of the Programs to the extent required by applicable Legal Requirements.

3.    **Obligations of the Parties**

3.1    Licensing Cooperation.  The Company shall cooperate with Buyer in connection with Buyer's efforts to obtain the appropriate state licenses to operate the Programs from the Agency and any other agency to the extent required by applicable Legal Requirements, including, without limitation, all other applications and documents required by the State of [Texas / California] for licenses and certifications required to operate the Programs.  Upon issuance of new licenses to Buyer, the Company shall forfeit its licenses to the Agency or the appropriate Governmental Authority.  Buyer agrees to use its commercially reasonable best efforts to obtain the necessary licenses as promptly as possible, but, in any event, no later than fifteen (15) months following the date of this Agreement.

3.2    Company Funds.  Buyer is authorized to receive on the Company's behalf any and all monies paid or to be paid to the Company pursuant to any of the Company's contracts, receipts for services performed by the Programs, accounts receivable and any other remittances, whether accrued before or during the Term (the "Company Funds").  Without limiting the generality of the foregoing, the Company (a) authorizes Buyer, to receive and open any mail of the Company related to the Programs, (b) agrees to endorse any checks payable to the Company to Buyer and (c) agrees to take any other actions necessary to facilitate Buyer's performance of the Services and other activities hereunder.  Buyer acknowledges and agrees that any costs and/or expenses related to the Programs and the Services shall be paid solely and exclusively from the Company Funds, and the Company shall have no liability for the payment of any such costs and expenses other than from the Company Funds.  To the extent the Company Funds are insufficient to pay any costs and/or expenses incurred by Buyer under this Agreement, such costs and/or expenses shall be the sole responsibility of Buyer.

3.3    Documents and Records of the Company.  The Company shall provide to Buyer access to all documents, books, records and other information in its possession pertaining to the operation of the Programs.  The Company shall cooperate fully with Buyer in the operation and administration of the Programs and Buyer's activities hereunder.  Buyer will provide the Company access to all documents, books, records and other information as may be necessary for the continued administration of the Company's Bankruptcy Case.  To the extent required, Buyer agrees to reasonably cooperate with the Company to assemble and supply such information as may be necessary for the Company to complete and file monthly operating reports and any other reports or documents to be filed with the Bankruptcy Court. Buyer agrees to provide reasonable access to any patient care ombudsman appointed in the Company's bankruptcy case, and to provide such information as may be reasonably requested by any ombudsman that is reasonably related to the execution of such ombudsman's statutory duties.

3

3.4     Bankruptcy Trustee Fees.  During the Term, Buyer shall pay all quarterly fees to the Office of the United States Trustee coming due during the Company's bankruptcy case.

**4.      Compensation**

As consideration for performance of the Services, Buyer shall be entitled to retain the Company Funds, net of all operating costs and/or expenses.  Buyer shall be solely authorized to manage and administer the Company Funds during the Term.

**5.      Competing Activities**

5.1     Other Ventures.  Except as otherwise set forth in the Purchase Agreement, nothing in this Agreement shall be interpreted to prohibit or limit in any way Buyer's power to engage or invest in, independently or with others, any business or activity, including, without limitation, those that might be the same or similar to the Programs that might be in direct or indirect competition with the Company. Neither the Company nor any of its equityholders, officers, managers, members, employees, agents, representatives or Affiliates shall have any right in or to such other businesses or activities or to the income or proceeds therefrom.  Buyer shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  Buyer shall have the right to hold any opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company.  The Company acknowledges that Buyer owns and manages other businesses, programs and activities, including, without limitation, businesses, programs and activities that may compete with the Company and for the time of Buyer.  The Company hereby waives any and all rights and claims which it might otherwise have against Buyer and its equityholders, officers, directors, managers, members, employees, agents, representatives and Affiliates as a result of such businesses, programs and activities, whether conducted during or after the Term.

5.2     Assumption of the Contracts and Programs of the Company.  Buyer may solicit parties to contracts with the Company, clients of the Company, referral sources, employees or contractors, or other Persons related to the Programs or activities of the Company, with the purpose that Buyer may assume or otherwise succeed to the interest of the Company, or may take the place of the Company in a contract or relationship following the termination or non-renewal of such contract or relationship with the Company. The Company hereby waives any and all rights and claims which it might otherwise have against Buyer and its equityholders, officers, directors, managers, members, employees, agents, representatives and Affiliates as a result of such activities, whether conducted during or after the Term.  Nothing herein shall be construed to create an obligation of Buyer to assume or succeed to the Company' interest in any of its contracts, programs, activities or relationships, except as expressly contemplated by the Purchase Agreement.  Upon issuance to Buyer of all permits and licenses necessary to operate the Programs, any and all accounts that are in the name of the Company, including, without limitation, utility accounts, leases and other corporate obligations, that are necessary for the operation of the Programs shall be, to the extent not transferred under the Purchase Agreement, if any, transferred into the name of Buyer, and the Company shall have no continuing liability for any costs or expenses associated with any such accounts.

**6.      Transactions Between the Company and Buyer**

Notwithstanding that it may constitute a conflict of interest, Buyer may engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement.

7.    **Intellectual Property**

To the extent any trademarks, service marks or other Intellectual Property of the Company are not transferred to Buyer at the Closing, the Company hereby grants the Buyer the right to use the name of the Company, together with any related trademarks, service marks or other intellectual property, as an independent contractor, for the duration of the Term.

8.    **Term and Termination**

8.1    <u>Term</u>.  This Agreement shall terminate automatically upon the securing by Buyer of all licenses contemplated by <u>Section 3.1</u> as determined in the sole discretion of Buyer, or pursuant to <u>Section 8.2</u> (the "<u>Term</u>").

8.2    <u>Termination for Convenience</u>.  Buyer shall have the right to terminate this Agreement upon written notice to the Company.

9.    **Sublease**

During the Term, Buyer has subleased facilities relating to the Programs to Company pursuant to the Sublease attached hereto as <u>Exhibit A</u>.  Until this Agreement is terminated, Buyer shall have complete access to such facilities to the extent necessary to perform its obligations under this Agreement.

10.    **Liability to Third Parties**

Buyer shall not assume any liability for derelictions, defaults or other actions of the Company by virtue of this Agreement.

11.    **Indemnification**

Buyer agrees to indemnify and keep the Company against any and all liabilities, costs, claims, demands, proceedings, charges, actions, suits or expenses of whatever kind or character that may be incurred or suffered by any of them however arising (other than by reason of gross negligence, willful misconduct or fraud on the part of the Company or any of its equityholders, officers, employees, or agents) in connection with the operation of the Programs after the Effective Date ("Indemnified Claims"). Buyer shall pay any and all Indemnified Claims from Company Funds.  In connection with the defense of any Indemnified Claims, Buyer shall have the right to select counsel for the Company, subject to the Company's consent, which consent may not be unreasonably withheld, and shall be entitled to be fully involved and participate fully in the defense of any Indemnified Claim.

The indemnities provided by Buyer hereunder shall cover all reasonable costs and out-of-pocket expenses payable or incurred by the Company in connection with any claims submitted with respect to services rendered by Buyer in connection with the Programs after the Effective Date.

12.    **General Provisions**

12.1    <u>Confidentiality</u>. The parties hereto agree that the matters set forth in this Agreement are strictly confidential and other than as required by applicable licensing and healthcare laws, securities laws, or the like, each party will make every effort to ensure that the information is not disclosed to any outside person or entities (including the press) without the written consent of the other party hereto. Notwithstanding the foregoing, this Agreement may be filed with the licensing department in the state

where the facilities relating to the Programs are located to the extent required by applicable Legal Requirements or necessary for approval hereof.

12.2    <u>HIPAA Compliance</u>. The parties hereto agree that the Services will comply in all material respects with all federal and state-mandated regulations, rules or orders applicable to the Services including, without limitation, regulations promulgated under Title 11, Subtitle F of the Health Insurance Portability and Accountability Act (Public Law 104-91) ("<u>HIPAA</u>").  Furthermore, the parties hereto shall amend this Agreement or execute any additional documentation to amend the Agreement to conform with HIPAA or any new or revised legislation, rules and regulations to which they are subject now or in the future including, without limitation, the Standards for Privacy of Individually Identifiable Health Information or similar legislation in order to ensure that the parties are at all times in conformance with all applicable Legal Requirements.

12.3    <u>Cooperation; Further Assurances</u>.  Each party hereto shall cooperate with and assist the other party hereto in taking such acts as may be appropriate to enable all parties hereto to effect compliance with the terms of this Agreement and to carry out the true intent and purposes hereof.  Without limiting the foregoing, following the Closing, each party hereto shall, and shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the true intent and purposes hereof.

12.4    <u>Other Remedies</u>.  Notwithstanding anything herein to the contrary, the parties hereto hereby agree that, in the event that either party hereto breaches, or threatens to breach, any provisions of this Agreement, such breach or threatened breach may cause irreparable injury to the non-breaching party hereto and money damages would not provide an adequate remedy to the non-breaching party hereto.  In such event, the non-breaching party hereto shall have the right, in addition to all other rights and remedies it may have, to a temporary restraining order, an injunction, specific performance and/or any other equitable relief (including rights of rescission) that may be available from a court of competent jurisdiction (in each case, with the requirement to post bond) at any time to enforce or prevent any breach or threatened breach by a party hereto.

12.5    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement and any amendments hereto, to the extent signed and delivered by means of digital imaging and electronic mail or a facsimile machine, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

12.6    <u>Headings</u>.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

12.7    <u>Assignment</u>.  Neither this Agreement nor any duties or obligations under this Agreement may be assigned by either party hereto without the consent of the other.

12.8    <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if (a) delivered personally against written receipt, (b) delivered by email transmission against email confirmation, (c) mailed by prepaid first class certified mail, return receipt requested or (d) mailed by overnight courier prepaid, to the parties hereto at the following addresses and email addresses, as applicable:

If to Buyer, to:

[Alpine Behavioral Texas, LLC / Alpine Behavioral California, LLC]
23 Corporate Plaza, Suite 215
Newport Beach, CA 92660
Attention:  Gerik Degner
Email:  gdegner@alpine-pacific.com

with copies (which shall not constitute notice) to:

Massumi + Consoli LLP
2029 Century Park E, Suite 280
Los Angeles, CA  90067
Attention:  Anthony Consoli, P.C.
Email:  aconsoli@mcllp.com

If to the Company, to:

GGG Partners, LLC
c/o Cedar Creek Recovery, Inc.
2900 Bristol Street, Suite B-300
Costa Mesa, CA 92626
Attention:  Katie Goodman
Email:  kgoodman@gggmgt.com

with copies (which shall not constitute notice) to:

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Attention:  David Neale
Email:  dln@lnbyb.com

12.9    <u>Waivers and Amendments</u>.    This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party hereto of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party hereto so waiving.  No waiver by any party hereto shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

12.10    <u>Severability</u>.    If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

12.11   <u>Entire Agreement</u>.  This Agreement constitutes the sole and entire agreement of the parties hereto with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

12.12   <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of [Texas / California], without giving effect to any choice or conflict of law provision or rule.  In the event any party hereto commences any Action relating to or arising from this Agreement, the parties hereto agree to the personal jurisdiction by and venue in the United States District Court for the Central District of California, the Bankruptcy Court, or any California State court sitting in the county of Los Angeles, California, and waive any objection to such jurisdiction or venue.  The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

12.13   <u>Waiver of Jury Trial</u>.  AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 12.13</u>.

12.14   <u>Construction</u>.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party hereto.  If any party hereto has breached any covenant or agreement contained in this Agreement in any respect, the fact that there exists another covenant or agreement relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached shall not detract from or mitigate the fact that such party is in breach of the first representation, warranty, covenant or agreement.

12.15   <u>Conflict with the Sale Order or Purchase Agreement</u>.  This Agreement is subject to and controlled by the terms of the Sale Order and the Purchase Agreement, including all of the representations, warranties, covenants and agreements set forth in the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Sale Order or the Purchase Agreement, the priority of governance is as follows: (a) the terms and conditions of the Sale Order shall govern, supersede and prevail, (b) to the extent the Sale Order is silent, then the terms and conditions of the Purchase Agreement shall govern, supersede and prevail and (c) to the extent the Sale Order and the Purchase Agreement are silent, the terms and conditions of this Agreement shall apply. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it,

extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

      12.16   <u>No Third Party Beneficiaries</u>.  The parties hereto do not intend that any third party shall have any rights under this Agreement except as expressly provided herein.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

       IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**BUYER:**

[ALPINE BEHAVIORAL TEXAS, LLC / ALPINE BEHAVIORAL CALIFORNIA, LLC]

By: _____
Name: _____
Its: _____

**THE COMPANY:**

[CEDAR CREEK RECOVERY, INC. / SOLID LANDINGS BEHAVIORAL HEALTH, INC. / SURE HAVEN, INC.]

By: _____
Name: _____
Its: _____

[Signature Page – Management Services Agreement]

## EXHIBIT A

## INTERIM SUBLEASE AGREEMENT

This INTERIM SUBLEASE AGREEMENT (this "Sublease") is entered into as of [_____ __], 2017 (the "Effective Date"), by and between [Alpine Behavioral Texas, LLC, a Texas limited liability company / Alpine Behavioral California, LLC, a California limited liability company] ("Buyer"), and [Cedar Creek Recovery, Inc., a Texas corporation / Solid Landings Behavioral Health, Inc., a California corporation / Sure Haven, Inc., a California corporation] ("Sublessee").  Capitalized terms used herein and not otherwise defined shall have the meaning set out in the Management Services Agreement (as defined below).

## RECITALS

A.    Concurrent with the execution of this Sublease, Sublessor and Sublessee are parties to that certain Asset Purchase Agreement, dated as of June 1, 2017 (the "Purchase Agreement"), by and among [(a) Solid Landings Behavioral Health, Inc., a California corporation, (b) Sure Haven, Inc., a California corporation, (c) Cedar Creek Recovery, Inc., a Texas corporation, (d) Silver Rock Recovery, a Nevada corporation, (e) EMS Toxicology, a Nevada corporation, (f) Alpine Behavioral Holdco, LLC, a Delaware limited liability company, (g) Alpine Behavioral California, LLC, a California limited liability company, (h) Alpine Behavioral Nevada, LLC, a Nevada limited liability company, (i) Alpine Behavioral Texas, LLC, a Texas limited liability company, (j) Alpine Behavioral Toxicology, LLC, a Nevada limited liability company][2], (k) Mark Shandrow, (l) Elizabeth Perry, and (m) CapStar Bank, a Tennessee banking corporation; and

B.    Sublessor, desires to sublease to Sublessee, and Sublessee desires to sublease from Sublessor, facilities relating to operation of the Programs pursuant to the terms of this Sublease; and

C.    Further concurrent with the execution of this Sublease, Sublessor has entered into a Management Services Agreement (the "Management Services Agreement") to manage the Programs on behalf of Sublessee for an interim period.

NOW, THEREFORE, in consideration of the promises, covenants and agreements contained herein, the receipt and sufficiency of which is hereby agreed and acknowledged, Sublessee and Sublessor, intending to be legally bound, agree as follows:

1.    Sublease.  Sublessor hereby subleases to Sublessee, upon all of the conditions set forth in this Sublease, the use of the facilities relating to the Programs.

2.    Term.  The term of this Sublease shall be coterminous with the Management Services Agreement; provided, that, in the event of a termination of the Management Agreement, termination of possession thereunder, eviction, or a similar remedy, then at Sublessee's sole option, this Sublease shall continue to allow the parties hereto to assist in transition of the facilities relating to the Programs, the management rights, and the assets to a substitute manager.

3.    Delivery of Sublease Area.  Upon the mutual execution and delivery of this Sublease, Sublessor will deliver possession of the facilities relating to the Programs to Sublessee.

---

[2] NTD: Substitute "Buyer" and "the Company" for the full company name, as applicable.

4.      <u>No Sublease Fee; Management Company</u>.  During the Term, Sublessor will not charge Sublessee a monthly rental fee for the use of the facilities relating to the Programs.  The Management Services Agreement shall be consideration hereunder, and Buyer shall occupy the facilities relating to the Programs pursuant to the terms of this Sublease and shall manage the daily operations of such facilities.

5.      <u>Notices</u>.  All notices and other communications given or made pursuant to the notice provisions set forth in the Purchase Agreement.

6.      <u>Entire Agreement</u>.   This Sublease, together with the Management Services Agreement, the Purchase Agreement and the other agreements executed as required by the Purchase Agreement, (i) constitutes the sole agreement between the parties hereto regarding the matters contained herein, (ii) supersedes all prior understandings and writings, and (iii) may be altered, modified or amended only by a writing signed by both parties hereto.  In the event of a conflict between this Sublease and the Management Services Agreement, the Management Services Agreement shall control.  In the event of a conflict between this Sublease and the Purchase Agreement, the Purchase Agreement shall control.

7.      <u>Amendments</u>.  This Sublease may be amended at any time only by the written agreement of Sublessee and Sublessor.  All amendments, changes, revisions and discharges of this Sublease, in whole or in part, and from time to time, shall be binding upon the parties despite any lack of legal consideration, so long as the same shall be in writing and executed by the parties.

8.      <u>No Third Party Benefit</u>.  This Sublease is intended to benefit only the parties to this Sublease, and no other person or entity has or shall acquire any rights under this Sublease.

9.      <u>Nonrecourse to Related Parties</u>.  Sublessor's and Sublessee's obligations under this Agreement are not with recourse to any manager, officer, director, employee, member, shareholder or agent of either party.

10.     <u>Counterparts</u>.  This Sublease may be executed in counterparts, each of which shall be deemed an original.  Executed counterparts may be delivered by electronic counterparts, and shall be effective when received.  This Sublease shall be of no force or effect unless and until it has been executed and delivered by both parties hereto.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Sublease as of the date first written above.

**SUBLESSOR:**

[ALPINE BEHAVIORAL TEXAS, LLC / ALPINE BEHAVIORAL CALIFORNIA, LLC]

By: _____
Name: _____
Its: _____

**SUBLESSEE:**

[CEDAR CREEK RECOVERY, INC. / SOLID LANDINGS BEHAVIORAL HEALTH, INC. / SURE HAVEN, INC.]

By: _____
Name: _____
Its: _____

[Signature Page – Interim Sublease Agreement]

**DISCLOSURE SCHEDULES**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**by and among**

**SOLID LANDINGS BEHAVIORAL HEALTH, INC.,
SURE HAVEN, INC.
CEDAR CREEK RECOVERY, INC.,
SILVER ROCK RECOVERY,
EMS TOXICOLOGY**


**ALPINE BEHAVIORAL HOLDCO, LLC,
ALPINE BEHAVIORAL CALIFORNIA, LLC,
ALPINE BEHAVIORAL NEVADA, LLC,
ALPINE BEHAVIORAL TEXAS, LLC,
ALPINE BEHAVIORAL TOXICOLOGY, LLC**


**MARK SHANDROW,
ELIZABETH PERRY,**


**AND**


**CAPSTAR BANK**


**dated as of June 1, 2017**

These disclosure schedules (these "<u>Disclosure Schedules</u>") are being furnished pursuant to that certain Asset Purchase Agreement (the "<u>Agreement</u>"), dated June 1, 2017, by and among (a) Solid Landings Behavioral Health, Inc., a California corporation ("<u>Solid Landings</u>"), (b) Sure Haven, Inc., a California corporation ("<u>Sure Haven</u>"), (c) Cedar Creek Recovery, Inc., a Texas corporation ("<u>Cedar Creek</u>"), (d) Silver Rock Recovery, a Nevada corporation ("<u>Silver Rock</u>"), (e) EMS Toxicology, a Nevada corporation ("<u>EMS Toxicology</u>" and together with Solid Landings, Sure Haven, Cedar Creek, and Silver Rock, the "<u>Debtors</u>"), (f) Alpine Behavioral Holdco, LLC, a Delaware limited liability company ("<u>Alpine Holdco</u>"), (g) Alpine Behavioral California, LLC, a California limited liability company ("<u>Alpine California</u>"), (h) Alpine Behavioral Nevada, LLC, a Nevada limited liability company ("<u>Alpine Nevada</u>"), (i) Alpine Behavioral Texas, LLC, a Texas limited liability company ("<u>Alpine Texas</u>"), (j) Alpine Behavioral Toxicology, LLC, a Nevada limited liability company ("<u>Alpine Toxicology</u>" and together with Alpine Holdco, Alpine California, Alpine Nevada and Alpine Texas, "<u>Purchasers</u>"), (k) Mark Shandrow ("<u>Shandrow</u>"), (l) Elizabeth Perry ("<u>Perry</u>" and together with Shandrow, the "<u>Equityholders</u>" and each of them individually, an "<u>Equityholder</u>"), and (m) CapStar Bank, a Tennessee banking corporation ("<u>Lender</u>"). All capitalized terms used but not defined in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement.

Without limiting any exceptions and qualifications contained in the Agreement, the respective representations and warranties of the Debtors in the Agreement, as applicable, are further made subject to the disclosures, exceptions, qualifications, information, items and other matters set forth herein (each, a "<u>Disclosure</u>" and collectively, the "<u>Disclosures</u>"). Unless otherwise expressly set forth herein, these Disclosure Schedules and the Disclosures contained herein are qualified in their entirety by reference to the Agreement, are intended only to further qualify and limit the respective representations and warranties contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations or warranties.

The headings and other captions contained in these Disclosure Schedules and any attachments hereto are included for convenience only and shall not affect the construction or interpretation of these Disclosure Schedules or any such attachments or modify any of the representations and warranties contained in the Agreement or any of the qualifications or exceptions set forth in the Agreement relating to such representations and warranties, including, without limitation, any qualifications based on knowledge.

## SCHEDULE 2.01(a)-1

## Assumed Real Property (Tenant) Leases

**Sure Haven, Inc.**

1. Lease agreement dated November 8, 2012 between Daniel Kahalili Trust and EMS Management, Inc. for real property located at 725 and 727 Center Street, Costa Mesa, CA 92627

2. Lease agreement dated March 16, 2017 between Real Property Management OC Metro and Solid Landings Behavioral Health / Sure Haven, Inc. for real property located at 3072 Madison Avenue, Costa Mesa, CA 92626

3. Lease agreement dated February 22, 2014 between The Heathers-Madison, LLC and Sure Haven for real property located at 3073 Madison Avenue, Costa Mesa, CA 92626

4. Lease agreement dated June 16, 2014 between The Heathers-Pierce, LLC and Sure Haven for real property located at 3125 Pierce Avenue, Costa Mesa, CA 92626

5. Lease agreement dated November 17, 2014 between 3129 Pierce Ave, LLC and Sure Haven for real property located at 3129 Pierce Avenue, Costa Mesa, CA 92626

6. Lease agreement dated September 24, 2014 between Bristol Quail, LLC and Sure Haven, Inc. for real property located at 2729 Bristol Street, Costa Mesa, CA 92626

7. Lease agreement dated November 13, 2013 between The Heathers Plumber, LLC and Sure Haven for real property located at 697 Plumer Street, Costa Mesa, CA 92626

8. Lease agreement dated March 24, 2016 between Meera Kharbanda and Sure Haven for real property located at 2368 Scholarship, Irvine, CA 92612

**Cedar Creek Recovery, Inc.**

1. Lease agreement dated February 17, 2015 between Kenneth Tumlinson and Susanna Tumlinson and Sure Haven for real property located at 11908, 12200, and 12206 Sparks Road, Manor, TX 78653, together with First Amendment to Lease dated October 22, 2015 and Second Amendment to Lease dated June 10, 2016

**Silver Rock Recovery**

1. Lease agreement dated January 15, 2015 between Spencer Airport Center Phase IV, LLC and Sure Haven d/b/a EMS Toxicology for real property located at 2060 Pama Lane, Las Vegas, NV 89119

2. Lease agreement dated December 1, 2014 between Jacks Properties I, LLC and Solid Landings Behavioral Health for real property located at 4011 S. McLeod, Las Vegas, NV 89121

**EMS Toxicology**

1. Lease agreement dated December 1, 2014 between BKM Patrick 102, LLC and EMS Toxicology for real property located at 6171 McLeod Drive, Suite A, Las Vegas, NV 89120

1

## SCHEDULE 2.01(a)-2

### Rejected Real Property (Tenant) Leases

**Sure Haven, Inc.**

1. Lease agreement dated July 25, 2014 between Tucker c/o Supreme Properties and Sure Haven, Inc. for real property located at 2062 S. Rene Drive, Santa Ana, CA 92704

2. Sublease agreement dated January 1, 2017 between Sure Haven, Inc. and Pablo A. Alcala and Miguel A. Ureta, Jr. for real property located at 2062 S. Rene Drive, Santa Ana, CA 92704

3. Lease agreement dated September 1, 2014 between Hyam Abedrabo and Sure Haven, Inc. for real property located at 1252 Conway Avenue, Costa Mesa, CA 92626

4. Oral sublease agreement between Sure Haven, Inc. and Kerry Jones for real property located at 1252 Conway Avenue, Costa Mesa, CA 92626

**Solid Landings Behavioral Health, Inc.**

1. Lease agreement dated November 3, 2014 between Paul Mazdiyasni and Solid Landings Behavioral Health for real property located at 2900 Bristol Street, Suite B201, Costa Mesa, CA 92626

2. Sublease agreement dated June 17, 2016 between Solid Landings Behavioral Health and Utelogy Corporation for real property located at 2900 Bristol Street, Suite B201, Costa Mesa, CA 92626

**SCHEDULE 2.01(b)**

**Other Real Property Interests**

**Sure Haven, Inc.**

1. Lease agreement dated July 25, 2014 between Tucker c/o Supreme Properties and Sure Haven, Inc. for real property located at 2062 S. Rene Drive, Santa Ana, CA 92704

2. Sublease agreement dated January 1, 2017 between Sure Haven, Inc. and Pablo A. Alcala and Miguel A. Ureta, Jr. for real property located at 2062 S. Rene Drive, Santa Ana, CA 92704

3. Lease agreement dated September 1, 2014 between Hyam Abedrabo and Sure Haven, Inc. for real property located at 1252 Conway Avenue, Costa Mesa, CA 92626

4. Oral sublease agreement between Sure Haven, Inc. and Kerry Jones for real property located at 1252 Conway Avenue, Costa Mesa, CA 92626

**Solid Landings Behavioral Health, Inc.**

1. Lease agreement dated November 3, 2014 between Paul Mazdiyasni and Solid Landings Behavioral Health for real property located at 2900 Bristol Street, Suite B201, Costa Mesa, CA 92626

2. Sublease agreement dated June 17, 2016 between Solid Landings Behavioral Health and Utelogy Corporation for real property located at 2900 Bristol Street, Suite B201, Costa Mesa, CA 92626

## SCHEDULE 2.01(c)-1

### Assumed Personal Property Leases

**Sure Haven, Inc.**

1.  Currently financed vehicles, listed below:

|  | Car Description | Vin Number | Contract Number | Lender |
|---|---|---|---|---|
| 1 | 15 Kia Soul | KNDJN2A29F7198840 | 611922285961 | Ally Auto Finance |
| 2 | 15 Kia Soul | KNDJN2A26F7799395 | 611922481095 | Ally Auto Finance |
| 3 | 15 Kia Soul | KNDJN2A27F7186539 | 611922876448 | Ally Auto Finance |
| 4 | 15 Kia Soul | KNDJN2A24F7187146 | 611921439427 | Ally Auto Finance |
| 5 | 15 Kia Soul | KNDJN2A26F7801288 | 611922694141 | Ally Auto Finance |
| 6 | 14 Ford Transit | NM0GE9F70E1141352 | 50809832 | Ford Credit |
| 7 | 14 Ford Transit | NM0GE9F73E1153737 | 50809849 | Ford Credit |
| 8 | 14 Ford Transit | NM0GS9F7XE1162606 | 50933120 | Ford Credit |
| 9 | 15 Ford Transit | NM0GE9F70F1195980 | 51533029 | Ford Credit |
| 10 | 15 Nissan NV200 | 5BZBF0AA4FN851194 | 0010 2484 7787 5000 1 | Nissan Motor Acceptance Corporation |
| 11 | 15 Nissan NVP | 5BZBF0AA9FN851241 | 0010 2484 9887 2000 1 | Nissan Motor Acceptance Corporation |
| 12 | 15 Nissan NVP | 5BZBF0AA3FN851252 | 0010 2486 8453 6000 1 | Nissan Motor Acceptance Corporation |
| 13 | 15 Nissan NVP | 5BZBF0AA4FN851504 | 0010 2490 0943 3000 1 | Nissan Motor Acceptance Corporation |

## SCHEDULE 2.01(c)-2

### Rejected Personal Property Leases

**Sure Haven, Inc.**

1. Lease Agreement between RICOH and Sure Haven, Inc. dated June 8, 2015, including Additional Equipment Addendums

2. Lease No. 795924 dated February 28, 2015 between Quantum Analytics and Sure Haven, Inc., including Addendum No. 1 dated January 29, 2016

3. Lease No. 795927 dated February 28, 2015 between Quantum Analytics and Sure Haven, Inc., including Addendum No. 1 dated January 29, 2016

4. Lease No. 796006 dated June 30, 2015 between Quantum Analytics and Sure Haven, Inc., including Addendum No. 1 dated January 29, 2016

5. Lease No. 795992 dated June 30, 2015 between Quantum Analytics and Sure Haven, Inc., including December 9, 2015 Assignment and Assumption Agreement in favor of EMS Toxicology and Addendum No. 002 dated February 1, 2016

**EMS Toxicology**

1. Lease No. 795992 dated June 30, 2015 between Quantum Analytics and Sure Haven, Inc., including December 9, 2015 Assignment and Assumption Agreement in favor of EMS Toxicology and Addendum No. 002 dated February 1, 2016

## SCHEDULE 2.01(k)

## Licenses

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| Sure Haven, Inc. | Sure Haven, Inc. | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Health Care Services | Certification No. 300664AP |
| Sure Haven, Inc. | Sure Haven, Inc. - Bristol Campus | 2729 Bristol Street | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2121878 |
| Sure Haven, Inc. | Sure Haven, Inc. - Bristol Campus | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00350234 |
| Sure Haven, Inc. | Sure Haven, Inc. | 2729 Bristol Street | Costa Mesa | CA | 92626 | City of Costa Mesa | Business License Tax Certificate No. 46230 |
| Sure Haven, Inc. | Sure Haven - Solid Landings Behavioral Health | 2729 Bristol Street | Costa Mesa | CA | 92626 | City of Costa Mesa Fire & Rescue Department | Outpatient Fire Clearance |
| Sure Haven, Inc. | Sure Haven, Inc. | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | License/Certification No. 300235DP |
| Sure Haven, Inc. | Sure Haven, Inc. | 725 Center Ave (*sic*) | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2062991 |

6

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| Sure Haven, Inc. | Sure Haven, Inc. | 725 Center Ave (*sic*) | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00344243 |
| Sure Haven, Inc. | Sure Haven, Inc. | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | License/Certification No. 300235GP |
| Sure Haven, Inc. | Sure Haven - Madison | 3073 Madison Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2109004 |
| Sure Haven, Inc. | Sure Haven - Madison 1 | 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00348993 |
| Sure Haven, Inc. | Sure Haven - Madison | 3072 Madison Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2109001 |
| Sure Haven, Inc. | Sure Haven - Madison 2 | 3072 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00348992 |
| Sure Haven, Inc. | Sure Haven | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | License/Certification No. 300235QP |

7

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| Sure Haven, Inc. | Sure Haven - Pierce 1 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2111033 |
| Sure Haven, Inc. | Sure Haven - Pierce 1 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00349354 |
| Sure Haven, Inc. | Sure Haven - Pierce 2 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2111032 |
| Sure Haven, Inc. | Sure Haven - Pierce 2 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00349353 |
| Sure Haven, Inc. | Sure Haven - Plumer | 697 Plumer Street | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 05D2121876 |
| Sure Haven, Inc. | Sure Haven - Plumer | 697 Plumer Street | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Registration No. CLR 00350233 |
| Sure Haven, Inc. | Sure Haven - Plumer | 697 Plumer Street | Costa Mesa | CA | 92626 | City of Costa Mesa, Developmental Services Department | Special Use Permit |
| Sure Haven, Inc. | Sure Haven | All licensed Sure Haven facilities | Costa Mesa | CA | 92626 | CARF International Accreditation | Three-Year Accreditation |
| Sure Haven, Inc. | Sure Haven | All licensed Sure Haven facilities | Costa Mesa | CA | 92626 | The Joint Commission Accreditation | New Accreditation |

8

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| Sure Haven, Inc. | Sure Haven, Inc. | 2900 Bristol Street, Suite B300 | Costa Mesa | CA | 92626 | City of Costa Mesa | Business License Tax Certificate No. 44595 |
| Cedar Creek Recovery, Inc. | Cedar Creek Recovery, Inc. | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | License No. 3861-4099 |
| Cedar Creek Recovery, Inc. | Cedar Creek Recovery | 11908 Sparks Road | Manor | TX | 78653 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 45D2109929 |
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Division of Public and Behavioral Health | State Certification |
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 29D2105428 |
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | License No. 8443-EXL-0 |

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | Official Permit for Food Establishment – Main Kitchen/Restaurant (CL-02-10256) |
| Silver Rock Recovery | Silver Rock Recovery | N/A | N/A | N/A | N/A | State of Nevada | Business License No. NV20151049065 |
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | Clark County | Business License No. 2001956-062-101 |
| Silver Rock Recovery | Silver Rock Recovery | 4011 McLeod Drive | Las Vegas | NV | 89121 | The Joint Commission Accreditation | Three-Year Accreditation |
| Silver Rock Recovery | Silver Rock Recovery | 2060 Pama Lane | Las Vegas | NV | 89119 | Nevada Division of Public and Behavioral Health | State Certification |
| Silver Rock Recovery | Silver Rock Recovery | 2060 Pama Lane | Las Vegas | NV | 89119 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Waiver, CLIA ID No. 29D2117709 |
| Silver Rock Recovery | Silver Rock Recovery | N/A | N/A | N/A | N/A | State of Nevada | Business License No. NV20151049065 |
| Silver Rock Recovery | Silver Rock Recovery | 2060 Pama Lane | Las Vegas | NV | 89119 | Clark County | Business License No. 2003090-062-190 |
| EMS Toxicology, LLC | EMS Toxicology, LLC | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | State of Nevada | Business License No. NV20141707223 |

10

| Licensed Entity | Name on License | Location Address | City | State | Zip | Agency | Type/Number |
|---|---|---|---|---|---|---|---|
| EMS Toxicology, LLC | EMS Toxicology, LLC | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | CMS / Clinical Laboratory Improvement Amendments | Certificate of Compliance, CLIA ID No. 29D2097777 |
| EMS Toxicology, LLC | EMS Toxicology, LLC | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | License No. 8384-LIC-0 |
| EMS Toxicology, LLC | EMS Toxicology, LLC | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | California Department of Public Health | Laboratory ID No. COS 00800653 |

## SCHEDULE 2.01(q)-1

### Assumed Contracts

**Sure Haven, Inc.**

1. Medical Director Employment Agreement for Akindele Kolade, MD.

2. Business Associate Agreement for Barbara Guysenir

3. Business Associate Agreement for Cal Psychiatric Services

4. Business Associate Agreement for Cecilia Noll

5. Settlement Agreement & General Release by and Among City of Costa Mesa and Solid Landings and Sure Haven

6. Business Associate Agreement for Isela Werchman

7. Business Associate Agreement for Joanna Garza

8. Business Associate Agreement for Randall Kopfer

**Solid Landings Behavioral Health, Inc.**

1. Settlement Agreement & General Release by and Among City of Costa Mesa and Solid Landings and Sure Haven

2. Workforce Optimization Client Service Agreement with Insperity PEO Services, LP

3. Kipu Records Services Agreement with Kipu Systems LLC

**Silver Rock Recovery**

1. Psychiatric Independent Contractor Agreement with Akindele Kolade, MD

**EMS Toxicology**

1. MPI Participating Ancillary Agreement with MultiPlan, Inc.

**Cedar Creek Recovery, Inc.**

1. Pharmacy Supply and Services Agreement with AM Pharmacy

2. Medical Director Agreement with Carlos Tirado, MD

## SCHEDULE 2.01(q)-2

### Rejected Contracts

**Sure Haven, Inc.**

1. Medical Director Employment Agreement for Life Ring Recovery, LLC

2. Facility staffing agreement with Maxim Staffing Solutions

3. Service Agreement with MedWaste Management LLC

4. Business Associate Agreement for Insurgence, LLC

**Solid Landings Behavioral Health, Inc.**

1. Barrins & Associates Consulting Letter Agreement

2. Luxury S Contract for Services with BC Services, Inc.

3. Suite License with Chargers Associates

4. CGM LabDAQ System with CompuGroup Medical US

5. Professional Services Agreement with GGG Partners, LLC

6. Interim Services Agreement with Hardesty, LLC

7. Consulting Agreement with Insurgence, LLC

8. Marketing Agreement with Internet Training Products, Inc.

9. Clinical Supervisor Agreement with John Biroc, Ph.D

10. Independent Contractor Agreement with Kevin Hutto

11. Medical Director Agreement with Life Ring Recovery

12. Revenue Cycle Management Services Agreement with Revenue Health Solutions LLC

**Silver Rock Recovery**

1. Commercial Services Agreement with Cox Communications Las Vegas, Inc.

2. Scheduled Maintenance Services Agreement with Gen-Tech of Nevada, Inc.

3. Construction Agreement with Sundance Builders

4. Wash/Dry/Fold Laundry Services Agreement with Thunder Suds LLC

5. Prescription Services Agreement with Walgreen Co.

13

   6.   Services Agreement with Western Fire Prevention

**Cedar Creek Recovery, Inc.**

   1.   Secure Shredding Services Agreement with Iron Mountain Texas

**SCHEDULE 2.01(t)**

**<u>Causes of Action</u>**

None.

**SCHEDULE 2.02(a)**

**Retained Assets**

None

## SCHEDULE 3.01

## <u>Assumed Liabilities</u>

None

**SCHEDULE 3.02**

**Excluded Liabilities**

1. Debtors' accounts payable

2. Debtors' loans payable to owners

3. Debtors' inter-company payables due to Affiliates

4. Debtors' employee expense reimbursements

5. Debtors' employee bonuses

6. Debtors' accrued commissions

7. Any liabilities arising from any Debtor Employee Plans or payroll obligations

8. Debtors' software licenses/fees payable

9. All Rejected Real Property (Tenant) Leases listed on Schedule 2.01(a)-2

10. All Rejected Personal Property Leases listed on Schedule 2.01(c)-2

11. All Rejected Contracts listed on Schedule 2.01(q)-2

# SCHEDULE 6.05(a)

## Compliance with Legal Requirements

**EMS Toxicology**

1. April 28, 2017 Statement of Condition-Level Deficiencies issued by Centers for Medicare & Medicaid Services (CLIA) and Nevada State Health Division in connection with April 11, 2017 inspection of EMS Toxicology.  Plan of Correction submitted on May 12, 2017.

2. May 18, 2017 Allegation of Compliance Not Credible, Evidence of Correction Unacceptable issued by the Nevada Department of Health and Human Services, Division of Public and Behavioral Health in connection with the Plan of Correction submitted on May 12 2017.

**Solid Landings Behavioral Health**

1. Investigative Subpoena issued by the California Department of Insurance in the Matter of Investigation No. LIQT-2016-00017

**Cedar Creek Recovery**

1. September 8, 2015 Complaint No. 1068155952 issued by Texas Department of State Health Services to Cedar Creek Recovery, Inc.

**SCHEDULE 6.05(b)**

**Violations of Legal Requirements**

**EMS Toxicology**

1. April 13, 2017 Statement of Standard-Level Deficiencies issued by California Department of Public Health, Laboratory Field Services, in connection with March 29, 2017 inspection of EMS Toxicology.  Notice of acceptance of Plan of Correction received May 18, 2017.

2. April 28, 2017 Statement of Condition-Level Deficiencies issued by Centers for Medicare & Medicaid Services (CLIA) and Nevada State Health Division in connection with April 11, 2017 inspection of EMS Toxicology.  Plan of Correction submitted on May 12, 2017.

3. May 18, 2017 Allegation of Compliance Not Credible, Evidence of Correction Unacceptable issued by the Nevada Department of Health and Human Services, Division of Public and Behavioral Health in connection with the Plan of Correction submitted on May 12 2017.

**Solid Landings Behavioral Health**

1. Investigative Subpoena issued by the California Department of Insurance in the Matter of Investigation No. LIQT-2016-00017

**Cedar Creek Recovery**

1. September 8, 2015 Complaint No. 1068155952 issued by Texas Department of State Health Services to Cedar Creek Recovery, Inc.

20

**SCHEDULE 10.01(c)**

**Regulatory Filings**

See attached.

Schedule 10.01(c)

| No. | Location Address | City | State | Zip | Agency | Required Forms |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | **CALIFORNIA** | | |
| 1 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Health Care Services | Initial Treatment Provider Application |
| 2 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Health Care Services | Facility Staffing Data |
| 3 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Health Care Services | Weekly Activities Schedule |
| 4 | 2729 Bristol Street | Costa Mesa | CA | 92626 | City of Costa Mesa Fire & Rescue Department | Outpatient Fire Clearance (For DHCS) |
| 5 | 2729 Bristol Street | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 6 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 7 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 8 | 2729 Bristol Street | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 9 | 2729 Bristol Street | Costa Mesa | CA | 92626 | City of Costa Mesa | Businesss License Tax Application |
| 1 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | Initial Treatment Provider Application |
| 2 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | ASAM Designation |
| 3 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | Facility Staffing Data |
| 4 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | Weekly Activities Schedule |
| 5 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Health Care Services | Incidental Medical Services Certification |
| 6 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | City of Costa Mesa Fire & Rescue Department | Residential Treatment Fire Clearance (For DHCS) |
| 7 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 8 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 9 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 10 | 725 Center Street, Units A and B | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 1 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Initial Treatment Provider Application |
| 2 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | ASAM Designation |
| 3 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Facility Staffing Data |
| 4 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Weekly Activities Schedule |
| 5 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Incidental Medical Services Certification |
| 6 | 3072 and 3073 Madison Avenue | Costa Mesa | CA | 92626 | City of Costa Mesa Fire & Rescue Department | Residential Treatment Fire Clearance (For DHCS) |
| 7 | 3073 Madison Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 8 | 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 9 | 3073 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 10 | 3073 Madison Avenue | | | | California Department of Public Health | Director's Attestation |
| 11 | 3072 Madison Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 12 | 3072 Madison Avenue | | | | California Department of Public Health | Application for Clinical Laboratory License |
| 13 | 3072 Madison Avenue | | | | California Department of Public Health | Laboratory Personnel Report |
| 14 | 3072 Madison Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 1 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Initial Treatment Provider Application |

Schedule 10.01(c)

| No. | Location Address | City | State | Zip | Agency | Required Forms |
|---|---|---|---|---|---|---|
| 2 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | ASAM Designation |
| 3 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Facility Staffing Data |
| 4 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Weekly Activities Schedule |
| 5 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Health Care Services | Incidental Medical Services Certification |
| 6 | 3125 and 3129 Pierce Avenue | Costa Mesa | CA | 92626 | City of Costa Mesa Fire & Rescue Department | Residential Treatment Fire Clearance (For DHCS) |
| 7 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 8 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 9 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 10 | 3125 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 11 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 12 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 13 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 14 | 3129 Pierce Avenue | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 1 | 697 Plumer Street | Costa Mesa | CA | 92626 | California Consortium of Addiction Programs and Professionals | Sober Living Environments Application for Registration |
| 2 | 697 Plumer Street | Costa Mesa | CA | 92626 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 3 | 697 Plumer Street | Costa Mesa | CA | 92626 | California Department of Public Health | Application for Clinical Laboratory License |
| 4 | 697 Plumer Street | Costa Mesa | CA | 92626 | California Department of Public Health | Laboratory Personnel Report |
| 5 | 697 Plumer Street | Costa Mesa | CA | 92626 | California Department of Public Health | Director's Attestation |
| 6 | 697 Plumer Street | Costa Mesa | CA | 92626 | City of Costa Mesa | Special Use Permit Application |
| 1 | 2900 Bristol Street, Suite B300 | Costa Mesa | CA | 92626 | City of Costa Mesa | Businesss License Tax Application |
| | | | | | **NEVADA** | |
| 1 | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Division of Public and Behavioral Health | Notification of Change of Ownership of State Certification to Substance Abuse Prevention and Treatment Agency |
| 2 | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | Application for Modified Medical Detoxification License |
| 3 | 4011 McLeod Drive | Las Vegas | NV | 89121 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 4 | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | Application for Exempt Laboratory |
| 5 | 4011 McLeod Drive | Las Vegas | NV | 89121 | State of Nevada | Application for State of Nevada Business License |
| 6 | 4011 McLeod Drive | Las Vegas | NV | 89121 | Clark County | Clark County Application for Business License |

58557327.1

Schedule 10.01(c)

| No. | Location Address | City | State | Zip | Agency | Required Forms |
|-----|------------------|------|-------|-----|--------|----------------|
| 7 | 4011 McLeod Drive | Las Vegas | NV | 89121 | The Joint Commission Accreditation | Seller Submits Notice Letter to Account Executive |
| 8 | 4011 McLeod Drive | Las Vegas | NV | 89121 | Nevada Division of Public and Behavioral Health | Submit application for Main Kitchen/Restaurant Food Establishment Permit |
| 1 | 2060 Pama Lane | Las Vegas | NV | 89119 | Nevada Division of Public and Behavioral Health | Notification of Change of Ownership of State Certification to Substance Abuse Prevention and Treatment Agency |
| 2 | 2060 Pama Lane | Las Vegas | NV | 89119 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 3 | 2060 Pama Lane | Las Vegas | NV | 89119 | State of Nevada | Application for State of Nevada Business License |
| 4 | 2060 Pama Lane | Las Vegas | NV | 89119 | Clark County | Clark County Application for Business License |
| 1 | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | State of Nevada | Application for State of Nevada Business License |
| 2 | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | CMS / Clinical Laboratory Improvement Amendments | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 3 | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | Nevada Department of Health and Human Services, Division of Public and Behavioral Health | Application for Medical Laboratory |
| 4 | 6171 McLeod, Suite A | Las Vegas | NV | 89120 | California Department of Public Health | Application for Clinical Laboratory License |
| | | | **TEXAS** | | | |
| 1 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Substance Abuse Facility License Application |
| 2 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Facility's Operational Plan |
| 3 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Proof of Liability Insurance |
| 4 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Completed Substance Use Disorder Facility Licensure Application Packet Documents for New/Initial Applicants |
| 5 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Completed ADA Checklist |
| 6 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Copy of Certificate of Occupancy |
| 7 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Inspection by Local Fire Marshal |
| 8 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Inspection of Alarm System by Fire Marshal |
| 9 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Kitchen Inspection by Texas Department of Health |

Schedule 10.01(c)

| No. | Location Address | City | State | Zip | Agency | Required Forms |
|---|---|---|---|---|---|---|
| 10 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Gas Piper Pressure Test by a Local Gas Company or Licensed Plumber |
| 11 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Inspection and Maintenance of Fire Extinguishers |
| 12 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Fire Alarm Installation Certificate |
| 13 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Floor Plan |
| 14 | 11908 Sparks Road | Manor | TX | 78653 | Texas Department of State Health Services, Regulatory Licensing Unit | Name and License Number of Medical Director |
| 15 | 11908 Sparks Road | Manor | TX | 78653 | CLIA Certificate of Waiver | Clinical Laboratory Improvments Amendments (CLIA) Application for Certification |
| 16 | 11908 Sparks Road | Manor | TX | 78653 | The Joint Commission | Seller Submits Notice Letter to Account Executive |

58557327.1

1
2
3
4
5
6

# EXHIBIT "9"

[Bidding Procedures]

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Bidding Procedures

Set forth herein are the bidding procedures (the "Bidding Procedures") to be employed with respect to the transfer of substantially all of the assets ("Transferred Assets") of (i) Solid Landings Behavioral Health, Inc., a California corporation ("Solid Landings"), (ii) Sure Haven, Inc., a California corporation ("Sure Haven"), (iii) Cedar Creek Recovery, Inc., a Texas corporation ("Cedar Creek"), (iv) Silver Rock Recovery, a Nevada corporation ("Silver Rock"), (v) EMS Toxicology, a Nevada corporation ("EMS Toxicology" and together with Solid Landings, Sure Haven, Cedar Creek, and Silver Rock, the "Debtors"), each a debtor and debtor-in-possession in the chapter 11 cases (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), jointly consolidated under Case No. _____. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Agreement (as defined below).

On June 1, 2017, the Debtors entered into an *Asset Purchase Agreement* (the "Agreement") with Alpine Behavioral Holdco, LLC, a Delaware limited liability company ("Holdco"), Alpine Behavioral California, LLC, a California limited liability company ("Alpine CA"), Alpine Behavioral Nevada, LLC, a Nevada limited liability company ("Alpine NV"), Alpine Behavioral Texas, LLC ("Alpine TX"), a Texas limited liability company, Alpine Behavioral Toxicology, LLC, a Nevada limited liability company ("Alpine Toxicology," collectively with Holdco, Alpine CA, Alpine NV, and Alpine TX, the "Stalking Horse Bidder"), pursuant to which the Stalking Horse Bidder would provide consideration, among other items of consideration, for the Transferred Assets equal to the following (the "Stalking Horse Proposal"): (i) cash in the amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), (ii) a secured term promissory note in the amount of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000), (iii) Stalking Horse Bidder's share of the amounts required to be paid to cure the Debtors' monetary defaults under those executory contracts and unexpired leases sought by Stalking Horse Bidder to be assumed by the Debtors and assigned to it, and (iv) the Make-Whole Agreement. The Debtors have computed the total value of the Stalking Horse Proposal to be $9,050,000. The Stalking Horse Proposal is subject to competitive bidding as set forth herein and approved by the Bankruptcy Court pursuant to Section 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Potential bidders may structure competing bids in any manner, including, but not limited to, that proposed in the Agreement by the Stalking Horse Bidder or as a restructuring or a cash bid for the purchase of the Transferred Assets (each, a proposed "Transfer Transaction").

## Participation Requirements

Any person desiring to submit a competing Bid (as defined herein) in connection with a Transfer Transaction (a "Potential Bidder") will be required to deliver the following (the "Participation Requirements") to the Debtors, care of the Debtors' Chief Restructuring Officer: (a) an executed confidentiality agreement; and (b) a statement demonstrating a bona fide interest in purchasing the Transferred Assets; and (c) either (i) written evidence of available funds; or (ii) a firm commitment for financing sufficient for the Potential Bidder to timely consummate the

1

purchase of the Transferred Assets; or (iii) other sufficient information, which may include current audited financial statements and the latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purposes of acquiring the Transferred Assets, current audited financial statements and the latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to timely consummate the purchase of the Transferred Assets. Each of (a), (b), and (c)(i)-(iii) shall be in form and substance satisfactory to the Debtors.

### Due Diligence

Any Potential Bidder who satisfies the Participation Requirements will be afforded due diligence access and additional information through access to an online data room (the "Data Room").

Potential Bidders or Qualified Bidders (as defined below) requesting information in connection with their due diligence should contact Tricia Desmarais, Esq., Solid Landings Behavioral Health, Inc., 2900 Bristol Street, Suite B-300, Costa Mesa, California 92626 (tricia.desmarais@solidlandings.com)

Each Potential Bidder and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder or Qualified Bidder and its proposed Transfer Transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors, in consultation with the Committee (as defined below), if any, to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors, in consultation with the Committee, if any, to determine that a Bid (as defined herein) made by a Qualified Bidder is not a Qualified Bid (as defined below).

### Bid Deadline

The deadline for submitting written bids relating to a proposed Transfer Transaction (a "Bid" or "Bids") shall be July 3, 2017 at 4:00 p.m. (Pacific Time) (the "Bid Deadline"). Such Bids may be transmitted electronically and must be must be received on or before that date and time by each of the following:

(a) Solid Landings Behavioral Health, Inc., Attn: Katie S. Goodman, Chief Restructuring Officer, 3155 Roswell Road NW, Suite 120, Atlanta, GA 30305 (kgoodman@gggmgt.com);

(b) Counsel to the Debtors, David Neale, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067 (DLN@LNBYB.com );

(c) CapStar Bank (the "Senior Secured Lender"), Attn: Scott McGuire, 1201 Demonbreun Street, Main Level, Nashville, TN 37203 (smcguire@capstarbank.com);

(d) Counsel to the Senior Secured Lender, David W. Houston, IV and Patrick Warfield, Burr & Forman LLP, 511 Union Street, Suite 2300, Nashville, TN  37219 (dhouston@burr.com; pwarfield@burr.com); and

(e) Counsel to the Official Committee of Unsecured Creditors (the "Committee"), if a Committee is appointed by the Office of the United States Trustee.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless all of the above-referenced parties consent.

### Initial Bid at Auction

Currently, the Stalking Horse Proposal, on the terms set forth in the Agreement, is the highest and best Bid and the Stalking Horse Proposal shall be the Initial Bid (as defined herein) for the Auction.  The "Initial Bid" at the Auction will be as follows: (1) if there is an accepted All-Cash Bid (as defined herein), the Auction will start at the amount so bid; or (2) if there is no accepted All-Cash Bid, the Auction will start at the Same or Better Terms Bid (as defined herein). All bidding after the Initial Bid shall continue thereafter in subsequent bid increments of at least $100,000.00, subject to provisions contained herein.

### Bid Requirements

To be eligible to participate in the Auction, each Bid and each Potential Bidder submitting such a Bid (other than the Stalking Horse Bidder and its Bid, and the Senior Secured Lender and any credit bid) must be determined by the Debtors, in consultation with the Committee, if any, and the Senior Secured Lender, to satisfy the conditions listed below for each type of bid category:

(a)　　Category 1:  The Same or Better Terms Bid.

(i)　　*Terms.*  The Bid must be on terms that, in the Debtors' business judgment, in consultation with the Committee, if any, and the Senior Secured Lender, are substantially the same or more favorable to the Debtors and their estates than the terms of the Agreement, plus a cash component in the amount of the Minimum Overbid (a "Same or Better Terms Bid"). As used herein, the term "Minimum Overbid" shall mean cash in the amount $350,000.00 to account for a break-up fee (the "Break-Up Fee") to the Stalking Horse Bidder, plus an initial bid increment of $100,000.00, for a total of $450,000.00 (the "Minimum Overbid"). The Same or Better Terms Bid must include either: (i) a proposed asset purchase agreement marked against the form in the Data Room to show any proposed amendments thereto (the "Modified Agreement") and a clean and executed Modified Agreement; or, (ii) in the case of Bids proposing a structure other than an asset purchase or as specified in the Agreement, such other proposed documents evidencing the proposed Transfer Transaction.

(ii)　　*Identity of Bidder.*  A Same or Better Terms Bid must disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid, including, without limitation, any current director, officer, equity holder, or other insider of the Debtors, and the complete terms of such participation or agreement entered into with such entity.

3

(iii) *Contact Information*.  A Same or Better Terms Bid must include the names and contact information of authorized representatives of the bidder who will be available to answer questions regarding the Bid, including advisors and related parties.

(iv) *Financing Sources*.  A Same or Better Terms Bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed Transfer Transaction with appropriate contact information for such financing sources.

(v) *Deposit*.  A Same or Better Terms Bid must include a good-faith deposit in immediately available funds in the greater amount of either (A) the Break-Up Fee, or (b) ten percent (10%) of the proposed cash payment as stated in the Same or Better Terms Bid that will be paid at the closing of the Transfer Transaction ("Same or Better Terms Deposit"), which funds shall be wire-transferred to an escrow agent mutually acceptable to the Debtors and the Senior Secured Lender or, in the event an escrow is not established, to counsel for the Debtors, within one (1) business day following the delivery of a Same or Better Terms Bid.  If a Same or Better Terms Bid is identified as the Successful Bid (as defined below), and the Successful Bidder who submitted such Same or Better Terms Bid fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Same or Better Terms Deposit shall become non-refundable.

(b)    Category 2:  All-Cash Bid:

(i) *Payment Obligation*.  A payment in immediately available funds in an amount not less than $9,500,000.00, which shall be paid at the closing of the Transfer Transaction (an "All-Cash Bid").

(ii) *Contingencies*.  An All-Cash Bid must include a statement that there are no conditions precedent to the bidder's authority to enter into or consummate a definitive agreement.

(iii) *Irrevocable*.  An All-Cash Bid must state that such offer is binding and irrevocable until the entry of an order approving the proposed Transfer Transaction.

(iv) *Identity of Bidder*.  An All-Cash Bid must disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid, including, without limitation, any current director, officer, equity holder, or other insider of the Debtors, and the complete terms of such participation or agreement entered into with such entity.

(v) *Contact Information*.  An All-Cash Bid must include the names and contact information of authorized representatives of the bidder who will be available to answer questions regarding the Bid, including advisors and related parties.

(vi) *Earnest Money Deposit*.  An All-Cash Bid must include a good-faith deposit in immediately available funds in the amount of ten percent (10%) of the proposed consideration under the All-Cash Bid ("Earnest Money Deposit"), which funds shall be wire-transferred to an escrow agent mutually acceptable to the Debtors and the Senior Secured

4

Lender or, in the event an escrow is not established, to counsel for the Debtors, within one (1) business day following the delivery of an All-Cash Bid.  If an All-Cash Bid is identified as the Successful Bid (as defined below), and the Successful Bidder who submitted such All-Cash Bid fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Earnest Money Deposit shall become non-refundable.

(vii)    *Financing Sources.*    An All-Cash Bid must contain written evidence of available funds or a firm irrevocable commitment for financing sufficient to consummate the proposed Transfer Transaction with appropriate contact information for such financing sources.

Each of the above requirements for both the Same or Better Terms Bid and the All-Cash Bid categories must be met to the reasonable satisfaction of the Debtors, the Committee, if any, and the Senior Secured Lender.

### Qualified Bidders and Bids

Potential Bidders who have satisfied the Participation Requirements will be deemed "Qualified Bidders" and Bids that contain all necessary Bid Requirements, as set out above, will be deemed "Qualified Bids," in each case, if the Debtors believe, in consultation with the Committee, if any, and the Senior Secured Lender, that such Bid would be consummated if selected as the Successful Bid (as defined below).  Assuming the Financing Contingency (as defined herein) is timely satisfied and/or waived, the Stalking Horse Bidder is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects. The Senior Secured Lender is deemed a Qualified Bidder and may participate in the Auction by credit bidding the indebtedness owed by the Debtors, plus any other amounts that the Senior Secured Lender may bid in cash.  Any bid that the Senior Secured Lender makes at the Auction will be considered a Qualified Bid.

Following consultation with the Committee, if any, and the Senior Secured Lender, the Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their Bid is a Qualified Bid before the Auction.  To the extent not provided directly by Potential Bidders, the Debtors will provide copies of the Qualified Bids to the Senior Secured Lender, the Committee, if any, the Stalking Horse Bidder and their respective counsel.

### Auction Participation

Unless otherwise agreed to by the Debtors or ordered by the Bankruptcy Court, only the Debtors, Qualified Bidders, the Committee (if any), the Senior Secured Lender, and their respective counsel and financial professionals are eligible to attend or participate at the Auction. Subject to the other provisions of these Bidding Procedures, if: (a) the Contingencies (as defined herein) are timely satisfied and/or waived by the Stalking Horse Bidder; (b) the Agreement is not terminated, and (c) the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid and Senior Secured Lender's right to credit bid, the Debtors will not hold an Auction and the Stalking Horse Bidder will be named the Successful Bidder.

**Auction**

If any Qualified Bid (other than the Stalking Horse Bid) for any of the Transferred Assets has been received and any Qualified Bidder (other than the Stalking Horse Bidder) has indicated its intent to participate in the Auction, the Debtors will conduct an auction (the "Auction") for the sale or other transfer of the Transferred Assets or for becoming the plan sponsor under a proposed restructuring (if applicable).  Notwithstanding the foregoing, Senior Secured Lender may cancel the Auction in the following two (2) situations: (1) the Agreement is terminated for any reason whatsoever; or (2) the condition to Stalking Horse Bidders' performance under the Agreement contained in Section 13.06 of the Agreement (the "Financing Contingency") is not timely satisfied or waived, and there is no other Qualified Bidder (excluding the Senior Secured Lender and the Stalking Horse Bidder).  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transfer Transaction.

The Auction shall take place at 10:00 a.m. (prevailing Pacific Time) on July 7, 2017 at the offices of counsel for the Debtors, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067.  At the Auction, only the Stalking Horse Bidder, the Senior Secured Lender, and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids.  The Debtors, following consultation with the Committee, if any, and the Senior Secured Lender, may conduct the Auction in the manner they reasonably determine, in their business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith, which such conduct and procedures may include, without limitation, selling the Transferred Assets as a whole, in lots, in piecemeal, or not selling certain portions of the Transferred Assets.

**Closing the Auction and Selection of the Back-Up Bid**

The Auction shall continue until there is only one offer that the Debtors (following consultation with the Committee, if any, and the approval of the Senior Secured Lender) determine, subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Stalking Horse Bidder and the Senior Secured Lender) submitted at Auction (the "Successful Bid").  The Qualified Bidder submitting the Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Agreement or other transaction documents, as applicable.

Immediately prior to the conclusion of the Auction, the Debtors, the Committee, if any, and the Senior Secured Lender shall (a) review each bid made at the Auction on the basis of financial and contractual terms, including any appropriate present value or discount, and such other factors as may be relevant to the process, and (b) identify the Successful Bid.

The Debtors (after consultation with the Committee, if any, and with the consent of the Senior Secured Lender) shall also select a back-up bid (the "Back-Up Bid"), which shall remain open and irrevocable until one (1) business day after the closing of the Transfer Transaction with the Successful Bidder or such later time as agreed to by the Qualified Bidder submitting such

Back-Up Bid.  In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtors (with the consent of the Senior Secured Lender) may elect to regard the Back-Up Bid as the highest or best bid for the Transferred Assets, and the Debtors will be authorized to consummate the Transfer Transaction contemplated by the Back-Up Bid without further order of the Bankruptcy Court.

### Acceptance of Qualified Bids

The Debtors, in consultation with the Committee, if any, and after the approval of the Senior Secured Lender may (a) determine which Qualified Bid, if any, is the highest, best and otherwise financially superior offer and (b) reject at any time any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or these Bidding Procedures, or (iii) contrary to the best interests of the Debtors, their estates, and creditors.

After conclusion of the Auction, but prior to the Sale Hearing (as defined below), the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which their Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities.

### Hearings to Approve the Transfer Transaction

In the event the Successful Bidder proposes to acquire the Transferred Assets pursuant to an Agreement, the Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to be conducted no later than July 14, 2017 (at a time to be determined by the Court), to approve and authorize the Transfer Transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.  The Debtors shall file a notice with the Bankruptcy Court within two (2) business days of the Auction providing further guidance on the transaction proposed by the Successful Bidder, including actual or proposed dates of hearings to seek court approval of the Transfer Transaction.

### Back-Up Bidder and Return of Earnest Money Deposit

The Earnest Money Deposit (if any) of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the Transfer Transaction with the Successful Bidder. If the Successful Bidder fails to close the Transfer Transaction for any reason other than a failure by the Debtors and/or the Senior Secured Lender to take any action or forbear from taking any action within their respective control, the Earnest Money Deposit delivered by the Successful Bidder (if any) shall become non-refundable.

### Payment of Expense Reimbursement and Break-Up Fee

The Break-Up Fee shall be paid, if applicable, in accordance with the terms and conditions stated in Sections 5.02 and 14.02 of the Agreement.  For the avoidance of doubt, in the event that the Senior Secured Lender participates in the Auction by credit bidding, the Break-Up Fee shall be paid, if applicable, in accordance with the terms and conditions stated in Sections 5.02 and 14.02 of the Agreement.

## Modifications

These Bidding Procedures may not be modified except with the express written consent of the Debtors and the Purchasers, in consultation with the Committee, if any, and the Senior Secured Lender.

At or before the Sale Hearing, the Debtors, in consultation with the Committee, if any, and the Senior Secured Lender, may impose, at or prior to the Auction, additional customary terms and conditions on proposed Transfer Transactions, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Bidding Procedures, adjourning the Auction and/or any hearing to consummate the Transfer Transaction with the Successful Bidder, in each case, without further notice to any Potential Bidder.